IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 03 C 3644 |
| | ) | |
| FUNDS IN THE AMOUNT OF ONE | ) | |
| HUNDRED THOUSAND AND ONE | ) | The Honorable Elaine E. Bucklo, |
| HUNDRED TWENTY DOLLARS | ) | Judge Presiding. |
| ($100,120.00 U.S.C.), | ) | |
| Defendant. | ) | |
| -------------------------------------------------------) | | |
| NICHOLAS P. MARROCCO, and | ) | |
| VINCENT J. FALLON, | ) | |
| Claimants. | ) | |

## NOTICE OF MOTION

TO:   James Michael Kuhn, Esq.           Richard Michael Beuke, Esq.
        Marsha A. McClellan, Esq.         Kogut & Beuke
        Assistant United States Attorneys    53 West Jackson Blvd., Suite 1410
        United States Attorney's Office      Chicago, IL 60604
        219 South Dearborn Street
        Suite 500
        Chicago, IL 60604

        Terry O'Donnell, Esq.
        Law Offices of Terry O'Donnell
        240 E. Lake Street, Suite 101
        Addison, IL 60101

      Please take notice that on April 22, 2004, at 9:00 p.m. I shall appear before the Honorable Judge Elaine E. Bucklo, in the courtroom usually occupied by her in the Dirksen Federal Building, at 219 S. Dearborn, Chicago, Illinois, and present Claimants' Motion to Suppress Evidence and Quash Arrest, Claimants' Motion for Daubert Hearing, and Claimants' Motion for Jury View or Court Views, copies of which are attached hereto.

Elizabeth Butler

LAW OFFICES
## KOMIE AND ASSOCIATES
One North LaSalle Street - Suite 4200
Chicago, Illinois 60602-4005
Telephone (312) 263-2800

## PROOF OF SERVICE

I, the undersigned, under oath state that I caused a copy of the **Notice of Motion** and **Claimants' Motion to Suppress Evidence and Quash Arrest, Claimants' Motion for Daubert Hearing, and Claimants' Motion for Jury View or Court Views** to be served on the above party at the above-listed addresses by placing a copy of both in the U.S. Mail, first class postage prepaid in Chicago, Illinois on April 19, 2004.

SUBSCRIBED and SWORN TO
before me this 19th day of April, 2004

NOTARY PUBLIC

"OFFICIAL SEAL"
MARY ROSE KOZICZ
Notary Public, State of Illinois
My Commission Expires 08/18/05

LAW OFFICES
KOMIE AND ASSOCIATES
One North LaSalle Street - Suite 4200
Chicago, Illinois 60602-4005
Telephone (312) 263-2800

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 03 C 3644 |
| | ) | |
| FUNDS IN THE AMOUNT OF ONE | ) | |
| HUNDRED THOUSAND AND ONE | ) | The Honorable Elaine E. Bucklo, |
| HUNDRED TWENTY DOLLARS | ) | Judge Presiding. |
| ($100,120.00 U.S.C.), | ) | |
| Defendant. | ) | |
| ------------------------------------------------- | ) | |
| NICHOLAS P. MARROCCO, and | ) | |
| VINCENT J. FALLON, | ) | |
| Claimants. | ) | |

## CLAIMANTS' MOTION TO SUPPRESS EVIDENCE AND QUASH ARREST

NOW COME the Claimants, NICHOLAS P. MARROCCO and VINCENT J. FALLON, by and through one of their attorneys, ELIZABETH BUTLER of KOMIE AND ASSOCIATES, and requests this Court to suppress evidence seized and quash arrest. In support thereof, the Claimants state as follows:

## CONSTITUTIONAL PROVISIONS

1. That the Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
> U.S. Const., IV, Amend.

2. That protection against unreasonable searches and seizures extends to intrusions by state authority by virtue of the Fourteenth Amendment of the federal constitution. "...nor shall

39

any State deprive any person of life, liberty, or property, without due process of law;" U.S. Const., Amend. XIV.

3. That the Constitution of the State of Illinois further protects its citizens from unreasonable governmental interference.

> All men are by nature free and independent and have certain inherent and inalienable rights among which are life, liberty and the pursuit of happiness. IL Const., Art. §1.

> No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws. IL Const., Art. §2.

