DOCKETED

MAY 1 2 2004

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)     No. 03 C 3644
v. )
)     Judge Bucklo
FUNDS IN THE AMOUNT OF ONE HUNDRED )
THOUSAND  AND ONE HUNDRED TWENTY )
DOLLARS ($100,120.00), )
)
Defendant. )

FILED

MAY 1 1 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES' RESPONSE
TO CLAIMANT FALLON'S MOTION TO SUPPRESS**

The United States of America, by Patrick J. Fitzgerald, United States Attorney for the

Northern District of Illinois, responds opposing claimant Vincent J. Fallon's motion to suppress.[1]

**Introduction**

The United States filed a verified civil forfeiture complaint against $100,120.00 in United

States funds ("hereinafter referred to as the "defendant funds"), alleging that it was furnished or

intended to be furnished in exchange for a controlled substance, was the proceeds from the sale of

a controlled substance, or was used or intended to be used to facilitate a violation of the Controlled

Substance Act, 21 U.S.C. § 801, *et seq.*, and was therefore, subject to forfeiture pursuant to 21

U.S.C. § 881(a)(6). Claimant Vincent J. Fallon ("Fallon") moved to suppress evidence obtained

from the detention of his baggage. The agents had sufficient articulable facts to detain Fallon's bag

for a drug dog sniff. This detention was reasonable in time and location, and supported by

reasonable suspicion. In addition, Fallon twice consented to the search of the bag by the agents.

---

[1] Claimant Nicholas Marrocco, the *sole* owner of the seized currency, lacked standing to
suppress evidence and he did not pursue any such motion.

45

## Statement of Facts

The facts leading to the detention of Fallon's brown bag (Gov. Ex. 7) containing the defendant funds are, for the most part, undisputed. The areas in dispute are identified below. The facts as testified by both agents are consistent with one another and neither agent's testimony was impeached. Fallon's testimony, on the other hand, was not credible, having been impeached several times with his prior deposition and affidavit, and with inconsistencies in his own testimony.

On the morning of December 6, 2002, Drug Enforcement Administration Task Force Agent Eric Romano ("TFA Romano") ran a check of the passenger manifest for the "Empire Builder" train that was scheduled to leave for Seattle, Washington, at 2:10 that afternoon. Tr. 140, 227-228.[2] TFA Romano was checking the list for the purchase of tickets with cash less than 72 before departure. Id., 140-141. He found that Fallon had purchased a one-way ticket with cash two days earlier for the current day's train to Seattle. Gov. Ex. 5; Tr. 142. The passenger information also showed that Fallon used a cellular phone number for a "call back" number and he had made two reservations for two trains to the same location, one day apart. Tr. 142; Gov. Ex. 5. Fallon was the only passenger on the Empire Builder meeting TFA Romano's search criteria. Tr. 230. Fallon was booked into Room 7 on car number 730. Gov. Ex. 5.

About thirty minutes prior to departure, TFA Romano and Task Force Agent Sterling Terry ("TFA Terry") arrived at the platform for the Empire Builder to meet with and interview Fallon when he arrived. Tr. 18, 153. Not having any idea of what Fallon looked like, TFA Romano asked the train attendant to notify him when the passenger with a ticket to room 7 on car number 730 had boarded the train. Id., 152. At approximately 1:50 p.m., the train attendant advised Romano and Terry that Fallon had boarded the train.[3] Tr. 20, 152. After a momentary delay, the TFAs entered

---

[2] "Tr." refers to the page number of the transcript of the testimony of TFAs Romano and Terry, which were filed with the court under separate cover.

[3] Fallon testified that he was late for the train and boarded at 2:00 p.m. but at his deposition he testified "I don't even remember when my train left. So I'm sure it was somewhere around -- I

the train and went upstairs to room 7. Tr. 155. Room 7 was located upstairs on the train, one of ten sleeper rooms located on that half of the car; five sleeper rooms were on each side of a hallway.[4] Tr. 223-224; Gov. Ex. 4.

The TFAs approached Room 7, TFA Romano was standing to the right of the door, TFA Terry to the left.[5] Tr. 26-27, 161-162. The door and the curtain to the room were open. *Id.*, 121, 233. Fallon was seated on the left-hand seat. *Id.*, 26-227, 233. The bag containing the currency was setting on the seat across from Fallon. *Id.*, 25, 171. A backpack or duffel-type bag was setting on the floor near Fallon.[6] *Id.*, 237. TFA Romano showed Fallon his DEA credentials and without entering the compartment asked if he could speak with him. *Id.*, 30-32, 158. Fallon replied that he would speak with TFA Romano. *Id.*, 122, 158. TFA Romano stated that Fallon was not under arrest, not accused on any crime, and did not have to talk with him if Fallon did not wish to. *Id.*, 122, 164, 166, 233-234. Other than showing their badges, the TFAs did not exhibit any weapons, handcuffs, police insignias, or any other indicia of their authority. *Id.*, 18, 231.

TFA Romano asked to see Fallon's train ticket and photo identification. *Id.*, 33, 118, 164-165. Fallon produced both and they were immediately returned to him.[7] *Id.*, 41, 118, 166.

---

totally forgot." Fallon Dep. Tr. at 19, attached as Gov. Supp. Ex. 14. He did testify that his memory was refreshed only after the benefit of hearing the testimony of TFAs Romano and Terry.

