UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

MAY 1 2 2004

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03 C 3644 |
| v. | ) | |
| | ) | Judge Bucklo |
| FUNDS IN THE AMOUNT OF ONE | ) | |
| HUNDRED THOUSAND AND ONE | ) | |
| HUNDRED TWENTY DOLLARS | ) | |
| ($100,120.00), | ) | |
| | ) | |
| Defendant. | ) | |

**FILED**

MAY 1 1 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## TESTIMONY OF DRUG ENFORCEMENT ADMINISTRATION
## TASK FORCE AGENTS ERIC ROMANO AND STERLING TERRY

The United States of America by Patrick J. Fitzgerald, United States Attorney for the

Northern District of Illinois files this transcript of the testimony Drug Enforcement Administration

Task Force Agents Eric Romano and Sterling Terry in support of its opposition to claimant Vincent

Fallon's Motion to Suppress.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:
JAMES M. KUHN, SR.
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-1877

Terry - direct by Komie

1   Q.   You can see Monroe from below?

2   A.   Correct.

3   Q.   You can see Madison, and you can see Washington as you look

4   out through the hole in the --

5   A.   Through the hole, correct.

6   Q.   -- through the holes that are built into the wall facing

7   the river, right?

8   A.   Correct.

9   Q.   And you told us earlier that you entered by the north door

10  to come in?

11  A.   That's correct.

12  Q.   So you had to walk south to get to room 7?

13  A.   Okay.

14  Q.   So in order to leave, you had to walk north initially --

15  A.   Okay.

16  Q.   -- to exit, is that correct?

17  A.   That's correct.

18  Q.   Now, is this door north of Madison Street in the City of

19  Chicago at the time you enter and exit the train?

20  A.   That's correct.

21  Q.   Now, do you then walk along the concrete platform with

22  Mr. Fallon?

23  A.   Correct.

24  Q.   Now, is he free to leave with his baggage?

25  A.   If Mr. Fallon chose to say, "I don't want to go any further

MICHAEL P. SNYDER, Official Reporter

Terry - direct by Komie

1  with you," yes, he is.

2  Q.  And would you give back the suitcase and the money?

3  A.  We'd have to.

4  Q.  But instead you continued to walk into the station?

5  A.  That's because we asked Mr. Fallon would he accompany us to

6  the station.

7  Q.  And this is after you had showed your badges?

8  A.  Correct.

9  Q.  And identified yourselves as police officers?

10 A.  Correct.

11 Q.  Now, this walk into the station goes from north of Madison

12 Street all the way back south of Adams because you can see

13 Adams when you're at the door to come into the station, can't

14 you?

15 A.  Correct.

16 Q.  And so you're a quarter block south of Adams at that

17 location, are you not?

18 A.  Like that.

19 Q.  Otherwise you couldn't see under the bridge?

20 A.  Correct.

21 Q.  So you go into the terminal by the north door, correct?

22 A.  Correct.

23 Q.  And you walk into the vestibule?

24 A.  Correct.

25 Q.  Through the glass doors that separate the vestibule from

Terry - direct by Komie

1   the departure gates?

2   A.   Correct.

3   Q.   You walk into the center core of the building and take a

4   right?

5   A.   Correct.

6   Q.   And you walk through the center of the station to where?

7   A.   The Amtrak police office.

8   Q.   Did you have to go through the Great Hall?

9   A.   No, sir.

10  Q.   Where did you make the turn to go to the Amtrak office?

11  A.   Once you come through the door itself to make the right

12  turn, you just walk straight ahead up a little ramp, and you're

13  looking right at the Amtrak police office.

14  Q.   Now, sir, the total distance from -- well, you've been a

15  police officer 15 years.   You know a block in Chicago is what

16  percentage of a mile, one-eighth?

17  A.   Correct.

18  Q.   And when you have two blocks, you have two-eighths, right?

19  A.   Correct.

20  Q.   Which is how much of a mile?

21  A.   A quarter.

22  Q.   And when you walk three blocks, you have three-eighths?

23  A.   Okay.

24  Q.   And when you walk through that station, as you know, the

25  station runs from the river on the east across to Canal?

Terry - direct by Komie

1   A.   Okay.

2   Q.   So the distance from where he was on the train to the

3   office is in excess of a quarter mile, is it not?

4   A.   Approximately about that.

5   Q.   And all this time, Mr. Romano is carrying the briefcase?

6   A.   I couldn't answer that, sir.  I can't remember him carrying

7   that.

8   Q.   Now, do you go into an Amtrak police office?

9   A.   Yes, sir.

10  Q.   Who goes in first?

11  A.   I opened the door, I go in first.  Mr. Fallon comes behind

12  me, and then Agent Romano comes in.

13  Q.   And the Amtrak ticket office has a door that's locked, is

14  that correct?

15  A.   The Amtrak ticket --

16  Q.   I'm sorry.  Withdraw the question.

17          The Amtrak police office has a locked door on it,

18  right?

19  A.   On the outside, yes, sir.

20  Q.   And the public can't just walk in and out of there, is that

21  right?

22  A.   That's correct.

23  Q.   Now, once one is behind that locked door, there is a desk?

24  A.   Correct.

25  Q.   And to the right is the passageway?

Terry - direct by Komie

1  A.  Correct.

2  Q.  And the passageway leads to chambers or rooms?

3  A.  That's correct.

4  Q.  And Mr. Fallon was taken to which room?

5  A.  As soon as you come through the door where the desk is at,

6  there are two chairs.  He was asked to have a seat right there.

7  Q.  Now, at this point in time, does the briefcase continue on

8  down the hall?

9  A.  No, sir.

10  Q.  Where is the briefcase?

11  A.  It's placed up against the wall inside the office itself.

12  Q.  And who does -- who places it?

13  A.  I can't remember that, sir.  Like I say, I wasn't carrying

14  anything.

15  Q.  Now, is the purpose of you not to carry something so that

16  you can grab Mr. Fallon if he runs?

17  A.  No, sir.

18  Q.  What was the purpose of you not carrying anything?

19  A.  There wasn't that much to carry.  If Mr. Fallon would have

20  had five, six, seven pieces of luggage, he couldn't carry it

21  all by himself, we would have gave him a hand.

22  Q.  Now, at this location, what happens?

23  A.  Mr. Fallon is asked to have a seat.  At that time Agent

24  Romano and Mr. Fallon, they go back and forth in a

25  conversation.

Terry - direct by Komie

1   Q.   Are you present?

2   A.   For some of the conversation, not all of the conversation.

3   Q.   Do you have a purpose in not participating in the

4   conversation?

5   A.   Normally when one of us is doing the interview, whoever

6   starts off that interview, that's the person that normally goes

7   all the way with it.

8   Q.   So it's the custom and practice to have Mr. Romano, since

9   he was the person who started at the train, finish it?

10  A.   Correct.

11  Q.   Now, what are you doing when you are not present at the

12  interview?

13  A.   I'm making xerox copies, there's a Chicago police report

14  number that I have to get, and the paper work that's generated

15  for DEA.  There is also paperwork that has to be done for

16  Chicago that I do.

17  Q.   Now, the purpose of getting off the train and going to the

18  office is to investigate the money, is that correct?

19  A.   Correct.

20  Q.   And the purpose of investigating the money is accomplished

21  by bringing it to the office for a dog sniff, is that right?

22  A.   Through conversation, that's determined later, yes, sir.

23  Q.   Now, sir, when you arrived at that office, you had access

24  to the file cabinet?

25  A.   Yes, sir.

Terry - direct by Komie

1  Q.  Did you ever pull out a consent to search form and hand it

2  to Mr. Fallon and ask for his signature?

3  A.  No, sir.

4  Q.  Now, did anyone tell Mr. Fallon his train was leaving and

5  he was free to go?

6  A.  No, sir, not at that moment.

7  Q.  The procedure that you engaged in, were you copying

8  documents?

9  A.  Yes, sir.

10  Q.  What documents were you copying?

11  A.  Train ticket, state ID.

12  Q.  So this is what, 2:10?

13  A.  Somewhere around there, yes, sir.

14  Q.  And you get back to the office what, about 2:05 or so,

15  2:10, somewhere in there?

16  A.  We got to the office before 2:10.  So we are around 2, I'd

17  say somewhere approximately around 2 o'clock.

18  Q.  Now, around 2 o'clock, it could be five or ten minutes

19  either way, right?

20  A.  Well, Mr. Fallon didn't get to the train station until

21  around 1:50 so I have to say 2, no more than five after 2.

22  Q.  And, of course, to walk a quarter mile, that takes time,

23  right?

24  A.  Yes, sir.

25  Q.  And that takes what, five, ten minutes?

Terry - direct by Komie

1   A.   Oh, no, sir.

2   Q.   How fast do you walk a quarter mile?

3   A.   From where we were coming, about three -- I mean, I

4   understand the question that you are asking me, but it doesn't

5   seem like it took us no five minutes to walk from the car back

6   to the office itself.

7   Q.   Now, we are in the office.  Does Mr. Romano ever give a

8   consent to search form to the claimant and ask him to sign it?

9   A.   No, sir, not to my knowledge.

10   Q.   And those are just steps away in a file cabinet?

11   A.   I would believe they are, yes, sir.

12   Q.   Now, did you call for the dog?

13   A.   Yes, sir.

14   Q.   What time did you call for the dog?

15   A.   It had to be after 2, 2:10, 2:15, somewhere in there.

16   Q.   And was the money free to go at that point?

17   A.   Yes, sir.

18   Q.   Was Mr. Fallon holding the money at the point you called

19   for the dog?

20   A.   Was he holding the money?

21   Q.   Yes.

22   A.   No, sir.

23   Q.   Had you placed it on the floor or somebody placed it on the

24   floor in that office?

25   A.   That's correct.

Terry - direct by Komie

1  Q.  Had that office been cleaned just before the briefcase was
2  put on the floor?
3  A.  That I don't know.  I didn't see anyone cleaning it, but
4  they normally come in several times a day to clean.
5  Q.  Now, how long before the dog arrives?
6  A.  Sir, to be honest, I couldn't tell you that.
7  Q.  Does the dog arrive sometime after 2:30?
8  A.  He should have got there before 2:30.  If he -- if I made
9  the call somewhere around 2:10 or so, he should have been there
10  before 2:30.  I believe it was before 2:30.
11  Q.  Of course, that depends where he's coming from?
12  A.  That's correct.
13  Q.  So if he was coming from the far south side, it could take
14  longer?
15  A.  It's possible, yes, sir.
16  Q.  Now, he gets there, and the dog is brought in?
17  A.  No, sir.  He always comes in first.
18  Q.  And did you have a conversation with him?
19  A.  No, sir.
20  Q.  Did you talk to him at all during the first time he comes
21  to the office?
22  A.  Well, I don't, I don't recall any conversation with him,
23  no, sir.
24  Q.  Then what happens?
25  A.  Once the dog guy arrives?  Agent Romano points out what we

MICHAEL P. SNYDER, Official Reporter

Terry - direct by Komie

1  got, he shows him the bag, where it's sitting.  The dog guy

2  asks Agent Romano to take the bag towards the back, hide it

3  wherever he likes while he go back and gets his dog.

4  Q.  So is it fair to say Mr. Romano has control of the bag?

5  A.  From that point, yes, sir.

6  Q.  And he takes the bag to another room?

7  A.  That's correct.

8  Q.  Did anyone ask Mr. Fallon for permission to do this?

9  A.  No, sir.

10  Q.  At this point in time, had you observed any criminal

11  activity of any kind?

12  A.  No, sir.

13  Q.  In any way, were you afraid for your personal safety?

14  A.  No, sir.

15  Q.  Was the Amtrak police office a public place or closed to

16  the public?

17  A.  Repeat that again.

18  Q.  Is the Amtrak police office not a public place but closed

19  to the public; only people who are authorized to be there could

20  be in there?

21  A.  Correct.

22  Q.  Did you hide the bag?

23  A.  No, sir.

24  Q.  Did anyone else hide the bag?

25  A.  Agent Romano.

Terry - direct by Komie

1  Q.  On how many previous occasions had that been done with

2  Officer King?

3  A.  Two.

4  Q.  On each one of those occasions, did the dog have an

5  affinity for the bag?

6  A.  Yes, sir.

7  Q.  Now, is it fair to say that while the bag was being placed

8  in that room, Mr. Fallon had no control over what was going on?

9  A.  No, sir.

10  Q.  Well, did he have the ability to walk in and take the bag

11  out?

12  A.  No, sir.

13  Q.  Now, when you recover narcotics in your investigation in

14  that station, do you hide the narcotics in that room and ask

15  the dog to fetch dope in that room?

16  A.  Once we see that it's narcotics, no, sir.

17  Q.  What's that?

18  A.  No, sir.

19  Q.  Have you ever asked a dog to search a suitcase in that

20  room?

21  A.  Yes, sir.

22  Q.  And prior to December 6th, have they discovered narcotics

23  in suitcases?

24  A.  Yes, sir.

25  Q.  And did that occur in that particular room where King or --

MICHAEL P. SNYDER, Official Reporter

Terry - direct by Komie

1  Mr. King was bringing his dog to search this money?

2  A.  Yes, sir.

3  Q.  Now, the bag is hidden.  Did you observe the search by the

4  dog?

5  A.  No, sir.

6  Q.  Did you learn about the search?

7  A.  Yes, sir.

8  Q.  And what time did you learn about the search?

9  A.  I couldn't give an approximate.  No later than 2:30.

10  Q.  Sometime after 2:30, is it fair to say?

11  A.  No, I would -- I think it was before 2:30.

12  Q.  So you learned about the results of the search before 2:30?

13  A.  Yes, sir, I believe it was.

14  Q.  When you say you believe, do you know?

15  A.  Well, sir, you asked me to remember back a couple years.  I

16  can't give you an exact.

17  Q.  Well, let me ask you this.  Do you have any memory of this

18  event other than your report?

19  A.  Yes, sir.

20  Q.  Okay.  Do you have a present memory, without a report, as

21  to what time the search took place of the bag?

22  A.  No, sir.

23  Q.  Do you have any present memory of who hid the bag?

24  A.  Yes, sir.

25  Q.  Do you have a present memory, without relying on a report

Terry - direct by Komie

1  in any way, as to what time the dog officer arrived?

2  A.  No, sir.

3  Q.  So this could have all occurred after 2:30?

4  A.  If you want to say that, sir, but like I say -- well, you

5  asked, that's my opinion.

6  Q.  That's an opinion you're testifying to, not a fact?

7  A.  On the time, on that particular time.

8  Q.  Now, was Mr. Fallon fingerprinted and photographed?

9  A.  Yes, he was.

10  Q.  And who fingerprinted him and photographed him?

11  A.  Agent Romano.

12  Q.  And when did that take place?

13  A.  After the dog alerted to the money itself.

14  Q.  And other than the dog alerting to the money, did you find

15  any narcotics?

16  A.  No, sir.

17  Q.  Did you discover any narcotics in the search of his person

18  that you conducted?

19  A.  No, sir.

20  Q.  And he was searched again in the office, was he not?

21  A.  No, sir.

22  Q.  Did you search him?

23  A.  No, sir.

24  Q.  Did Romano search him?

25  A.  No, sir, not to my knowledge.

Terry - direct by Komie

1   Q.   Not when you were present?

2   A.   Correct, sir.

3   Q.   Now, the money was not free to go, is that fair to say?

4   A.   After the dog alerted to it, no, sir.

5   Q.   And at that point, did you know of any narcotics

6   transaction?

7   A.   No, sir.

8   Q.   Did you know of any law being violated?

9   A.   No, sir.

10  Q.   Did you have any information of any purpose of travel that

11  was illegal?

12  A.   No, sir.

13  Q.   The photographs and fingerprints were taken and sent to the

14  Chicago Police Department?

15  A.   No, sir.

16  Q.   Where were they sent?

17  A.   They go to DEA.

18  Q.   And is this a electronic process or a manual process?

19  A.   Fingerprint taking?

20  Q.   Yes.

21  A.   It's manual.

22  Q.   So that's the old fashioned with the ink and rollers?

23  A.   That's correct.

24  Q.   And this takes place before the claimant, Mr. Fallon, is

25  free to leave, is that correct?

Terry - direct by Komie

1  A.  Repeat that again.  This takes place?

2  Q.  Before Mr. Fallon is allowed to leave this private Amtrak

3  office, he's fingerprinted?

4  A.  Correct.

5  Q.  And so he's held till he's fingerprinted, is he not?

6  A.  Correct.

7  Q.  And he's also photographed?

8  A.  Correct.

9  Q.  And this is although there is no information about any

10  criminal activity, is that correct?

11  A.  Correct.

12  Q.  Now, the currency in this case no longer exists, is that

13  correct?

14  A.  To my knowledge.

15  Q.  It's been -- even though it's been sniffed by the dog, has

16  been sent back into the Federal Reserve system --

17  A.  Okay.

18  Q.  -- and it hasn't been washed prior to going?  You didn't

19  take it home and put it in a washing machine and clean it, did

20  you?

21  A.  No, sir.

22  Q.  Did you send it to a commercial laundry?

23  A.  No, sir.

24  Q.  Did it go to a bank?

25         MR. MAY:  Objection, Judge.  It's beyond the scope of

Terry - direct by Komie

1   the --

2            MR. KOMIE:  Well, I am allowing the Court to have the

3   predicate for dealing with the pending motions that are on file

4   without having to call everyone back for a hearing.

5            MR. KUHN:  Judge, we are only prepared here today to

6   deal with the motion to suppress.  The fact that the money was

7   deposited subsequent to seizure is not addressed in the motion,

8   and we are not prepared to address that issue.  We would be

9   prejudiced if we had to today without the proper witnesses and

10  preparation.

11           THE COURT:  Well, how many more questions do you have

12  of him on this?

13           MR. KOMIE:  I've got a different one now.

14  BY MR. KOMIE:

15  Q.  Sir, you've been a police officer for 15 years?

16  A.  That's correct.

17  Q.  You are not a naive young man anymore?

18  A.  Well, thank you for the young part.

19  Q.  So, sir, you are aware the currency in the United States is

20  contaminated by drugs?

21           MR. MAY:  Objection, Judge, beyond the scope.

22           THE COURT:  Yes.

23           MR. KOMIE:  Well, it goes to the probable cause

24  question.

25           MR. MAY:  Judge, it's not part of the motion.  It's

Terry - direct by Komie

1  beyond the scope of the hearing.

2          THE COURT:  I agree.

3          MR. KOMIE:  I'm sorry?

4          THE COURT:  Go on.  Finish.

5          MR. KOMIE:  I'm sorry?

6          THE COURT:  No, it's not part of this.

7          MR. KOMIE:  Okay.

8  BY MR. KOMIE:

9  Q.  Now, the only basis that you have to hold the money is the

10 dog sniff, is that correct?

11 A.  That's correct.

12 Q.  No other basis that you are aware of?

13 A.  That's correct.

14 Q.  And that was the sole basis for seizing the money on that

15 day, in your mind, was the dog sniff?

16 A.  Well, other than the conflicting statements that Mr. Fallon

17 made along with the dog sniff, that's correct.

18 Q.  Now, sir, the program that you're a part of, does the

19 Chicago Police Department get a portion of the funds that are

20 seized?

21 A.  That's correct.

22 Q.  And what percentage of the portion do they get?

23          MR. MAY:  Objection, Judge, as to relevance here.

24 It's also beyond the scope of this hearing.

25          MR. KOMIE:  This would be classic bias prejudice.

MICHAEL P. SNYDER, Official Reporter

Terry - direct by Komie

1       THE COURT:  I agree.  He can answer that.
2  BY THE WITNESS:
3  A.  To be honest with you, sir, I do not know.  There are
4  several agencies that are involved with the program, and at
5  what percentage, to be honest with you, I don't know.
6  BY MR. KOMIE:
7  Q.  Would it be surprising to learn 80 percent?
8  A.  80 percent of the proceeds go to Chicago?
9  Q.  Yes.
10  A.  Yeah, it would be.
11  Q.  Now, sir, did you observe this currency?
12  A.  Yes, sir.
13  Q.  And the only way to get at the currency was to enter the
14  briefcase?
15  A.  That's correct.
16  Q.  Now, is it fair to say that after 2:30 in the afternoon,
17  there are still judges on duty in Chicago on a Friday?
18  A.  Yes, sir.
19  Q.  Did anyone go to get a warrant to open the briefcase?
20  A.  No, sir.
21  Q.  With the briefcase immobilized and not able to go, could
22  you have held the briefcase until a warrant was obtained?
23  A.  If need be.
24  Q.  And the process of obtaining a warrant would take what,
25  three or four hours?

Terry - direct by Komie

1  A.  Possibly, yes, sir.

2  Q.  And was the briefcase opened with a knife?

3  A.  Yes, sir, I believe it was.

4  Q.  And when the briefcase was opened with a knife, did you

5  have an opportunity to observe the contents?

6  A.  Yes, sir.

7  Q.  And the person who opened it with a knife, was it you or

8  Romano?

9  A.  Agent Romano.

10  Q.  And the purpose of both of you being together is to make

11  sure there is no shrinkage in the money, the money doesn't

12  reduce in quantity, so you're both there so you can see what's

13  going on, is that the purpose?

14  A.  Yes, sir.

15  Q.  And at that time, does there appear to be currency in the

16  briefcase?

17  A.  Yes, sir.

18  Q.  Were there any drugs in the briefcase?

19  A.  I didn't see none, sir.

20  Q.  Did you search the briefcase?

21  A.  Later, yes, sir, it was searched.

22  Q.  Was any contraband found in the briefcase?

23  A.  No, sir.

24  Q.  And that includes the money?  The money wasn't contraband

25  either, was it?

Terry - direct by Komie

1   A.  Not at the time when we first observed it, no, sir.

2   Q.  So you enter into the briefcase, and you discover bundles

3   of currency?

4   A.  That's correct.

5   Q.  And there in the classic American style with a rubber band?

6   A.  Yes, sir.

7   Q.  And the rubber band holds some quantity of U.S. currency?

8   A.  That's correct.

9   Q.  And there are multiple bills?

10  A.  Correct.

11  Q.  And there are 19 rubber band bundles, is that correct?

12  A.  It was determined, yes, sir.

13  Q.  Did you ask for Mr. King to have Deny examine any one of

14  the 19 bundles?

15  A.  No, sir.

16  Q.  Did you ask Mr. King for Deny to examine any one of the

17  individual bills?

18  A.  No, sir.

19  Q.  To your knowledge, did Deny perform any investigation in

20  connection with the bills?

21  A.  Yes, sir.

22  Q.  What did he do?

23  A.  Well, to my knowledge, the bills were taken to the, another

24  room where Mr. King and Deny entered into that room.  Agent

25  Romano was back there.  When he came out, Agent Romano gave me,

Terry - direct by Komie

1  he told me Deny had alerted to the money also.

2  Q.  Had alerted to the briefcase.  Was the briefcase opened or

3  closed at that point?

4  A.  I'm sorry, I have no idea because it was taken to the back.

5  Q.  When you were present when it was popped open with the

6  knife, was that before or after the search by the dog?

7  A.  That was before.

8  Q.  So the briefcase was popped open with a knife in the Amtrak

9  police office outside Mr. Fallon's presence?

10  A.  No, sir.

11  Q.  Where did it get popped open?

12  A.  Right there by the desk.

13  Q.  So it was open, and is that the portion at the front of the

14  Amtrak office?

15  A.  Correct.

16  Q.  And it was then closed again?

17  A.  It was how it looks right now, just sat back on the floor

18  up against the wall.

19  Q.  Okay.

20         MR. KOMIE:  So if I may approach the witness?

21         THE COURT:  Yes.

22  BY MR. KOMIE:

23  Q.  Government's 7.  We all agree that's the same briefcase?

24  A.  Yes, sir.

25  Q.  That case was closed and locked?

Terry - direct by Komie

1   A.   Yes, sir.

2   Q.   And the lock on this case is a push down lock?

3   A.   Yes, sir.

4   Q.   And in order to get into that particular briefcase without

5   cutting it off, the lock altogether with a knife, one has to

6   insert a knife between the lock and the bar, which is the other

7   part of the lock, is that correct?

8   A.   I would assume so, sir, place something inside the keyhole

9   there.

10  Q.   Okay.  Now, the knife or key or whatever was used to get

11  into this case didn't belong to Mr. Fallon, did it?

12  A.   No, sir.

13  Q.   It wasn't furnished by Mr. Fallon?

14  A.   No, sir.

15  Q.   At the time the case was popped open, did you have a search

16  warrant?

17  A.   No, sir.

18  Q.   So let me understand the sequence of events.  The case is

19  searched first.  Deny is summoned after the case is searched,

20  is that correct?

21  A.   That's correct.

22  Q.   So first in time comes an opening of the briefcase with a

23  knife, the case is searched, Deny is called for?

24  A.   That's correct.

25  Q.   After Deny is called for, everyone sits around and waits

Terry - direct by Komie

1   for Deny?

2   A.  Well, during that time, Agent Romano was getting personal

3   information from Mr. Fallon, name, address.  There is a form

4   called a 202 that has personal history on it.

5   Q.  And what about photographs and fingerprints?  Has that

6   taken place?

7   A.  No, not yet.

8   Q.  Now, is it fair to say after this briefcase is popped open

9   that the money is not leaving?

10  A.  At that time, if Mr. Fallon had requested at that time that

11  he wanted to stop this procedure, he don't want to do anything

12  with this, we are not having any indication that this is, from

13  a dog alert, we have no reason to detain or hold Mr. Fallon.

14  Q.  Now, at this point, is Mr. Fallon given the briefcase and

15  told he can leave if he wants?

16  A.  No, sir.

17  Q.  Who has possession of the briefcase from the time it's

18  popped open until the time Deny gets there?

19  A.  It sits right up against the wall.

20  Q.  So it's some distance from him?

21  A.  No more than a foot or two.

22  Q.  Now, the dog then comes and does the alerting?

23  A.  That's correct.

24  Q.  And then the briefcase is opened again?

25  A.  I'm not -- when you say the briefcase is opened again.

Terry - direct by Komie

1  Q.  Well, you told us in the sequence of things that the

2  briefcase is opened and 19 bundles are counted.  Are the 19

3  bundles counted the first time?

4  A.  Oh, no, sir.  At that time it's opened, it's observed, we

5  don't know how many bundles are in it at that time.

6  Q.  And are the bundles then placed on the table?

7  A.  Not at the time, no, sir.

8  Q.  So that occurs after the dog sniff?

9  A.  That's correct.

10  Q.  And they are placed on a table?

11  A.  On the desk, yes, sir.

12  Q.  And they are counted?

13  A.  Yes, sir.

14  Q.  And then after the dog sniff is when the photographs and

15  fingerprints take place?

16  A.  Yes, sir.

17  Q.  What time do you release Mr. Fallon?

18  A.  I could not answer what time Mr. Fallon left out of there,

19  give you an exact time.

20  Q.  Were you still on duty at 4:30?

21  A.  Yes, sir.

22  Q.  Were you still at that location?

23  A.  At 4:30?  Yes, sir, I believe I was.

24  Q.  Was Mr. Fallon there?

25  A.  I don't know if he was in the -- he wasn't in the office at

Terry - direct by Komie

1   4:30.

2   Q.  Was he sitting in the area that, the front of the office?

3   A.  No, sir.

4   Q.  Had he been photographed and fingerprinted by 4:30?

5   A.  Yes, sir.

6   Q.  Do you have access to his photographs and fingerprint

7   cards?

