# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
v. )  No. 03 C 3644
)
**FUNDS IN THE AMOUNT OF ONE** )
**HUNDRED THOUSAND AND ONE HUNDRED** )
**TWENTY DOLLARS ($100,120** )
**U.S.C.),** )
)
Defendant. )
)
**NICHOLAS P. MARRACCO and VINCENT** )
**J. FALLON,** )
)
Claimants. )

## MEMORANDUM OPINION AND ORDER

On December 6, 2002, law enforcement officials seized $100,120 in cash from Vincent Fallon, who was preparing to travel via Amtrak from Chicago to Seattle on a one-way ticket. The government has filed this action under 21 U.S.C. § 881(a)(6), which provides for the forfeiture of drug proceeds. Claimants Mr. Fallon and Nicholas P. Marrocco ("claimants") move to quash the seizure of the $100,120 in cash seized from Mr. Fallon. I held an evidentiary hearing on the motion. The motion is granted.

On the morning of December 6, 2002, Amtrak police officer Eric Romano did a computer search of ticketed passengers leaving Union Station on that day. He discovered that Mr. Fallon had purchased a one-way first class ticket for $310.80 cash for Seattle within

the last 72 hours on a train that was to leave Union Station at 2:10 p.m. that day. He told his partner, Chicago Police Officer Sterling Terry about his finding and they arranged to be outside the train at the time it began boarding. They did not know what Mr. Fallon looked like and therefore had to rely on the train attendant, who was checking tickets for boarding passengers, to tell them when Mr. Fallon got on. They knew from his ticket that he would be the only passenger in compartment 7 of the particular car. The car was near the front of the train, which meant that it was between two and three blocks from the entrance to Union Station (the tracks run underground in a north-south direction).

The police officers approached compartment 7 and found the curtain covering the small window to the side of the door but the door open. They saw Mr. Fallon sitting on one of two facing seats in the small (slightly more than six feet in length and three and a half feet wide) compartment. On the opposite seat sat a brown leather attache case. Whether it was visible or not is disputed. Mr. Fallon says it was covered by his jacket. The officers both say they could see it. Officer Romano proceeded, either directly in front of the door, as seems more likely, or to the right of it as he claims, with Officer Terry standing to the left of the door, to talk to Mr. Fallon. Much of the ensuing conversation is undisputed. Both officers and Mr. Fallon say that Officer Romano identified himself and Officer Terry, and both showed their

2

identification and badges to Mr. Fallon. They were dressed in casual clothes. Officer Romano had on a black leather jacket; while he was carrying a weapon he says it was not visible. He is a large man. Officer Romano told Mr. Fallon that he was with the DEA Task Force. He asked Mr. Fallon for his identification and ticket and looked at both. He asked Mr. Fallon where he was going and was told Seattle. In response to a question, Mr. Fallon said he would be out there about a week and was going to visit a girlfriend. Officer Romano said they were looking at people coming in and going out of Chicago who might be carrying drugs, large sums of money or weapons. He asked Mr. Fallon whether he was carrying any of these.

At this point Officer Romano says Mr. Fallon was sweating. Mr. Fallon does not deny this but says it was because he had hurried to the train. This was, however, December, and I think it more likely (he was only carrying a backpack and the briefcase) that Officer Romano's questioning was making him nervous. Mr. Fallon is 27 years old. He has 60 hours of college credit at the College of DuPage. Officer Romano says he asked Mr. Fallon if the bags he had were his, whether he had packed them himself, and whether the contents were his or whether anyone had given him anything to carry. Mr. Fallon agrees these questions were asked, although he says they were asked about each bag in turn. Mr.

Fallon agrees that he said the bags were his, that he had packed them, and that no one had given him anything to carry.

Officer Romano asked if Officer Terry could search the backpack. Mr. Fallon said yes, and Officer Terry did so, finding nothing incriminating. Officer Romano says he asked Mr. Fallon if he could search the briefcase and Mr. Fallon said yes. Mr. Fallon says he said no, that it contained personal things that he did not want anyone going through, and I credit this testimony. At any rate, the briefcase was locked, as the officers discovered, when Officer Romano took the briefcase from the seat. Officer Romano asked Mr. Fallon if he had a key, and Mr. Fallon said no. Officer Romano asked Mr. Fallon how he was going to open the bag without a key and Mr. Fallon said he used a knife. Officer Romano asked Mr. Fallon again what was in the bag and Mr. Fallon said money. Mr. Romano asked him how much and Mr. Fallon said $50,000.