## STANDING REQUIREMENTS

4. That both Claimants have standing to bring this motion. Mr. Marrocco has Fourth Amendment standing to bring this motion based on his ownership interest in the Defendant res. Mr. Marrocco filed a verified claim alleging ownership of the Defendant res.

5. That Mr. Fallon has standing to bring this motion based on his possessory interest in the Defendant res as well as his reasonable expectation of freedom in his private train room from governmental intrusion. *United States v. Jeffers*, 342 U.S. 48, 53 (1951), *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968). (See Fallon's affidavit, attached as Exhibit A.)

## FACTUAL AVERMENTS

6. That on December 4, 2002, the Claimant, VINCENT FALLON, bought a first class sleeper room, one-way ticket from Chicago, Illinois to Seattle, Washington on Amtrak Train #7. Mr. Fallon bought a ticket for the right to occupy private sleeper car #0730, room #7 departing from Chicago on December 6, 2002.

7. That approximately 48 hours after buying his ticket, Mr. Fallon boarded the Amtrak train #7.

8. That on December 6, 2002 Mr. Fallon boarded Amtrak Train #7, sleeper car #0730, and walked to his reserved room.

9. That Mr. Fallon did not arrange to have any of his luggage or personal items

transported in the cargo area.

10. That the private room on the train leased by Mr. Fallon contained a bed, wash basin, toilet and a seating area. The room provided sufficient space for Mr. Fallon to store his luggage. The room also contained a window with a shade to be pulled down for additional privacy.

11. That Mr. Fallon's privately leased room contained all the amenities necessary to conduct all private activities as if he were in a hotel room.

12. That no one other than Mr. Fallon was scheduled to lease and occupy room #7 while the train traveled from Chicago, Illinois to Seattle, Washington.

13. That after Mr. Fallon assumed occupancy of his leased, private room two Chicago police officers entered his room.

14. That the police officers did not obtain a search warrant for Mr. Fallon's privately leased room prior to entering the room.

15. That the police officers did not obtain a search warrant for Mr. Fallon's luggage prior to entering his privately leased room in which his luggage was located.

16. That at no time during the events leading up to Mr. Fallon's seizure did Mr. Fallon abandon his privately leased room.

17. That at no time during the events leading up to the seizure of Mr. Fallon's belongings, and the Defendant res, did Mr. Fallon abandon any of his luggage.

18. That prior to this unlawful seizure Mr. Fallon had no criminal record other than a traffic offense.

19. That prior to this unlawful seizure Mr. Fallon was never arrested or charged with possession or trafficking of illegal drugs.

20. That at the time the police officers entered Mr. Fallon's private room, the officers had not received a tip that Mr. Fallon had participated in a drug transaction.

21. That at the time the police officers entered Mr. Fallon's private room, they had not received a tip that Mr. Fallon was traveling to complete a drug transaction.

22. That at the time the police officers entered Mr. Fallon's private room, they had no knowledge of any drug transactions connected to Mr. Fallon in any way.

23. That at the time the police officers entered Mr. Fallon's private room, Mr. Fallon had

not violated any federal, state or municipal laws.

24. That prior to the police officers entering Mr. Fallon's private room, the officers had no knowledge whether Mr. Fallon had contraband in his suitcase.

25. That United States currency is not contraband.

26. That the Chicago police officers failed to knock on Mr. Fallon's door prior to entering his private room.

27. That both police officers entered Mr. Fallon's privately leased room without obtaining permission to enter from Mr. Fallon.

28. That after entering Mr. Fallon's room, the officers demanded Mr. Fallon produce identification and traveling documents.

29. That Mr. Fallon supplied valid state identification and travel documents.

30. That the officers found Mr.Fallon's documents to be in order.

31. That the officers took Mr. Fallon's identification card.

32. That one of the officers put Mr. Fallon against the wall of his private room and frisked him.

33. That the other officer searched through Mr. Fallon's backpack and coat which were located in Mr. Fallon's private room compartment.

34. That neither officer asked permission before searching Mr. Fallon's coat prior to doing so.

35. That Mr. Fallon did not give the officers permission to search his coat.

36. That after the officer searched Mr. Fallon, he told Mr. Fallon to sit down.

37. That Mr. Fallon did not consent to the search of his briefcase, which was also located in his private room.

38. That one of the officers took Mr. Fallon's briefcase. The officers had Mr. Fallon surrounded so he could not move away.