[4] Five deluxe rooms were upstairs on the other half of the train car. Tr. 233.

[5] Fallon states that TFA Romano stood in the doorway with his feet on the threshhold and TFA Terry was not in his line of sight. However, in his affidavit Fallon said "two Chicago police officers entered his room" (¶ 11), and "both police officers entered [his] privately room" (¶ 21), although the room with the seats open as they were had floor space of only 18 X 42 inches. Neither version of Fallon's testimony should be credited.

[6] We really do not know where Fallon's coat was at this time. Fallon says that he took it off as he running onto the train while wearing a backpack on his back and carrying the brown bag with its strap over his shoulder, both over his coat, and that he removed his coat *without* stopping or removing either bag from his shoulders.

[7] Fallon contends that both his ticket and ID were retained by TFA Romano, despite his testimony that he never showed Romano his train ticket. Romano Dep. Tr. 43-44.

3

TFA Romano asked Fallon a series of questions and Fallon responded that he was going to visit a female friend and planning to stay for about one week (Tr. 124, 167, 234), he was unemployed but had worked as a waiter at various restaurants (Tr. 131, 235), and that the address on his state identification card was not current but that he stayed with friends and received mail at a post office box. Tr. 236. Fallon refused to provide TFA Romano with the address where he lived.[8] *Id.*, 236, 253. TFA Romano at this time noticed Fallon starting to sweat and from his forehead, and his hands were noticeably trembling. *Id.*, 169, 235.

TFA Romano told Fallon that he was looking for persons traveling with weapons, drugs, or large amounts of currency, that is, more than $10,000. *Id.*, 34, 168, 236-237. In response, Fallon answered that he had no weapons and no drugs or large amounts of currency. *Id.*, 34, 236, 237. TFA Romano asked if both bags were Fallon's and if he knew the contents of each and Fallon replied yes to both questions. *Id.*, 169-170, 237. TFA Romano asked Fallon if he would consent to a search his bags.[9] *Id.*, 34-35, 171-173, 238. Fallon answered in the affirmative and handed TFA Romano the bag from the floor. *Id.*, 34-35, 123, 238-239. TFA Romano handed that bag to TFA Terry who looked through it in the hallway, and then it was returned to Fallon. *Id.,* 35, 173. TFA Romano then reached into the room and picked up the brown bag. *Id.*, 36, 173, 239. Fallon not only gave consent to search the brown bag, he did not say or do anything in protest. *Id.*, 36, 173, 128-239. TFA Romano found the bag was locked and asked Fallon if he had a key. *Id.*, 37, 174, 239-240. Fallon said he did not have a key. *Id.*, 37, 174, 240. TFA Romano again asked if the brown bag belonged to Fallon and Fallon said that it was indeed his and he did not have the key. *Id.*,174. TFA Romano asked how Fallon was going to open the bag and got no response. *Id.*, 37, 174

TFA Romano then re-asked Fallon what was in the bag. *Id.*, 38, 174, 239-240. Fallon then

---

[8]  At the time, Fallon lived on North Bosworth in Chicago with his sister and her fiance.

[9]  While TFAs Romano and Terry both testified that Romano asked for consent to search on the in the plural ("bags"), Fallon testified that the request was made for only one bag.

told him that money was in the bag. *Id.*, 38, 175, 241. When asked how much money, Fallon responded "about $50,000." *Id.*, 38, 124, 176, 241. Fallon then told TFA Romano that he planned to purchase a house in Seattle with the money. *Id.*, 125, 259.

At about 1:55 p.m., TFA Romano told Fallon that the bag and its contents would be detained for further investigation. *Id.*, 42, 176-177, 241. He further told Fallon that he could accompany them to the Amtrak police office in the station if he wished but if he did he would miss his train. *Id.*, 40, 180, 241-242. Fallon chose to accompany the agents to the office. *Id.*, 180, 242. TFA Romano frisked Fallon for weapons before they left the train. *Id.*, 39, 247. Fallon carried his backpack/duffel bag and the agents made no physical contact with him during the walk to the office. *Id.*, 189.

Once inside the office, Fallon sat in a chair next to an unlocked door and could have left at any time. *Id.*, 49, 126, 191, 244. At about 2:00 p.m, TFA Terry contact the Chicago Police Department and requested a drug detection dog at Union Station.[10] *Id.*, 52. TFA Romano again asked Fallon about opening the brown bag to which Fallon instructed the agents as to how the brown bag could be opened with a knife or scissors. *Id.*, 125. Fallon then told Romano to "open the freaking bag." *Id.*, 192, 245. TFA Romano opened the brown bag with some type of knife and observed what was later determined to be 19 rubber-banded bundles of United States currency. *Id.*, 64, 193-194, 245. Fallon now TFA Romano him that the money belonged to an outside investor but would not name that person. *Id.*, 246. Fallon then stated that he was going to invest the money in glass blowing and glass art. *Id.*, 127-128, 246, 259. Fallon also told TFA Romano that he was unemployed. *Id.*, 247.