8   A.  Do I have access to it?

9   Q.  Yes.

10  A.  No, sir.

11  Q.  Do they reflect a time that he was photographed and

12  fingerprinted?

13  A.  No, sir.

14  Q.  So they weren't written on the FBI card on the face of it?

15  A.  The time?  No, sir, not to my knowledge, no, sir.

16          MR. KOMIE:  Judge, it's 12 o'clock.  Can I move for

17  the customary luncheon recess?

18          THE COURT:  Well, I have a problem that it looks like

19  we are not going to be done.  I am going to have to leave.  I

20  have to -- I am going to have to cut this off at 2:30 this

21  afternoon.  I was hoping to finish it today.

22          MR. KOMIE:  I don't believe that's possible, Your

23  Honor.

24          THE COURT:  You don't think it's possible?

25          MR. KOMIE:  No.  I tried to warn you on Thursday that

Terry - direct by Komie

1   I suspected it could take up to three days.

2           THE COURT: Well, I don't think it will do that.  I

3   have a problem with the other two days.  I didn't realize that

4   I was -- I'm going to need to leave early for something this

5   afternoon.

6           Well, all right, but wait a minute.  Mike's got a

7   problem.

8       (Discussion off the record.)

9           THE COURT: All right.  Let's see if we can't do

10  that.  All right, he will try to get someone else so we can

11  resume at 1.  All right.

12          MR. KOMIE: Thank you.

13          THE COURT: All right.  Let's try to resume at 1.

14          MR. MAY: Judge, will you be ending at 2:30 today?

15          THE COURT: I do have to end at 2:30.

16          MR. MAY: And then what about --

17          THE COURT: We'll just resume tomorrow at 9:15 or

18  something.

19          MR. MAY: Thank you.

20          MR. KOMIE: Judge, can you instruct the officer not

21  to have lunch with the other officers and so forth while he's

22  in the middle of testimony?

23          THE COURT: Yes.

24          MR. KUHN: Not to have lunch or just not to talk

25  about the case?

Terry - direct by Komie

1        MR. KOMIE:  I like to keep them separate when they

2   are on the stand because we are only talking about a short

3   period of time.  It's not like it's a long period of time.

4   It's like one hour.

5        THE COURT:  I think it would be good if they lunch

6   separately.

7        MR. KUHN:  Okay, Judge.

8        THE COURT:  Thank you.

9     (Recess from 12:10 p.m. until 1:00 p.m..)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

104

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   UNITED STATES OF AMERICA,      )  Docket No. 03 C 3644
                                    )
 4                  Plaintiff,      )
                                    )
 5           v.                     )  Chicago, Illinois
                                    )  April 26, 2004
 6   FUNDS IN THE AMOUNT OF ONE     )  1:00 o'clock p.m.
     HUNDRED THOUSAND AND ONE       )
 7   HUNDRED AND TWENTY DOLLARS,    )
                                    )
 8                  Defendant.      )
                                   _____
 9   NICHOLAS P. MARROCCO and       )
     VINCENT J. FALLON,             )
10                                  )
                    Claimants.      )
11
            TRANSCRIPT OF PROCEEDINGS - EVIDENTIARY HEARING
12            BEFORE THE HONORABLE ELAINE E. BUCKLO

13   APPEARANCES:

14   For the Government:        HON. PATRICK J. FITZGERALD
                                United States Attorney, by
15                              MR. MR. JAMES MICHAEL KUHN
                                MR. DANIEL E. MAY
16                              Assistant United States Attorneys
                                219 South Dearborn Street
17                              Chicago, Illinois 60604

18   For the Defendant:         KOMIE & ASSOCIATES, by
                                MR. STEPHEN M. KOMIE
19                              One North LaSalle Street
                                Suite 4200
20                              Chicago, Illinois 60602