At this point, Officer Romano's testimony differs from that of Mr. Fallon and Officer Terry in a significant respect. Officer Romano says he decided at that point that he had enough suspicion to detain the briefcase, and so told Mr. Fallon. He says he told Mr. Fallon that he did not have to accompany them, and could continue on to Seattle, but that he was taking the bag. Mr. Fallon says he was told he had to accompany the officers inside the station for additional questioning. Officer Terry also testified

4

that they asked Mr. Fallon to accompany them off the train. I credit Mr. Fallon's testimony on this point.

At some point on the train, Officer Romano frisked Mr. Fallon. He put Mr. Fallon up against the window side of his compartment to do the frisk.

The train was due to leave, and presumably did so, shortly after the officers and Mr. Fallon got off. (While there is a dispute as to whether all of the above began at 1:50 or five minutes later, the discussion did not last long, and it was shortly after 2:00 at the latest when they exited. The train was due to leave at 2:10.) They walked back to Union Station, to the Amtrak Police office, taking five minutes or so for the walk. Mr. Fallon says that Officer Romano became quite aggressive in his questioning during this walk, asking him whose money was in the bag, what he was going to do with it, and other questions. The time it took to walk back to Union Station from the train was approximately five minutes. Mr. Fallon was not handcuffed.

At the Amtrak Police office, Officer Romano opened the locked door. Mr. Fallon was again frisked, photographed and fingerprinted. Officer Terry called his dispatcher and asked for a police dog to conduct a sniff search of the bag. Mr. Fallon was told to sit and was asked for personal identification information. He lied about his address. It is disputed whether Mr. Fallon had his ticket and ID at the time they arrived in the station. At any

5

rate, they were taken from him, if he had them, and photocopied. They were then returned to him. Mr. Fallon was asked further questions and gave conflicting statements about the purpose of the money, telling Officer Romano at one point that he was going to buy a house in Seattle and at another that he was going to buy artwork. He told Officer Romano that he had been employed as a waiter and therefore had cash. He also said he had other investors whose money was in the bag, but declined to name them.

Officer Romano took a pocket knife and opened the bag. He saw that it contained bundles of money. He left the money in the bag and closed the latch on the briefcase. The patrol officer with the dog, "Deny," arrived someplace between 2:25 p.m. and 3:00. None of the witnesses (who also included Deny's handler, Officer Richard King), agreed on this point. It was not, however, more than an hour after the encounter on the train. Officer King told Officer Romano to hide the briefcase in another room, which was done. Deny found the bag and gave a positive alert that it contained drugs or money that had been contaminated with drugs. Deny was not asked to sniff any of the 19 bundles of money found in the bag. The money was later taken to a bank and deposited with other money. The actual amount is $100,120.00.

Officer Romano told Mr. Fallon that he would pursue criminal money laundering charges and called the duty attorney at the U.S. Attorney's office but was told that criminal charges would not be

6

pursued. He then gave Mr. Fallon various forms to sign, including a receipt for the cash, a verification of address, and a voluntary disclaimer of interest and ownership. Mr. Fallon signed each and was told he could leave. He left sometime between 4:00 and 4:30 p.m. Mr. Fallon did not have counsel at the time he signed the disclaimer form. He claims a possessory interest in the money although ownership is claimed by his co-claimant, Mr. Marrocco.

I have made the credibility determinations enumerated above based on my observation of the witnesses and their testimony, including their demeanor.