39. That one of the officers commanded Mr. Fallon to come with the officers.

40. That subsequent to the police officers seizing Mr. Fallon's brief case, Mr. Fallon had not violated any federal state or municipal laws.

41. That the officers took Mr. Fallon off the train without his consent. One officer

walked in front of Mr. Fallon. The other officer walked behind Mr. Fallon.

42. That the officers led Mr. Fallon off the train. One officer was one Mr. Fallon's right side and the other was behind him.

43. That the officers were carrying Mr. Fallon's briefcase.

44. That the officers took Mr. Fallon down to the platform without his consent.

45. That the officers walked Mr. Fallon from the platform under Riverside Plaza, through the vestibule, crossing under Canal Street, and into Union Station without Mr. Fallon's consent.

46. That the officers took Mr. Fallon to the police office in the train station without Mr. Fallon's consent.

47. That the walk from the train to the police office in the station is approximately 1/4 mile.

48. That the officers did not have a narcotics dog with them when they entered Mr. Fallon's privately leased room.

49. That the officers did not arrange for a narcotics dog to be present on the platform when the officers took Mr. Fallon from the train.

50. That the officers did not arrange for a narcotics dog to be present in the train vestibule.

51. That the officers did not arrange for a narcotics dog to be present in the police office when they took Mr. Fallon to the office.

52. That one of the officers searched Mr. Fallon in the police office. The officer did not ask Mr. Fallon permission prior to doing so.

53. That the officers used their office to intimidate, cower, and bully Mr. Fallon.

54. That Mr. Fallon wanted to continue on his trip to Seattle, Washington.

55. That while at the police office Mr. Fallon asked to leave. The officers said they would release him if he cooperated. The officers did not let Mr. Fallon go.

56. That while in the police office Mr. Fallon again told the officers they did not have permission to open his case.

57. That one of the officers opened Mr. Fallon's case by breaking the lock. An officer then brought the case to a room in the back.

LAW OFFICES
**KOMIE AND ASSOCIATES**
One North LaSalle Street – Suite 4200
Chicago, Illinois 60602-4005
Telephone (312) 263-2800

58. That the officers and Mr. Fallon had to wait for a dog to arrive to conduct a sniff test.

59. That approximately 40 minutes to 1 ½ hours elapsed between the time the officer took the money into the back room and the dog arrived.

60. That the dog sniff was done in the back room, outside of Mr. Fallon's view.

61. That the dog sniff was not conducted in the private train compartment, or the train's passageway, or the platform, or the vestibule.

62. That the officer wrote Mr. Fallon a receipt for the money and let him go.

63. That none of the Chicago police officers advised Mr. Fallon he was not under arrest and was not accused of any crime.

64. That none of the Chicago police officers told Mr. Fallon he could end the interrogation at any time.

65. That none of the Chicago police officers told Mr. Fallon he did not have to speak to the officers.

66. That Mr. Fallon was never given his Miranda warning.

67. That while in the police office, the officers fingerprinted and photographed Mr. Fallon.

68. That the police officers fingerprinted and photographed Mr. Fallon even though they had no probable cause to believe his identification was fraudulent.

69. That the police officers fingerprinted and photographed Mr. Fallon even though they had no probable cause to believe he had committed a crime.

70. That between four to five hours elapsed from the time the police officers entered Mr. Fallon's train compartment and the time he was released by the officers.

71. That due to the unlawful detention by officers, Mr. Fallon missed his train to Seattle, Washington.

## ARGUMENT

72. That the exclusionary rule to the violation of an individual's Fourth Amendment rights applies to forfeiture proceedings because the proceedings are quasi-criminal in nature. *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 697, 85 S.Ct. 1246 (1965).

73. That this Court must grant Claimant's motion to suppress the Defendant res because the Chicago police violated Mr. Fallon's Fourth Amendment right when seizing the money.

74. That the Fourth Amendment prohibits the unreasonable search and seizure of an individual's property interests. U.S. Const., Amend. IV. This privacy right extends to state action by way of the Fourteenth Amendment. U.S. Const., Amend. XIV.