At about 2:25 p.m., Chicago Police Canine Officer Richard King ("Officer King") arrived

---

[10] Fallon argues that TFA Terry's own report states that he did not call for a dog until 2:15 p.m. Claimant's Ex. 2, box 44. However, Fallon's conclusion as to what box 44 means has no basis in the evidence. TFA Terry specifically testified that reference in his report to "O.E.C. — McKinney #9" was not the time that he called the canine unit. Tr. 107-108.

at Union Station.[11]  Tr. 53, 197; Gov. Ex. 11.  After a short discussion with TFA Romano, Romano

hid the brown bag containing the money in a roll call room while Officer King retrieved his dog,

"Deny."  Tr. 198.  Once in the room, Deny was given the command to search and began searching

the room until he found the brown bag and alerted to it.  *Id.*, 199-200.  Fallon was fingerprinted and

photographed, and after criminal prosecution was declined by the United States Attorney's Office,

Fallon signed an address acknowledgment form, a disclaimer of ownership interest, and receipt for

19 bundles of United States currency.  *Id.*, 203, 206; Gov. Ex. 8-10.  Fallon was released between

3:30 and 4:00 p.m. that same day.  *Id.*, 118, 209.

## Argument

**1.      Fallon Waived Standing to Contest the Seizure.**

Although Fallon initially filed a claim to the defendant funds, he advised the United States

Attorney in November 2003, that he was withdrawing his claim to the money.  *See* Gov. Sup. Ex.

12 , attached.  By withdrawing as a party to the case, Fallon did not answer the interrogatories

propounded to him.  One of those interrogatories specifically asked him:

> If you contend that either the arrest of the defendant funds, or the seizure of any
> personal property which gave rise to this case, or the arrest of any individual
> associated with the investigation which led to the seizure of the defendant funds was
> unlawful or in violation of any right guaranteed by the United States Constitution,
> please state each and every fact upon which you base your contention and identify
> each and every witness (by name, address and telephone number) and identify each
> and every document (and the name, address and telephone number of the custodian
> of the document) which supports your contention.

*See* Gov. Sup. Ex. 13, attached.

Failing to answer this interrogatory because he withdrew his claim, Fallon never put the

---

[11] Fallon disagrees that King arrived about 25 minutes after he got to the office. He testified
at the hearing that he waited at least 45 minutes for the dog, yet at his deposition he testified "It
could have been a half-hour, 45 minutes," and in his affidavit he said that it took "40 minutes to
1 1/2 hours" for dog to arrive.  Fallon Dep. Tr. at 36; Fallon Affidavit in support of Motion to
Suppress, ¶ 52.

United States on notice that he was contesting the seizure of the money or that any of the issues raised in the motion to suppress would be issues contested and litigated in this case until the filing of this motion, one week before trial. Relying on his representation, as the United States was entitled to do, discovery was not conducted with an intent to discover any facts on the issues raised here. Consequently, the United States did not conduct any investigation that might provide it with evidence to combat his motion. As the motion was not filed until five working days before trial, the United States effectively had no time to investigate and seek evidence, other than its own agents' testimony, to respond to and defeat the motion. Based on this prejudice and lack fo notice to the United States, Fallon's withdrawal of his claim, as communicated to the United States, compels the denial of the motion to suppress for lack of standing.

## 2.     The Initial Encounter on the Train was Consensual.

The fourth amendment does not forbid all searches and seizures, but rather, only those that are unreasonable. *Elkins v. United States,* 364 U.S. 206, 213 (1960). Not all police/citizen encounters implicate fourth amendment concerns. *Terry v. Ohio,* 392 U.S. 1, 19 n. 16 (1968). If agents stop individuals and seek their voluntary cooperation through noncoercive questioning, however, the encounter is not a seizure under the Fourth Amendment. *United States v. Robinson,* 30 F.3d 774, 782 (7trh Cir. 1994). The proper test for determining whether a given encounter rises to the level of a fourth amendment seizure on a train is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."[12] *Florida v. Bostick,* 501 U.S. 429, 436 (1991)

There is generally no seizure when, as here, an agent merely approaches a traveler and, after identifying himself, begins to ask routine questions relating to the individual's identification, travel plans, and ticket information. *United States v. Odum,* 72 F.3d 1279, 1283 (7th Cir. 1995). These encounters require no suspicion whatsoever to initiate. *United States v. Berke,* 930 F2.d 1219, 122

---

[12] The reasonable person presupposes an innocent person." *Bostick,* 501 U.S. at 438.

n.5 (7th Cir. 1991). The no suspicion requirement applies to encounters taking place with passengers in their sleeper cars on Amtrak trains. *United States v. Rem*, 984 F.2d 806, 812 (7th Cir. 1993), *citing United States v. Colyer*, 878 F.2d 469, 475-476 (D.C. Cir. 1989) ("[w]hile an Amtrak sleeper car may in some ways resemble a residence, it enjoys no such status in the law.") and *United States v. Tartaglia*, 864 F.2d 837, 8411 (D.C. Cir. 1989) (no heightened expectation of privacy in train roomette; automobile exception applied); *see also United States v. Little*, 18 F.3d 1499, 1504 (10th Cir. 1994) (en banc) (no higher expectation of privacy in train roomette); *United States v. Kim*, 27 F.3d 947, 952 n.2 (3d Cir. 1994) (district court's finding that train sleeper car was public place not error). Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19 n.16; *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990). Moreover, when a defendant consents to questioning by police, there is no fourth amendment seizure, *United States v. Parker*, 936 F.2d 950, 953 (7th Cir. 1991), and an agent's non-threatening request to search the individual's luggage will not convert a consensual interview into an investigatory stop. *See Bostick*, 501 U.S. at 435; *Odum*, 72 F.3d at 1983.