21

22                   ALEXANDRA ROTH, CSR, RPR
                      Official Court Reporter
23                   219 South Dearborn Street
                           Room 1744-A
24                   Chicago, Illinois 60604
                         (312) 294-0134
25
```

Terry - direct                                              105

1          (Proceedings had in open court:)

2               MR. KOMIE:  This is United States of America versus

3    $100,120 United States Currency.  I am Stephen, S-t-e-p-h-e-n,

4    last name Komie, K-o-m-i-e, on behalf of claimants.

5               MR. KUHN:  James Kuhn and Daniel May for the United

6    States.

7               THE COURT:  All right.  Go ahead.

8               STERLING TERRY, CLAIMANTS' WITNESS, DULY SWORN

9                    DIRECT EXAMINATION (Resumed)

10   BY MR. KOMIE:

11   Q.  Good afternoon, Mr. Terry.

12               You recall you are the same Officer Terry who

13   testified this morning.  You are still under oath?

14   A.  Yes, sir.

15   Q.  Officer Terry, Suppression Exhibit No. 5 PNR, do you know

16   where the original PNR is today, the one that was seen by you

17   at 12:00 o'clock in the afternoon on the 6th of December?

18   A.  No, sir.

19   Q.  Has that been lost or mislaid?

20   A.  I have no knowledge.  Normally I -- what we do when we have

21   a PNR like that, when we do our paperwork for DEA, our

22   paperwork is submitted with that.  So Agent Romano, it's his

23   file.  But I wouldn't know if he sent that file or not.

24   Q.  In preparing for your testimony today, at any time did you

25   see a copy of the original PNR that you saw that day?

Terry - direct

1   A.  That's correct.

2   Q.  Did you ever see one, the original one?

3   A.  The original one?  Yes, sir.

4   Q.  Is that the Exhibit No. 5?

5   A.  Yes, sir.

6   Q.  One that was run at 3:45 -- 3:35 in the afternoon?

7   A.  Yeah, that's not the original but that's the one -- that's

8   the one that I have seen today.  The original, that's the one I

9   don't know where it's at.

10  Q.  The original one is lost or mislaid at this point, as far

11  as you know?

12  A.  That's correct.

13  Q.  Now, is it fair to say you don't work weekends back in

14  December of 2002?

15  A.  Not unless we're called.

16  Q.  So you came to work at 8:00 o'clock.  You would have been

17  going off duty at 4:00?

18  A.  8:30 getting off at 5:00.

19  Q.  Getting off at 5:00.

20          And because of the time that this took place, did you

21  prepare the paperwork?

22  A.  That's correct.

23  Q.  And did you on December 6, 2002, prepare the paperwork in

24  this case?

25  A.  For Chicago, that's correct.

Terry - direct

1   Q.  And that was closer to the time of the event than the DEA

2   report that was prepared on the 9th of December, is that

3   correct?

4   A.  That's correct.

5   Q.  Now on that date did you indicate that the time and date of

6   the occurrence here was December 2 -- December 6 of 2002, at

7   1400, or 2:00 o'clock on what would be a normal watch in our

8   country?

9   A.  That's correct.

10  Q.  And so this occurred at 2:00 in the afternoon, is that

11  right?

12  A.  That's correct.

13  Q.  Now, did you also on this report indicate the exact time

14  that you summoned the canine unit?

15  A.  No, sir.

16  Q.  Well, if I may show you what I am going to mark as the

17  Claimant's Exhibit No. 2 for identification.  This is the

18  Chicago Police Department case report, sir?

19  A.  That's correct.

20  Q.  And you have been preparing these for 15 years?

21  A.  That's correct.

22  Q.  And you've been trained that to tell the whole truth and

23  nothing but the truth when you write one of these?

24  A.  That's correct.

25  Q.  So to the best of your knowledge, this document is

1  accurate, is that right?

2  A.  That's correct.

3  Q.  Now, on this document does it indicate notifications?

4  A.  Yes, it does.

5  Q.  Does it indicate a notification to the canine officer,

6  Mr. King?

7  A.  No, sir.  What this indicated is that I called for a report

8  number.

9  Q.  Okay.  Well, sir, turning your attention down to the third

10  line from the bottom, on notifications.  Does it indicate next

11  to the box that indicates the canine unit notification

12  occurring there?

13  A.  Where do you see canine at?

14  Q.  Your name, sir?

15  A.  Yes, sir.

16  Q.  McKinney?

17  A.  Yes, sir.

18  Q.  And the time this takes place is 1415 in the afternoon.

19  That would be 2:15, is that right?

20  A.  That's correct.

21  Q.  Would that be the time that you called the canine unit?

22  A.  No, sir.

23  Q.  Now, to your knowledge, did the train leave at 2:10?

24  A.  To my knowledge, yes, sir.

25  Q.  Now, sir, if you had cared to continue your investigation

1    on the train, that train would have stopped in Aurora, would it

2    not?

3    A.   I believe it would have, sir.

4    Q.   And you could have then deadheaded back?

5    A.   No, sir.  We never travel the trains.

6    Q.   So that's one of the reasons why you left the train, that

7    you didn't intend to go to Aurora?

8    A.   I had no intention on travelling whatsoever.

9    Q.   Now, did you ever make copies for your own file of any of

10   these documents?

11   A.   No, sir.

12   Q.   Have you had an opportunity at any time to examine the

13   fingerprint card or the photographs to decide -- determine what

14   time of day they were taken?

15   A.   No, sir.

16   Q.   So is it fair to say that the meeting with Claimant Fallon

17   takes place within ten minutes of the departure of the train?

18   A.   Is it fair to say that the meeting did -- when it first

19   started off?

20   Q.   Yes, sir.

21   A.   No, we started somewhere I would say approximately 1:53 so

22   like that.  The train will leave at 2:10.  I -- when we first

23   initiated, Mr. Fallon was on the train itself.

24   Q.   On that day, sir, you wrote a report which you acknowledge

25   is Exhibit No. 2, bears your signature, right?

1   A.   That's correct.

2   Q.   And in that report, did you not write that you arrived at

3   that location at 13:55?

4   A.   If that's what's on the report, yes, sir.

5   Q.   Sir, I am not trying to trick you.  I am just reading from

6   the report.  May I show you Exhibit 2?

7   A.   That is correct.

8   Q.   Okay.  So that was the time you arrived out at the sleeping

9   car, is that right?

10  A.   Somewhere approximately that time, yes, sir.

11  Q.   You wait around five minutes, and at that time you got the

12  signal from the porter, is that right?

13  A.   That's correct.

14  Q.   And at that time you boarded the train.  That's about

15  2:00 o'clock?

16  A.   Mr. Fallon got there about 1:50.  The porter immediately

17  notified -- he gave us a nod that was Mr. Fallon getting ready

18  to board the train at that time.  But we approached Mr. Fallon

19  before 2:00 o'clock.

20  Q.   Okay.  So just before 2:00.

21  A.   Yes, sir.

22  Q.   And the train is leaving within 15 minutes?

23  A.   Correct.

24  Q.   So you had to conduct your business rather hurriedly.

25  Otherwise you were going to Aurora?

1   A.   No, we wouldn't never made it that far.   We have been on

2   the train before when we conducted interviews and we couldn't

3   finish.   So we just had to leave.

4   Q.   So on this occasion you conducted your business and took

5   him off the train before the train leaves.   And as you are

6   walking down the platform the train is leaving?

7   A.   No, it's not leaving just yet.   As we're walking down the

8   platform, the train is still stationed there.   We didn't take

9   him off.   We asked Mr. Fallon would he come with us.

10  Q.   Okay.   Without quibbling, was the train moving as you

11  walked down the platform?

12  A.   No, sir.

13  Q.   Did the train move as you were entering the station?

14  A.   No, sir.

15  Q.   Did the train move as you were walking into the office?

16  A.   I couldn't see the train from that position right there,

17  sir.

18  Q.   Now, sir, did you ever ask the Amtrak officials to hold the

19  train until you completed your investigation?

20  A.   No, sir.

21  Q.   So clearly when you took him off the train, you understood

22  that he wasn't going to make the ride, is that correct?

23  A.   That's correct.

24  Q.   And you also knew that there was not another train until

25  the next day?

Terry - direct                                        112

1   A.   That's correct.

2   Q.   And so there is no alternate transportation using that

3   ticket for 24 hours?

4   A.   That's correct.

5   Q.   Now, on that day you also prepared what's titled in the

6   police department a major incident notification, narcotic and

7   game investigation section report, is that right?

8   A.   That's correct.

9   Q.   And than report you indicated the date and time of the

10  occurrence also to be on December 6 at 1400, is that correct?

11  A.   That's correct.

12  Q.   So in two different reports you indicate that the

13  occurrence takes place at 2:00 o'clock?

14  A.   That's correct.

15  Q.   Now, sir, when you were at the police academy, weren't you

16  taught to put in that box or the form the minute and time that

17  you encountered the person you are questioning?

18  A.   That's correct.

19  Q.   And so would it be fair to say, taking you back to that day

20  and your frame of mind when you were writing this report, that

21  the initial conversation with Mr. Fallon started at

22  2:00 o'clock in the afternoon?

23  A.   According to that report that you have, yes, sir.

24  Q.   So actually we're now ten or 11 minutes before the train

25  will depart?

1  A.  That's correct.

2  Q.  Now, at any time when you asked Mr. Fallon to get off the

3  train -- by the way, at that moment you know the train is

4  leaving without him, right?

5  A.  That's correct.

6  Q.  And any time at that, did you ever offer to say, stay here

7  and we will pay for your airfare to get to Seattle while we

8  conduct our investigation?

9  A.  No, sir.

10  Q.  Did you offer him any other means of transportation to

11  Seattle when you took him off the train at that time?

12  A.  No, sir.

13  Q.  So is it a fair statement that the only thing that was

14  suspicious about Mr. Fallon's travel prior to meeting him and

15  confronting him in his compartment was the PNR?

16  A.  That's correct.

17  Q.  And once you arrived at his compartment you found nothing

18  suspicious?

19  A.  No, sir.

20  Q.  That's correct?

21  A.  That's correct.

22  Q.  And you had no criminal investigation reason to identify

23  him at the moment he was asked for identification, is that

24  correct?

25          MR. MAY:  Judge, I am going to object.  These

Terry - direct                                      114

1    questions were asked two hours ago.

2           THE COURT:  I agree.  This is repetitious.

3    BY MR. KOMIE:

4    Q.  Now, sir, in the time between when the report was written

5    on the 6th by you and the report you and Mr. Romano turned in

6    to the DEA took place on the 9th, that was a four-day period?

7    A.  That's correct.

8    Q.  And so did you work on Monday?

9    A.  Yes, sir.

10   Q.  And on that Monday did you take the money to the bank?

11   A.  Yes, sir, I believe we did.

12   Q.  Did you deposit it in the bank?

13   A.  Yes, sir.

14   Q.  And so the report that is dated the 9th is prepared after

15   the money has already been seized and deposited in the bank?

16   A.  That's correct.

17   Q.  Now, sir, if you wish to maintain evidence in its original

18   form, can you place it in a bag and place your initials on it

19   and have it stored in the vault?

20   A.  That's correct.

21   Q.  And did you have the money stored in a vault in this case?

22   A.  It was kept in the overnight vault at DEA headquarters,

23   that's correct.

24   Q.  And then was it retrieved and deposited?

25   A.  That's correct.

1   Q.   Now, did Mr. Fallon have a criminal record of narcotics

2   when he was at your office?

3        MR. MAY:   Judge, I'm going to object.   This was asked

4   previously.

5        MR. KOMIE:   No, that was asked before they got on the

6   train.   We are now talking about when he is back at the office.

7        THE COURT:   You mean the question, did he look to see

8   if he had?

9        MR. KOMIE:   Let me rephrase it so we polish that.

10  BY MR. KOMIE:

11  Q.   Sir, while you were at the office, you were doing

12  paperwork, right?

13  A.   That's correct.

14  Q.   Did you run Mr. Fallon on a computer?

15  A.   No, sir.

16  Q.   So no one checks his criminal record before he is

17  photographed and fingerprinted?

18  A.   I don't know if Agent Romano checked it or not.   I didn't

19  check it.

20  Q.   And so everything is done here by you without knowing

21  whether he has a criminal record?

22  A.   That's correct.

23  Q.   Prior to this date, did you have any information about

24  Mr. Fallon?

25  A.   No, sir.

1    Q.   Is the only information you had about Mr. Fallon the

2    information contained on the PNR?

3               MR. MAY:  Objection, Judge.  This was asked already.

4               THE COURT:  It was covered.

5               MR. KOMIE:   Okay.  May I have a moment, your Honor?

6         (Brief pause.)

7    BY MR. KOMIE:

8    Q.   Now, you said it was your job to do the copying that day?

9    A.   Yes, sir.

10   Q.   Directing your attention to Government Exhibit No. 6.   Is

11   this an Amtrak ticket?

12   A.   Yes, sir, it is.

13   Q.   And did you copy that ticket?

14   A.   Yes, sir.

15   Q.   And is that the same condition it was on the day that you

16   copied it?

17   A.   Yes, sir.

18   Q.   Now, that particular ticket was in your possession, was it

19   not, when you copied it?

20   A.   That's correct.

21   Q.   Did you also copy his identification card?

22   A.   That's correct.

23   Q.   And do you know where that copy is today?

24   A.   No, sir.

25   Q.   Showing you what's marked as Exhibit No. 7, did you see

1    anyone put Exhibit 7 in a brown bag before it was hidden in the

2    room for a search?

3    A.   Did I see anyone put this in another bag?

4    Q.   Like a brown grocery bag?

5    A.   No, sir.

6    Q.   Now, did you ever at any time see where this was hidden in

7    the room?

8    A.   No, sir.

9    Q.   With respect to No. 7, could you send this to the

10   laboratory for analysis if you wanted to?

11   A.   I believe you can, sir.

12   Q.   And did you do so in this case?

13   A.   No, sir.

14          MR. KOMIE:   Tender the witness, your Honor.

15                       CROSS-EXAMINATION

16   BY MR. MAY:

17   Q.   Mr. Terry, a few minutes ago you were asked by counsel

18   about Xeroxing the state identification card and the ticket, is

19   that correct?

20   A.   That's correct.

21   Q.   And you did that while you were in the Amtrak police

22   office, is that correct?

23   A.   Yes, sir.

24   Q.   Prior to that, you had -- you and Officer Romano had asked

25   Mr. Fallon to observe his ticket and his identification, is

Terry - cross

1   that correct?

2   A.   Yes, sir.

3   Q.   And that occurred on the train, is that right?

4   A.   Yes, sir.

5   Q.   After you and Agent Romano had observed the ticket and the

6   identification, what happened with them?

7   A.   They were returned to Mr. Fallon.

8   Q.   How did you get those later on while -- to Xerox them in

9   the police office?

10  A.   Once we got there, we asked Mr. Fallon could we see them

11  again.

12  Q.   And did he provide them to you?

13  A.   Yes, sir.

14  Q.   And that's the point where you Xeroxed them?

15  A.   Yes, sir.

16  Q.   From the time that you boarded the train, whether it was

17  3:55, 3:56, 3:57, 3:58 or 2:00 o'clock, until the time that he

18  was released, approximately how long of a time was that?

19  A.   It's in the morning, an hour and a half to two hours.

20  Q.   So somewhere between 3:30 and 4:00 o'clock, is that

21  correct?

22  A.   That's correct.

23  Q.   And during the time that you were in his presence or you

24  observed him, did you ever display your gun?

25  A.   No, sir.

1  Q.  Did you ever handcuff him?

2  A.  No, sir.

3  Q.  Was he ever handcuffed in your presence by anybody else?

4  A.  No, sir.

5  Q.  Did you ever observe Agent Romano draw his gun or display

6  his weapon?

7  A.  No, sir.

8  Q.  You indicated previously that you had a large sweater on.

9  A.  Yes, sir.

10 Q.  Was in any -- at any time do you remember your weapon being

11 displayed in any fashion, whether it was in its holster or not?

12 A.  No, sir.

13 Q.  Now, counsel asked you questions about this PNR.  And you

14 indicated that you had received information from Agent Romano

15 about a PNR related to Mr. Fallon, is that correct?

16 A.  That's correct.

17 Q.  And the things that struck your interest on this PNR was

18 the fact that cash had been paid.  It had been paid within 48

19 hours, and it was a one-way ticket to Seattle, is that correct?

20 A.  That's correct.

21 Q.  And is it a matter of course as part of your duties to

22 conduct field investigations or questioning of individuals with

23 similar travel itineraries?

24 A.  Yes, sir.

25 Q.  And you do that on a regular basis as part of this

1   transportation interdiction unit, is that correct?

2   A.   That's correct.

3   Q.   And you in fact went to the -- this Amtrak train, which is

4   a Superliner car?

5   A.   That's correct.

6   Q.   And you approached that somewhere in the vicinity of about

7   1:50 in the afternoon and had a conversation with the porter or

8   the train person, is that correct?

9   A.   That's correct.

10  Q.   And at some point you and Officer Romano then entered onto

11  the train and went up to the second story and walked down the

12  corridor to berth or room No. 7?

13  A.   That's correct.

14  Q.   Did you or Agent Romano at any time step into that

15  compartment No. 7?

16  A.   No, sir.

17  Q.   I believe on your testimony, the only time that one of you

18  had in fact physically had done something was Agent Romano had

19  put his hands or his arm into the compartment to lift off that

20  brown briefcase, is that correct?

21  A.   That's correct.

22  Q.   And that was after Mr. Fallon had given you and Officer

23  Romano permission to search that particular case, is that

24  correct?

25  A.   That's correct.

Terry - cross                                        121

1    Q.   And prior to that, Mr. Fallon had given you and Agent

2    Romano permission to search the knapsack or the backpack that

3    he also had in his possession, is that correct?

4    A.   That's correct.

5    Q.   And when that was searched, how did that get into your

6    possession?

7    A.   It was passed -- Mr. Fallon passed it to Agent Romano, and

8    Agent Romano passed it to me.

9    Q.   And in terms of conversations that Officer Romano had with

10   Mr. Fallon, when Agent Romano had those conversations, Agent

11   Romano was outside the berth, is that correct?

12   A.   That's correct.

13   Q.   And when you first approached the berth or room No. 7, what

14   was the condition of the door?

15   A.   It was open.

16   Q.   Was there anything -- did you or Officer Romano have to do

17   anything to open the door to see inside?

18   A.   No, sir.

19   Q.   You testified that you were by the part of the door or by

20   the part of the wall where there was a curtain, is that

21   correct?

22   A.   That's correct.

23   Q.   But you could see into some part of the compartment, is

24   that correct?

25   A.   That's correct.

1   Q.  And when you looked into the compartment, you could observe

2   that brown briefcase laying on the -- the one seat opposite

3   Mr. Fallon, is that correct?

4   A.  That's correct.

5   Q.  Now, when you and Officer -- or Agent Romano got to that --

6   to the berth, how did you identify yourselves?

7   A.  With photo identification and badges.

8   Q.  And did Officer -- or Agent Romano tell Mr. Fallon what his

9   purpose was there at that time?

10  A.  Yes, sir.

11  Q.  And did Agent Romano indicate to him that he was not in

12  custody, he was not under arrest, and he could talk to you and

13  Agent Romano if he so chose?

14  A.  That's correct.

15  Q.  And what did Mr. Fallon say to Agent Romano and you at that

16  time?

17  A.  Said, yes, sure.

18  Q.  Did Agent Romano then explain what the purpose of the -- of

19  your inquiries or your questions would be?

20  A.  Yes, sir.

21  Q.  And what did Agent Romano say to Mr. Fallon at that time?

22  A.  Explained to him that we are working the train stations.

23  We are there every day.  We normally interview people, you

24  know, looking for any kind of weapon, narcotics or large

25  amounts of currency.

1  Q.  And what did Mr. Fallon say to that when Mr. -- Agent

2  Romano said that?

3  A.  He said he understood.

4  Q.  Did Agent Romano then ask him if he had any of those items?

5  A.  Yes, sir.

6  Q.  And what did the -- what did Mr. Fallon say at that time?

7  A.  He said, no, he didn't.

8  Q.  Did Agent Romano then ask him about any of the bags that he

9  had in his possession?

10 A.  Yes, sir.

11 Q.  And what did he ask him, if you can recall?

12 A.  He asked him, did anybody give him anything to carry in his

13 travels?  Do we have any contents in the bag that he don't know

14 anything about.

15 Q.  And what did Mr. Fallon say to that?

16 A.  He said no, no one gave him anything to carry.

17 Q.  Did Agent Romano then ask him for permission to search

18 those bags?

19 A.  Yes, sir.

20 Q.  What specifically did Mr. Fallon say at that time?

21 A.  He said yes.

22 Q.  And that was -- at that point then you've already testified

23 as to how both of those -- the first -- the backpack was

24 searched, is that correct?

25 A.  That's correct.

Terry - cross

1  Q.  And then Agent Romano -- did Agent Romano then ask him if

2  that -- this brown attache bag belonged to Mr. Fallon?

3  A.  Yes, sir.

4  Q.  And did Mr. Fallon say, yes, it was his?

5  A.  Yes, he did.

6  Q.  What did Mr. Fallon say, if anything, about a key to this?

7  A.  He said he did not have the key for it.

8  Q.  Did Mr. -- or Agent Romano then ask him what, if anything,

9  again was contained in that briefcase?

10  A.  Yes, he did.

11  Q.  What did Mr. Fallon say?

12  A.  He said money.

13  Q.  Did he say how much money was contained in this?

14  A.  He said about 50,000.

15  Q.  Did Agent Romano then ask Mr. Fallon where this money had

16  come from or whose money was it?

17  A.  He did, but he said he didn't have to answer that.

18  Q.  Did Mr. -- or did Agent -- excuse me.

19        Did Mr. Fallon say anything else at that point or

20  prior to that about why he was going to Seattle?

21  A.  He initially said he was going out there to see a friend of

22  his, a young lady.

23  Q.  And did he indicate how long he was going to be out there?

24  A.  He said about a week.

25  Q.  At this time when he finally said something about there

1   being about $50,000 in here, did Mr. Fallon make any other

2   comments at that time about why he was going out to Seattle?

3   A.  He said he was going to buy a house.

4   Q.  Did Mr. -- or did Agent Romano then ask Mr. Fallon how the

5   bag could be opened if Mr. Fallon had no key?

6   A.  Yes, he did.

7   Q.  And what did Mr. Fallon say at that time?

8   A.  He said you use a sharp object, knife, scissors, anything

9   of that nature.

10  Q.  Was this around the time that Agent Romano then suggested

11  or asked if Mr. Fallon would go back to the Amtrak police

12  station, or police office, for further talking?

13  A.  Yes, sir.

14  Q.  At any time up until that point had you or Officer -- or

15  Agent Romano displayed any weapons?

16  A.  No, sir.

17  Q.  And when Mr. Fallon -- did Mr. Fallon up to that point

18  indicate anything about not wanting to come to the station?

19  A.  No, sir.

20  Q.  Did -- at any time up until that time, did Mr. Fallon

21  indicate that he did not want somebody looking into that

22  briefcase?

23  A.  No, sir.

24  Q.  In fact, everything up to that point was, yes, go ahead and

25  look into it, but you may need some kind of sharp object to

Terry - cross

1  open it?

2  A.  That is correct.

3  Q.  Would that be a fair characterization of his comments up to

4  that point?

5  A.  Yes, sir.

6  Q.  You indicated that it may be a quarter of a mile from where

7  you got off the train to the Amtrak police station, is that

8  correct, or the Amtrak office?

9  A.  At the most, yes, sir.

10  Q.  And when you arrived in the office, was Mr. Fallon placed

11  in a particular seat?  Was he handcuffed?

12  A.  No, sir, he was not handcuffed.  I was asked to have a seat

13  right by the door, as a matter of fact.

14  Q.  Did he make any statements at that time that you can recall

15  about the briefcase again?

16  A.  He again indicated it could be opened with any kind of

17  object.  You know, we can go ahead and open it.

18  Q.  And was Agent Romano able to open it?

19  A.  Yes, sir.

20  Q.  And how was he able to open it, if you can recall?

21  A.  He used a knife.

22  Q.  And did Agent Romano and yourself look into the bag at that

23  time?

24  A.  That's correct.

25  Q.  And what if anything did you observe inside the bag?

1  A.  Bundles of currency wrapped around with rubber band.

2  Q.  Did Agent Romano then ask Mr. Fallon again how much money

3  was in the bag?

4  A.  Yes, sir.

5  Q.  And what did Mr. Fallon say at this time?

6  A.  He said about 50,000 again.

7  Q.  Did Officer -- or did Agent Fallon tell Mr. -- did Agent

8  Romano, excuse me, tell Mr. Fallon at that time, looks like

9  there was more than $50,000 in there?

10  A.  Yes, sir.

11  Q.  What did Mr. Fallon say in response, if anything?

12  A.  He said he didn't have to tell us anything about the money.

13  Q.  At this time were -- during this period of time I think you

14  indicated that you were doing some Xeroxing?

15  A.  Yes, sir.

16  Q.  And you had called for a canine dog, is that correct?

17  A.  That's correct.

18  Q.  Do you recall any other statements by Mr. Fallon before the

19  dog arrived as to why Mr. Fallon was going out to Seattle?

20  A.  He later indicated that he was going to purchase some --

21  some art, glass art, antique glass.  That was the purpose for

22  going.

23  Q.  So now he had told you that he was going out there to visit

24  a girlfriend.  He told you he was going out there to buy a

25  house.  And on the third occasion while he was in the office he

1  told you he was going out to buy some glass work or glass art,

2  is that correct?

3  A.  That's correct.

4  Q.  And initially he had told you that there was -- he had no

5  money with him, or he had no large amounts of money, is that

6  correct?

7  A.  That's correct.

8  Q.  Later on he told you he had $50,000 in the locked attache

9  case, is that correct?

10  A.  Yes, sir.

11  Q.  He also told you he didn't have a lock for that attache

12  case though it belonged to him?

13  A.  A key.  Yes, he said he didn't have a key for it.

14  Q.  And at that point you were awaiting for the canine unit to

15  come, is that correct?

16  A.  That's correct.

17  Q.  And I believe in your testimony you indicated that the

18  canine unit came around sometime around 2:30?

19  A.  Somewhere in that area, yes, sir.

20  Q.  Sometimes after this -- the dog -- as you had been told,

21  the dog made a positive hit on the briefcase, is that correct?

22  A.  That's correct.

23  Q.  And it was sometime after that that the contents of the bag

24  were removed?

25  A.  That's correct.

1  Q.  And it was determined that there were 19 bundles of

2  currency at that time?

3  A.  Yes, sir.

4  Q.  You didn't unwrap the money to count it at all, did you?

5  A.  No, sir.

6  Q.  And that was to take place later on when it's taken to a

7  Federal Reserve Bank, where it's officially accounted to get an

8  official accounting of the money, is that correct?

9  A.  That's correct.

10        MR. MAY:  If I can have one minute, Judge?

11        (Brief pause.)

12        MR. MAY:  Judge, I have no further questions.

13        THE COURT:  Any more?  Okay.

14                    REDIRECT EXAMINATION

15  BY MR. KOMIE:

16  Q.  Sir, did Mr. Fallon tell you that he was a cash-paid

17  employee?

18  A.  Yes, sir.

19  Q.  Did he tell you that he worked jobs as a waiter and

20  bartender?

21  A.  Yes, sir.

22  Q.  Did he tell you that he was always paid in cash for those

23  functions?

24  A.  Yes, he did.

25  Q.  And that was all told to you on that day, is that right?

1   A.  That's correct.

2   Q.  That's before the dog arrives but after the money has been

3   examined by opening the case?

4   A.  That's correct.

5   Q.  Now, at any time during this conversation, were narcotics

6   mentioned?

7   A.  No, sir.

8   Q.  Was there any discussion about going to purchase narcotics?

9   A.  No, sir.

10  Q.  Any discussion about coming from selling?

11  A.  No, sir.

12  Q.  Now, sir, you would agree, would you not, that one can buy

13  a house and purchase antique glass at the same time?

14  A.  Yes, sir.

15  Q.  In fact, Seattle was known for that, was it not?

16  A.  I don't know if it's known for it, but I wouldn't be

17  surprised.

18  Q.  Now, at any time prior to the canine arriving, did you

19  attempt to allow him to go back and get on the train?

20  A.  By then the train had left.

21  Q.  Train had left.

22          So you were present for additional questioning beyond

23  what you told us in your direct examination?

24  A.  Yes, sir.

25  Q.  And that additional questioning was asking him questions

1  about where he got the money, is that right?

2  A.  That's correct.

3  Q.  And he answered those questions, is that right?

4  A.  He answered in the statement that he didn't have to tell us

5  anything about the money.

6  Q.  That was on the train?

7  A.  That was inside the office also.  He made the statement

8  more than once.

9  Q.  Well, you did inquire about the money, did you not?

10  A.  That's correct.

11  Q.  And when you asked him where he got it, he told you he had

12  been a waiter?

13  A.  Yes, sir.

14  Q.  Told you he had been a bartender?

15  A.  Yes, sir.

16  Q.  Told you he worked in a pizza parlor?

17  A.  Yes, sir.

18  Q.  Told you he was always paid in cash?

19  A.  Yes, he did.

20  Q.  And that he saved his money, did he not?

21  A.  Yes, sir.

22  Q.  Did you conduct any investigation to determine whether or

23  not that was true prior to releasing him that day?

24  A.  I myself personally, no, sir.

25  Q.  Did you have any information on the other hand that it

1   wasn't true at the time you seized the money?

2   A.  No, sir.

3   Q.  Now, if I understand your testimony correctly, the only

4   entry into the compartment made by police officers on that day

5   was the arm of Agent Romano?

6   A.  Yes, sir.

7   Q.  You never set foot in it?

8   A.  No.  From how the seats are, you really don't have to set

9   foot in.  You can stand on the outside and --

10  Q.  That's not the question I am asking.

11  A.  No, sir.  He didn't.

12  Q.  Did you ever put your arm in there and take the backpack

13  off the seat?

14  A.  Did I do it?

15  Q.  Yes.

16  A.  No, sir.

17  Q.  Did you search the backpack on the train?

18  A.  Yes, sir.

19  Q.  So you searched a total of two bags on the train?

20  A.  Well, we couldn't search the -- the attache case at that

21  time because it was locked.  Mr. Fallon had indicated that it

22  was money in there.

23  Q.  Sir, I'm asking you this morning.  You told us you searched

24  a duffle bag.

25  A.  That's correct.

1   Q.   Duffle bag could not be described as an attache case, could

2   it?

3   A.   That's correct.

4   Q.   Could be described as a backpack, could it?

5   A.   That's correct.

6   Q.   Okay.  So we have a total of three bags here, do we not?

7   A.   No, sir.

8   Q.   Did we have a backpack?

9   A.   I call it a backpack.  Duffle back, backpack, if I made a

10  mistake on that, then I apologize.

11  Q.   Okay.  Let me ask you.  I am not trying to embarrass you.

12  Did you make a mistake this morning?

13  A.   If I called it a backpack, then I guess I did.  Yes, sir.