Claimants first argue that the entire interaction between the officers and Mr. Fallon was coercive, and therefore violated Mr. Fallon's rights under the Fourth Amendment, given the nature of the interaction and the setting on an Amtrak train. Not all interactions between law enforcement officials and individuals are seizures under the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). A given encounter only rises to that level when a reasonable person does not feel free to leave or otherwise terminate the interaction. *Florida v. Bostick*, 501 U.S. 429, 436 (1991). The officers needed no suspicion to approach Mr. Fallon and ask him routine questions about his identification and his travel plans. *United States v. Odum*, 72 F.3d 1279, 1283 (7th Cir. 1995). The fact that Mr. Fallon had entered his private compartment on the train when the officers approached him does not

7

change this analysis. *See, e.g., United States v. Rem*, 984 F.2d
806, 812 (7th Cir. 1993) (collecting cases holding no heightened
expectation of privacy in a sleeper car/roomette).

However, a routine interaction can mature into an
investigatory stop. *Odum*, 72 F.3d at 1283-84. Here, the
interaction between the officers and Mr. Fallon became such a stop
once Mr. Fallon had refused consent to search his briefcase, and
Officer Romano seized the briefcase for further investigation and
asked Mr. Fallon to accompany the officers off the train.
Claimants contest the validity of Officer Romano's seizure of the
briefcase. Law enforcement officers may make a warrantless seizure
of an individual's luggage, for brief further investigation, when
the officers "possess specific and articulable facts warranting a
reasonable belief that a traveler's luggage contains" contraband.
*United States v. Place*, 462 U.S. 696, 703 (1983); *see also United
States v. Ward*, 144 F.3d 1024, 1030 (7th Cir. 1998). The detention
itself must also be reasonable in scope. *Place*, 462 U.S. at 709;
*Ward*, 144 F.3d at 1030.

At the time Officer Romano seized the briefcase, he knew the
following about Mr. Fallon and the circumstances. Mr. Fallon had
purchased a one-way ticket from Chicago to Seattle, with cash,
within 72 hours of traveling. Mr. Fallon appeared nervous as the
officers questioned him, and had refused consent to search the
briefcase. The briefcase was locked, and Mr. Fallon admitted he

did not have a key but explained that he used a knife to open the briefcase. Mr. Fallon initially stated that he was not carrying large amounts of currency, but then stated that the briefcase contained $50,000 worth of currency. The officers had not run a criminal background check on Mr. Fallon, despite their advance notice of his identity, and they did not observe any suspicious behavior on Mr. Fallon's part as he boarded the train. The officers had no information alerting them to, or even suggesting, imminent criminal activity involving Mr. Fallon. Mr. Fallon's refusal to allow a search of his briefcase cannot form the basis of a reasonable suspicion. *United States v. Skidmore*, 894 F.2d 925, 927 (7th Cir. 1990). Although it is a close question, the other circumstances combine to create a reasonable suspicion entitling the officers to briefly detain Mr. Fallon's briefcase for further investigation.

However, the officers overstepped by opening the briefcase without probable cause and without a warrant. After Officer Romano had seized the briefcase and escorted Mr. Fallon to the Amtrak police station, he telephoned for a canine officer and his dog to perform a drug sniff of the briefcase. Officer Romano did not wait for the team, opening the briefcase before they arrived. While a reasonable suspicion may suffice for a temporary *seizure* of an individual's luggage, a *search* of that luggage must be supported by probable cause. *See, e.g., United States v. Faison*, 195 F.3d 890,

9

893 (7th Cir. 1999). What little information the officers had about Mr. Fallon and the circumstances of his travel may have sufficed for a reasonable suspicion, but does not reach the level of probable cause to believe that an offense had been or was being committed. The government relies on the alert by Deny, a trained drug detection dog. However, the briefcase had already been opened, and searched, by Officer Romano before Deny arrived on the scene.[1] The dog's later alert cannot retrospectively justify the search. Claimants' motion is granted.

**ENTER ORDER:**

Elaine L Bucklo

**Elaine E. Bucklo**
United States District Judge

Dated:    March 21, 2005

---

[1] The government also references the inconsistent answers provided by Mr. Fallon in response to questioning at the Amtrak police station. However, by the time Mr. Fallon was being questioned, he was in a custodial setting - he had been fingerprinted, frisked twice, and photographed. He was also placed in a room to which the public did not have access, and his briefcase had been removed from his physical possession. Despite all this, no one read Mr. Fallon his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436 (1966). The government may not rely on these statements to support a finding of probable cause.

10