> The security of one's privacy against arbitrary intrusion by the police--which is at the core of the Fourth Amendment--is basic to a free society. It is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause. The knock at the door, whether by day or by night, as a prelude to a search, without authority of law but solely on the authority of the police, did not need the commentary of recent history to be condemned as inconsistent with the conception of human rights enshrined in the history and the basic constitutional documents of English-speaking peoples. *Wolf v. Colorado*, 338 U.S. 25, 26 (1949).

75. That this Fourth Amendment right exists in public and private spaces. *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868 (1968). An individual has a Fourth Amendment property right to his or her luggage, *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637 (1983), and in a temporary dwelling. *Stoner v. California*, 376 U.S. 483, 490 (1964).

76. That the Supreme Court has held an investigatory stop, in a public place, by police does not violate individual's Fourth Amendment right to privacy when the stop is limited in scope and when the police officer has grounds to fear for his or the public's safety.

> We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself

> and others in the area to conduct a carefully limited search of the outer
> clothing of such persons in an attempt to discover weapons which
> might be used to assault him." *Terry* at 30.

77. That the *Terry* exception to the Fourth Amendment requirement of probable cause prior to a search is limited to "confrontation on the street between the citizen and the policeman investigating suspicious circumstances." *Id*, 1. The importance of the *Terry* ruling is it addresses a police officer's authority to approach and frisk an individual when encountering them unexpectedly in public. The Court in *Terry* is careful to distinguish this ruling from long-standing case law demanding probable cause prior to a search. "We do not retreat from our holdings that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." *Terry*, at 20.

78. That in *Terry*, the United States Supreme Court found the police officer had reasonable grounds to frisk the defendants for weapons after the detective, walking his beat, observed the defendants passing by and staring into the same store window approximately 24 times within a brief period of time.

79. That in the instant case, there was no reason for the Chicago police officers to conduct a *Terry* stop. The element of reasonable suspicion of an offense taking place coupled with the need for immediate police response, which is at the center of the *Terry* ruling, is not present in the instant case. In the instant case, the police knew Mr. Fallon would be boarding the train. In fact, they were lying in wait for Mr. Fallon to enter his privately leased room. While waiting for Mr. Fallon to enter his private room, the officers did not observe any suspicious activity by Mr. Fallon prior to or upon him boarding the train. Moreover, the officers had not received a tip that Mr. Fallon had committed or was in the process of committing an offense. The officers also had not receive a tip that Mr. Fallon was carrying contraband. Plainly put, the police officers had no "articulable suspicion of criminal activity, amounting to more than a hunch" to warrant an investigative stop. *Terry* at 27.

80. That the requirement in *Terry* that the suspicious activity take place in a public area is also not present in the instant case. Here, the police officers cornered Mr. Fallon in his private quarters - his sleeper room, which is not a public place. As soon as Mr. Fallon entered his

private quarters, the police officers were no longer allowed to conduct an investigative stop.

81. That when the police frisked Mr. Fallon and found no weapons, the police had no further justification to detain Mr. Fallon under the *Terry* doctrine.

82. Similarly, when Mr. Fallon produced valid identification and travel documents, the police had no further justification to detain Mr. Fallon under the *Terry* doctrine.

83. The police officers had no justification to conduct a *Terry*-type investigatory search of Mr. Fallon. Thus, Mr. Fallon's constitutional right to privacy was violated by the officers' actions. This court must grant this motion to suppress evidence and quash arrest.

84. That Mr. Fallon's constitutional right to travel freely and unimpeded by police stops also extends to his right to possess his luggage. "Particularly in the case of detention of luggage within the traveler's immediate possession, the police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary." *Place*, at 709.

85. That police are only able to detain luggage in a public place within the limits established for a *Terry*-type investigative stop. An investigative stop in a public place, absent probable cause, is not a violation of an individual's Fourth Amendment privacy rights when the detention is minimally intrusive in light of strong law enforcement interests. *Place*, at 703.

86. That in applying the *Terry*-type investigation to the detention of luggage, the United States Supreme Court found the detention of luggage for 90 minutes while waiting for a dog sniff to take place, violated a person's constitutional rights. The court reasoned the police could have obtained a dog in advance so that the detention of defendant's luggage would not have been so lengthy.

> Moreover, in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation. We note that here the New York agents knew the time of Place's scheduled arrival at LaGuardia, had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion on respondent's Fourth Amendment interests. *Id*, 709.