Here, although arguing to the contrary, even Fallon's testimony establishes that the initial encounter as a consensual one. It is undisputed that the agents approached Fallon's room and found the door open. The agents were dressed like ordinary citizens. They did not display any weapons or handcuffs or any coercive indicia of their authority. They identified themselves and their purpose for speaking with Fallon. He consented to the interview and voluntarily answered their questions. No coercive or intimidating questions were asked. Upon request Fallon produced his identification and gave consent to search at least one of his bags, most probably both. Fallon left the train under his own power upon request, he was not physically assisted in any way. The initial encounter upon the train was a consensual one and the "suspicion that [was] required is zero." *United States v. Edwards*, 898 F.2d 1273, 1276 (7th Cir. 1990).

3.    **Reasonable Suspicion Existed to Seized the Brown Bag (Government Exhibit 7).**

A consensual encounter can develop into an investigatory detention as a result of police behavior. *United States v. Place*, 462 U.S. 696 (1983). Then a further detention must be supported by reasonable suspicion based on the totality of circumstances. *Id.* at 703. That "totality" includes the agent's experience and the behavior of the suspect. *United States v. Sterling*, 909 F.2d 1078, 1083-1084 (7th Cir. 1990). Among the factors considered is whether the suspect fits the "drug courier profile"[13]; whether the travel involves a "drug source city"; whether the suspect appears visibly nervous; discrepancies in the suspect account of the trip; and equivocal information regarding whether others may have access to suspected baggage. *United States v. Withers*, 972 F.2d 837, 843 (7th Cir. 1992); *Edwards*, 898 F.2d at 1277.

This encounter became an investigatory detention when TFA Romano detained the brown bag for further investigation. At the time the brown bag was detained, TFA Romano had sufficient articulable facts to justify the detention. Fallon purchased a one-way ticket with cash about 48 hours before departure. *Florida v. Royer*, 460 U.S. 491, 502 (1983); *United States v. McCarthur*, 6 F.3d 1270, 1277 (7th Cir. 1993) (ticket purchased with cash supports finding of illegal drug conduct); *Edwards*, 898 F.2d at 1277 (ticket purchased with cash supports reasonable suspicion for *Terry* stop).[14] Fallon initially advised the agents that he planned to stay in Seattle for a definite period of time — one week — yet did not have a return ticket, instead he bought a one-way ticket. *Withers*, 972 F.2d at 843 (implausible answers support suspicion of illegal drug conduct). His call back telephone number was for a cell phone which TFA Romano found suspicious because passengers

_____

[13] The "drug courier profile" can include travel involving a source city for drugs, one-way ticket purchased with cash shortly to departure, and a questionable call back number. *Parker*, 936 F.2d at 952-953; *Johnson*, 910 F.2d at 1507.

[14] Fallon incorrectly argues that the amount of cash spent on the ticket is a critical factor. It is not. The fact the cash is used is unusual and makes it difficult, if not impossible, to identify the person actually buying the ticket.

are asked for a home telephone number and a cell phone number, like paying with cash, conceals the location and identity of the traveler. Fallon made multiple reservations, another unusual circumstance and counter-indicative of a vacation traveler. Fallon also refused to provide a current address. It is also undisputed that Fallon was sweating and trembling and that he told TFA Romano conflicting stories about the contents of the brown bag.

Fallon said that he alone packed the brown bag, yet he did not have key to open it. Fallon said that he had no large amounts of currency with him, yet when later asked what was in the locked brown bag, Fallon said that there was "about $50,000 inside." *Withers*, 972 F.2d at 843 (discrepancies in information provided to agents supports suspicion of illegal drug conduct); *United States v. Currency in the Amount of $150,660.00*, 980 F.2d 1200, 1207 (8th Cir. 1992) (inconsistent statements). Fallon initially told agents that he was going to Seattle to visit friends. Upon discovery of the money, he changed his reason for travel to "going to purchase a house." *Withers*, 972 F.2d at 843; *Currency in the Amount of $150,660.00*, 980 F.2d at 1207. Fallon initially said that he worked as a waiter as many various restaurants. Later, he said that he was unemployed.

These facts, taken together, establish the reasonable suspicion necessary to "justify the modest investigatory detention of [the money] for purposes of the 'sniff' test." *United States v. Thomas*, 87 F.3d 909, 912 (7th Cir. 1996). In *Thomas*, the traveler's luggage was detained for a dog sniff. The factors known to the officers at the time of the detention were (1) a one-way ticket from Los Angeles purchased with cash, (2) nervous actions, (3) contradictory answers to simple questions. *Id.* The court found reasonable suspicion supporting the detention of the luggage. *Id.*

Likewise, *Johnson* supports the detention of the bag. Johnson purchased a one-way ticket with cash from Los Angeles the day before the train departed and gave a bad call back number. She acted nervously and had identification in different names. These facts supported the detention of her luggage for a dog sniff. 910 F.2d at 1507. Similarly, in *Edwards*, the defendant paid cash for a train ticket from Los Angeles, acted nervously when stopped, and said someone else might have had

access to his bags supported detention of the bags for a dog sniff. 898 F.2d 1275.

Here, the agents had more. They had the same one-way cash ticket along with contradictory answers to simple questions. Plus, they had a traveler carrying a large sum of money in bag which he claimed to be his and that he packed himself, but to which *he did not have access* as it was locked. The totality of circumstances here clearly provide articulable facts establishing a reasonable suspicion to detain the brown bag containing the currency.