14  Q.   You called it a duffle bag this morning?

15  A.   That's what I believe it is, a duffle bag.

16  Q.   Okay.  Now, in your testimony with my learned colleague you

17  mentioned a backpack?

18         MR. MAY:  Judge, I am the one that confused it.

19  BY THE WITNESS:

20  A.   Yes, sir.

21         MR. MAY:  Backpack, duffle bag, I meant the same

22  thing.  I apologize.

23         THE COURT:  They are two different things.  They are

24  two different things.  Okay.

25  BY MR. KOMIE:

Terry - redirect

1  Q.  Okay.  So your memory of what takes place at the train is

2  one duffle bag is searched?

3  A.  That's correct.

4  Q.  And now you say there was no search of a backpack?

5  A.  No, sir.

6  Q.  Could there have been a backpack present?

7  A.  No, sir, I didn't see one.

8  Q.  Did you handle one that day?

9  A.  No, sir.

10  Q.  Did Mr. Romano handle a duffle bag or a backpack on that

11  day?

12  A.  Duffle bag.

13  Q.  No backpack?

14  A.  No, sir.

15  Q.  And so the total number of pieces of luggage that were

16  closed in this case, to your knowledge, was two?

17  A.  Yes, sir.

18  Q.  And that one was searched on the train and the other

19  searched in the office?

20  A.  Yes, sir.

21  Q.  Do you have access to cameras?

22  A.  Yes, sir.

23  Q.  If you wanted to just photograph the contents of this

24  briefcase, could you just photograph it and given it back to

25  the claimant and told him to be on his way?

1   A.   Could we have done that?

2   Q.   Yes.

3   A.   Yes, sir.

4   Q.   And did you rule that out on that day?

5   A.   That's something that we normally don't do, sir.   We

6   normally don't take pictures.   Once there has been a

7   determination that it contains currency, we just go ahead with

8   our normal procedures.

9   Q.   Okay.   Now, let's talk about that.   You say it's your

10   normal procedure.   Whenever currency is discovered, does it

11   ever leave with the claimant?

12   A.   Yes, sir, it has.

13   Q.   Okay.   Now, we are going back prior to this day.   How many

14   years have you been with the unit at the station?

15   A.   Three.

16   Q.   And during those three years, how many times did you seize

17   money?

18   A.   Numerous times, hundreds of times.

19   Q.   Hundreds?

20   A.   Yes, sir.

21   Q.   And out of the -- how many times did you encounter folks

22   with money?

23   A.   Quite a few times.

24   Q.   Okay.   You say there are over a hundred seizures. 200, 300?

25   A.   To be exact, I couldn't be.   But I'd say over a hundred.

Terry - redirect                                      136

1  Q.  Okay.  And how many people did you encounter to get a

2  hundred seizures?

3  A.  Sometime two, sometime one, anywhere -- a hundred or more.

4  Q.  Hundred or more?

5  A.  Yes, sir.

6  Q.  And how many occasions of the times that you found money

7  did you allow the people to leave with the money?

8  A.  Once.

9  Q.  That was over three years?

10 A.  Yes, sir, since I have been there.

11 Q.  How much money was that?

12 A.  I have no idea, sir.  The person in question told us that

13 he had money, but he didn't want to talk about it.  He was

14 informed that --

15 Q.  Sir, I didn't ask you that.  That's not the pending

16 question.

17 A.  Okay.  Apologies.

18 Q.  Okay.  The pending question I asked you, how much money did

19 he have in his possession on that day?

20 A.  I have no idea, sir.

21 Q.  So is it fair to say that once everyone knows there is a

22 large amount of currency there, where it's been opened and

23 looked at, that the money never leaves?

24 A.  Not unless the canine indicates on it.

25 Q.  And does the canine always indicate on it?

1    A.   He has.

2              MR. KOMIE:  Thank you.  No further questions.

3              THE COURT:  Any more?

4              MR. MAY:  No, Judge.

5              THE COURT:  You may be excused.

6        (Witness excused.)

7              THE COURT:  Call your next witness.

8        (Witness duly sworn.)

9              THE COURT:  Go ahead.

10             ERIC ROMANO, DEFENDANT'S WITNESS, DULY SWORN

11                      DIRECT EXAMINATION

12   BY MR. KOMIE:

13   Q.   Mr. Romano, I know your name.  Would you please state and

14   spell it for the court reporter?

15   A.   Eric Romano, E-r-i-c, R-o-m-a-n-o.

16   Q.   Mr. Romano, what is your profession or occupation?

17   A.   I'm a police detective for Amtrak police here in Chicago.

18   Q.   And how long have you held that job?

19   A.   Approximately eight years.

20   Q.   Mr. Romano, prior to being a police detective for Amtrak,

21   did you work for any other police department?

22   A.   I worked for the Village of Broadview, Illinois.

23   Q.   And in connection with your work for the Village of

24   Broadview, you graduated from the Illinois Police Academy?

25   A.   Chicago Police Academy.

Romano - direct                                    138

1   Q.  Chicago Police Academy, trained at Broadview Police?

2   A.  Yes.

3   Q.  And how many years did you serve as patrolman?

4   A.  Just over eight years.

5   Q.  And did you receive any promotions?

6   A.  No.

7   Q.  Did you quit the Broadview department and then go to work

8   for the railroad police?

9   A.  Approximately eight months later, yes.

10  Q.  And the job you do as a detective for the railroad, what

11  are your duties?

12  A.  Currently I am assigned to a Drug Enforcement

13  Administration task force.  I occasionally do work other

14  criminal cases for the railroad.

15  Q.  Sir, then you're a police officer in Illinois?

16  A.  Yes.

17  Q.  Based on being a railroad policeman.

18  A.  Yes.

19  Q.  And your powers are derived then, are they not, sir, from

20  the State of Illinois?

21  A.  I'm sorry?

22  Q.  Your railroad police powers are derived by statute from the

23  State of Illinois?

24  A.  State of Illinois and the U.S. government.

25  Q.  Now, turning your attention to December of 2002,

1   specifically the 6th.  What were your duties on that day?

2   A.  Routine narcotic interdiction duties at Chicago Union

3   Station.

4   Q.  Sir, do you have a policy of searching the railroad

5   databases to learn about passengers?

6   A.  No, no policy that I'm aware of.

7   Q.  How do you learn about who's travelling?

8   A.  I -- I peruse the Amtrak reservation computer.

9   Q.  Do you have a warrant when you do that?

10  A.  No.

11  Q.  Do you do that by subpoena?

12  A.  No.

13  Q.  Did you then go into the Amtrak office to do this?

14  A.  I went into my office, yes.

15  Q.  And the police in the building are two different kinds.

16  There is the Metra police?

17  A.  No.  The Metra police are not assigned to Union Station.

18  Q.  So they're not in the station?

19  A.  They may be periodically after 9/11.  But Amtrak police

20  have jurisdiction in Union Station.

21  Q.  Okay.  And they're actually the little railroad itself, or

22  are they one of the contracted railroads like Union Pacific,

23  one of the others?

24  A.  Amtrak or Metra?

25  Q.  The Amtrak.

Romano - direct

1   A.   No, that -- Amtrak owns that station.

2   Q.   Okay.  So your employer is Amtrak itself?

3   A.   Correct.

4   Q.   And your paycheck says Amtrak?

5   A.   Correct.

6   Q.   So you went into the ticket office?  Or is this computer in

7   your own office?

8   A.   The Computer is in my office.

9   Q.   And you conducted a search of that computer?

10  A.   Yes, I did.

11  Q.   On what day did you conduct the search concerning Mr.

12  Fallon's PNR?

13  A.   I believe it was December 6.

14  Q.   When you say you believe, do you know as you sit there?

15  A.   It was December 6.

16  Q.   And can you tell us the day, the time of day?

17  A.   Sometime in the morning.  I don't recall exactly.  It was

18  before -- it had to be before 1:00 o'clock.

19  Q.   Did you have any information that directed you to search

20  the computer concerning Mr. Fallon?

21  A.   No direct information concerning Mr. Fallon, no.

22  Q.   Now, when you went through the computer, what were you

23  searching for?

24  A.   I was searching for mainly first class tickets, but also

25  some coach tickets purchased within usually 72 hours of travel.

1    There is other characteristics involved there.

2    Q.   So the criteria you used to sort out the persons of

3    interest is based on the number of hours in advance they

4    purchase the ticket?

5    A.   Among other things, yes.

6    Q.   And so if somebody were to purchase a ticket prior to 72

7    hours with cash, would that make no difference?

8    A.   Prior to 72 hours?

9    Q.   Yes.  In other words, 120 hours before departure?

10   A.   That would make a difference, yes.

11   Q.   Two weeks?

12   A.   That would make a difference.

13   Q.   Now, what other criteria were you using to conduct the

14   search?

15   A.   Tickets purchased with cash, tickets purchased within

16   generally 72 hours, whether or not the caller leaves a

17   call-back telephone number, what kind of telephone number it

18   is, whether it's disconnected, one-way travel, that type of

19   thing.

20   Q.   Now, you're aware that United Airlines runs a program out

21   of Chicago where you can travel one way on the railroad and be

22   returned by plane?

23   A.   I have heard of that.  I am not real intimate with it, but

24   I have heard of that.

25   Q.   Conversely, you can fly to Seattle and be returned by

1   train?

2   A.  I've -- like I said, I have heard of it.  I don't know much

3   about it.

4   Q.  Okay.  Now, as you're sitting at your desk writing this

5   program on your computer, do you print anything off?

6   A.  I print the PNRs that are of interest to me.

7   Q.  And on that day, how many PNRs were of interest to you?

8   A.  Just the one that I recall.

9   Q.  Could there have been others?

10  A.  I don't think so.  We didn't have any others that I can

11  recall.

12  Q.  Okay.  Now, what were the factors that brought your

13  interest here?  Was it the fact the ticket was paid for in

14  cash?

15  A.  The ticket was paid for in cash.  The ticket was purchased

16  less than 48 hours prior to travel.  The travel arrangements

17  had been changed once.  The call-back number was a cell number.

18  And the travel was for one way.

19  Q.  Now, you lived through the revolution of phone service in

20  Illinois.  Many people have cellular phone numbers.  Nothing

21  criminal about that?

22  A.  No, sir.

23  Q.  That's correct?

24  A.  That's correct.

25  Q.  And you're also aware of the fact people change their

143

1    travel plans?

2    A.   Yes.

3    Q.   Nothing criminal about that, right?

4    A.   No.

5    Q.   Did you have any information in the PNR as to an illegal

6    reason to change travel plans?

7    A.   No.

8    Q.   Did you have any information in the PNR concerning

9    narcotics transactions?

10   A.   No.

11   Q.   Did you know Mr. Fallon previously?

12   A.   No.

13   Q.   Had Mr. Fallon had any connection to you or any

14   investigation you were aware of?

15   A.   None that I am aware of.

16   Q.   So now you run this document.  Where is it today?

17   A.   The original document?

18   Q.   Yes, the one you ran in the morning.

19   A.   Probably it's either in the case file, or it's in a file

20   somewhere.

21   Q.   Okay.  Showing you what's marked as Government Exhibit

22   No. 5, which we all agree is a PNR.

23   A.   Yes.

24   Q.   The PNR gives you the time of the running, is that right?

25   A.   That's correct.

Romano - direct                                    144

1   Q.   And what time is that PNR printed?

2   A.   I printed this one at 3:35 p.m.

3   Q.   So that was after everything was done with the dog, right?

4   A.   Yes.

5   Q.   Now, for a reason I don't understand, I am sure no one else

6   does, why do we have two different -- in terms of the way the

7   page is laid out, one is in one direction, and one is printed

8   in another.

9          Does the computer do that?

10  A.   No, I do that.  I may have done it just to have the

11  information on the same page.  That's usually why I do it.

12  This is the actual PNR up here.  Everything down here is the

13  history of the reservation, when it was first called in and

14  when the ticket is ultimately purchased.

15  Q.   So for the aid of the Court, the reason that this is upside

16  down is economy of paper?

17  A.   It's -- I do that so I don't have two separate pages I have

18  to keep track.

19  Q.   So it's economy of the copying process?

20  A.   It's just my method.

21  Q.   Okay.  So when the original was printed out at 3:43 in the

22  afternoon, have I got that?  3:35 in the afternoon?

23  A.   No.  This is not the original.

24  Q.   This is one -- but it's original as to that time?

25  A.   I printed this one out after the encounter.

Romano - direct

145

1   Q.   Okay.   Now, if the Court were to read this in its complete

2   form without being copied, which comes first, the top portion

3   or the bottom portion?

4   A.   It depends on how I access it.   I can pull the top portion

5   up first, read the information, then pull up the history and

6   print the history first.   It's totally up to the operator.

7   Q.   Now, you would agree with me, sir, that $310 is not a lot

8   of currency, would you not?

9   A.   $310 is not a lot of currency?

10  Q.   Right.

11  A.   No.

12  Q.   Is that correct?

13  A.   I would agree with that.

14  Q.   And in Chicago where a lot of currency transacts hands, we

15  are not a small town, a large town like Chicago, a person

16  paying $310 for a ticket is not an unusual occasion?

17  A.   No, it's not.

18  Q.   Now, you obtained the document, and you can't tell us where

19  it is today?

20  A.   It's either in the case file or I gave it to -- I may have

21  given it to the other agent.   I usually print out several

22  copies for our files.

23  Q.   Have you had an opportunity to give one to the government,

24  to my colleagues?

25  A.   Yes, I did.

Romano - direct                146

1   Q.   You gave them the original?

2   A.   No, I believe I gave them a copy.

3   Q.   And you gave them a copy of the original that --

4   A.   I gave them the same copy that you have, sir.

5   Q.   Okay.  So the only copy you have given them is the

6   afternoon copy?

7   A.   That's the only copy I saw that they had, yes.

8   Q.   Did you look at your file before testifying here today?

9   A.   Yes, I did.

10  Q.   Did you see the original in that file?

11  A.   No, I don't recall seeing it.

12  Q.   So as far as you know, it's lost or mislaid?

13  A.   It may have been destroyed or crumpled up in my pocket or

14  something.  I don't recall.  Maybe locked in my desk somewhere.

15  I don't recall that.

16  Q.   But as you sit there today, you have no knowledge where the

17  original one with the morning time print on it is?

18  A.   No.

19  Q.   That's correct?

20  A.   That's correct.

21  Q.   Now, did you do anything after you received that document?

22  A.   The -- when I originally ran it in the morning?

23  Q.   Yes.  What you said you ran -- you went to your printer and

24  got a printoff, right?

25  A.   I accessed the computer, yes.

1   Q.   When you got that printoff, what did you do next?

2   A.   I told my partner we have got one that might look good for

3   the afternoon -- for one of the afternoon trains.

4   Q.   So is this sort of like a fishing hole?  Some days the fish

5   are running, some days they are not?

6   A.   No.

7   Q.   So your very statement is, might look good?

8   A.   That's what I said, yes.

9   Q.   And did you have any information about criminal activity?

10  A.   No.  I told my partner that the PNR in question displayed

11  what we call drug courier characteristics.

12  Q.   Do Americans travel with the same characteristics that have

13  nothing to do with drugs?

14  A.   Yes.

15  Q.   Now, you speak to your partner.  Who's your partner?

16  A.   Agent Sterling Terry.

17  Q.   You and Mr. Terry.  What time does this conversation take

18  place?

19  A.   Sometime in the morning.  I don't recall when.

20  Q.   Okay.  Now, does anyone go to a computer and run the name

21  of Vincent Fallon?

22  A.   We may have called our base and had them run him through

23  their computer system.  I don't recall if we did or not.

24  Q.   Okay.  Now, do you recall if you got back a negative

25  response?

1    A.   I -- we probably did, although I don't recall.

2    Q.   So when you went out to the train that day, you had no

3    information of any criminal warrant for his arrest?

4    A.   No.

5    Q.   That's correct?

6    A.   That's correct.

7    Q.   You had no information that he was to be searched by court

8    order?

9    A.   None to my knowledge.

10   Q.   And it was your intention to meet with him with certain

11   objectives in mind, is that correct?

12   A.   It was my intention to attempt a consensual interview with

13   him.

14   Q.   And the purpose of this interview is to identify him?

15   A.   Not necessarily only identify him.

16   Q.   Was that one of the purposes?

17   A.   Yes.

18   Q.   Was one of the purposes of the interview to determine

19   whether or not he had weapons?

20   A.   Not initially, no.

21   Q.   Was one of the purposes of the interview to determine

22   whether or not he had drugs?

23   A.   The initial purpose of the interview is to find out their

24   purpose of travel, if they're willing to speak with us, how

25   long they are going to be travelling, that type of thing.

Romano - direct

1    Q.  Do you recall my original question?  Was the purpose of the

2    interview to find drugs?

3    A.  To find contraband.

4    Q.  Now, the objective is to locate contraband.  You would

5    agree money is not contraband?

6    A.  In and of itself, no.

7    Q.  And you would agree as a railroad policeman that your

8    function is not to police the currency, is that correct?

9    A.  I am not sure I understand.

10   Q.  Well, you're not allowed to run around the station and ask

11   people how they got their money, is that correct?

12   A.  I don't do that, no.

13   Q.  Now, it's fair to say that when you go to this train

14   platform, you have no information about drugs, drug

15   transactions, or anything involving Mr. Fallon?

16   A.  That's correct.

17   Q.  As a railroad policeman, you are familiar with the station?

18   A.  Yes.

19   Q.  Are you familiar with the fact that the Empire Builder sits

20   on the far east track for passenger travel, on the north side?

21   A.  It was that day.  They changed it since, but that day it

22   was there.

23   Q.  And the train has two sections, one that goes to Portland,

24   Oregon, and one that goes to Seattle?

25   A.  Correct.

Romano - direct                                    150

1   Q.   The engine back to the food compartments are the sleeping

2   cars that go to Seattle?

3   A.   Generally.   Sometimes they configure that train

4   differently.   But, generally, yes, that's correct.

5   Q.   And the back portion of the train are the sleeping

6   compartments and coaches destined for Portland?

7   A.   Portland and stations in between, yes.

8   Q.   There is a break in the track somewhere in Idaho, and they

9   go in different directions?

10  A.   Spokane, Washington, I believe it is.

11  Q.   Somewhere out there.

12  A.   Spokane.

13  Q.   And because of that, the length of the train stretches from

14  the base of Union Station all the way down to the Chicago River

15  to where the engine is?

16  A.   Correct.

17  Q.   And the south end of that track is at Adams Street?

18  A.   Correct.

19  Q.   And the north end of that track is at Randolph?

20  A.   Well, the track runs all the way up past Lake Street.   It

21  doesn't --

22  Q.   In other words, the portion the passengers can get in and

23  out, the concrete pier that's used ends at about Randolph?

24  A.   It ends north of Madison Street.   I don't know exactly

25  where.

Romano - direct                                         151

1   Q.  Now, is it fair to say that Coach 730 on that day sat north

2   of Madison Street?

3   A.  Sleeper Car 730.  I don't know if it sat at Madison Street

4   or on what side of Madison Street.  I know it was probably six

5   or seven cars north of the entrance to the station.

6   Q.  Now, to go there, you have to walk from the Amtrak police

7   office?

8   A.  Correct.

9   Q.  Where is that located?

10  A.  The Amtrak police office is on the main floor of Union

11  Station, directly across from the Metra ticket counter.

12  Q.  Was it there in December of 2002?

13  A.  Yes.

14  Q.  Is that where you maintain your office?

15  A.  Yes.

16  Q.  At your office, do you maintain consent to search forms?

17  A.  I think so, yes.

18  Q.  And are they available for you if you want to use them?

19  A.  Yes.

20  Q.  Did you take any with you when you went to the train at

21  that day?

22  A.  No.

23  Q.  When you went to the train, did you have a picture of

24  Mr. Fallon?

25  A.  No.

Romano - direct

1  Q.  Did you have any background information about Mr. Fallon?

2  A.  No.

3  Q.  When you arrived at the train, is it fair to say you have

4  no idea who on the planet was Mr. Fallon?

5  A.  That's correct.

6  Q.  And in order to discover who might be Mr. Fallon, you had

7  to speak to a porter?

8  A.  I spoke to the sleeping car attendant for that car, yes.

9  Q.  And the attendant was a gentleman who was on the train?

10  A.  I don't know -- I don't recall if it was a man or a woman.

11  Q.  The person, the person was a person --

12  A.  The person was assigned to that sleeping car.

13  Q.  Right.  And you and your partner, Mr. Terry, stationed

14  yourselves on the platform?

15  A.  Correct.

16  Q.  Now, the platform is what, 4 feet wide?

17  A.  No, it's probably 8 or 10 feet wide.

18  Q.  10 feet wide?

19  A.  8 or 10 feet wide.

20  Q.  And there are concrete or steel abutments holding up the

21  ceiling?

22  A.  Holding up the ceiling?

23  Q.  In other words, from the platform going --

24  A.  Yeah, there is pillars every so many feet.

25  Q.  Right.

1          Did you station yourself by some of the pillars?

2    A.   No.  We were in plain view of the entire car.

3    Q.   Now, did you arrive at the car about five minutes to 2:00?

4    A.   No.  We -- we were out at the car before they even started

5    boarding the train.

6    Q.   What time did you arrive out at the car?

7    A.   About 1:35, I believe.

8    Q.   And so you were standing around surveilling the people

9    walking up the platform?

10   A.   Well, there was no -- the only people coming toward us were

11   people in those sleeping cars.  Everybody else stopped before

12   they got to us.  So there wasn't --

13   Q.   To answer my question --

14   A.   No, there wasn't much -- no, there was nobody to look at.

15   Q.   Now, is it fair to say prior to being notified by the

16   porter that the occupant of Room 7 had arrived, you had no idea

17   who you were dealing with?

18   A.   No.

19   Q.   That's correct?

20   A.   That's correct.

21   Q.   Now, the train is sitting on the siding.  The entrance to

22   the sleeping car is on the north end of the car?

23   A.   No, the entrance to the Superliner sleepers is in the

24   center of the car.

25   Q.   So if I understand your testimony correctly, this is like a

1   Metra train where you get on in the center?

2   A.   That's -- yeah, they're similar cars, yes.

3   Q.   And so this car is broken in the center by an entry?

4   A.   Correct.

5   Q.   And you stationed yourself around that entry?

6   A.   Correct.

7   Q.   And is this like a Metra door, two-door or --

8   A.   No, its a single door that opens on hinges.

9   Q.   And does the Porter then station himself at the top of the

10  vestibule?

11  A.   No, the porters -- the car attendants generally station

12  themselves on the platform right next to the door.

13  Q.   Now, do you ever see Mr. Fallon come up to the train?

14  A.   Eventually we did, yes.

15  Q.   Did you see him do anything illegal?

16  A.   No.

17  Q.   Did you suspect any criminal activity at that point?

18  A.   No.

19  Q.   Does he then enter the train?

20  A.   I believe he showed his ticket to the attendant and then

21  entered the train, yes.

22  Q.   And did he go somewhere?

23  A.   Went inside and upstairs.

24  Q.   You couldn't see where he went, is that fair to say, from

25  where you were standing?

1   A.  No.  That's fair to say.

2   Q.  How long are you standing there before you get a

3   notification from the porter that the person has arrived?

4   A.  As soon as Mr. Fallon stepped into the vestibule and turned

5   the corner, the porter looked at me.  And I don't recall if

6   they nodded or winked or whatever, just indicating that that

7   was the individual for Room No. 7.

8   Q.  Did you then board the train?

9   A.  We waited about half a minute to a minute, and then we

10  boarded the train.

11  Q.  So you waited for him to get to his room?

12  A.  Correct.

13  Q.  Now, would you agree that a compartment, sleeping

14  compartment, on an Amtrak train is not a public place when a

15  person leases that for a trip?

16  A.  No, it's not a public place.

17  Q.  And is it a place where you would expect privacy?

18  A.  Correct.

19  Q.  When you waited for him to get there, you then boarded the

20  train?

21  A.  After about a minute, yes.

22  Q.  And did you walk to the location of Room 7?

23  A.  Yes, we did.

24  Q.  Is Room 7 left or right from the center of the car?

25  A.  It was -- it was on the right side of the car, I believe.

1    Q.   You believe, or do you know?

2    A.   Well, they turn those cars back and forth all the time.

3    When we entered the car and walked down the corridor, train --

4    Room No. 7 was on the left side.

5    Q.   So what you remember is walking down the corridor and a

6    left-handed entry to the room?

7    A.   Up -- we went upstairs and then walked down the corridor.

8    Q.   So it was a left-handed entry to the room?

9    A.   I believe so, yes.

10   Q.   Now, are you right or left-handed?

11   A.   I am right-handed.

12   Q.   So you would note that it's on the opposite side?

13   A.   Yes.

14   Q.   As you went down to the corridor, did you see any criminal

15   activity afoot?

16   A.   No.

17   Q.   Smell any odors of narcotics?

18   A.   No.

19   Q.   See anything out of the ordinary?

20   A.   No.

21   Q.   When you arrived at this room, was the shade down?

22   A.   No.

23   Q.   Was there any portion of the room that had a shade and

24   glass facing the public corridor?

25   A.   There are windows on either side of the door, and then the

1   door is of course part glass.

2   Q.  Was the shade down on the windows on either side of the

3   door?

4   A.  I don't recall.  I think they're curtains.  I don't

5   recall -- no, they are shades.

6            I don't recall if they were up or down.

7   Q.  Now, at the time you approached this door, did you have a

8   warrant to enter the room?

9   A.  No.

10  Q.  When you arrived at the door, what did you see?

11  A.  I saw Mr. Fallon, an individual we identified as

12  Mr. Fallon, sitting down in one of the seats.

13  Q.  At the time you observed him, was he doing anything?

14  A.  He was just sitting there.

15  Q.  Had he stowed his baggage?

16  A.  His bag -- two bags we saw him get on the train with were

17  inside the room.

18  Q.  Had he taken his coat off?

19  A.  I don't remember.

20  Q.  Was he wearing a coat?

21  A.  I believe he was when he got on the train.  I don't

22  remember if he was wearing it inside the -- when I saw him.

23  Q.  By the way, is that a heated location?

24  A.  Inside the car?  Yes.

25  Q.  Now, when you arrived there, did you intend to engage in a

1   conversation with him?

2   A.   I intended to attempt to engage in a conversation with him.

3   Q.   Did you understand that he was no longer in a public place

4   once he was in that room?

5   A.   Yes.

6   Q.   Did you understand that there was no criminal activity

7   afoot, and he wasn't in a public place?

8   A.   Yes, I understood that.

9   Q.   Did you then turn to him and speak to him?

10  A.   I knocked on his door first.

11  Q.   And after you knocked on his door, who spoke first?

12  A.   He did.

13  Q.   What if anything did he say?

14  A.   He just looked up to me and said, yeah, or, yes, something

15  like that.

16  Q.   Acknowledging your presence?

17  A.   Correct.

18  Q.   And then you said?

19  A.   I said, how are you doing?  I am a policeman assigned to

20  the Drug Enforcement Administration.  Can I talk to you for a

21  minute?

22  Q.   Did you hear anything in response to your question?

23  A.   He looked at my credentials that I had in my left hand and

24  said, sure, what's up, or --

25  Q.   Do you have them here today?

1   A.   Yes.

2   Q.   Can you show them to us, please?

3            MR. KOMIE:   This will be Defendant's 3.   We can make

4   copies.

5   BY MR. KOMIE:

6   Q.   Showing you what's been marked as Defendant's 3, is this

7   the document you showed to him?

8   A.   Yes, it is.

9   Q.   Can you hold it up --

10  A.   I was trying to keep that from happening.

11  Q.   I'm sorry.   Can you hold it up in the manner you did for

12  the Court on that day?

13  A.   Just like this (indicating).

14  Q.   Can you show it directly to the Court?

15  A.   (Witness complied.)

16  Q.   And that was your -- is that also accompanied by a tin

17  badge of some kind?

18  A.   Yes, sir, it is.

19  Q.   Where would that be located?

20  A.   Right behind the credentials.

21  Q.   That's a railroad police badge?

22  A.   No, it's a Drug Enforcement Administration.

23  Q.   Okay.   And did you show that badge on that day?

24  A.   Yes, I did.

25  Q.   So you showed him both parts of the identification?

Romano - direct                                    160

1   A.  Yes, I did.

2   Q.  Were you carrying any arms on that day?

3   A.  Yes, I was.

4   Q.  What arms if any were you carrying?

5   A.  I was carrying my standard sidearm.

6   Q.  And that would be?

7   A.  A .40 caliber Glock.

8   Q.  And 16 -- so how many rounds?

9   A.  Fourteen and one.  I'm sorry, 14 rounds, 13 and one.

10  Q.  Thirteen and one?

11  A.  Thirteen in the magazine, one in the chamber.

12  Q.  And did you have any other ammunition on you?

13  A.  Yes, I did.

14  Q.  How many other additional ammunition did you have?

15  A.  I had one magazine in my coat pocket.

16  Q.  Did you have any police jewelry like handcuffs?

17  A.  I had a pair -- jewelry?

18  Q.  I call them jewelry after I heard Charley Chan once do

19  that, because people wear them to police stations.

20          Did you have handcuffs with you?

21  A.  I had one set of handcuffs on the back of my belt.

22  Q.  Any other police paraphernalia?

23  A.  No.

24  Q.  Were you wearing a coat that day?

25  A.  Yes, I was.

Romano - direct                                        161

1   Q.  What kind of coat?

2   A.  I think I was wearing a black leather jacket, waist-length.

3   Q.  And underneath you were wearing?  Without going below the

4   surface, what were you wearing?

5   A.  I was wearing a long-sleeved shirt and blue jeans.

6   Q.  And so the weapon was attached to the belt?

7   A.  Correct.

8   Q.  Between the coat and blue jeans?

9   A.  Correct.

10  Q.  Now, when you knocked and had this conversation, the door

11  is no bigger than a person, right?

12  A.  That's about it, right.

13  Q.  So you and Mr. Terry can't fit in the same door at the same

14  time?

15  A.  I wasn't standing exactly in the doorway.

16  Q.  Where were you?

17  A.  I was -- I was standing just to the right of the doorway so

18  I could look directly at Mr. Fallon.  Terry --

19  Q.  So if I understand this correct, you walk down the corridor

20  and were on the left, correct?

21  A.  Correct.

22  Q.  And so you go beyond the door and turn around to have the

23  conversation?

24  A.  That's right.

25  Q.  And Mr. Terry follows you.  And you would have been walking

1    towards the station, according to your testimony.  So you have

2    been walking southbound?

3    A.  I -- like I said before, I don't remember which way the car

4    was turned that day.  They -- those cars are turned all