87. That the government's intrusions on Mr. Fallon's constitutional rights were even more invasive than those of the defendant in *Place*. In *Place*, DEA agents in the Miami

International Airport became suspicious of Place while watching him stand in an airport line. The agents questioned him but allowed him to continue his travels to New York. The Miami agents phoned ahead to New York where DEA agents were waiting for Place's arrival. The agents seized Place's luggage and held it for 90 minutes without probable cause. The U.S. Supreme Court found that this detention was outside the permissible limits of a *Terry*-type investigative stop.

88. That in the instant case, the police officers had 48 hours notice of Mr. Fallon's travel plans. This was much more time than the agents had when observing and questioning Place in the Miami terminal. Thus, according to the standards set in *Place* the Chicago police officer had ample time to ensure that a dog was available to conduct a sniff of Mr. Fallon's case on the train. Moreover, the officers knew exactly where to meet Mr. Fallon in order to conduct the dog sniff test. In the instant case, Mr. Fallon was detained for five hours while the agents searched his case and waited for a dog sniff to take place. This is far longer than the defendant in *Place* was detained. Overall, the intrusions on Mr. Fallon's possessory and liberty rights were in violation of the permissible limits of a *Terry*-type investigative stop.

89. That lacking grounds to conduct a *Terry* investigatory stop, the police officers had to obtain a warrant or obtain consent prior to conducting a search. *United States v. Ventresca*, 380 U.S. 102, 106 (1965), *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868 (1968).

90. An individual's Fourth Amendment protections extend to hotel rooms for the duration of the occupancy. *Hoffa v. United States*, 385 U.S. 293, 300 (1966). Mr. Fallon's sleeping arrangements were so much like that of a hotel room rental that Mr. Fallon had a privacy expectation while in his leased room. Like a hotel room, a private room on a train is leased for a set amount of time. Like a hotel room, the lessee of a private train room has the expectation of privacy for the duration of the lease. Like a hotel room, and unlike the arrangements in a Greyhound bus, the lessee protects his or her privacy by way of a door. Like a hotel room, a private train room like the one leased by Mr. Fallon has all the accoutrements of a hotel: bed, wash basin, toilet, seating area, and a window shade.

91. That Mr. Fallon had a reasonable expectation of privacy while in his privately leased room. Mr. Fallon purchased a ticket to allow him occupancy in a private room on the train for

LAW OFFICES
**KOMIE AND ASSOCIATES**
One North LaSalle Street - Suite 4200
Chicago, Illinois 60602-4005
Telephone (312) 263-2800

the duration of the trip from Chicago, Illinois to Seattle, Washington. Mr. Fallon was the sole occupier of the private room for the duration of the trip. Mr. Fallon's room was closed off to other travelers by virtue of a door. Thus, Mr. Fallon had a reasonable expectation he would not be intruded upon while in his privately leased room on the train.

92. The police officers did not have either Mr. Fallon's consent to enter his room or a search warrant.

93. That Mr. Fallon did not give the police officers permission to enter his train compartment. The police officers entered compartment and immediately frisked Mr. Fallon and searched his coat and backpack. The officers took Mr. Fallon's case as soon as he forbid them to open it. Given the limited space in the compartment and the speed in which the officers proceeded Mr. Fallon was not free to leave the moment the officers entered his room.

94. That it is important to note had the police officers had probable cause they had sufficient time to obtain a search warrant prior to Mr. Fallon departing on the train. Mr. Fallon bought his train ticket on December 4, 2001 for departure on December 6, 2001. As of December 4, 2001 the agents knew all the circumstances surrounding Mr. Fallon's purchase of a train ticket. The officers had up to 48 hours to obtain a search warrant. The failure to obtain a search warrant prior to the search and seizure was a violation of Mr. Fallon's constitutional rights.

95. That the officers' failure to obtain a search warrant despite sufficient time to do so, does not create "exigent circumstances". The exigent circumstances doctrine recognizes entry by police without a warrant may be legal when there is a compelling need for official action and no time to secure a warrant. *Michigan v. Tyler*, 436 U.S. 499, 509 (1978).

96. When a search is conducted without previously obtaining a warrant, the officer conducting the search must have probable cause to believe "the facts and circumstances within [the arresting officer's] knowledge ...[are] sufficient in themselves to warrant a man of reasonable caution in belief that an offense has been or is being committed. *United States v. Faison*, 195 F.3d 890, 893 (7th Cir. 1999). "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." *Terry*, 21.