**4.     The Length of the Detention Did Not Exceed Permissible Limits**

Fallon next contends that the length of the detention of the bag exceeded what was reasonable. He contends that moving the bag from the train to the police office and/or the twenty-five minute wait for the drug dog violated the fourth amendment. There is no hard and fast time limit for a permissible *Terry* stop. *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Instead, a court considering the reasonableness of a particular detention's duration must "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686; *Place*, 462 U.S. at 709, *but see United States v. Borys*, 766 F.2d 304, 313-314 & n3 (7th Cir. 1985) (Seventy-five minute wait for drug dog where suspect did not wait for luggage "lies within the outer bounds of the Fourth Amendment.").[15]

Moving the bag from the train to the police office did not exceed *Terry*. Our court of appeals has never held that moving a *Terry* investigation of luggage from the area of encounter to the police office at the train station or airport is improper. *Edwards*, 898 F.2d at 1975 (moving bags to the Union Station Amtrak police office); *United States v. Ferguson*, 935 F.2d 1518, 1521 (7th Cir. 1991) (luggage moved to DEA office at Union Station); *Borys*, 766 F.2d at 307 (taking detained luggage to DEA airport office); *Withers* 972 F.2d at 840 (same); *see also United States v. Mendenhall*, 446

---

[15] Fallon argues for the application for the "Doctrine of Laziness of Officers." Try as we might, we are unable to find any statutory or judicial support for this "doctrine."

U.S. 544, 554 (1980) (moving suspect meeting courier profile to DEA office at airport).

In addition, the twenty-five minute wait for the drug dog does not exceed the permissible scope of the detention. TFA Romano was only required to have a drug dog readily available — not immediately available. *United States v. Ward*, 144 F.3d 1024, 1035 (7th Cir. 1998) ("Demanding that [agents] have a dog on or near the premises for every bus interdicted strikes us as unreasonable."); *Borys*, 766 F.2d at 314 (no requirement for agents to have dog immediately available, only readily available — 75 minute delay not unreasonable); *United States v. Cooper*, 873 F.2d 269, 275-276 (11th Cir. 1989) (agents not required to have drug dog immediately available – 35 minute delay reasonable); *United States v. Alpert*, 816 F.2d 958, 964 (4th Cir. 1987) (refusing to impose *per se* rule requiring that narcotics dogs be kept at each airport where Terry stops are used in interdiction of drug traffic); *United States v. West*, 731 F.2d 90, 92 (1st Cir. 1984) (no requirement for DEA agents to "have a dog waiting near the gate whenever a sniff test of a known suspect's baggage is either probable or possible").

Because the agents did not call for a dog until after they had determined that a bag would be detained does not show a lack of diligence on their part. *Sterling*, 909 F.2d at 1085. Once contacted, the drug dog was immediately brought to Union Station and the sniff test was conducted as soon as it could be arranged.[16]

### 5. Fallon's Actions Support Finding That He Gave Consent to the Search of the Bag.

Next, we address the issue of consent to search the brown bag. Although disputed by the parties, TFAs Romano and Sterling provided consistent and unimpeached testimony that Fallon consented to the search of the brown bag, not just once but on at least two occasions. Fallon's

---

[16] Fallon's reliance on *Place* is misplaced. In *Place*, the suspect did not wait with his bag as did Fallon and the agents took the luggage "all the way across Queens to Kennedy Airport", and "mislead Place . . . telling him they were taking it to a federal judge to try to secure a search warrant. *Borys*, 766 F.2d at 313. *See also* 1 W. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 2.2(f), at 373 (2d ed. 1987) (noting that *Place* "addresses only the situation of exposure of luggage to the dog in the suspect's absence").

testimony, on the other hand, was impeached several times and is inconsistent with his actions.

A person's conduct is indicative of the existence of and the scope of a consensual search. *United States v. Williams*, 951 F.2d 853, 856 (7th Cir. 1992); *United States v. Hardin*, 710 F.2d 1231, 1235 (7th Cir. 1983). Here, it is undisputed that Fallon consented to the searching of at least one of his bags. It is also undisputed that, after the consent search of Fallon's duffel bag, when TFA Romano grabbed the brown bag containing the money to search it, Fallon voiced no objection to his taking custody. It is also undisputed that upon TFA Romano finding the brown bag locked, Fallon told him he had no key, even though he previously said he owned the bag and had packed it himself.

After TFA Romano seized the bag and found it locked, not only did he testify that Fallon told him to "go ahead and open it," it is undisputed that Fallon told TFA Romano *how* to open it. Although Fallon testified that he did not give permission to open the bag, his conduct says otherwise. Why tell TFA Romano how to open the bag (with a knife or scissors) if not giving consent to do so. The only conclusion that makes any sense is one of Fallon's consent.

Alternatively, should this court find that Fallon did give consent to Agent Romano to open the bag, its detention for the dog sniff was still lawful and the only evidence that can be suppressed are those statements made by Fallon after the unlawful search. As the finding of currency in the bag was not a ground for detention for the dog sniff test, the basis for the detention of the bag for the drug detection dog and probable cause obtained therefrom are unaffected by the search of the bag and cannot be suppressed.