5    different ways in the yard.  I don't recall which way it was.

6    I want to say we were actually walking northbound down that

7    corridor.

8    Q.  Okay.  But you agree it can only be north or south?

9    A.  Correct.

10   Q.  So one of you is on the door that would be south or north,

11   and one is on the door that is either south or north on the

12   other side?  Do you understand?

13   A.  I understand you.

14        I was on one side and Terry was on the other.  Nobody

15   was standing in the doorway.

16   Q.  Now, at this location you weren't afraid for your personal

17   safety?

18   A.  No.

19   Q.  That's correct?

20   A.  That's correct.

21   Q.  Nobody had made any furtive gestures or tried to threaten

22   you in any way?

23   A.  No.

24   Q.  Did you have a radio with you?

25   A.  No, I did not.

Romano - direct                                       163

1   Q.  Did Mr. Terry?

2   A.  Not to my knowledge.

3   Q.  Now, at the time you get on this train, is it about

4   2:00 o'clock?

5   A.  I believe it was about 1:50.

6   Q.  Did you have an opportunity to review Mr. Terry's report

7   which he wrote contemporaneous with the event?

8   A.  Yes, I did.

9   Q.  Did you happen to note that he indicated this event

10  occurred at 2:00 o'clock on December 6?

11  A.  That was -- I don't know which report that was.  The --

12  Q.  Let me show you Defendant's No. Exhibit 2 and ask you to

13  examine it.  Direct your attention to Box No. 5.

14          Do you need my glasses?

15  A.  No, I don't wear glasses.  Thank you.

16          The one time on there is 1355.

17  Q.  Sir, looking at Box No. 1, it says, time of occurrence.

18  What time does it say?

19  A.  It says 1400.

20  Q.  And based on your life and experience with the police, 1400

21  means 2:00 o'clock, right?

22  A.  That's correct.

23  Q.  And that train was leaving at 2:10, right?

24  A.  Correct.

25  Q.  Now, so you fellows are each looking at different

1   directions as you're looking in this door, is that right?

2   A.   That's correct.

3   Q.   That's your testimony?

4   A.   That's correct.

5   Q.   Okay.  Did you ever tell him he could shut the door and

6   have no further conversation with you?

7   A.   I -- I told him he didn't have to talk to us.

8   Q.   You never told him he could shut the door, did you?

9   A.   I don't recall saying anything about the door.

10  Q.   Okay.  Now, at that location, a person has no other exit

11  from that room other than the one you are blocking, is that

12  right?

13  A.   I was not blocking an exit, sir.

14  Q.   Well, could a person get out that room without walking

15  towards you?

16  A.   He could have stepped out of the doorway and walked right

17  past me.

18  Q.   Now, did you ask him for identification?

19  A.   Yes, I did.

20  Q.   Did you have any information that he was somebody else

21  other than Fallon?

22  A.   No.

23  Q.   Did he supply identification?

24  A.   Yes.

25  Q.   Did you look at that identification?

Romano - direct

1   A.   Yes.

2   Q.   That's 2 feet inside the door or so?

3   A.   Probably a foot, if that.

4   Q.   So in order to get the ticket, you had to put your arm in

5   the door, didn't you?

6   A.   I reached in to take the ticket from him, yes.

7   Q.   And you did that also for the identification, didn't you?

8   A.   Yes.

9   Q.   Now, did some conversation take place?

10  A.   Yes.

11  Q.   What conversation takes place?

12  A.   I -- after identifying myself, after -- ourselves, after

13  looking at Mr. Fallon's identification and ticket, I handed

14  both documents back to him.   I told him he was not under

15  arrest.   He didn't have to talk to us unless he wanted to.   And

16  he didn't have -- he could terminate the encounter at any time

17  if he wanted to.

18  Q.   Does he say anything?

19  A.   He said, I understand.   What's up?   Or something to that

20  effect.

21  Q.   And what if anything did you say?

22  A.   After I looked at both documents and handed them back to

23  him, I asked him what his purpose of travel was on that day.

24  Q.   Are you the travel police?

25  A.   No.

Romano - direct

1  Q.  Are you permitted to ask Americans where they are going,

2  what they are doing?

3  　　　　MR. KUHN:  Objection, your Honor.  That's an

4  argumentative question.

5  　　　　THE COURT:  Sustained.

6  　　　　MR. KOMIE:  I will withdraw it and go on to another

7  one.

8  BY MR. KOMIE:

9  Q.  Did he tell you he was going to Seattle?

10  A.  Yes.

11  Q.  Was there anything suspicious about that?

12  A.  In and of itself, no.

13  Q.  Now, did you say something after that?

14  A.  Yes.

15  Q.  What did you say?

16  A.  I asked how long he planned on being in Seattle.

17  Q.  And what if any answer did he give?

18  A.  He told me about a week.

19  Q.  Anything suspicious about that?

20  A.  No.

21  Q.  What if anything did you do next?

22  A.  I asked him if he -- if -- I explained to him our -- my

23  duties at Union Station.

24  Q.  I am asking what you actually said.  What did you speak?

25  A.  I said my partner and I are assigned to a DEA task force.

1    We look for people coming in and out of Chicago carrying

2    illegal items such as weapons -- excuse me -- weapons --

3              MR. KOMIE:  Can I get the witness some water, your

4    Honor?

5              THE WITNESS:  I'm fine.  I'm all right.  I am fighting

6    a cold right now.

7    BY MR. KOMIE:

8    Q.  I'm sorry.

9    A.  That's okay.

10   Q.  Let me know when you are ready to resume.

11   A.  I'm fine.

12   Q.  Okay.  You said to him?

13   A.  I explained our purpose at Union Station.  I explained that

14   we work there every day, and we are looking for individuals

15   travelling under certain circumstances, carrying illegal items

16   such as weapons, narcotics, large amounts of U.S. currency.

17   Q.  Now, before you said that, you were satisfied his

18   identification was in order, and you are satisfied his travel

19   plans were appropriate, is that correct?

20   A.  Yes.

21   Q.  So the subject now changes to telling him about your

22   mission, is that correct?

23   A.  Yes.

24   Q.  At that point had you smelled any narcotics?

25   A.  No.

Romano - direct

1   Q.   Seen any narcotics?

2   A.   No.

3   Q.   Had he behaved like a narcotics addict?

4   A.   I -- he was behaving normally at that point, other than he

5   was swaying a little bit and trembling, that kind of thing.

6   Q.   Okay.  Well, now, you may recall from your days as a police

7   officer, when you walk up to a car to write a ticket, people

8   tremble, is that right?

9   A.   Sometimes.

10  Q.   And it's not an unusual reaction when police officers

11  approach a citizen for the first time to tremble a little bit?

12  A.   People are different.

13  Q.   Right.

14  A.   Some do, some don't.

15  Q.   Some are John Wayne and others aren't?

16  A.   Sure.

17  Q.   Now, he just walked to the train station carrying baggage.

18  Do people sweat when they carry baggage, enter cars, and take

19  off their coats?

20  A.   I suppose some people do.

21  Q.   Now, did you ask him if he was sweating because he was hot?

22  A.   No.

23  Q.   What was said next?

24  A.   After I advised Mr. Fallon of our purpose, I asked him if

25  the bags he was carrying were his.

1   Q.  And he said?

2   A.  He said they were.

3   Q.  So far nothing suspicious?

4   A.  No.

5   Q.  That's correct?

6   A.  That's correct.

7   Q.  What next?

8   A.  I asked him if he had packed the bags himself and knew the

9   contents of the bags, to which he replied he did.

10  Q.  Now, the purpose of these questions is to prepare for

11  searching the bags.  Is that not true?

12  A.  Not necessarily.

13  Q.  Well, did you say to him, sir, I want to search your bags

14  at that point?

15  A.  No.

16  Q.  Now, you went to a training course where the question to

17  search the bag comes at the end of the questioning you just

18  started, is that correct?

19  A.  Eventually I get to the point where I will ask if they will

20  consent to a search.

21  Q.  And this is part of a protocol that's been designed and you

22  have been trained to use where you start out by identifying

23  somebody.  And the end of the protocol is you ask to search the

24  bags.

25  A.  Correct.

1  Q.  Now, is there some further conversation at this point?

2  A.  Yes, there is.

3  Q.  Who speaks?

4  A.  I do.  I -- after asking Mr. Fallon the question about the

5  bags and if he packed the backpack himself, knew the contents

6  of it, he answered me.  I asked him if my partner could search

7  his bags.

8  Q.  And he said?

9  A.  He said, yeah, go ahead.

10  Q.  Now, how many bags were there?

11  A.  Two.

12  Q.  What kind of bags?

13  A.  One was that brown leather attache.  The other bag was some

14  type of small duffle bag, if I recall.

15  Q.  Directing your attention to Government No. 7 I am holding

16  up.  That's the bag you are saying?

17  A.  Yes.

18  Q.  Now, where is Bag Government 7 sitting when you first came

19  to the car?

20  A.  That bag was sitting on the seat directly across from

21  Mr. Fallon.

22  Q.  And was it in a location where one would expect privacy?

23  A.  It was inside the room.

24  Q.  Now, at the time that you're asking to inspect the bags,

25  did you have any suspicion of any narcotics?

Romano - direct

1   A.   No.

2   Q.   Did you have suspicion of any criminal activity afoot?

3   A.   No.

4   Q.   Were you in any way worried about your personal safety?

5   A.   No.

6   Q.   Now, sir, if you wanted to search a closed container, based

7   on both your police training, your Amtrak training, undoubtedly

8   your DEA training, were you taught that you can go get a

9   warrant from a Judge?

10  A.   Yes.

11  Q.   And were you aware that judges were available at

12  2:00 o'clock in the afternoon on a Friday in the City of

13  Chicago if you needed one?

14  A.   I'm sure there were.

15  Q.   And that if you want to get one, you might be delayed four

16  hours, but you could eventually obtain a warrant?

17  A.   Probably.

18  Q.   Now, at the time you're asking to go into the bags, did you

19  have any legal process for going there?

20  A.   Mr. Fallon consented.

21  Q.   Other than that?

22  A.   No.

23  Q.   What happens next?

24  A.   Mr. Fallon picked up the small duffle bag, handed it to me

25  outside the door.   I handed it to my partner so I could keep an

1  eye on Mr. Fallon.  My partner looked inside the bag, handed it

2  back to me, said, okay, nothing in there.  I handed it back to

3  Mr. Fallon.

4  Q.  At that point were you satisfied that no criminal activity

5  was afoot?

6  A.  Regarding that bag?  Yes.

7  Q.  Okay.  So you had -- you actually had no suspicion

8  concerning the briefcase, is that correct?  You had no

9  information about narcotics at that moment?

10 A.  I had no suspicion about anything until -- up to that

11 point.

12 Q.  Did you then ask to search the briefcase?

13 A.  Yes, I did.

14 Q.  And what, if anything, did Mr. Fallon say?

15 A.  I don't recall Mr. Fallon saying anything.  I picked the

16 second -- I picked that bag up.  I looked at the bag.  Agent

17 Terry looked at it.  And we determined that there was a lock on

18 it.

19 Q.  Okay.  So when you picked the bag up, can you show the

20 Court how you picked up the bag?

21           MR. KOMIE:  May I approach?

22 BY THE WITNESS:

23 A.  The bag is sitting on the seat.  I reached in, picked the

24 bag up, handed it out to Agent Terry.

25 BY MR. KOMIE:

1  Q.  Now, when you handed it to Agent Terry, did he examine the

2  bag?

3  A.  We both did.

4  Q.  And did you discover it's locked?

5  A.  Yes.

6  Q.  And what if anything did you do next?

7  A.  I asked Mr. Fallon if he had a key.

8  Q.  Now, prior to asking that, you had no suspicion of

9  anything, is that correct?

10  A.  No.  That's correct.

11  Q.  Now, you asked Mr. Fallon for the key.  What if anything

12  did he say?

13  A.  He said he didn't have a key.

14  Q.  And what if anything do you do or say then?

15  A.  I asked him again if the bag was his.

16  Q.  What did he say?

17  A.  He said, yes, the bag is mine, but I don't have a key.

18  Q.  What if anything was done next?

19  A.  I asked him how were you going to get into the bag?  And he

20  didn't answer me.

21  Q.  So it's just silence?

22  A.  Well, he didn't answer me to that point.

23  Q.  Who speaks next?

24  A.  I believe I did.

25  Q.  You say you believe.  Do you know?

Romano - direct

1   A.  Yes, I did.

2   Q.  Was the identification in order and not a forgery?

3   A.  I didn't -- didn't look like a forgery to me.

4   Q.  So as far as you knew, the identification was in order?

5   A.  Correct.

6   Q.  So it was nothing suspicious about the identification?

7   A.  None that I recall.

8   Q.  Did you then ask for a ticket?

9   A.  Yes, I did.

10  Q.  Did he show you a ticket?

11  A.  Yes.

12  Q.  Showing you Exhibit No. 6, is this a Xerox copy of that

13  ticket?

14  A.  Yes, it is.

15  Q.  Was the ticket in order?

16  A.  It appeared to be, yes.

17  Q.  Did you have any suspicion of criminal activity at that

18  point?

19  A.  No.

20  Q.  Did you ask if you could search his bags?

21  A.  No, not at that point.

22  Q.  Did you have a conversation with him at that point?

23  A.  Yes, I did.

24  Q.  Now, in order to get his ticket, he is sitting in the

25  chair, is he not?

1   A.   Yes.

2   Q.   That's 2 feet inside the door or so?

3   A.   Probably a foot, if that.

4   Q.   So in order to get the ticket, you had to put your arm in

5   the door, didn't you?

6   A.   I reached in to take the ticket from him, yes.

7   Q.   And you did that also for the identification, didn't you?

8   A.   Yes.

9   Q.   Now, did some conversation take place?

10  A.   Yes.

11  Q.   What conversation takes place?

12  A.   I -- after identifying myself, after -- ourselves, after

13  looking at Mr. Fallon's identification and ticket, I handed

14  both documents back to him.  I told him he was not under

15  arrest.  He didn't have to talk to us unless he wanted to.  And

16  he didn't have -- he could terminate the encounter at any time

17  if he wanted to.

18  Q.   Does he say anything?

19  A.   He said, I understand.  What's up?  Or something to that

20  effect.

21  Q.   And what if anything did you say?

22  A.   After I looked at both documents and handed them back to

23  him, I asked him what his purpose of travel was on that day.

24  Q.   Are you the travel police?

25  A.   No.

1  Q.  Are you permitted to ask Americans where they are going,

2  what they are doing?

3          MR. KUHN:  Objection, your Honor.  That's an

4  argumentative question.

5          THE COURT:  Sustained.

6          MR. KOMIE:  I will withdraw it and go on to another

7  one.

8  BY MR. KOMIE:

9  Q.  Did he tell you he was going to Seattle?

10  A.  Yes.

11  Q.  Was there anything suspicious about that?

12  A.  In and of itself, no.

13  Q.  Now, did you say something after that?

14  A.  Yes.

15  Q.  What did you say?

16  A.  I asked how long he planned on being in Seattle.

17  Q.  And what if any answer did he give?

18  A.  He told me about a week.

19  Q.  Anything suspicious about that?

20  A.  No.

21  Q.  What if anything did you do next?

22  A.  I asked him if he -- if -- I explained to him our -- my

23  duties at Union Station.

24  Q.  I am asking what you actually said.  What did you speak?

25  A.  I said my partner and I are assigned to a DEA task force.

1   We look for people coming in and out of Chicago carrying

2   illegal items such as weapons -- excuse me -- weapons --

3                MR. KOMIE:  Can I get the witness some water, your

4   Honor?

5                THE WITNESS:  I'm fine.  I'm all right.  I am fighting

6   a cold right now.

7   BY MR. KOMIE:

8   Q.  I'm sorry.

9   A.  That's okay.

10  Q.  Let me know when you are ready to resume.

11  A.  I'm fine.

12  Q.  Okay.  You said to him?

13  A.  I explained our purpose at Union Station.  I explained that

14  we work there every day, and we are looking for individuals

15  travelling under certain circumstances, carrying illegal items

16  such as weapons, narcotics, large amounts of U.S. currency.

17  Q.  Now, before you said that, you were satisfied his

18  identification was in order, and you are satisfied his travel

19  plans were appropriate, is that correct?

20  A.  Yes.

21  Q.  So the subject now changes to telling him about your

22  mission, is that correct?

23  A.  Yes.

24  Q.  At that point had you smelled any narcotics?

25  A.  No.

1  Q.  Seen any narcotics?

2  A.  No.

3  Q.  Had he behaved like a narcotics addict?

4  A.  I -- he was behaving normally at that point, other than he

5  was swaying a little bit and trembling, that kind of thing.

6  Q.  Okay.  Well, now, you may recall from your days as a police

7  officer, when you walk up to a car to write a ticket, people

8  tremble, is that right?

9  A.  Sometimes.

10  Q.  And it's not an unusual reaction when police officers

11  approach a citizen for the first time to tremble a little bit?

12  A.  People are different.

13  Q.  Right.

14  A.  Some do, some don't.

15  Q.  Some are John Wayne and others aren't?

16  A.  Sure.

17  Q.  Now, he just walked to the train station carrying baggage.

18  Do people sweat when they carry baggage, enter cars, and take

19  off their coats?

20  A.  I suppose some people do.

21  Q.  Now, did you ask him if he was sweating because he was hot?

22  A.  No.

23  Q.  What was said next?

24  A.  After I advised Mr. Fallon of our purpose, I asked him if

25  the bags he was carrying were his.

Romano - direct

1  Q.  And he said?

2  A.  He said they were.

3  Q.  So far nothing suspicious?

4  A.  No.

5  Q.  That's correct?

6  A.  That's correct.

7  Q.  What next?

8  A.  I asked him if he had packed the bags himself and knew the

9  contents of the bags, to which he replied he did.

10  Q.  Now, the purpose of these questions is to prepare for

11  searching the bags.  Is that not true?

12  A.  Not necessarily.

13  Q.  Well, did you say to him, sir, I want to search your bags

14  at that point?

15  A.  No.

16  Q.  Now, you went to a training course where the question to

17  search the bag comes at the end of the questioning you just

18  started, is that correct?

19  A.  Eventually I get to the point where I will ask if they will

20  consent to a search.

21  Q.  And this is part of a protocol that's been designed and you

22  have been trained to use where you start out by identifying

23  somebody.  And the end of the protocol is you ask to search the

24  bags.

25  A.  Correct.

1  Q.  Now, is there some further conversation at this point?

2  A.  Yes, there is.

3  Q.  Who speaks?

4  A.  I do.  I -- after asking Mr. Fallon the question about the

5  bags and if he packed the backpack himself, knew the contents

6  of it, he answered me.  I asked him if my partner could search

7  his bags.

8  Q.  And he said?

9  A.  He said, yeah, go ahead.

10  Q.  Now, how many bags were there?

11  A.  Two.

12  Q.  What kind of bags?

13  A.  One was that brown leather attache.  The other bag was some

14  type of small duffle bag, if I recall.

15  Q.  Directing your attention to Government No. 7 I am holding

16  up.  That's the bag you are saying?

17  A.  Yes.

18  Q.  Now, where is Bag Government 7 sitting when you first came

19  to the car?

20  A.  That bag was sitting on the seat directly across from

21  Mr. Fallon.

22  Q.  And was it in a location where one would expect privacy?

23  A.  It was inside the room.

24  Q.  Now, at the time that you're asking to inspect the bags,

25  did you have any suspicion of any narcotics?

Romano - direct

1  A. No.

2  Q. Did you have suspicion of any criminal activity afoot?

3  A. No.

4  Q. Were you in any way worried about your personal safety?

5  A. No.

6  Q. Now, sir, if you wanted to search a closed container, based

7  on both your police training, your Amtrak training, undoubtedly

8  your DEA training, were you taught that you can go get a

9  warrant from a Judge?

10  A. Yes.

11  Q. And were you aware that judges were available at

12  2:00 o'clock in the afternoon on a Friday in the City of

13  Chicago if you needed one?

14  A. I'm sure there were.

15  Q. And that if you want to get one, you might be delayed four

16  hours, but you could eventually obtain a warrant?

17  A. Probably.

18  Q. Now, at the time you're asking to go into the bags, did you

19  have any legal process for going there?

20  A. Mr. Fallon consented.

21  Q. Other than that?

22  A. No.

23  Q. What happens next?

24  A. Mr. Fallon picked up the small duffle bag, handed it to me

25  outside the door.  I handed it to my partner so I could keep an

1  eye on Mr. Fallon. My partner looked inside the bag, handed it

2  back to me, said, okay, nothing in there. I handed it back to

3  Mr. Fallon.

4  Q.  At that point were you satisfied that no criminal activity

5  was afoot?

6  A.  Regarding that bag? Yes.

7  Q.  Okay. So you had -- you actually had no suspicion

8  concerning the briefcase, is that correct? You had no

9  information about narcotics at that moment?

10  A.  I had no suspicion about anything until -- up to that

11  point.

12  Q.  Did you then ask to search the briefcase?

13  A.  Yes, I did.

14  Q.  And what, if anything, did Mr. Fallon say?

15  A.  I don't recall Mr. Fallon saying anything. I picked the

16  second -- I picked that bag up. I looked at the bag. Agent

17  Terry looked at it. And we determined that there was a lock on

18  it.

19  Q.  Okay. So when you picked the bag up, can you show the

20  Court how you picked up the bag?

21       MR. KOMIE:  May I approach?

22  BY THE WITNESS:

23  A.  The bag is sitting on the seat. I reached in, picked the

24  bag up, handed it out to Agent Terry.

25  BY MR. KOMIE:

1  Q.  Now, when you handed it to Agent Terry, did he examine the

2  bag?

3  A.  We both did.

4  Q.  And did you discover it's locked?

5  A.  Yes.

6  Q.  And what if anything did you do next?

7  A.  I asked Mr. Fallon if he had a key.

8  Q.  Now, prior to asking that, you had no suspicion of

9  anything, is that correct?

10  A.  No.  That's correct.

11  Q.  Now, you asked Mr. Fallon for the key.  What if anything

12  did he say?

13  A.  He said he didn't have a key.

14  Q.  And what if anything do you do or say then?

15  A.  I asked him again if the bag was his.

16  Q.  What did he say?

17  A.  He said, yes, the bag is mine, but I don't have a key.

18  Q.  What if anything was done next?

19  A.  I asked him how were you going to get into the bag?  And he

20  didn't answer me.

21  Q.  So it's just silence?

22  A.  Well, he didn't answer me to that point.

23  Q.  Who speaks next?

24  A.  I believe I did.

25  Q.  You say you believe.  Do you know?

1   A.  I did.

2   Q.  Okay.  When you spoke next, what did you say?

3   A.  I asked him what was inside the bag.

4   Q.  Now, what if anything did he say?

5   A.  He said there is money in there.

6   Q.  So up until this point, everything is routine?

7   A.  Correct.

8   Q.  Now, what if anything is said or done next?

9   A.  I said I thought you told me you didn't have any money in

10  there.

11  Q.  And what if anything is said or done next?

12  A.  He didn't answer me.

13  Q.  Just silence?

14  A.  Correct.

15  Q.  Did you speak again?

16  A.  Yes, I did.

17  Q.  What did you say?

18  A.  I said, I asked him how much money he had in the bag.

19  Q.  Is money contraband?

20  A.  In and of itself, no.

21  Q.  At that time had you found any drugs?

22  A.  No.

23  Q.  Seen, smelled, sensed in any way drugs anywhere?

24  A.  I did not, no.

25  Q.  What if anything was said then?

1   A.   I asked him how much money he had in the bag.   And I -- he

2   told me $50,000, or about $50,000, something to that effect.

3   Q.   How much time has passed now, about three to five minutes?

4   A.   From?

5   Q.   The time you started talking at the door.

6   A.   Maybe three minutes, if that.

7   Q.   Some period of time?

8   A.   Two to three minutes.

9   Q.   It took time to search the bag, right?

10  A.   It took Agent Terry maybe ten seconds to open that bag and

11  see -- the first bag and see there was nothing in there, not

12  long at all.

13  Q.   What if anything happens next?   What if anything happens

14  next?   Did someone speak or do something?

15  A.   I felt at that point I had enough suspicion to detain this

16  bag based on some evasive answers.   And I told Mr. Fallon I was

17  going to detain the bag.

18  Q.   So let me see if I understand this.   Everything is routine

19  up to the point you discovered cash there?

20  A.   We didn't discover any cash on the train.

21  Q.   Okay.   Let me step back and ask another question.

22  Everything is routine until you start asking questions about

23  the contents of the briefcase?

24  A.   Yes.

25  Q.   And the only suspicion you have about the briefcase at the

Romano - direct

1   time you make the decision to arrest the contents is that the

2   answers and questions he gave you concerning the contents?

3   A.  He also said he -- it was his bag and he didn't have a key

4   for it.  He didn't know how he was going to open it.

5   Q.  So let's add that to the group.  Is that the total sum of

6   the information you had at the moment you arrested the bag?

7   A.  His behavior started to play a factor in that.

8   Q.  Wait.  You told me it was routine up until the point that

9   you got to asking about the contents of the bag.

10  A.  Yes.

11  Q.  Correct?

12  A.  Correct.

13  Q.  That's true?

14  A.  Yeah.

15  Q.  Okay.  So your decision to arrest that bag was based on

16  what happened once it left the routine portion and it was about

17  him saying what the contents are?

18  A.  I felt he was being deceitful about the contents of the

19  bag.  And his nervousness and fidgeting just started making me

20  think, well, okay, he is hiding something here.

21  Q.  Okay.  So at that moment the bag is arrested, is that

22  right?

23  A.  At that moment I determined that I was going to seize the

24  bag.

25  Q.  Okay.  And the bag then was in your possession from then

1    on?

2    A.  No, I had put the bag back down.  I don't recall.  We like

3    to let these people carry their own luggage to the station.  So

4    we may have given it back to him.  I don't remember.

5    Q.  You gave him back the bag with money?

6    A.  I don't know what was inside of it, but we were standing

7    right there.

8    Q.  Okay.  So one of the things you do for your own safety is

9    fill their hands so when they walk in the station their hands

10   are filled with baggage?

11   A.  That could be one of the things.

12   Q.  And so when you take them back into the station, his hands

13   are full.  He can't reach for a weapon of any kind.  So it's a

14   prudent police thing to do?

15   A.  Yes, that's correct.

16           THE COURT:  When is it that he said he didn't know how

17   he was going to open the bag?  I thought you said he didn't

18   respond to that question.

19           THE WITNESS:  No, he didn't respond to when I asked

20   him why he didn't have a key to it.

21           THE COURT:  Then you asked him how he was going to

22   open it.  At one point you say he didn't say anything.

23           THE WITNESS:  He shrugged his shoulders and didn't say

24   anything.

25           THE COURT:  From that you derived that he didn't know

1  how he was going to do it?

2       THE WITNESS:  I wasn't sure what -- how he was going

3  to do it, your Honor.

4       THE COURT:  That was something different than what you

5  just said.  I was wondering.

6       THE WITNESS:  Sorry, I wasn't clear on that.

7  BY MR. KOMIE:

8  Q.  So at this moment the bag is not free to leave, and it is

9  going off the train unless you are going to Aurora?

10  A.  That train wasn't going to Aurora.

11  Q.  Well, it's on his way to Seattle, but the next stop where

12  you can get off without a special stop would be Aurora?

13  A.  Glenview.

14  Q.  Glenview.  That's the one?

15  A.  That's correct.

16  Q.  So if you wanted to continue your investigation on the

17  train without moving the bag or the person, you would have to

18  ride to Glenview at least.

19  A.  We would not have continued the investigation on the train.

20  The train was getting ready to leve.  We do not delay trains

21  unduly.  And we do not do interdictions on moving trains.

22  Q.  So at the point that the bag wasn't free to leave, you had

23  to get off the train?

24  A.  We were going to get off the train.

25  Q.  With the bag?

1  A.  Yes.

2  Q.  And so who speaks next?

3  A.  I did.

4  Q.  And what did you say?

5  A.  I told Mr. Fallon that I was going to detain the bag,

6  although he is free to travel on if he so chooses.  He can stay

7  on the train.  He would be more than welcome to escort my

8  partner and I to our office there in the station.

9  Q.  Now, sir, prior to this day, have you ever read a Supreme

10  Court case called Place?

11  A.  The name is not familiar.  I may have read its contents.  I

12  don't know.

13  Q.  Concerning the seizure of luggage?

14  A.  Was that for a Greyhound Bus case?

15  Q.  I am just asking you.  Ever heard of Place?

16  A.  No.

17  Q.  Now, who speaks next?

18  A.  Mr. Fallon did.

19  Q.  What if anything did he say?

20  A.  He said, I will go with you guys.

21  Q.  And what happens then?

22  A.  Mr. Fallon, myself and Agent Terry got off the train.

23  Q.  Where did he go?

24  A.  We walked to the Amtrak police office.

25  Q.  So is it fair to say that that walk would have spanned the

1    distance of the train back to the building?

2    A.   Yes.

3    Q.   And is it fair to say that probably was from Washington or

4    Madison all the way back to the building at Adams Street?

5    A.   Washington?  No, it was -- no.

6    Q.   Madison?

7    A.   Approximately Madison Street.

8    Q.   Can I get you some water?

9    A.   No.

10   Q.   You seem to be coughing.

11   A.   I am good.

12   Q.   From Madison to Adams, you would agree, in the City of

13   Chicago you go Madison, Monroe, Adams, three blocks?

14   A.   That would be two blocks.

15   Q.   Okay.  And from there you entered the station?

16   A.   Correct.

17   Q.   And the station entry doors are set south of Adams Street?

18   A.   No, I think they are right underneath Adams Street.

19   Q.   As you stand at the doors, the north track, you can look

20   out the doors and see the bridge?

21   A.   Yeah.

22   Q.   Adam Street sign?

23   A.   That's correct.

24   Q.   Adams Street?

25   A.   I stand corrected.

Romano - direct

1  Q.  Waterway?

2  A.  Yes.

3  Q.  So is it fair to say it's south?

4  A.  Little bit, yes.

5  Q.  A quarter block south of the bridge span?

6  A.  Quarter block?  No, that's not a quarter block.

7  Q.  Eighth of a block?  Some --

8  A.  It's south of the bridge span.  I --

9  Q.  And then you walk into the station.  You walk through the

10  station into the vestibule?

11  A.  That's into the concourse area.

12  Q.  And from there you walk to the office?

13          THE COURT:  I am sorry.  I wasn't paying attention to

14  the time.  We are going to have to stop.  We will resume at

15  9:15 tomorrow morning.

16          MR. KOMIE:  Judge, could you please admonish the

17  witness because he still has a working detail with Mr. Terry

18  and also possibly Mr. King.

19          THE COURT:  What do you wish me to admonish him?

20          MR. KOMIE:  Not to speak to anyone concerning his

21  testimony between now --

22          THE COURT:  That's correct.  Do not.  See you tomorrow

23  morning.

24          MR. MAY:  How long do you plan on going tomorrow?

25          THE COURT:  If we need to we will go all day to 4:30.

Romano - direct                                    183

1    I didn't think this would be this long.

2         MR. KOMIE:  This is going faster than I thought it

3    was.

4         THE COURT:  Okay.

5      (Hearing adjourned until the following day, April 26, 2004,

6         at the hour of 9:15 o'clock a.m.)

7                        CERTIFICATE

8         I HEREBY CERTIFY that the foregoing is a true, correct

9    and complete transcript of the proceedings had at the hearing