LAW OFFICES
**KOMIE AND ASSOCIATES**
One North LaSalle Street · Suite 4200
Chicago, Illinois 60602-4005
Telephone (312) 263-2800

97. That the "exigent circumstances" exception to obtaining a warrant was not operative in this case. The information the officers gathered on Mr. Fallon could not have caused a person of reasonable caution to believe an offense had or was being committed. The only information they had was Mr. Fallon bought a one-way ticket, from Chicago, Illinois to Seattle, Wisconsin. They knew Mr. Fallon paid for the ticket with cash, two days in advance. The agents knew Mr. Fallon had no prior convictions for drug possession or trafficking. The agents knew they had no informant's tip indicating Mr. Fallon had been involved in a drug transaction prior to boarding the train. The agents knew they had no information Mr. Fallon was traveling with any illegal drugs in his possession. The agents knew they had no information Mr. Fallon was traveling in order to complete a drug transaction. Thus, the DEA agents had no probable cause to believe Mr. Fallon had committed or was in the process of committing an offense.

98. At the time the agents entered Mr. Fallon's compartment they only knew Mr. Fallon had bought a one-way ticket to Seattle with cash. The officers waited by the train until Mr. Fallon entered his room. The officers had no more information of suspicious activity by Mr. Fallon when Mr. Fallon boarded the train as the officers did when Mr. Fallon bought his train ticket. Nothing occurred from the time Mr. Fallon bought his ticket to the time he boarded the train which would have caused a person of reasonable caution to believe that an offense had been or was being committed. No probable cause and no exigent circumstances existed to justify the police officer's search and seizure of Mr. Fallon's compartment and his case.

99. That because the officers had no probable cause to enter Mr. Fallon's sleeper room, the items seized as a result of their search must be suppressed.

100. That given the lack of a warrant, probable cause, or exigent circumstances, this Court must grant Claimant's motion to suppress evidence and quash arrest. The seizure of the money from the case can not justify the agents' wrongful actions.

> We may not justify the search after the fact, once we know illegal activity was afoot; the legitimate expectation of privacy does not depend on the nature of the defendant's activities, whether innocent or criminal. If this were the case, then the police could enter private homes without warrants, and if they find drugs, justify the search by citing the rule that society is not prepared to accept as reasonable an expectation of privacy in crack cocaine kept in private homes. Presumably

if no narcotics are found (or, as the concurrence speculates, no pipe bombs are found), the owner of the home would be able to bring a civil lawsuit for nominal damages for the technical violation of privacy rights. The Fourth Amendment requires more than this. *United States v. Pitts*, 322 F.3d 449, 458 (7th Cir. 2003).

101. That money is not contraband

The existence of any sum of money, standing alone, is not enough to establish probable cause to believe the money is forfeitable.... As far as we can tell, no court in the nation has yet held that, standing alone, the mere existence of currency, even a lot of it, is illegal. We are certainly unwilling to be the first to so hold. Absent other evidence connecting the money to drugs, the existence of money or its method of storage are *not* enough to establish probable cause for forfeiture under §881. *United States v. $506,231 in U.S.C.*, 125 F.3d 442, 452 (7th Cir. 1997).

102. That the officers violated Mr. Fallon's constitutional right to privacy and possession of his luggage based on nothing more than the purchase of a train ticket. This Court must uphold the meaning and intent of the Fourth Amendment and grant Claimant's motion.

103. That both the Claimants, Vincent J. Fallon and Nicholas P. Marrocco, seek to quash the arrest and suppress evidence seized as a result of the illegal search and seizure. Specifically, the Claimants seek to quash the arrest and suppress evidence of the defendant res, $100,120.00 in U.S. currency, based on the unlawful actions of the Chicago police officers.

WHEREFORE, the Claimants respectfully prays this Court to grant its motion to suppress evidence and quash arrest of the Defendant res.

Respectfully submitted,
NICHOLAS P. MARROCCO and
VINCENT H. FALLON,
Claimants.

By: _Elizabeth Butler_
Elizabeth Butler

LAW OFFICES
KOMIE AND ASSOCIATES
One North LaSalle Street - Suite 4200
Chicago, Illinois 60602-4005
Telephone (312) 263-2800

# SEE CASE
# FILE FOR
# EXHIBITS