## 6. The Dog Alert, Combined with the Other Factors, Established Probable Cause.

As an initial matter, it must be noted that nowhere is his motion to suppress does Fallon raise any issues concerning the propriety or the significance of the positive dog alert to the brown bag and its contents. This is not a matter for suppression, but is properly considered at trial after hearing all the evidence, including expert testimony on the dog's alert.

That being said, however, Fallon argues that the court of appeals enacted a *per se* prohibition on the use of dog sniff evidence and claims his authority *United States v. $506,231 in United States Currency*, 125 F.3d 442 (7th Cir. 1997). Fallon's reliance on *$506,231.00* is misplaced.

First of all, our court of appeals has never outlawed the use of drug detection dogs. To the contrary, they have continually cited approvingly of their use. *See e.g*, *United States v. Limares*, 269 F.3d 794, 797 (7th Cir. 2001). Similarly, the Ninth Circuit Court of Appeals has a done a complete about-face on this issue, reversing its position in upholding a seizure and forfeiture based upon what it now terms a "sophisticated dog sniff." *United States v. $22,474 in U.S. Currency*, 246 F.3d 1212, 1216 (9th Cir. 2001). This "sophisticated dog sniff" that changed the outlook of that court was established through the testimony of Dr. Stephan Rose, the United States' expert witness in this case.

Second, the holding of *$506,231* is that the district court lacked jurisdiction to over that *in rem* forfeiture action. 125 F.3d at 454. In dicta only, the court of appeals discussed *that* dog alert being considered only upon the evidence presented in *that* case. In *$506,231*, currency was found in a barrel at a pizza parlor during the execution of a search warrant issued in a stolen property investigation. *Id.* at 444. After the money was transported from the pizza parlor to the police station (no longer at the place of seizure) it was examined by the drug detection dog. *Id.* at 453. The dog did not alert to all the currency but "grabbed one bundle of money from a table and ripped the packaging apart." *Id.* There was no evidence presented of illegal drug trafficking except for "uncorroborated and unsubstantiated double hearsay" and a statement that a drug dog alerted *Id.* at 452.

Here, the record supports the drug involvement of the defendant currency. In addition to the drug courier factors set forth above, the defendant currency caused an alert by a trained, *and reliable*, drug detection dog. Such an alert can indeed provide probable cause for seizure and serve as a basis for forfeiture. *See Limares*, 269 F.3d at 798; *see also Currency US, $42,500*, 283 F.3d at 984 n.1; *United States v. Currency US, $42,500*, 283 F.3d 977, 984 n.1 (9th Cir. 2002) (aggregate of

14

circumstantial facts combined with drug detection dog alert supports forfeiture under the preponderance of evidence standard.); *United States v. $10,700.00*, 258 F.3d 215, 229-232 & n.10 (3d Cir. 2001). The drug dog alert, combined with the other factors present at the time of the dog sniff, one-way cash ticket purchased shortly before departure, inconsistent answers about the content of the bag and the reason for travel, and the strong evidence that Fallon not only did own or pack the brown bag himself, but did not have knowledge of its contents, support the finding of probable cause to seize the bag and initiate this civil forfeiture action.

### Conclusion

Based on the foregoing, claimant Fallon's motion to suppress should be denied.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:
JAMES M. KUHN, SR.
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-1877

**TERRY O'DONNELL**
Attorney at Law
240 E. Lake Street #101
Addison, IL 60101
630.832.5000

November 21, 2003

Mr. James Kuhn
Asst. US Attorney
219 South Dearborn
Chicago, IL 60604

      Re:  03 C 3644 ($100,120.00)

VIA FAX

Dear Mr. Kuhn:

I am faxing to you today Mr. Marrocco's discovery responses.

I will file the response and serve you with a file stamped-copy on Monday.

As you will learn as his deposition, Mr. Marrocco claims that all of the money in Fallon's possession was in fact his.  As Fallon also agrees with this we will be withdrawing Fallon's claim and he will not be responding to your interrogatories.

However, I will accept any notice of deposition for Fallon and we will produce him.

Finally, your interrogatories asked for certain bank information. It was not our intent to be unclear or confusing in responding that Mr. Marrocco did not have an interest in any accounts.  However, Mr. Marrocco did have signature authority while he was the general manager at Bloomingdale Pizza.  He did not have an interest in the company or the account, and, more importantly does not possess any documents concerning the account.  He will, of course, answer any questions you have concerning the account at his deposition.  I believe he was not obligated to speculate as to that account at this time as your interrogatory only asked for accounts in which he had an interest.

We can do the deps on December 3rd or 5th any time after 11:00 a.m. If you would like I can send notice of deps for your agents on whichever day we do not use for Marrocco or Fallon.

Sorry about the typed letter;  my secretary is sick and my computer went down.

Sincerely,

Terry O'Donnell

GOVERNMENT EXHIBIT
Suppression 12

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03 C 3644 |
| v. | ) | |
| | ) | Judge Bucklo |
| FUNDS IN THE AMOUNT OF ONE | ) | |
| HUNDRED THOUSAND AND ONE | ) | |
| HUNDRED TWENTY DOLLARS | ) | |
| ($100,120.00), | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' FIRST SET OF
## INTERROGATORIES AND REQUESTS TO
## <u>PRODUCE TO CLAIMANT VINCENT J. FALLON</u>

The United States of America, by Patrick J. Fitzgerald, United States Attorney for the

Northern District of Illinois, pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure and

Supplemental Rule C(6), requests claimant Vincent J. Fallon answer the following Interrogatories

under oath and to produce all documents and things responsive to the following requests within thirty

(30) days after the service thereof:

### Definitions

1.      "Document" shall have the full meaning ascribed to it in Rule 34 of the Federal Rules

of Civil Procedure, and shall include all items described in Federal Rule of Evidence 1001.