10   of the aforementioned cause on the day and date hereof.

11

12   _____        _____

13   Official Court Reporter                            Date
     U.S. District Court
     Northern District of Illinois
14   Eastern Division

15

16

17

18

19

20

21

22

23

24

25

1     IN THE UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF ILLINOIS
2        EASTERN DIVISION

3 UNITED STATES OF AMERICA,   )
       Plaintiff,  )
4             ) No. 03 C 3644
     v.      ) Chicago, Illinois
5             )
 FUNDS IN THE AMOUNT OF $100,120, ) April 27, 2004
6      Defendant.  )
 ---------------------------------) 10:00 a.m.
7 NICHOLAS P. MARROCCO, and    )
 VINCENT J. FALLON,      )
8      Claimants.
    TRANSCRIPT OF PROCEEDINGS - HEARING
9
    BEFORE THE HONORABLE ELAINE E. BUCKLO
10
 APPEARANCES:
11
 For the Plaintiff: MR. JAMES M. KUHN
12         MR. DANIEL E. MAY
         ASSISTANT UNITED STATES ATTORNEY
13         219 South Dearborn Street, 5th floor
         Chicago, Illinois 60604
14         (312) 353-1877
         (312) 353-8694
15

16 For the Claimants: MR. STEPHEN M. KOMIE
         KOMIE AND ASSOCIATES
17         One North LaSalle Street, Suite 4200
         Chicago, Illinois 60602-4005
18         (312) 263-2800

19

20

21

    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
22     TRANSCRIPT PREPARED BY COMPUTER

23       MICHAEL P. SNYDER
        Official Reporter
24      United States District Court
    219 South Dearborn Street, Room 1902
25      Chicago, Illinois 60604
      Telephone (312) 435-5563

Romano - direct by Komie

1        (Proceedings in open court.)

2             THE COURT:  Good morning.

3             MR. KOMIE:  Good morning, Your Honor.

4             THE COURT:  Okay.  Let's see.  Where were we?  You

5    were on the stand, I believe.  Thank you.

6          ERIC ROMANO, CLAIMANT'S WITNESS, PREVIOUSLY SWORN

7             THE COURT:  All right.  Do you understand you are

8    still under oath?

9             THE WITNESS:  Yes, I do, Your Honor.

10            THE COURT:  All right.  There is a cup there.  I

11   don't usually like to have bottles, things sitting around here.

12            THE WITNESS:  I apologize for the plastic.

13            THE COURT:  Go ahead.

14            MR. KOMIE:  Thank you, Your Honor.

15                   DIRECT EXAMINATION (resumed)

16   BY MR. KOMIE:

17   Q.  Good morning, Mr. Romano.

18   A.  Good morning.

19            MR. KOMIE:  May I approach the witness, Your Honor?

20            THE COURT:  Sure.

21   BY MR. KOMIE:

22   Q.  Showing you what's been marked as Government Exhibit No. 5,

23   which is the printout from Amtrak, to assist the Court, I would

24   direct your attention to the bottom of the page which is upside

25   down, and if we look at the line across the page, we can see

Romano - direct by Komie

1  that there is a time printed of 12 something p.m., is that

2  correct, sir?

3  A.  Where?  Oh, you said the bottom of the page, okay.

4        Yes, 12:10 p.m..

5  Q.  And is that the time the reservation was made?

6  A.  That's Pacific time.  Amtrak's reservation system is based

7  on Pacific time, so it would have actually been 2:10 p.m.

8  Chicago time.

9  Q.  And that was made on December?

10  A.  3rd.

11  Q.  3rd?

12        Now, we see two items, 1 and 2.  Was the reservation

13  made for two separate dates?

14  A.  There was one reservation made for travel on the 5th of

15  December, and it was apparently changed for travel on the 6th

16  of December.

17  Q.  Now, does it say when it was changed?

18  A.  There is no further time, so it was changed the same day

19  and the same time the initial reservation was made.

20  Q.  Could two tentative reservations be made simultaneously and

21  then the traveler call back to select the time?

22  A.  Yes.

23  Q.  So it is possible that at the time the traveler called in

24  and selected these two travel times, that tentative

25  reservations were made but no tickets were issued?

Romano - direct by Komie

1   A.   This reservation was made over the telephone, so no ticket

2   would have been issued unless a credit card was used.

3   Q.   Now if we can turn to Government Exhibit No. 6.   Government

4   Exhibit No. 6 is an Amtrak ticket?

5   A.   Yes.

6   Q.   Does it tell you the date of issue?

7   A.   Yes.

8   Q.   What date was it issued?

9   A.   December 4th, 2002.

10  Q.   And on December 4th of 2002, what day was selected for

11  travel?

12  A.   December 6th, 2002.

13  Q.   Now, if we turn back to Exhibit 5, does this indicate when

14  the ticket was issued?

15  A.   Yes, it does.

16  Q.   When was the ticket issued?

17          Just wait for the Court to get it.

18          Okay, can you tell us when it was issued?

19  A.   It was issued 3:49 p.m. on December 4th.

20  Q.   So the record indicates that the caller who made the

21  reservation called on December 3rd and within 24 hours came in

22  and purchased the ticket?

23  A.   Correct.

24  Q.   And does it indicate whether any portion of the itinerary

25  was ever canceled?

Romano - direct by Komie

1  A.  No.

2  Q.  So isn't it true, sir, in this circumstance, what happened

3  is two tentative reservations were made, and the traveler

4  finally selected one when they purchased the ticket?

5  A.  That's what it looks like, yes.

6  Q.  So, in fact, this traveler was not a no-show for any

7  portion of the travel?

8  A.  Not to my knowledge.

9  Q.  And a no-show means a person who purchases a ticket and

10  doesn't show up on departure time?

11  A.  Yes.

12  Q.  Now, all this information was available to you when you ran

13  your computer check the morning of the 6th?

14  A.  Correct.

15  Q.  Could you speak up a little bit.

16  A.  Correct.

17        MR. KOMIE:  Judge, maybe the microphone is not on?

18        THE COURT:  Are you not hearing?

19        MR. KOMIE:  No, I can't hear him.  He's closer to you

20  than he is to me.

21        THE COURT:  True.

22  BY MR. KOMIE:

23  Q.  Now, let's, if we may, go back to the 6th in the afternoon.

24  When we almost reached the conclusion yesterday, you indicated

25  that the bag was seized on the train, is that correct?

Romano - direct by Komie

1    A.   That's correct.

2    Q.   And so the bag was under arrest and could not leave under

3    any circumstances unless you authorized it to leave at that

4    point, is that right?

5    A.   The bag was seized at that point, and it was going to stay

6    in our custody.

7    Q.   Now, you leave the train, and you're walking into the

8    station.  Did you hear the conductor say "All aboard"?

9    A.   No.

10   Q.   Did you see any signals for the train to leave?

11   A.   I wasn't paying any attention to any signals.

12   Q.   You walked to the Metra office where the police function

13   is?

14   A.   We walked to the Amtrak police office.

15   Q.   And did you use your key to open the door?

16   A.   Yes.

17   Q.   And is that a locked door?

18   A.   Yes.

19   Q.   Did you then go into the office with the bag and

20   Mr. Fallon?

21   A.   Yes.

22   Q.   Between the train and the door, did you question

23   Mr. Fallon?

24   A.   I don't recall if I said anything to Mr. Fallon or not.

25   Q.   So nothing of what you consider evidentiary or

MICHAEL P. SNYDER, Official Reporter

Romano - direct by Komie

1  investigative substance takes place between the time you leave

2  the train and get to the door?

3  A.   Not that I recall.

4  Q.   Well, is there anything that would refresh your memory?

5  A.   About a conversation I had from the time I stepped off the

6  train till the time we got to the office?

7  Q.   Well, let me ask you.  Do you remember any conversation of

8  any substance between the train door and the office?

9  A.   No.

10  Q.   Now, you get to the office.  Where do you go in the office?

11  A.   Right inside the front door.

12  Q.   What is inside the front door?

13  A.   There is a desk with a chair, and to the right of that

14  immediately inside the door are two other chairs.

15  Q.   And is this a police office?

16  A.   Yes.

17  Q.   Are there any other suites of offices or chambers there?

18  A.   There are other offices, yes.

19  Q.   How many other offices?

20  A.   Six or seven.

21  Q.   Where is your office?

22  A.   My office is in the back area away from this outer office

23  that we were in.

24  Q.   What did you do with the bag, which is Government Exhibit

25  7, when you arrived at the office?

Romano - direct by Komie

1   A.   When we arrived at the office, the bag was placed on the

2   floor against the wall behind the desk.

3   Q.   Where is Mr. Fallon placed?

4   A.   He sat down with one of the, in one of the chairs right by

5   the front door.

6   Q.   Now, the desk is opposite the front door?

7   A.   The desk faces the front door.

8   Q.   And the bag was put behind the desk?

9   A.   No.   The bag was put against the wall that is behind the

10  desk, but not out of view.   The bag was actually put right

11  adjacent to these two chairs, against the wall.

12  Q.   Did you ever leave the room with the bag in it?

13  A.   I left the room several times.

14  Q.   Was there always an officer in the room when you left?

15  A.   Yes, either Agent Terry or I were there.

16  Q.   So the bag was never left without a police person there?

17  A.   No.

18  Q.   That's correct?

19  A.   That's correct.

20  Q.   What do you do next?

21  A.   I believe I went into my office and retrieved some blank

22  forms.

23  Q.   What kind of forms would those be?

24  A.   Personal history report, address acknowledgment form,

25  fingerprint cards, that type of thing.

Romano - direct by Komie

1  Q.  So one of your purposes when you went to your office was to
2  get a fingerprint card to take Mr. Fallon's fingerprints?
3  A.  No, not at that point.
4  Q.  Did you get one?
5  A.  I picked -- we have packages of forms for every arrest or
6  every incident, and I picked up one of those packages to take
7  it back out.
8  Q.  Okay.  Now, at your office, do you have consent to search
9  forms?
10 A.  Probably.
11 Q.  And are they available for you to fill in the blanks like
12 put in the person's name and a place for them to sign to waive
13 their constitutional rights?
14 A.  We have consent to search forms.
15 Q.  On that day, did you pick up one?
16 A.  No.
17 Q.  Did you use one in connection with this case?
18 A.  No.
19 Q.  Now, you pick up this package of forms.  Where do you go
20 next?
21 A.  I went back out to the front where Mr. Fallon was sitting.
22 Q.  What happened then?
23 A.  I asked Mr. Fallon what was inside the bag, and again he
24 said, he stated:  There is $50,000 in there; open the freaking
25 bag.

Romano - direct by Komie

1  Q.  And did you do so?

2  A.  Agent Terry and I were able to unlock it, yes.

3  Q.  Well, did you use a key?

4  A.  No.

5  Q.  Did you use a knife?

6  A.  I believe we used a Swiss Army knife or something like

7  that.

8  Q.  And showing you what's been marked as Exhibit 7 for the

9  government, is this the bag in question that you opened with an

10  army knife?

11  A.  Yes, it is.

12  Q.  And when you opened it with an army knife, can you

13  demonstrate for the Court how you did it?

14  A.  Well, I don't have an army knife with me.  I think it was

15  something like a Swiss Army knife.

16       We were able to manipulate this lock.  It recessed

17  underneath this bar.  It opened up.

18  Q.  So you used the blade to insert between the bar --

19  A.  No, in the little hole right here where the key would go.

20  Q.  So you were able to use the blade to insert into the

21  keyhole to cause the tumblers to allow it to open?

22  A.  However it works in there, the knife was able to unlock

23  that.

24  Q.  Okay.  Now, at the time you were doing this, did you have a

25  warrant to go into the bag?

Romano - direct by Komie

1  A.  No.

2  Q.  When you opened the bag, what did you see?

3  A.  Numerous bundles of U.S. currency.

4  Q.  Did you discover any narcotics?

5  A.  No.

6  Q.  Did you smell any?

7  A.  No.

8  Q.  What happened next?

9  A.  Agent Terry I think went into the back and called Chicago

10  to get a canine.  I stood there, I sat down with Mr. Fallon, I

11  believe I asked him whose money this was.

12  Q.  Let me back up.  At the time Mr. Terry goes to the

13  telephone, was this around 2:15 in the p.m.?

14  A.  No, it probably was closer to 2 o'clock.

15  Q.  Well, did you board the train at sometime between just

16  before 2 and 2?

17  A.  We engaged Mr. Fallon at approximately 1:50.

18  Q.  So Mr. Terry's report that says 2 o'clock is in error?

19  A.  That may be the time his dispatcher gave him.  That's got

20  nothing to do with the time we log on our reports for the

21  encounter, so that's not my --

22  Q.  And would the time of 2:15 on his report for contacting the

23  dog be in error also?

24        MR. KUHN:  Objection, Your Honor.  That wasn't his

25  testimony.  Officer Terry specifically said that was not

MICHAEL P. SNYDER, Official Reporter

Romano - direct by Komie

1  contacting the dog.  Mr. Komie is twisting his words.

2         THE COURT:  I'd have to go back to my notes to see

3  what was said in that regard.

4         MR. KOMIE:  Judge, I am going to tie it up when I

5  move to admit the report later on.

6         THE COURT:  Go ahead, but -- the best you can do is

7  --

8  BY MR. KOMIE:

9  Q.  Would the time of 2:15 for notification of the dog be in

10  error?

11  A.  I don't know what time Agent Terry called for the dog.

12  Q.  Okay.  Now, Agent Terry goes and calls for the dog.  Are

13  you filling out paperwork at this point?

14  A.  I'm sitting down speaking with Mr. Fallon, yes.

15  Q.  Are you filling out a DEA information form?

16  A.  Personal history report.

17  Q.  Okay.  Do you frisk Mr. Fallon?

18  A.  I patted him down for weapons before we left the train.

19  Q.  And did that take place in the train car?

20  A.  Yes.

21  Q.  Did that take place in the private room?

22  A.  No, actually it took place in the doorway of his private

23  room.

24  Q.  Was he in the room when he was being patted down?

25  A.  He was in the doorway.

MICHAEL P. SNYDER, Official Reporter

Romano - direct by Komie

1  Q.  And did you pat him down again in the office at any time?

2  A.  Probably.

3  Q.  And did you turn his pockets inside out in the office?

4  A.  No.

5  Q.  Did you find, when you patted him down, did you find any

6  narcotics on him?

7  A.  No.

8  Q.  Did you find any contraband of any kind?

9  A.  No.

10  Q.  On that day, did you have a radio with you?

11  A.  No.

12  Q.  Before you went to the train, did you do a criminal history

13  check?

14  A.  No.

15  Q.  Did you do one at the office?

16  A.  I believe so.

17  Q.  And when you ran his criminal history check, you learned

18  that he had no criminal history except for traffic, is that

19  correct?

20  A.  Correct.

21  Q.  Now, does that criminal history check take place while

22  you're filling out the paperwork as you're sitting there?

23  A.  I don't recall exactly when I called the base, but at some

24  point I called them.

25  Q.  So is it fair to summarize that before the dog arrives, the

Romano - direct by Komie

1  bag has been opened with a knife, Mr. Fallon has been

2  determined not to have any warrants for his arrest and has been

3  determined not to have a criminal history other than traffic?

4  A.  Correct.

5  Q.  And is it further fair to say that at this particular

6  point, you found no evidence of criminal activity?

7  A.  Up to that point, that's correct.

8  Q.  Now, what time does the dog arrive?

9  A.  I don't remember exactly what time, but it was -- I don't

10  believe it was any more than 25 or 30 minutes from the time we

11  walked into the office till the time --

12  Q.  So some period of time, 30 to 35 minutes?

13  A.  I don't, I don't think it was that long.

14  Q.  25 to 30 minutes, somewhere in that range?

15  A.  Somewhere, 25 to 30 minutes.

16  Q.  Who came with the dog?

17  A.  Chicago police Officer Rick King.

18  Q.  Now, during the entire time you're sitting there, which by

19  your own statement is 25 minutes, does Mr. Fallon talk to you

20  about being engaged in any narcotics transaction?

21  A.  No.

22  Q.  The handler of the dog arrives, Mr. King.  What happens?

23  Do you have a conversation with him?

24  A.  A brief conversation.

25  Q.  And what if anything do you say to him?

Romano - direct by Komie

1   A.  I just said we need your dog for a sniff search.

2   Q.  And did you indicate what was in the briefcase to him?

3   A.  No.

4   Q.  What happened then?

5   A.  He turned around and walked out to his vehicle to get his

6   dog.

7   Q.  What did you do?

8   A.  I picked up the bag and took it back into the roll call

9   area of the police office and secreted it inside a cabinet.

10  Q.  When you say secreted, is this an open room?

11  A.  Yes.

12  Q.  Are there chairs in the room?

13  A.  Yes.

14  Q.  Desks?

15  A.  Yes.

16  Q.  Are the desks attached to the chairs?

17  A.  They are more like tables.

18  Q.  Tables?

19  A.  They are not attached to the chairs.

20  Q.  And how big a room is it?

21  A.  Probably 25 by 15.

22  Q.  In the room, did you have anyplace to hide the briefcase in

23  a container?

24  A.  Yes, in a filing cabinet.

25  Q.  Did you put it in a filing cabinet?

Romano - direct by Komie

1   A.   Yes.

2   Q.   And what did -- what if anything happened when the dog

3   returned?

4   A.   Officer King came in with the dog, and he brought the dog

5   in the roll call area where the bag was secreted.  He let the

6   dog off the leash, gave the dog his commands, and the dog did

7   his thing.

8   Q.   And what did you see, if anything?

9   A.   I saw the dog walk across the room, he went right to the

10  cabinet where the bag was secreted and started scratching on

11  it.

12  Q.   So if I understand your testimony correctly, the dog

13  handler and the dog come to the door to the room, the command

14  is given to the dog, and the dog goes straight to the cabinet?

15  A.   Yes.

16  Q.   No searching around the perimeter of the room?

17  A.   Not that I recall.

18  Q.   And when that takes place, what happens to the cabinet?

19  Anything happen to the cabinet?

20  A.   No.  Nothing that I remember.

21  Q.   Now, the dog can't get through the cabinet.  What did the

22  dog do?

23  A.   The dog may have been able to partially open the door, I

24  don't recall that.

25  Q.   And then what happened?

Romano - direct by Komie

1   A.   Officer King indicated to me that the dog had alerted

2   positively on this, this bag.

3   Q.   At any time did you see the dog put its mouth to that bag?

4   A.   I don't, I don't recall.

5   Q.   You don't recall seeing that?

6   A.   I don't remember, no.  He may have.  I don't know.

7   Q.   Did the dog ever touch the bag?

8   A.   I don't recall that either.  Officer King told me the dog

9   alerted to it.

10   Q.   Well, you were standing there, weren't you?

11   A.   I was in an adjacent room.

12   Q.   Now, what happened next?

13   A.   After Officer King told me that the dog alerted positively

14   to the bag, he asked me what was inside of it.  We said the kid

15   says he's got $50,000 in here.  So I retrieved the bag from the

16   cabinet, took it back out in front.

17   Q.   So you physically were the person responsible for hiding

18   it?

19   A.   Yes.

20   Q.   You hid it in a cabinet, and you came back into the room,

21   and it was still in the cabinet when you found it?

22   A.   Yes.

23   Q.   And you took it out of the cabinet?

24   A.   Yes.

25   Q.   And you brought it somewhere else?

Romano - direct by Komie

1  A.  I took it back out to where Mr. Fallon and Terry were

2  sitting.

3  Q.  Now, while the dog was still present, did you ever have any

4  of the bundles that were in the bag -- there are 19 bundles,

5  right?

6  A.  Correct.

7  Q.  Did you have any of the bundles taken out and have the dog

8  search for the bundles?

9  A.  I did not.

10  Q.  Did you ever have any of the individual bills taken out and

11  the dog search for them?

12  A.  No.

13  Q.  Now, at this time, had there been any discussion of

14  narcotics, that Mr. Fallon was going to do a narcotics deal of

15  any kind?

16  A.  No.

17  Q.  Had there been any discussion of him receiving the money

18  from a narcotics transaction?

19  A.  We asked him where the money came from.

20  Q.  And when you asked him, did he ever say he got it from a

21  narcotics transaction?

22  A.  No.

23  Q.  So at this point, you have no information that this money

24  is connected to narcotics other than what you're relying upon

25  as the dog?

Romano - direct by Komie

1   A.   That's correct.

2   Q.   What did you do next?

3   A.   I told Mr. Fallon that the dog had alerted positively, and

4   I was going to call the U.S. Attorney's office for possible

5   money laundering charges.

6   Q.   Do the railroad police investigate money laundering?

7   A.   I do as part of the DEA task force.

8   Q.   So that's not a job of a railroad policeman, correct?

9   A.   It could be.

10  Q.   Illinois doesn't have a money laundering statute, does it?

11  A.   We don't go through the state.   We go through the federal

12  courts.

13  Q.   Now, at this point you call the U.S. attorney, and they

14  decline prosecution?

15  A.   I believe I called the duty pager, and it was probably a

16  few minutes before they called me back.

17  Q.   And you made a phone call, and they declined any

18  prosecution?

19  A.   They -- it was a few minutes before they called me back.

20  Q.   How long?

21  A.   Ten to 15 minutes.

22  Q.   Okay.   Did you have a conversation?

23  A.   Yes.

24  Q.   Did the voice over the phone identify itself as an

25  assistant United States attorney?

Romano - direct by Komie

1  A.  Yes.

2  Q.  Did you tell him what you had there?

3  A.  I told him the facts of the case we knew up to that point.

4  Q.  And at that point did they decline prosecution?

5  A.  Yes.

6  Q.  At this point, do you fingerprint Mr. Fallon?

7  A.  Pretty soon after that, yes.

8  Q.  Now, you observed no criminal activity, is that right?

9  A.  No.

10  Q.  That's correct?

11  A.  That's correct.

12  Q.  He committed no crime in your presence, right?

13  A.  Correct.

14  Q.  You had no information a crime had been committed outside

15  your presence, is that correct?

16  A.  That's correct.

17  Q.  And yet you fingerprinted him, is that right?

18  A.  That's correct.

19  Q.  And also photographed him?

20  A.  Correct.

21  Q.  Do you know where that fingerprint card is today?

22  A.  In the case file.

23  Q.  Does it take, state on the front of it what time it was

24  taken?

25  A.  I don't think so.

Romano - direct by Komie

1  Q.  Where is the case file?

2  A.  At our office up in Des Plaines.

3  Q.  So you didn't review it for today?

4  A.  I reviewed the case file last week.

5  Q.  And the fingerprint card was in there, and you didn't note

6  the time of taking?

7  A.  I don't think there is a time on the fingerprint card.

8          MR. KOMIE:  May I approach the witness, Your Honor?

9          THE COURT:  Yes.

10 BY MR. KOMIE:

11 Q.  Sir, showing you what is marked as Defendant's Exhibit No.

12 4, or excuse me, Claimant's Exhibit No. 4 for identification,

13 is that a fingerprint card?

14 A.  That's a copy of one.

15 Q.  And is that a copy of the fingerprint card you used in

16 connection with Mr. Fallon?

17 A.  It's got his name on it.  Probably.

18 Q.  And his Social Security?  A Social Security number, is that

19 right?

20 A.  That's a Social Security number.  I don't know if it's his.

21 Q.  Okay.  Well, on this card, it indicates that you obtained

22 his height, weight, color of hair, eye color?

23 A.  Yes.

24 Q.  Those are all things you took down in your personal history

25 report, is that right?

Romano - direct by Komie

1  A.  Yes.

2  Q.  And you would have put that on the fingerprint card, would

3  you not?

4  A.  Yes.

5  Q.  And I notice that it's in a typed form.  Do you type your

6  fingerprint cards before you use them?

7  A.  No.

8  Q.  Are they electronically printed out?

9  A.  This one was, but this one was done up at our office in Des

10  Plaines.

11  Q.  So that occurs -- so Exhibit No. 4 didn't occur on that

12  day?

13  A.  The prints did.  The typed information did not.

14  Q.  Okay.  So this would be a electronic version of the

15  fingerprint card you used on the day in question?

16  A.  Correct.

17  Q.  And the original fingerprint card is somewhere else?

18  A.  It's in the case file.

19  Q.  Okay.  Showing you what's No. 5, is this a document you

20  filled out, Federal Bureau of Investigation, United States

21  Department of Justice, Washington, D.C.?

22  A.  This is the back of the fingerprint card.

23  Q.  And so that's an electronic version of the back of it?

24  A.  Yes.

25  Q.  And does it indicate the charge or citation?

Romano - direct by Komie

1  A.  Yes, it does.

2  Q.  And does it indicate the charge of money laundering?

3  A.  Yes.

4  Q.  And did you write that yourself when you filled out the

5  card?

6  A.  I probably typed it into the computer.

7  Q.  And did you put a parentheses there and put "If tax based"?

8  A.  I didn't.  That may come automatically with the charge.  I

9  don't know.  It's a new system.  I don't know much about it.

10  Q.  Okay.  Well, this also reflects that he works at Al's

11  Pizzeria and Steakhouse and gives an address, does it not?

12  A.  That was -- he claimed that was his last place of

13  employment.

14  Q.  And it gives an address for him and a telephone number?

15  A.  The address he gave us was the P.O. box.

16  Q.  So 4 and 5 are electronic versions of the original?

17  A.  Correct.

18  Q.  Now, he has been fingerprinted and photographed.  Did you

19  give him a receipt for the money?

20  A.  I gave him a receipt for 19 bundles of U.S. currency.

21  Q.  And would that be Government Exhibit No. 8?

22  A.  That's a, that's an address acknowledgment form.

23  Q.  So when it says "Receipt for seized property," it doesn't

24  mean that, on the top line?

25  A.  That's not the actual receipt.  That -- this is an address

Romano - direct by Komie

1  acknowledgment form, and obviously this is where you're

2  supposed to write down what your case is.

3  Q.  Now, is this all in your handwriting?

4  A.  Yes.

5  Q.  So you're the person who prepared the inked, ball point ink

6  portions of Exhibit A?

7  A.  Yes.

8  Q.  And you prepared that on that day, right?

9  A.  Yes.

10  Q.  And that's after he has been photographed, fingerprinted,

11  and kept in your office for a period of time?

12  A.  I filled out that form after he was fingerprinted and

13  photographed, correct.

14  Q.  Now, about this time, is it about 4 o'clock?

15  A.  No.

16  Q.  What time is it?

17  A.  Not even close.  Probably between 2:45 and 3 o'clock.

18  Q.  So this occurs after the dog has sniffed it?

19  A.  What occurs?

20  Q.  This occurs, the address acknowledgment and receipt for

21  stolen, or for seized property occurs after?

22  A.  Yes.  I would have filled out those forms, that form and

23  the disclaimer and the DEA 12 receipt just before we let, just

24  before he leaves.

25  Q.  Okay.  You were about to say "just before we let him go"?

Romano - direct by Komie

1   A.   No, just before we were done.

2   Q.   And what time were you done on this job?

3   A.   I don't recall the exact time.

4   Q.   Would you have any quarrel with the report of your partner

5   which says 4:30?

6           MR. MAY:  Objection, Judge.  That was not the

7   testimony and/or characterization of the statements of Officer

8   Terry yesterday.

9           THE COURT:  I'll go back and see.  The other one

10  there actually was 2:15.

11          MR. MAY:  He testified yesterday that his contact was

12  no more than an hour and a half, two hours at the most.

13          MR. KOMIE:  May I approach with the report, Judge, so

14  I can show it to you?  I will show it to counsel.

15          THE COURT:  Yes.

16          MR. KOMIE:  Can I show this to you?

17          THE COURT:  Go ahead.

18          MR. KOMIE:  (Tendering).

19          THE COURT:  All right.

20          MR. KOMIE:  May I go forward, Your Honor?

21          THE COURT:  Yes.

22  BY MR. KOMIE:

23  Q.   Would that be about 4:30 in the afternoon?

24  A.   What?

25  Q.   What?

Romano - direct by Komie

1  A.  I don't -- what about 4:30?

2  Q.  In other words, at the time you allow him to leave and

3  you're done with him is about 4:30 in the afternoon?

4  A.  No.  We were finished with this long before that.

5  Q.  When did you finish with this?

6  A.  Between, between 3:30 and 4 o'clock we were done.

7  Q.  And was Mr. Fallon released?

8  A.  Mr. Fallon left.

9  Q.  At what time?

10  A.  Between 3:30 and 4 o'clock.

11  Q.  Now, sir, are you a notary public?

12  A.  No.

13  Q.  Was there a notary in the police station that day?

14  A.  Not to my knowledge.

15  Q.  Now, before Mr. Fallon left, was he required to sign any

16  documents?

17  A.  A DEA 12 receipt for the 19 bundles of currency, and he

18  voluntarily signed a disclaimer of ownership and interest.

19  Q.  And that would be Exhibit No. 9?

20  A.  That's a disclaimer of interest.

21  Q.  You have to speak so the Court can hear you.

22  A.  That is a disclaimer of interest and ownership.

23  Q.  I know I am standing close to you, but the Court and the

24  room has to hear.

25  A.  I know.

Romano - direct by Komie

1          THE COURT:  I can hear.

2    BY MR. KOMIE:

3    Q.  Now, sir, who, without looking at the signature of the

4    claimant, who filled in this form?

5    A.  I did.

6    Q.  And is it your handwriting on all portions of the form with

7    the exception of the signature of the claimant?

8    A.  Yes.

9    Q.  And this form provides, as required by Illinois law, for a

10   disclaimer, for a notary public.  Was one summoned at any time?

11         MR. KUHN:  Objection to the characterization of

12   what's required by Illinois law on this particular form, Judge.

13         MR. KOMIE:  I will withdraw that question and put

14   another.

15   BY MR. KOMIE:

16   Q.  Was any notary summoned to the police station to do a

17   disclaimer?

18   A.  No.

19   Q.  Now, sir, on that date -- if I could show you Suppression

20   No. 10, Government Exhibit, this document is a receipt for cash

21   or other items?

22   A.  That's what its purpose is, yes.

23   Q.  And whose handwriting is on this document?

24   A.  Mine.

25   Q.  And did you fill this out?

Romano - direct by Komie

1   A.  Yes, I did.

2   Q.  And whose signatures are on this document?

3   A.  Mine, Agent Terry's, and Mr. Fallon's.

4   Q.  So he signed three forms before he could leave, is that

5   right?

6   A.  No, that's not correct.

7   Q.  Did he sign all three forms at the same time?

8   A.  Yes.

9   Q.  Were they handed to him in a group?

10  A.  No, not -- no, they were not.

11  Q.  Now, where are you when these are being signed?

12  A.  In the front office where we conducted the business.

13  Q.  Was the fingerprinting done in the front office?

14  A.  No.

15  Q.  Where was the fingerprinting done?

16  A.  In the, in the police roll call room, which is probably

17  about a 15-step walk from this office.

18  Q.  Fifteen feet?

19  A.  If that.

20  Q.  And the roll call room has a fingerprint table?

21  A.  A portable one, yes.

22  Q.  And the fingerprint table has an ink pad on it?

23  A.  Yes.

24  Q.  And the classic what we've seen in the movies, a roller?

25  A.  No, it's a new ink pad.  We don't need the ink anymore.  It

Romano - direct by Komie

1  inks itself.

2  Q.  Do you have to put somebody's fingers in the ink in order

3  to take the print?

4  A.  Yes.

5  Q.  And that was done in a room separate and apart from the

6  room where Mr. Fallon had been sitting?

7  A.  Yes.

8  Q.  This is done before he signs the forms?

9  A.  Yes.

10  Q.  And at that point, was he allowed to leave that office and

11  go to the washroom directly across and wash his hands?

12  A.  He was allowed to go to the washroom in the office there,

13  yes.

14  Q.  And did you give him any kind of fingerprint remover for