2.      "Defendant funds" refers to the $100,120.00 seized by the United States on or about

December 6, 2002.



GOVERNMENT
EXHIBIT
Suppression 13

(1)  the period of attendance at each institution; and,

(2)  whether you graduated, and if so, with what certification, diploma, or degree.

*Interrogatory No. 2*:  If you have ever been arrested or convicted of a crime in any country, please state the date of the arrest or conviction, the charge(s), the name and address of the court in which you were convicted, the offense you were charged with or were convicted of, and the sentence or other outcome (e.g., prison term, probation).

*Interrogatory No. 3*:  If you have ever been involved in any other legal action, whether civil or criminal, as a plaintiff, defendant, petitioner, respondent, or witness, please describe the nature of each such action, the name and address of the court where the action was pending, and the date of the action.

*Interrogatory No. 4*:  If you contend that either the arrest of the defendant funds, or the seizure of any personal property which gave rise to this case, or the arrest of any individual associated with the investigation which led to the seizure of the defendant funds was unlawful or in violation of any right guaranteed by the United States Constitution, please state each and every fact upon which you base your contention and identify each and every witness (by name, address and telephone number) and

4

identify each and every document (and the name, address and telephone number of the custodian of the document) which supports your contention.

*Interrogatory No. 5*:  If you contend that the defendant funds were *not* used or intended to be used to facilitate drug trafficking activities or does *not* constitute proceeds from drug trafficking activities, please set forth each and every fact upon which you base your contention and identify each and every document (and the name, address and telephone number of the custodian of the document) which supports your denial.

*Interrogatory No. 6*:  List by name, address, current or last known telephone number each and every employer for whom you have worked since January 1999, specifying for each the following: the inclusive dates of employment; the duties of employment; the amount of gross and net monthly salary; the reasons for leaving the employment.

*Interrogatory No. 7*:  State whether you successfully traveled to Seattle, Washington in December 2002 and, if so, how long you stayed there, who you stayed with, the purpose of your trip, what type of business, if any, you conducted there, who you conducted business with (identified by name, address and telephone number, when you returned to Chicago, the mode of travel, the name of any

5

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,       ]
                                ]
            Plaintiff,          ]
                                ]
      vs.                       ]      No. 03 C 3644
                                ]
FUNDS IN THE AMOUNT OF ONE      ]
HUNDRED THOUSAND AND ONE        ]
HUNDRED TWENTY DOLLARS          ]
($100,120.00),                  ]
                                ]
            Defendant.          ]


            The deposition of VINCENT J. FALLON, called

by the Plaintiff for examination, taken pursuant to the

Federal Rules of Civil Procedure of the United States

District Courts pertaining to the taking of depositions,

taken before BARBARA J. SMALL, a Notary Public within and

for the County of Cook, State of Illinois, and a Certified

Shorthand Reporter of said state, taken at 219 South

Dearborn Street, Suite 500, Chicago, Illinois, on the 9th

day of December, 2003, at 11:15 a.m.



GOVERNMENT
EXHIBIT
Suppression 14

BARBARA J. SMALL, C.S.R.

2

1    APPEARANCES:

2        HON. PATRICK J. FITZGERALD
         United States Attorney
3        219 South Dearborn Street, Suite 500
         Chicago, Illinois 60604
4        By:  MR. JAMES M. KUHN, SR.
              Assistant United States Attorney
5
             appeared on behalf of the government;
6
7        MR. DANIEL OZGA
         240 East Lake Street, Suite 101
8        Addison, Illinois 60101

9            appeared on behalf of the claimants.

10   ALSO PRESENT:  MR. NICHOLAS MARROCCO

11                       o0o

12               INDEX OF EXAMINATIONS

                                      PAGE   LINE
13   VINCENT J. FALLON

14           DIRECT EXAMINATION
             BY MR. KUHN ...................... 4      10
15
             CROSS-EXAMINATION
16           BY MR. OZGA ..................... 58      25

17

18               INDEX OF EXHIBITS

19   DEPOSITION EXHIBIT

20       1    documents ...................... 38     12

21

22

23

24

25

19

1      A.   There wasn't anyone around.

2      Q.   Your sister wasn't there?

3      A.   She wasn't there presently, not with me, no.

4      Q.   Was she there during that nighttime at any time?

5      A.   Yeah, I think she was working or something, she

6  came home like really late.  She, she's a bartender as well,

7  so she works pretty much the hours that I do.

8      Q.   How about her fiancé, was he in the apartment when

9  the money was there?

10     A.   No, he was staying with his parents or something

11  like that, I don't know where he was.

12     Q.   When did you get up the next day to go to the

13  train station?

14     A.   You know, I really don't remember.  That day was

15  such a nightmare, I -- I completely don't remember what time

16  I got up.

17     Q.   How did you get to --

18     A.   I don't even remember when my train left.  So I'm

19  sure it was somewhere around -- I totally forgot.

20     Q.   Do you remember how you got to Union Station?

21     A.   Yeah.  I believe it was -- it was Ray who gave me

22  a ride, who is my sister's fiancé.  It was either her or

23  him, one of them gave me a ride.  Probably him.