15  the ink?

16  A.  I don't remember.

17  Q.  Now, after that, is he taken back to the front office?

18  A.  After he washed his hands and whatever he had to do in

19  there, he walked back to the front office, yes.

20  Q.  And when he gets back to the front office, is that the

21  point in time he's presented these forms?

22  A.  I showed him each form individually and explained their

23  purpose individually to him.

24  Q.  And did you ever tell him that in order to go, he had to

25  sign these?

Romano - direct by Komie

1    A.   No.

2    Q.   After he signed these, did you make any arrangements for

3    his transportation to Seattle as he missed his train?

4    A.   No.

5    Q.   Did you at any time offer to speak to the railroad so that

6    he could leave the next day?

7    A.   Agent Terry or I probably did.  One of us always --

8    Q.   When you say probably, do you have a specific memory of you

9    doing it?

10   A.   I did not, no.

11   Q.   During the period of time he was there, was he permitted

12   any phone calls?

13   A.   He never asked to use a phone.

14   Q.   At any time while he was there, did you read to him what we

15   all call the Miranda warnings, you know, "You have the right to

16   remain silent," et cetera?

17   A.   No.

18   Q.   And so you made a conscious choice not to read those to

19   him, is that correct?

20   A.   There was never any necessity to read his rights to him.

21   Q.   Well, you did call the U.S. attorney, didn't you, to see

22   about charging?

23   A.   Yes.

24   Q.   So you were thinking of charging him, were you not?

25   A.   That was up to the U.S. Attorney's office, not me.

Romano - direct by Komie

1    Q.   But you yourself were thinking of charging him, were you

2    not?

3    A.   No.

4    Q.   Now, at the time you called the U.S. attorney, you had no

5    evidence of any kind that the money had been exchanged in

6    violation of law, is that correct?

7    A.   No.  No, I had no evidence to that point.

8    Q.   Now, if I can show you Exhibits 1 through 4, if I can call

9    on my colleagues to get the originals, No. 1, is that a picture

10   you took?

11   A.   Yes.

12   Q.   And can you tell the Court when you took the picture?

13   A.   I took this picture last Wednesday evening, I believe.

14   Q.   So this is not a picture of car 730, room 7, is that

15   correct?

16   A.   It could be.

17   Q.   No, I didn't ask you that question.  Is the car you

18   photographed car 730?

19   A.   Not that day, no.

20   Q.   And so this is a prototype?

21   A.   Prototype?

22   Q.   Well, let's say it's -- it's another railroad car, we agree

23   on that?

24   A.   No, I can't, I can't agree to that.  It may have been the

25   exact same one.  They swap these cars around all the time.

Romano - direct by Komie

1  Q.  Well, the question I have is on the day in question, you

2  entered car 730?

3  A.  Yes.

4  Q.  And you didn't photograph car 730 on that day?

5  A.  No.

6  Q.  Now, when you went to photograph this, you went obviously

7  to a railroad yard, right?

8  A.  No.  Actually I went, there was a train sitting in the

9  station with the same cars on it.

10 Q.  So you went to the Empire Builder sitting in the station

11 waiting to depart?

12 A.  No, I didn't go to the Empire Builder.

13 Q.  Just any train?

14 A.  I went to an identical car.

15 Q.  Okay.  So identical meaning a car that's similar to?

16 A.  No, a car that's identical to the 730 car on December 6th.

17 Q.  And you then photographed what was in that car room 7?

18 A.  They are identical cars.

19 Q.  Okay.  Instead of quibbling with you, here's No. 2.  Taken

20 on the same day?

21 A.  Yes, sir.

22 Q.  No. 3, taken on the same day?

23 A.  Yes, sir.

24 Q.  No. 4, taken on the same day?

25 A.  Yes, sir.

Romano - direct by Komie

1  Q.  Now, this car contains a shade to pull down for the

2  exterior window?

3  A.  Yes.

4  Q.  This car contains a shade from the portion to the

5  compartment to the room?

6  A.  I think it's a curtain.

7  Q.  A curtain?

8  A.  Yes.

9  Q.  So it's some way to have privacy, right?

10  A.  Yes.

11  Q.  Would you agree that this is a private room, right?

12  A.  Correct.

13  Q.  It's not a public space of any kind?

14  A.  No.

15  Q.  That's correct?

16  A.  That's correct.

17  Q.  And you're a man of how many years?

18  A.  My age?

19  Q.  Yes, sir.

20  A.  Forty-four.

21  Q.  And you're how tall?

22  A.  Five-eleven.

23  Q.  And your weight, sir?

24  A.  Probably about 200 pounds, maybe 205.

25  Q.  Would it be a fair statement that a man of your muscular

Romano - direct by Komie

1  build would fill the entire doorway if standing in front of it?

2  A.  If I was standing in the doorway, probably.

3  Q.  And that if you were standing there, nobody could get by

4  you?

5  A.  If I was standing in the doorway?  Probably not.

6  Q.  Unless it was a mouse?

7  A.  I'm not that big.

8  Q.  Now, when you got to this location on the day in question,

9  what side of the door were you on, so the Court knows, if we

10  can mark that?

11          MR. KOMIE:  Would that be okay with you if he marks

12  it?

13          MR. KUHN:  Those are the only ones we have.  If we go

14  to trial, those will be the ones we'll be using.  If you want

15  to mark it, that's okay with me.

16  BY MR. KOMIE:

17  Q.  Well, maybe you could just indicate for the Court, because

18  the Court has an excellent memory.

19  A.  The best, the best view I guess would be this is the

20  entrance to the room, Your Honor, and I was standing to the

21  right of the door frame.

22          THE COURT:  All right.

23          MR. KOMIE:  Okay, Your Honor.  That would be No. 3,

24  Government Exhibit 3.

25  BY MR. KOMIE:

Romano - direct by Komie

1  Q.  And so if we use Government Exhibit 3 as the best view,

2  Mr. Terry would then be in the next one, is that right, on the

3  other side?  Left side of the door?

4  A.  He was on the left side of the door.

5  Q.  Now, I happen to note that the best view, Government

6  Exhibit 3, appears to be taken from a room across the hall, is

7  that correct?

8  A.  That's correct.

9  Q.  And we can note that because we can see the partition in

10  the lower left-hand corner of the exhibit?

11  A.  Correct.

12  Q.  Now, the corridor in question is narrow, is that not true?

13  A.  It's pretty narrow.

14  Q.  And it's really basically for one person to walk unless

15  they turn sideways when passing another?

16  A.  Two people can get down those corridors.  We have people

17  walk past us all the time.

18  Q.  Okay.  Now, when the two of you are standing there, the

19  corridor is blocked by the two of you?

20  A.  Not completely.

21  Q.  And the opposite, from the opposite side of this door is

22  the door to the next room, was that open or closed on that day?

23  A.  I don't recall.

24        MR. KOMIE:  May I have a minute, Your Honor?

25     (Pause.)

MICHAEL P. SNYDER, Official Reporter

Romano - direct by Komie

1  BY MR. KOMIE:

2  Q.  Sir, when you were at that railroad car, we have Exhibit 3,

3  and you were frisking Mr. Fallon, he had to be standing up, is

4  that right?

5  A.  I -- I didn't frisk Mr. Fallon, first of all.

6  Q.  Did someone else?

7  A.  I patted Mr. Fallon down for weapons after I asked him if

8  he had any.

9  Q.  So that occurs at the car?

10  A.  Correct.

11  Q.  And in Exhibit 3, was he inside the room?

12  A.  No.  He was standing right in the doorway.

13  Q.  Where were his hands as you frisked him?

14  A.  I don't recall.  When people raise their hands during

15  consensual interview, we always tell them put your hands down,

16  it's not, you are not under arrest.  I don't recall where his

17  hands were.

18  Q.  Now, you told me what is your policy or procedure.  What

19  happened with Mr. Fallon?

20  A.  I don't recall if he put his hands up or not.

21  Q.  Do you recall whether you put your hands into his pockets?

22  A.  I did not put my hands in his pockets.

23  Q.  Do you recall whether he was wearing a jacket at the time

24  you frisked him?

25  A.  I didn't frisk him, sir.  I patted him for weapons.

Romano - direct by Komie

1   Q.  Patted, okay, let's use your term.  Patted.  Did he have a

2   jacket on when you patted him?

3   A.  I don't remember if he did or not.

4   Q.  Did he have a shirt on?

5   A.  Yes.

6   Q.  Did he have pants on?

7   A.  Yes.

8   Q.  Did you pat down the trunk of his body?

9   A.  I crushed his pockets and his waist for, looking for

10  weapons.

11  Q.  Did you check his legs to see whether he had a sidearm

12  attached to his ankle?

13  A.  I may have, yes.

14  Q.  Now, at the time you had patted him down, he had told you

15  he had no weapons, is that right?

16  A.  That's correct.

17  Q.  He had further told you that he was traveling with a

18  ticket.  You checked his ticket?

19  A.  Correct.

20  Q.  You had also checked his identification.  That was in

21  order?

22  A.  It appeared to be.

23  Q.  And you had no information that he was in any way posing a

24  personal safety risk to you, is that right?

25  A.  No.

Romano - direct by Komie

1  Q.  That's correct?

2  A.  That's correct.

3  Q.  Made no movements of the type to threaten you?

4  A.  No.

5  Q.  Said nothing threatening?

6  A.  No.

7  Q.  That's correct?  All these things are correct, is that

8  right?

9  A.  That's correct.

10  Q.  And then as part of your protocol, you frisk him?

11  A.  I patted him down for weapons for my safety.

12  Q.  Now, the briefcase was in the room when you arrived, right?

13  A.  Yes.

14  Q.  It wasn't in the public corridor?

15  A.  No.

16  Q.  That's correct?

17  A.  That's correct.

18  Q.  And there was nothing about the briefcase out of the

19  ordinary when you saw it with your eyes?

20  A.  No.

21  Q.  And at the time you seized it, you weren't aware of any

22  violation of federal or state law, is that correct?

23  A.  That's correct.

24  MR. KOMIE:  Judge, we tender the witness.

25  THE COURT:  Okay.

Romano - cross by Kuhn

1                    CROSS-EXAMINATION

2    BY MR. KUHN:

3    Q.  Let me try to fill in some holes here.

4              You have been in law enforcement for about 20 years?

5    A.  Yes.

6    Q.  You have an associate's in criminal justice from the

7    College of DuPage?

8    A.  Yes.

9         MR. KOMIE:  Judge, may I move to the jury box?  My

10   colleague has a soft voice.

11        THE COURT:  Sure.

12        MR. KOMIE:  I can't hear him from the table.

13   BY MR. KUHN:

14   Q.  You've been a national instructor for interdiction classes

15   in narcotics?

16   A.  I have, yes.

17   Q.  Now, in your 11 years with Amtrak, how often do you board

18   trains?

19   A.  Numerous times.

20   Q.  On a daily basis?

21   A.  Yes.

22   Q.  And are you familiar with the Empire Builder?

23   A.  Yes, I am.

24   Q.  That's train No. 7?

25   A.  727, yes.

Romano - cross by Kuhn

1   Q.   And that leaves every day out of Chicago?

2   A.   Yes.

3   Q.   And as Mr. -- I think Mr. Komie asked you, it goes to

4   Seattle, and then part of it breaks up?

5   A.   It splits in Spokane, Washington.  Half goes to Seattle,

6   the other half goes to Portland.

7   Q.   And on the Empire Builder, there are these sleeper cars.

8   What kind of cars are those?

9   A.   They are called Superliners.

10  Q.   Superliner cars?

11  A.   Yes.

12  Q.   Are you familiar with a Superliner car?

13  A.   Yes.

14  Q.   Are all the Superliner cars identical?

15  A.   All of them.

16  Q.   And there is an upstairs and a downstairs?

17  A.   Yes.

18  Q.   And what is downstairs in a Superliner car?

19  A.   Downstairs is a, at one end of the car is a handicap

20  bedroom and five washrooms.  The opposite end of the car is a

21  family bedroom and four economy bedrooms.

22  Q.   And upstairs in the Superliner, what do you find there?

23  A.   One-half of the car is ten economy bedrooms, and the other

24  half of the car is five first class bedrooms.

25  Q.   And I think as you testified before, the door is in the

Romano - cross by Kuhn

1  center of the train car, so you go up, the first class bedrooms

2  are on one side, and the economy rooms are on the other?

3  A.  Correct.

4  Q.  And how are the standard bedrooms identified on each one of

5  these cars?

6  A.  They are identified numerically.

7  Q.  In Mr. Fallon's case, he was in No. 7?

8  A.  Correct.

9  Q.  These deluxe or the first class rooms, how were those

10  identified?

11  A.  The deluxe rooms are identified alphabetically, A through

12  E.

13  Q.  And the standard rooms that we are talking about on a

14  Superliner, there is 14 of them, are any of them different from

15  the others?

16  A.  The 14 standard rooms?

17  Q.  Yes.

18  A.  No, they are all the same.

19  Q.  Identical?

20  A.  Identical.

21  Q.  And how big is a standard room?

22  A.  It's approximately three and a half feet from window to

23  door, approximately six and a half feet long, and approximately

24  seven and a half feet high.

25  Q.  And as we've heard, there are two seats that fold down to

Romano - cross by Kuhn

1   make a bed.  When the seats are in the seated position to make
2   seats, how much space is in between the two seats?
3   A.   Maybe a foot and a half.
4   Q.   And each one of these has a door and a curtain?
5   A.   Correct.
6           MR. KUHN:  May I approach the witness, Your Honor?
7           THE COURT:  Yes.
8   BY MR. KUHN:
9   Q.   I show you what has already been admitted as Government's
10  Exhibit Suppression 1 through 4.  They are four Polaroids that
11  you testified you took, and that's a unit, a No. 7 on a sleeper
12  car, or a Superliner car, I think, is that what you call it?
13  A.   A Superliner sleeper, correct.
14  Q.   And that particular one, you don't know if that was on car
15  No. 730 or not?
16  A.   No, I have no idea.
17  Q.   But is the unit that you took those photographs, is that
18  identical or does it accurately depict what sleeper car No. 7
19  on car No. 730 on the Empire Builder on December 6 of 2002
20  looked like?
21  A.   Identical.
22  Q.   Same size?
23  A.   Same size.
24  Q.   Same amenities?
25  A.   Yes.

Romano - cross by Kuhn

1   Q.   That car does not have a toilet?

2   A.   This particular bedroom does not.

3   Q.   Doesn't have a sink?

4   A.   No.

5   Q.   Doesn't have a wash basin?

6   A.   No.

7   Q.   Doesn't have a shower?

8   A.   No.

9   Q.   Those are in the deluxe rooms that are at the other end of

10  the car?

11  A.   Correct.

12  Q.   And you can tell or can you tell by a ticket what type of

13  sleeping accommodations that passenger has?

14  A.   Yes.

15  Q.   And how can you tell?

16  A.   The bedroom number is printed right on the front of the

17  ticket.

18  Q.   So if I show you Exhibit No. 6 here, that's Mr. Fallon's

19  ticket?

20  A.   Yes.

21  Q.   And this photocopy, this was made from a ticket that you

22  obtained from Mr. Fallon?

23  A.   Yes.

24  Q.   And this says that he's in room No. 7?

25  A.   That's correct.

Romano - cross by Kuhn

1   Q.  And because it's a number instead of a letter, you can tell

2   that's just standard accommodations?

3   A.  Yes.

4           MR. KUHN:  Judge, I don't believe Exhibit 6 has been

5   admitted into evidence yet.  We would move to admit it.

6           MR. KOMIE:  No objection.

7           THE COURT:  It's admitted.

8       (Government Exhibit No. 6 received in evidence.)

9   BY MR. KUHN:

10  Q.  You testified that on the morning of December 6 of 2002,

11  you sat down at a computer and checked passenger manifests?

12  A.  At some time in the morning, yes.

13  Q.  And was that for trains leaving Chicago that day, coming

14  in, or both?

15  A.  Both.

16  Q.  And when you do that, I believe you testified you're

17  looking for certain characteristics?

18  A.  Yes.

19  Q.  Tickets purchased within 72 hours of the train leaving?

20  A.  Correct.

21  Q.  Tickets purchased with cash?

22  A.  Yes.

23  Q.  One-way tickets?

24  A.  Yes.

25  Q.  Tickets with unusual, no phone number or cell phone

Romano - cross by Kuhn

1  numbers?

2  A.  Or pager number, similar to that, yes.

3  Q.  Why are those things significant to you?

4  A.  They are significant to me because they, those factors

5  together indicate somebody traveling for, you know, trying to

6  get somewhere in a hurry because they are running from the law,

7  possibly involved in some type of other criminal activity, and

8  they are also standard drug courier characteristics.

9  Q.  Are those the type of things you find on a typical

10  vacationer who is taking a trip on Amtrak?

11  A.  No.

12  Q.  They usually don't pay with cash and buy at the last

13  minute, do they?

14  A.  They may pay with cash, but, no, those travel arrangements

15  are made weeks in advance.

16  Q.  Now, the fact that this train was destined for Seattle,

17  would that have any significance to you?

18  A.  Yes.

19  Q.  And what is the significance of that?

20  A.  Well, Seattle is a, what we call a source city.  Seattle is

21  known for narcotics coming down from British Columbia, Canada,

22  and also money going from Seattle back into British Columbia,

23  Canada.

24  Q.  And this is information that you have obtained in your

25  duties as an interdiction agent for the Drug Enforcement

Romano - cross by Kuhn

1  Administration task force?

2  A.  Correct.

3  Q.  I will show you what we have marked as Government Exhibit

4  No. 5.  That's a passenger name record printout you testified

5  to?

6  A.  Yes.

7  Q.  And that was printed out at 3:35 in the afternoon on the

8  6th?

9  A.  Correct.

10  Q.  I know you testified that wasn't the one that you got prior

11  to the train coming in, but does that contain the same

12  information?

13  A.  Yes, it does.

14  Q.  And other than the time it's printed out, that would be

15  identical to the information you had prior to the Empire

16  Builder leaving on that day?

17  A.  Yes.

18          MR. KUHN:  Judge, we'd move for the admission of

19  Government Exhibit Suppression 5.

20          MR. KOMIE:  No objection.

21          THE COURT:  It's admitted.

22      (Government Exhibit Suppression No. 5 received in

23      evidence.)

24  BY MR. KUHN:

25  Q.  Again, I think you testified that told you when the ticket

Romano - cross by Kuhn

1  was purchased and when the reservation was made and that it was

2  paid with cash?

3  A.  Yes.

4  Q.  Now, the train was scheduled to leave at 2:10 in the

5  afternoon?

6  A.  Correct.

7  Q.  So you went out there about 1:35?

8  A.  Correct.

9  Q.  And I think that you already testified you didn't know who

10  Vincent Fallon was?

11  A.  No.

12  Q.  You'd never seen him before?

13  A.  No.

14  Q.  And in all of your -- when you're checking the passenger

15  manifest that day, was Mr. Fallon the only passenger with which

16  you found these specific characteristics?

17  A.  Yes.

18  Q.  And on an average day, how many passengers board the Empire

19  Builder in Chicago?

20  A.  I would say at least 100.

21  Q.  So out of 100 passengers, Mr. Fallon is the only one who is

22  going one way, bought a ticket with cash with less than 48

23  hours boarding departure?

24  A.  He's the only one I found.

25  Q.  So when you got out there, you were with task force Agent

Romano - cross by Kuhn

1  Terry?

2  A.  Yes.

3  Q.  Anyone else with you?

4  A.  No.

5  Q.  Are there other agents on duty in the afternoon who do the

6  same duties?

7  A.  I don't -- there were, but not at the train station.

8  Q.  They weren't working that train with you?

9  A.  No.

10  Q.  Just the two of you?

11       And so you went out to the platform, which I think we

12  already determined was the far east one closest to the river.

13  A.  Yes.

14  Q.  On the north end of the concourse?

15  A.  Correct.

16  Q.  And how were you dressed?

17  A.  Casual civilian dress, leather jacket, jeans.

18  Q.  No police insignias?

19  A.  No.

20  Q.  No gun showing?

21  A.  No.

22  Q.  No handcuffs showing?

23  A.  No.

24  Q.  Was it your intention that the traveling public could not

25  tell you were a law enforcement officer?

Romano - cross by Kuhn

1   A.   That's our intention, yes.

2   Q.   Agent Terry dressed similarly?

3   A.   Yes.

4   Q.   And then you talked to the attendant and asked him

5   basically to give you a wink or a nod when the passenger

6   present his ticket to room No. 7 for car 730?

7   A.   Correct.

8   Q.   So having never traveled Amtrak, if I have my ticket and

9   I'm on car 730 in room 7, how am I going to -- I have no idea

10  where that is, is there a mechanism where I can find my

11  compartment?

12  A.   There is usually a gate agent standing at the gate or the

13  conductor for the train, and he'll direct the people to

14  whatever car they are going to.

15  Q.   Okay.  And then there is an attendant outside that car?

16  A.   Correct.

17  Q.   And they check tickets to make sure they are getting in the

18  right car?

19  A.   Yes.

20  Q.   So when Mr. Fallon or when -- after the attendant

21  encountered Mr. Fallon, he gave you the sign that says that the

22  occupant in No. 7 just went aboard?

23  A.   Yes, correct.

24  Q.   You said you waited about a minute?

25  A.   About a minute, yes.

Romano - cross by Kuhn

1  Q.  So this is about, we are at about 1:51 now?

2  A.  Approximately.

3  Q.  Why did you wait a minute?

4  A.  Just to be sure that the attendant was correct and that the

5  individual was going to room No. 7.

6  Q.  Because if Mr. Fallon isn't in room No. 7, you won't know

7  who he is?

8  A.  No.

9  Q.  So you went up to room No. 7, you park yourself at the

10  right side of the door, and Agent Terry stays at the left?

11  A.  Correct.

12  Q.  And you see Fallon sitting on the seat on the left-hand

13  side?

14  A.  Correct.

15  Q.  And you engaged in conversation with him?

16  A.  Yes.

17  Q.  Okay.  Did you tell him that he was not under arrest?

18  A.  Yes, I did.

19  Q.  Did you tell him he could terminate the conversation at any

20  time?

21  A.  Yes, I did.

22  Q.  His door was open?

23  A.  Yes.

24  Q.  So when he went in and sat down, he did not shut the door?

25  A.  No.

Romano - cross by Kuhn

1  Q.  And I think you said, when you asked him those questions,
2  he said, yeah, sure, that he would talk to you.  That was his
3  response?
4  A.  Correct.
5  Q.  You told him he wasn't accused of any crime?
6  A.  Yes, I did.
7  Q.  And you told him -- well, first you asked to see his
8  ticket?
9  A.  Yes.
10  Q.  Which he showed you?
11  A.  Yes.
12  Q.  And you returned it to him?
13  A.  Correct.
14  Q.  And then you asked to see his identification?
15  A.  Yes.
16  Q.  Which he showed you, and you returned that to him as well?
17  A.  Yes.
18  Q.  That was a state of Illinois ID card?
19  A.  Right, state ID.
20  Q.  Then you asked him what the purpose of his travel was?
21  A.  Yes.
22  Q.  And what did he tell you the first time?
23  A.  He told me he was going out to see a ladyfriend in Seattle.
24  Q.  Did you ask how long he was going for?
25  A.  Yes.

Romano - cross by Kuhn

1  Q.  And what did he tell you?

2  A.  About a week.

3  Q.  And as you started to question him about the purpose of his

4  travel, did you notice anything unusual about his person or any

5  nonverbal communication from him?

6  A.  Yeah, he began to sweat quite heavily, and his hands were

7  trembling as he was sitting in his seat.

8  Q.  Were his hands trembling before you started asking him

9  questions?

10 A.  Not that I noticed.

11 Q.  And did you ask him what he did for a living then?

12 A.  Yes.

13 Q.  What did he tell you?

14 A.  He told me he was not employed at that time.

15 Q.  Did he tell you that he used to work as a waiter at various

16 restaurants around the area where he lives?

17 A.  Yes.

18 Q.  But he was not employed at that time?

19 A.  That's correct.

20 Q.  Did you ask him about the address on the state ID card?

21 A.  Yes.

22 Q.  Did you ask if that was still his current address?

23 A.  Yes, I did.

24 Q.  What did he tell you?

25 A.  He said no, that was not his current address.

Romano - cross by Kuhn

1  Q.  Did you ask him where his permanent address was?

2  A.  Yes, I did.

3  Q.  What did he tell you?

4  A.  He told me he stays with friends, and the only address he

5  had was a post office box.

6  Q.  So he did not give you a permanent land-based address --

7  A.  No, he did not.

8  Q.  -- where he lived?

9       And then you explained to him your mission and why

10  you were interviewing him?

11  A.  Correct.

12  Q.  And I think you said, you know, you were looking for

13  weapons, drugs, money, contraband?

14  A.  Yes.

15  Q.  Did you ask him if he understood what you were doing?

16  A.  Yes.

17  Q.  And how did he respond?

18  A.  He understood, he said he understood.

19  Q.  And then did you ask him if he was carrying any guns,

20  explosives, or weapons?

21  A.  Yes, I did.

22  Q.  And he said no?

23  A.  He said no.

24  Q.  Did you ask him if he was carrying any drugs?

25  A.  Yes.

Romano - cross by Kuhn

1  Q.  And he said no?

2  A.  Correct.

3  Q.  And you asked him if he was carrying large sums of money?

4  A.  Yes.

5  Q.  Did you explain to him what you mean by large sums of

6  money?

7  A.  I told him over $10,000.

8  Q.  And how did he respond to you?

9  A.  He said no, he was not carrying anything.

10  Q.  And as you were standing there next to the doorway of his

11  compartment, you could see his bags?

12  A.  Yes.

13  Q.  The one, Exhibit 7, this was sitting on the right seat?

14  A.  Correct.

15  Q.  And then he had an additional bag?

16  A.  Some type of duffel bag sitting on the floor in between the

17  seats.

18  Q.  And you asked him if both of those bags were his?

19  A.  Yes.

20  Q.  Did you ask the former famous standard question, did you

21  pack them yourself, and did anybody give you anything to put in

22  there that you don't know about?

23  A.  Yes, I did.

24  Q.  And how did he respond to those questions?

25  A.  He said he packed the bags himself, and nobody had given

Romano - cross by Kuhn

1  him any packages or anything to carry.

2  Q.  And all the time you are still standing outside of his

3  compartment?

4  A.  Correct.

5  Q.  You're in the hallway?

6  A.  Yes.

7  Q.  You have never set foot inside that compartment?

8  A.  No.

9         THE COURT:  I know this is cross-examination, but

10  this is your witness.  Right now I'd like to hear him

11  testifying instead of you.  If you want me to get anything out

12  of this, other than to repeat going over the other, I'd rather

13  you didn't do that.

14         MR. KUHN:  Okay.  I apologize, Judge.

15  BY MR. KUHN:

16  Q.  Did you ask if you could search his bags?

17  A.  Yes.

18  Q.  And how did you ask that?

19  A.  I said, "Can my partner look inside your bags?"

20  Q.  And you asked in the plural?

21  A.  Yes.

22  Q.  And his response?

23  A.  Yes, he said, yeah, go ahead, or something like that.

24  Q.  Okay.  And the duffel bag was searched first?

25  A.  Yes.

Romano - cross by Kuhn

1    Q.   How did Agent Terry get that bag?

2    A.   Mr. Fallon leaned over, picked the bag up, and handed it to

3    me, and I handed it to Terry.

4    Q.   And that was clean, nothing there?

5    A.   Nothing there.

6    Q.   And then did you go on to this bag, No. 7?

7    A.   Yes.

8    Q.   Okay.  How did you get possession of that?

9    A.   I picked the bag up off the seat.

10   Q.   And as you picked the bag up off the seat, did Mr. Fallon

11   say anything to you?

12   A.   No.

13   Q.   Did he say, "Don't touch my bag"?

14   A.   No.

15   Q.   Did he say, "I don't want you to search it"?

16   A.   No.

17   Q.   And you looked at it and found it was locked?

18   A.   Correct.

19   Q.   And is that significant to you in any way?

20   A.   It could be.

21   Q.   And how could that be significant?

22   A.   Oh, there is something in there he doesn't want anybody to

23   see.

24   Q.   Did you ask him if he had a key?

25   A.   Yes.

Romano - cross by Kuhn

1 Q.  And this bag has a hole in it for a key?

2 A.  Yes.

3 Q.  That would work this clasp?

4 A.  Correct.

5 Q.  What did he tell you when you asked if he had a key?

6 A.  He told me he didn't have a key.

7 Q.  Is that significant to you in any way?

8 A.  Yes.

9 Q.  Why is that significant to you?

10 A.  Well, again, there is something in there he is trying to

11 hide or he's carrying it for somebody else.

12 Q.  If he had packed it himself, would you have expected that

13 he would have a key?

14 A.  Yes.

15 Q.  And you had just asked him if he packed it himself, and he

16 said yes?

17 A.  Yes, that's correct.

18 Q.  And then did you ask him again what was in the bag?

19 A.  Yes, I did.

20 Q.  And what did he, how did he respond?

21 A.  He didn't answer me.

22 Q.  There was no response?

23 A.  No response.

24 Q.  Did you ask him again?

25 A.  Yes, I did.

Romano - cross by Kuhn

1  Q.  And did you get a response this time?

2  A.  He said, "There's money in there."

3  Q.  Did you ask how much?

4  A.  Yes, I did.

5  Q.  And what did he tell you?

6  A.  He told me there's 50,000, there's $50,000 in the bag.

7  Q.  Did you ask him where he got the money?

8  A.  Yes, I did.

9  Q.  And what was his response?

10  A.  He did not answer the question.

11  Q.  What did you decide to do at this time?

12  A.  At this point, I decided to detain the bag.

13  Q.  Now, you initially encountered Mr. Fallon at ten minutes to

14  2.  What time is it now that you decide to detain this bag?

15  A.  No later than 2:54 maybe, 2:55 at the very latest.  I'm

16  sorry, 1:55 or 1:54.

17  Q.  So you had been talking to him for four or five minutes?

18  A.  Probably three to four minutes.

19  Q.  Okay.  And when you told him you were going to detain the

20  bag, did you tell him you were going to take it anywhere?

21  A.  Yes, I was -- I told him we were going to take it to our

22  office.

23  Q.  Did you ask him to come to the office with you?

24  A.  I asked, I said, "You're free to go, but the bag is going

25  with us.  You can go with us if you want or you can stay on the

Romano - cross by Kuhn

1  train."

2  Q.  How did he respond?

3  A.  He said, "I'm going with the bag."

4  Q.  Did you tell him that may have some effect on him taking

5  this train?

6  A.  I told him he was going to miss that train.

7  Q.  Now, we heard some testimony that the train was half mile,

8  a mile or so north of the station up there.  How big is the

9  Empire Builder?

10  A.  It's, the Empire Builder usually has three sleeper cars on

11  it, a lounge car, a dining car, and four coaches, and a baggage

12  car.

13  Q.  And a Superliner is, that's a sleeper car?

14  A.  Well, Superliner is the entire type, the entire train.

15  There is Superliner coaches and Superliner sleepers.

16  Q.  A Superliner sleeper, okay.  So this particular day, car

17  No. 730, how far north of the concourse was that sitting on the

18  train tracks out there?

19  A.  Probably seven cars.

20  Q.  And each car is how long?

21  A.  85 feet.

22  Q.  So about 600 feet?

23  A.  Approximately.

24  Q.  Okay.  So you got off the train and walked the 600 feet

25  into the station, walked across from 19 all the way past No. 1?

Romano - cross by Kuhn

1    A.   Correct.

2    Q.   Up a little ramp, across the foyer area, and there is the

3    office?

4    A.   Correct.

5    Q.   Police office?

6              And that has a locked door from the outside?

7    A.   Yes.

8    Q.   Is it locked from the inside?

9    A.   No.

10   Q.   Anybody who wants to walk out can just walk out?

11   A.   Bar right there, you can open the door and walk right out.

12   Q.   And can you describe what that office looks like from

13   outside?

14   A.   Correct.

15   Q.   Can you describe it for me?

16   A.   Sure.  It's, from the outside there is a desk on the left

17   part of the office with a chair, and to the right there are two

18   chairs.

19   Q.   Okay.  And is the door solid or does it have a window in

20   it?

21   A.   No, it's all glass.

22   Q.   How about the wall next to the door, is that solid or is

23   that glass as well?

24   A.   Solid.

25   Q.   But you can see through the door?