24     Q.   Besides the bag containing the money, did you have

25  anything else with you?

36

1        Q.   So who was the person, which agent took the bag

2  out of the room?

3        A.   It was the black man.

4        Q.   The black man.

5        A.   He took the money out of the room.

6        Q.   And how long was he out of the room?

7        A.   Almost for the entirety of the time, the duration.

8        Q.   And did you see a dog come?

9        A.   Yes, I did.

10       Q.   And there was a police officer with a dog?

11       A.   With a dog, yes.

12       Q.   German shepherd?

13       A.   I believe it was a German shepherd, yeah.

14       Q.   How much time passed between the time the bag with

15  the money left the room you were in and you saw the dog

16  arrive?

17       A.   How much time had elapsed in between -- in between

18  --

19       Q.   The bag leaving the room you were in and the dog

20  arriving.

21       A.   It could have been a half-hour, 45 minutes.  We

22  waited for the dog for quite a while.

23       Q.   While you were waiting for the dog, the black

24  agent was not in the same room with you?

25       A.   Correct.  Yeah, that's exactly true.

43

1    any excuse or if I just, you know, just gave him any

2    explanation whatsoever, that I would be let go.

3        Q.   No, I'm talking about when they first came and met

4    you on the train.

5        A.   If he what?

6        Q.   When they first met you on the train they showed

7    you identification, right?

8        A.   No, he didn't, he didn't say that I was under

9    arrest for anything or anything like that.

10       Q.   Did he tell you that you were not under arrest?

11       A.   No, he didn't.  Didn't, no.

12       Q.   Did he tell you you were not being accused of any

13   crime?

14       A.   He didn't, no, there was nothing to that effect

15   said.

16       Q.   Did the agent --

17       A.   Said it was just a, it was a normal procedure,

18   that he did it 33 times that day or something like that.

19       Q.   Did the white agent, did he ask to see your train

20   ticket and some identification?

21       A.   He asked to see my identification.  I don't

22   believe he said anything about my train ticket because

23   obviously I needed that to board the train.

24       Q.   Did you provide him with a copy of your train

25   ticket?

44

1    A.    Yeah, I did.   Yes, I believe that was later on in

2    the office though.

3    Q.    Not on the train?

4    A.    No, I don't believe that happened on the train, to

5    the best of my knowledge.

6    Q.    Did you ever provide either agent with your state

7    identification card?

8    A.    Yes, I did.

9    Q.    When did you do that?

10   A.    I believe it was when I was on the train.

11   Q.    And they handed both your train ticket and your

12   identification card got back to you?

13   A.    No, they hung on to it.

14   Q.    For how long?

15   A.    All the way up until the point I was leaving.   I

16   mean these guys, these guys, they must have really thought

17   that they had some kind of criminal or something because

18   they were fingerprinting me and taking photographs of me and

19   stuff.   I mean way out of line.   Way out of line.   They were

20   very unprofessional about the situation.   Very

21   unprofessional.

22   Q.    Did one of the agents ask you the purpose of your

23   travel?

24   A.    Yeah, yeah, yeah.   Absolutely.

25   Q.    Were you asked how long you were planning to be in

NORTHERN DISTRICT OF ILLINOIS    )
                                       )     SS

COUNTY OF COOK                    )

## CERTIFICATE OF SERVICE

      JAMES M. KUHN, being first duly sworn on oath, deposes and says that he is employed in the Office of the United States Attorney for the Northern District of Illinois, that on the 23rd day of July, 2003, he caused a copy of:

UNITED STATES' FIRST SET OF
INTERROGATORIES AND REQUESTS TO
PRODUCE TO CLAIMANT NICHOLAS P. MARROCCO

UNITED STATES' FIRST SET OF
INTERROGATORIES AND REQUESTS TO
PRODUCE TO CLAIMANT VINCENT J. FALLON

to be placed in a Government envelope, postage prepaid, addressed to the following named individual(s), and deposited envelope(s) in the United States mail in Chicago, Illinois, on said date before the hour of 4:00 p.m.

      Richard M. Beuke
      Terry O'Donnell
      53 West Jackson, Suite 1410
      Chicago, Illinois 60604

      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

      Executed on July 23, 2003.

                                    JAMES M. KUHN, SR.
                                    Assistant United States Attorney

NORTHERN DISTRICT OF ILLINOIS      )
                                      )     SS

COUNTY OF COOK                      )

## CERTIFICATE OF SERVICE

JAMES M. KUHN, being first duly sworn on oath, deposes and says that he is employed in the Office of the United States Attorney for the Northern District of Illinois, that on the 11th day of May, 2004, he caused a copy of:

UNITED STATES' RESPONSE
TO CLAIMANT FALLON'S MOTION TO SUPPRESS

TESTIMONY OF DRUG ENFORCEMENT ADMINISTRATION
TASK FORCE AGENTS ERIC ROMANO AND STERLING TERRY

to be placed in a Government envelope, postage prepaid, addressed to the following named individual(s), and deposited envelope(s) in the United States mail in Chicago, Illinois, on said date before the hour of 4:00 p.m.

Stephen M. Komie
Komie and Associates
One North LaSalle Street, Suite 4200
Chicago, Illinois 60602

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 11, 2004.

JAMES M. KUHN, SR.
Assistant United States Attorney