Romano - cross by Kuhn

1  A.  Yes.  I'm sorry.  The wall next to, adjacent to the door is

2  also glass.  The whole front is glass.

3  Q.  Okay.  That's what I thought.  Okay.

4          So when you're sitting at the desk that you're

5  talking about when you walked in, are you looking out at like

6  the Metra ticket area because you're looking through all this

7  glass?

8  A.  Yes.

9  Q.  And right next to the desk, I believe you said there were

10  two chairs?

11  A.  Correct.

12  Q.  So when you got there into the office, you unlocked the

13  door and went in and Mr. Fallon sat on one of the chairs?

14  A.  Yes.

15  Q.  And those chairs, where are they located in comparison with

16  the door?

17  A.  They are right inside the door to the right.

18  Q.  And Mr. Fallon sat at the one right next to the door?

19  A.  I don't remember which seat.

20  Q.  One of those?

21  A.  One of those two seats.

22  Q.  And the door was unlocked?

23  A.  Correct.

24  Q.  From the inside?

25  A.  Yes.

Romano - cross by Kuhn

1  Q.  And Mr. Fallon was never handcuffed?

2  A.  No.

3  Q.  Never detained?

4  A.  No.

5  Q.  When you were walking through the train station, if

6  Mr. Fallon had told you he decided he didn't want to go to the

7  office, what would you have done?

8  A.  I would have stopped and made sure he understood that the

9  bag was still being detained, and if he didn't want to go with

10  us, I would have tried to write out a receipt quick before he

11  could, you know, before he got on his train.

12  Q.  Now, when you're inside the office now, did you have some

13  conversation about the bag?

14  A.  Yes.

15  Q.  What was that conversation?

16  A.  I asked Mr. Fallon again what was inside the bag, and he

17  told me it was $50,000 in the bag, and he said go ahead and

18  open it.

19  Q.  Which you did with a Swiss Army knife?

20  A.  Yes.

21  Q.  And then I believe, I just don't -- you testified that you

22  saw it was currency and then closed it?

23  A.  Correct.

24  Q.  Did you touch any of the currency?

25  A.  I think I touched one bundle, yes.

Romano - cross by Kuhn

1  Q.  Did you say anything at that time?

2  A.  I told Mr. Fallon it looked like there was more than

3  $50,000 in the bag.

4  Q.  Did he respond to you?

5  A.  No.

6  Q.  Now, the initial encounter with Mr. Fallon started at 1:50.

7  What time is it now?

8  A.  About 2 o'clock.

9  Q.  Was that the point where a decision was made to contact a

10  drug detection dog?

11  A.  Yes.

12  Q.  And Agent Terry did that, I believe you testified?

13  A.  Agent Terry did that.

14  Q.  Now, while you were waiting for the dog, did you have

15  further conversation with Mr. Fallon?

16  A.  Yes, I did.

17  Q.  And what was that conversation about?

18  A.  I asked Mr. Fallon where the money came from.  He told me

19  it came from himself and some other investors who he wouldn't

20  identify.  I asked him what the money was for, and he said he

21  was going to Seattle to purchase glass blowing items, I think.

22  Q.  Did you ask him to identify any of his investors?

23  A.  Yes, I did.

24  Q.  And his response?

25  A.  He would not identify any of them.

Romano - cross by Kuhn

1  Q.  Did you ask him if he had any documentation to substantiate
2  this sum of money?
3  A.  Yes, I did.
4  Q.  And what did he say to you?
5  A.  He said he did not have.
6  Q.  And while you were in the office, did you ask him if he was
7  currently employed?
8  A.  Yes, I did.
9  Q.  And how did he respond?
10  A.  He stated he was not employed at that time.
11  Q.  Now, he was never handcuffed at any time?
12  A.  No.
13  Q.  When you were -- when he made the decision to leave the
14  train and said he was coming with you, did anyone touch him in
15  any way?
16  A.  I patted him down for weapons.
17  Q.  And how did you do that?  Where was he, where were you,
18  what happened?
19  A.  Mr. Fallon was standing in the doorway of this bedroom.  I
20  asked him if he had any weapons or guns or knives or hand
21  grenades or anything like that on him.  He indicated no, and I
22  said, do you mind if I pat you down, it's for my safety and my
23  partner's safety?  And he said, no, go ahead.  I don't recall
24  if he put his hands up.  It was in the doorway of this room.
25  Q.  He said, no, go ahead?

Romano - cross by Kuhn

1   A.   Correct.

2   Q.   And what was your purpose in patting him down for weapons

3   prior to taking the walk with him to the police office?

4   A.   Well, first of all, we are not going to let somebody in the

5   police office who we are going to be sitting there for a while

6   without first knowing that they are not armed, and, second of

7   all, we want to make sure that if he is armed, or if an

8   individual is armed, we find the weapon right there rather than

9   risk something happening on the platform with 200 people

10  around.

11  Q.   Now, I don't want to dwell too much on it, but you have had

12  experience with, past experience with weapons?

13  A.   Yes, I have.

14  Q.   You testified Officer King came, came in and talked with

15  you?

16  A.   Correct.

17  Q.   And based upon your conversation, you secreted the bag in

18  the roll call room?

19  A.   Yes.

20  Q.   Then you saw Officer King bring his dog in?

21  A.   Yes.

22  Q.   King told that you the dog had alerted to the bag or the

23  contents of this bag?

24  A.   Correct.

25  Q.   Now, at that point, did you consider the possibility that

MICHAEL P. SNYDER, Official Reporter

Romano - cross by Kuhn

1   money laundering charges may be brought?

2   A.   Yes, I did.

3   Q.   And you testified you contacted the United States

4   Attorney's office?

5   A.   Correct.

6   Q.   Now, how much time had elapsed from the time you initially

7   contacted Mr. Fallon at 1:50 to the time you contacted the U.S.

8   Attorney's office?

9   A.   Probably about 45 minutes to an hour.

10  Q.   And how many times during that encounter did Mr. Fallon ask

11  if he could leave?

12  A.   None.

13  Q.   How many times if any did you tell him that he was free to

14  leave at any time?

15  A.   I told him that a couple of times prior to the canine

16  getting there.

17  Q.   And in your mind, once the canine had, was he free to go at

18  that time?

19  A.   No.

20  Q.   And why is that?

21  A.   Our policy is to contact the U.S. Attorney's office, advise

22  them of the facts known to us to that point, and determine

23  whether or not they should advise us to lock him up for money

24  laundering.

25  Q.   And you need to get approval from the United States

Romano - cross by Kuhn

1  Attorney's office before you can lodge any federal charges

2  against anyone?

3  A.  Correct.

4  Q.  Now, when you first got to the office, you said you sat the

5  bag down on the floor?

6  A.  Yes.

7  Q.  And then later on you secreted it in the back room, I think

8  you said in the file cabinet?

9  A.  Yes.

10  Q.  Now, how long had you had your office in the Amtrak train

11  office?

12  A.  That particular office, about seven or eight years.

13  Q.  And there is a cleaning crew that comes in and cleans that

14  office up?

15  A.  Several times a day.

16  Q.  And prior to you taking this bag, Government Exhibit 7 into

17  the office, to your knowledge had any drugs, cocaine,

18  marijuana, heroin, or anything been in the office that day?

19  A.  No.

20  Q.  And if anything had been in there, would you have been

21  notified about it?

22  A.  Yes.  Yes, I would have.

23  Q.  And you yourself, prior to the detention of this bag, when

24  was the last time you had handled any drugs, illegal drugs,

25  marijuana, heroin, cocaine, crack, ecstasy, methamphetamine,

Romano - cross by Kuhn

1   any of that prior to actually handling this bag?

2   A.   I don't recall exactly when, but it wasn't -- I didn't

3   handle any narcotics that day.

4   Q.   Okay.   In the morning you got up, showered, got ready for

5   work, washed yourself off?

6   A.   Two showers a day.

7   Q.   And you have, in your duties as a DEA task force agent, you

8   have seized currency and drugs off of trains prior to December

9   6 of 2002?

10  A.   Yes.

11  Q.   And had you often participated in dog sniff searches in the

12  Amtrak office prior to that day?

13  A.   Yes.

14  Q.   And had you secreted suspected contraband, drugs, money,

15  and other things prior to that day?

16  A.   Yes.

17  Q.   And how do you select what location you are going to put

18  the material in?

19  A.   The dog handler will tell me whether he wants to work his

20  dog in an office, some dogs are flighty, and they don't like to

21  be around people, they work best where there is nobody around,

22  or they work best outside.   So it's up to the canine handler.

23  Q.   But you decide exactly where it's going to be hidden in a

24  particular room?

25  A.   Correct.

Romano - cross by Kuhn

1  Q.  And do you hide it in the same place all the time?

2  A.  No.

3  Q.  When was the last time prior to this day that you hid

4  suspected drugs or money in the same place that you put this

5  bag?

6  A.  I don't, I don't recall if I had used that cabinet at all.

7  It was a fairly new cabinet, if I recall.

8  Q.  And after the dog alerted and King left, you emptied the

9  contents of the bag?

10  A.  I took the bag back out to the desk in front of where

11  Mr. Fallon was sitting and Agent Terry was and dumped the

12  contents onto the desk.

13  Q.  And you didn't count the individual bills, but you just

14  counted the bundles?

15  A.  Just the bundles.

16  Q.  Now, when in relation to the time that you first contacted

17  the assistant United States attorney did you fingerprint and

18  photograph Mr. Fallon?

19  A.  Yes, I did.

20  Q.  When did you?

21  A.  Oh, when?

22  Q.  Right.  Before or after?

23  A.  I fingerprinted and photographed Mr. Fallon after the

24  canine alert.

25  Q.  Did you fingerprint and photograph him before you contacted

Romano - cross by Kuhn

1  the U.S. attorney or after?

2  A.  I called the U.S. attorney, the duty pager, and I was

3  waiting for a call back from them.

4  Q.  And while you were waiting for the call back, that is when

5  you --

6  A.  Fingerprinted and photographed him, I believe, yes.

7  Q.  I will show you what I've marked as Government Exhibit

8  Suppression 8.  I think Mr. Komie asked you about that.

9  A.  Yes.

10  Q.  That's an address acknowledgment form?

11  A.  Yes.

12  Q.  Now, prior to filling out this form, did you ask Mr. Fallon

13  for his permanent address where he lived?

14  A.  Yes, I did.

15  Q.  And did he give you anything besides what's on here?

16  A.  No.

17  Q.  He gave you the P.O. box?

18  A.  That's correct.

19  Q.  And the other address, this was the one off his ID card,

20  wasn't it?

21  A.  I don't remember if that was the one on his ID card.  I

22  believe he told me one or, one of his parents lived there, I

23  think.

24  Q.  And I believe you testified before, you filled this out,

25  this is all your handwriting, correct?

Romano - cross by Kuhn

1   A.   Yes.

2   Q.   And that would be for, with the exception of signature of

3   addressee, do you know whose signature appears there?

4   A.   That's correct.

5   Q.   Whose signature appears there?

6   A.   Oh, Vincent Fallon's.

7            MR. KUHN:   Judge, we'd move for admission of

8   Suppression Exhibit No. 8.

9            MR. KOMIE:   No objection.

10           THE COURT:   It's admitted.

11       (Government Exhibit Suppression No. 8 received in

12       evidence.)

13  BY MR. KUHN:

14  Q.   Prior to Mr. Fallon signing this, did you explain the

15  purpose of it to him?

16  A.   Yes.

17  Q.   What did you tell him?

18  A.   I told him that all correspondence between himself and DEA

19  would be done through the mail, and we need his correct address

20  and where he gets his mail delivered so he gets that, receives

21  that correspondence.

22  Q.   Prior to him signing there, did you threaten or coerce him

23  to sign it in anyway?

24  A.   No.

25  Q.   Did Mr. Fallon ask any questions about the form?

Romano - cross by Kuhn

1  A.  Not that I recall.

2  Q.  Did he express any reluctance in signing it?

3  A.  No.

4  Q.  Let me show you Government Exhibit Suppression No. 9.

5  That's your voluntary or disclaimer of interest form?

6  A.  Yes.

7  Q.  And you've filled this out as well?

8  A.  Yes, I did.

9  Q.  And the line that says claimant, whose signature appears

10  above it?

11  A.  Vincent Fallon's.

12  Q.  And under witness, is that your signature?

13  A.  That's my signature, yes.

14  Q.  Did you complete this form before Mr. Fallon signed it?

15  A.  Yes, I did.

16  Q.  And did you sign it before he signed it or after?

17  A.  I signed it after he did.

18  Q.  And did you read this form to Mr. Fallon?

19  A.  I didn't read to it him.  I explained it to him.

20  Q.  Did you hand it to him and give him the opportunity to read

21  it?

22  A.  Yes, I did.

23  Q.  Did you tell him he should read it?

24  A.  Yes, I did.

25  Q.  How did you explain it to him?

Romano - cross by Kuhn

1   A.   I told him that this form is basically him saying that

2   that's not -- "This is not my money, I don't want anything to

3   do with it, I don't want to be bothered with it, I give it up."

4   Q.   Did you tell him that if he was claiming ownership of the

5   money, that he should not sign it?

6   A.   Yes, I did.

7   Q.   Did you threaten or coerce him in any way to sign this

8   form?

9   A.   No.

10  Q.   Did he express any reluctance or remorse at signing this

11  form?

12  A.   No.

13          MR. KUHN:   I'd move for admission of Government

14  Exhibit Suppression 9, Your Honor.

15          MR. KOMIE:   No objection.

16          THE COURT:   It's admitted.

17      (Government Exhibit Suppression No. 9 received in

18       evidence.)

19  BY MR. KUHN:

20  Q.   Agent Romano, I am going to show you Government Exhibit

21  Suppression 10, and that's your DEA 12 receipt?

22  A.   Yes.

23  Q.   I believe you also testified you filled all this out too?

24  A.   Yes, I did.

25  Q.   And there is a diagonal line in the middle with signature

Romano - cross by Kuhn

1  above it?  Whose signature is that?

2  A.  That's Vincent Fallon.

3  Q.  He signed in your presence?

4  A.  Yes, he did.

5  Q.  And then the bottom, your signature and Agent Terry?

6  A.  Correct.

7  Q.  Did you sign those after Mr. Fallon signed or before?

8  A.  After.

9  Q.  And the top part you filled out before he signed?

10  A.  Yes.

11  Q.  Or after?

12  A.  After.  I'm sorry, the top, he signed the form after it was

13  filled out.

14  Q.  Okay.  So at the time he signed it, it said 19 bundles of

15  United States currency to the bank count?

16  A.  Correct.

17  Q.  Did you explain this form to him before he signed it?

18  A.  Yes, I did.

19  Q.  What you tell him?

20  A.  I told him it was a receipt for 19 bundles of currency.  I

21  explained to him that the currency, we don't count it, it gets

22  sealed in evidence bags and goes to a bank for count.  I also

23  told him that whoever he was responsible to this money to, he'd

24  better show this receipt so they don't think he stole it

25  himself or something.

Romano - cross by Kuhn

1  Q.  Why did you tell him that?

2  A.  We don't want --

3       MR. KOMIE:  Objection.  His thinking process is

4  irrelevant.  It's what he said.

5       THE COURT:  Sustained.

6       MR. KOMIE:  This is not about an arrest here.  It's

7  about what he said.

8  BY MR. KUHN:

9  Q.  During your encounter with Mr. Fallon, was there anything,

10  any conversation that would cause you to tell him to let

11  someone else know about this receipt?

12  A.  Yes.

13  Q.  What was that conversation?

14  A.  He told me there were other investors that had contributed

15  to the money to this.

16  Q.  And did you threaten or coerce him to sign this in any way?

17  A.  No.

18  Q.  Did he express to you any reluctance or remorse at having

19  signed this form?

20  A.  No.

21       MR. KUHN:  We'd move for admission of Government

22  Exhibit No. 10.

23       MR. KOMIE:  No objection.

24       THE COURT:  It is admitted.

25     (Government Exhibit Suppression No. 10 received in

Romano - cross by Kuhn

1       evidence.)

2   BY MR. KUHN:

3   Q.   And then the money was later taken to the bank, counted to

4   be $100,120?

5   A.   Correct.

6   Q.   So when you, during your encounter with Mr. Fallon when you

7   asked him his purpose for going to Seattle, he told you first

8   that he was going to visit a female friend; secondly, he was

9   going to by a house; then he told you he was taking money out

10  there for some investors; and then he said he was going to

11  investing in glass art and glass blowing?

12  A.   Yes.

13  Q.   And also on at least two occasions you asked him for his

14  address or where he lived, and he would only give you a P.O.

15  box?

16  A.   Correct.

17          THE COURT:   When did he say -- you hadn't testified

18  to that before.   When did he say he was going to get a house?

19          THE WITNESS:   After he told us on the train that he

20  had money in the bag.   I asked him what, how much money and

21  what was it for, and he said, "I'm going out to Seattle till to

22  buy a house."

23          MR. KUHN:   I have no other questions, Judge.

24          THE COURT:   Any more questions?

25          MR. KOMIE:   Do you want to give Mike a rest?

Romano - redirect by Komie

1          THE COURT:  Pardon me?

2          MR. KOMIE:  Do you want to give Mike a rest before we

3   get started?

4          THE COURT:  Do you want a break?

5          MR. KOMIE:  No, but I am just courteous.  He's been

6   doing it for more than an hour.

7          THE COURT:  Do you want break, Mike?

8          Okay.

9                    REDIRECT EXAMINATION

10  BY MR. KOMIE:

11  Q.  If I understand your testimony correctly, sir, after the

12  sniff of the dog, you in your own words agree that Mr. Fallon

13  was under arrest and not free to go, is that correct?

14  A.  After the dog sniff, yes.

15  Q.  And he was detained under arrest until such time as he

16  signed these forms and he was permitted to leave?

17  A.  No, that's not correct.

18  Q.  Well, he was under arrest until the U.S. attorney said we

19  are not going to file any charges?

20  A.  That's correct.

21  Q.  So at the time that you determined he was under arrest, you

22  had no evidence of a drug transaction, is that correct?

23  A.  No, no evidence.

24  Q.  You had no evidence of criminal activity taking place by

25  Mr. Fallon in your presence?

Romano - redirect by Komie

1   A.  Not in my presence, no.

2   Q.  You had no evidence that the money was stolen, is that

3   correct?

4   A.  No evidence.

5   Q.  You had no evidence that the money was obtained illegally?

6   A.  Not to that point.

7   Q.  And so both the money and the claimant are under arrest by

8   the point, immediately after the dog sniff?

9   A.  Correct.

10  Q.  And the claimant remained under arrest until the U.S.

11  attorney declines charges?

12  A.  Correct.

13  Q.  And the currency always remains under arrest?

14  A.  That's correct.

15  Q.  Now, let's go back to the train.  On the train, you've now

16  added that he told you that he was going to purchase a house,

17  is that correct?

18  A.  That was a later statement he made during the --

19  Q.  This occurs on the train, before or after the frisk?

20  A.  Oh, before the frisk.

21  Q.  Before the frisk?

22  A.  Before the frisk.

23  Q.  So is it my understanding that the frisk takes place after

24  the seizure of the money when you're taking him to the office?

25  A.  I patted him down for weapons for my safety and my

Romano - redirect by Komie

1  partner's safety after I determined that I had enough suspicion

2  to seize that bag.

3  Q.  Okay.  Now, you're telling us that you seized the bag on

4  suspicion, is that correct?

5  A.  On my --

6  Q.  Just now, you just said "suspicion," correct?

7  A.  Correct.

8  Q.  Now, at that particular moment, you had no suspicion of any

9  particular crime, is that correct?

10  A.  That's correct.

11  Q.  You had no suspicion that a crime had taken place in the

12  station that morning involving that money, is that correct?

13  A.  That's correct.

14  Q.  Or the bag?

15  A.  That's correct.

16  Q.  No crime had taken place in your presence?

17  A.  Correct.

18  Q.  And you had no intelligence information, for lack of a

19  better term, of any drug transaction that involved that money,

20  is that right?

21  A.  That's correct.

22  Q.  And so the money was arrested based on suspicion alone, is

23  that correct?

24  A.  There are -- no, there were other factors.

25  Q.  Well, let me ask you some more questions then.

Romano - redirect by Komie

1          You hadn't seen the money at that point, is that

2    right?

3    A.   No.   That's correct.

4    Q.   The dog hadn't been there?

5    A.   Correct.

6    Q.   You entered the train not even knowing who Fallon was?

7    A.   Correct.

8    Q.   You came to his bedroom to question him and identify him,

9    correct?

10   A.   We went to his bedroom to interview him.

11   Q.   You were mistaken about the reservation having, the train

12   missed previously, correct?

13   A.   Mistaken?

14   Q.   Didn't you first think that he had missed the prior train?

15   Wasn't that your original testimony?

16   A.   No.   No.   I had said he had made a reservation for the

17   previous day, but changed it.   I didn't say anything about him

18   missing a train.

19   Q.   But now that you had the ticket in your possession, you

20   knew that he had only purchased one ticket on the 4th, and it

21   had never been altered?

22   A.   The information I had indicated he had purchased a ticket

23   on the 4th for travel on the 6th.

24   Q.   Sir, you had the ticket in your possession in that car, and

25   it indicated no changes, is that correct?

Romano - redirect by Komie

1   A.   His ticket?

2   Q.   Yes.

3   A.   The ticket --

4   Q.   The exhibit.  You have seen it in this courtroom.

5   A.   It's sitting right in front of me.

6   Q.   Did there?

7   A.   No, there would not be any changes indicated on the ticket

8   anyway, sir.

9   Q.   Now, it is lawful to purchase a residence with cash, is it

10   not?

11   A.   As far as I know.

12   Q.   And so your function at that station is not to investigate

13   real estate transactions, is it?

14          MR. KUHN:  Objection, Your Honor.  It's

15   argumentative.

16          MR. KOMIE:  I'll withdraw it.

17   BY MR. KOMIE:

18   Q.   Now, you will agree that Amtrak sells passengers

19   accommodations that include toilets and wash basins?

20   A.   Correct.

21   Q.   And one can call a ticket agent and ask to purchase

22   something, and when they arrive there discover that maybe some

23   of the features are not in the room they ultimately purchased,

24   is that correct?

25   A.   I suppose so.

MICHAEL P. SNYDER, Official Reporter

Romano - redirect by Komie

1  Q.  And so if the person is capable of being advised by the

2  ticket agent that your accommodations do contain washrooms and

3  toilets within the suite of rooms or, in the case of a family

4  room, a suite of rooms, or in the case of a bedroom, there are

5  wash basins and toilets, are there not?

6  A.  I'm not sure what you're asking me about.

7  Q.  If you're confused, I will ask another question.

8  A.  I'm not confused.  I'm not certain what you are asking me

9  about that.

10  Q.  Well, what I'm asking you, sir, is that on a Superliner

11  train that has a Pullman feature, sleeping facilities for

12  individuals privately, there are wash basins and sinks in some

13  of the more deluxe accommodations?

14  A.  Yes, there are.

15  Q.  Now, would you say that in American business, time is of

16  the essence generally?

17  A.  It's one, sure.

18  Q.  So people make train trips in a hurry sometimes because

19  business demands it?

20  A.  I've never heard anybody making a train trip because they

21  are in a hurry to get somewhere for business.

22  Q.  Well, are you familiar with the fact that Amtrak offers

23  service from Chicago to Springfield in a hurry to get to the

24  capital?

25  A.  Sure, yes.

Romano - redirect by Komie

1  Q.  And are you familiar that Amtrak offers service out of

2  Chicago west for people who want to go somewhere but who don't

3  like airplanes?

4  A.  Yes.

5  Q.  And people can be in a hurry and just not like to fly?

6  A.  Sure.

7  Q.  Now, Seattle is, likes to advertise itself not as a drug

8  source city but as the king city, does it not?

9  A.  I don't think any city advertises itself as a drug city,

10. but I'm not sure what Seattle advertises itself as.

11  Q.  It has advertised itself as the number one Condi Nast

12  location of the United States to live, does it not?

13  A.  Number one what?

14  Q.  Location to live.

15  A.  I have no idea.

16  Q.  It was selected by the readers of many national magazines

17  as the number one place to live?

18          MR. KUHN:  Objection, Judge.  This is not a question.

19  Mr. Komie is testifying here.

20          MR. KOMIE:  Withdraw it.

21  BY MR. KOMIE:

22  Q.  At the time that you arrested the money, you had no

23  information that it was intended for the purchase of narcotics,

24  is that correct?

25  A.  Not at that time, no.

Romano - redirect by Komie

1  Q.  At the time you arrested the money, you had no information

2  that it was intended to do anything else other than go to a

3  real estate transaction, is that correct?

4  A.  I had no idea what is was going to do.

5  Q.  He told you he was going to see a lady friend.  Is that a

6  good reason for a travel?

7  A.  Probably.

8  Q.  No criminal association with that?

9  A.  No.

10  Q.  Now, your testimony clearly on my colleague's examination

11  is that the money was detained at 1:54, is that correct?

12  A.  Approximately.

13  Q.  So your testimony would be that the report of your partner,

14  Officer Terry, is in error when he says the time you arrived

15  was 13:55 and the time of the occurrence was 14:00?

16       MR. KUHN:  Objection, Judge.  It's argumentative.

17  It's improper to have one witness comment on the credibility of

18  another.

19       MR. KOMIE:  I am setting this up for the Court.

20       THE COURT:  You can ask him if it's accurate, I

21  guess.

22       MR. KOMIE:  Okay.  Let me rephrase it then.

23  BY MR. KOMIE:

24  Q.  Would you say it is accurate to describe the time of

25  arrival as December 6th at 13:55?

Romano - redirect by Komie

1   A.  My watch said 13:50.

2   Q.  Would you say it was accurate to describe the time of the

3   occurrence at 1400?

4   A.  Time of occurrence was 13:50.

5   Q.  Would you say it was accurate that the time of notification

6   to police headquarters to obtain a narcotics dog was December

7   6th at 14:15?

8   A.  I don't recall.  I don't know when Agent Terry made that

9   call.  He made it to his unit.  I had nothing to do with that.

10  Q.  Would you say it would be accurate to describe that the

11  date and time of completion and release of the claimant was

12  December 6th at 16:30?

13  A.  No.  We were done long before that.

14  Q.  Now, the report of your colleague was written on December

15  6th.  Your report, on the other hand, was not written on that

16  day, is that correct?

17  A.  That's correct.

18  Q.  In fact, you did not write a report before you left that

19  day, is that correct?

20  A.  That's correct.

21  Q.  Now, at that time, were your duty hours including Saturday

22  and Sunday?

23  A.  They may have.  I don't know, I don't know if we worked

24  that weekend or not.

25  Q.  Did you write a report that weekend?

MICHAEL P. SNYDER, Official Reporter

Romano - redirect by Komie

1   A.   No.

2   Q.   Did you ultimately write a report on December the 12th of

3   2002?

4   A.   I started my reports Monday the 9th.

5   Q.   So when you say you started, you did some portion?

6   A.   I -- we always do that report first, the 6 and the seizure

7   form, we do those reports first.

8   Q.   To assist the Court, the report you're referring to is a

9   DEA Form 6?

10  A.   Correct.

11  Q.   And you started writing that report on Monday, is that

12  correct?

13  A.   That's correct.

14  Q.   Now, is it fair to say that when you wrote that report,

15  there was a period of several days intervening?

16  A.   Two days.

17  Q.   During the Christmas holidays?  During the Christmas

18  period, December?

19  A.   There were two days between the time of the incident and

20  the time I wrote that report.

21  Q.   Right.  And without prying into your personal life beyond

22  saying during that period of time, if you were off duty, did

23  you attend any parties, drink any alcohol?

24  A.   I don't know.

25          MR. KUHN:  Objection, Your Honor.  That is not --

MICHAEL P. SNYDER, Official Reporter

Romano - redirect by Komie

1        MR. KOMIE:  It goes to an event that intervenes
2  between the time of the event and the writing of the report.
3        THE COURT:  He may answer.
4  BY THE WITNESS:
5  A.  We may have worked that weekend, because we do work a lot
6  of weekends.  I don't recall going to any parties.
7  BY MR. KOMIE:
8  Q.  And so the first time you sit down to write this report is
9  Monday?
10  A.  Correct.
11  Q.  And how much do you write on Monday?
12  A.  I don't recall.
13  Q.  Did you finish the whole report on that day?
14  A.  I don't recall if I did or not.  I'm sure I finished most
15  of the body of the report.
16  Q.  Did you prepare a draft of the report on that day?
17  A.  I believe so.
18  Q.  Did you send it to Mr. Terry to correct at any time?
19  A.  He read over the report at some time before we submitted it
20  to our supervisor.
21  Q.  Did he correct it in any way?
22  A.  Not that I recall.
23  Q.  Now, so you will agree that there is a three-day difference
24  between when the events take place and you draft your report?
25  A.  Two days.

Romano - redirect by Komie

1  Q.  Two days?

2  A.  Yes, sir.

3  Q.  Two full days?

4  A.  Two days.

5  Q.  So about 72 hours, 48 to 72?

6  A.  Two days is 48 hours to me.

7  Q.  Okay.  Now, at any time did you tape record your

8  communications between you and Mr. Fallon?

9  A.  No.

10  Q.  Did you have any contemporaneous notes of this event?

11  A.  I handwrote out the personal history report, if that's what

12  you are asking.

13          MR. KUHN:  Judge, this is well beyond the scope of

14  cross.  These are things he could have brought out on direct.

15          MR. KOMIE:  Well, this goes to this question of time.

16          I understand.

17          THE COURT:  I will let you ask a few more questions.

18          MR. KOMIE:  I understand.  Thank you, Your Honor.  I

19  will move on.

20  BY MR. KOMIE:

21  Q.  So, sir, as you sit there today, at the time of the

22  seizure, there was no specific criminal event that you could

23  point your finger at?

24  A.  Regarding Mr. Fallon?

25  Q.  The money.

Romano - redirect by Komie

1  A.  No.

2  Q.  Correct?

3  A.  That's correct.

4  Q.  And you cannot tie it up to any criminal event, is that

5  correct?

6  A.  At that point?  No.

7  Q.  That's correct, is it not?

8  A.  At that point, that's correct.

9         MR. KOMIE:  I have no further questions.

10        THE COURT:  All right.  Let's take a short break.

11        Oh, do you have any more questions?

12        MR. KUHN:  No, Judge.

13        THE COURT:  Okay.  Let's just take a short break.

14     (Witness excused.)

15              *         *         *         *         *

16     (End of proceedings.)

17              C E R T I F I C A T E

18        I, Michael P. Snyder, do hereby certify that the
   forgoing is a __PARTIAL__, true, and accurate transcript of the
19  proceedings had in the above-entitled case before the Honorable
   ELAINE E. BUCKLO, one of the judges of said Court, at Chicago,
20  Illinois, on April 27, 2004.

21                    _____
                      Official Court Reporter
22                    United States District Court
                      Northern District of Illinois
23                    Eastern Division

24

25

MICHAEL P. SNYDER, Official Reporter