IN THE
UNITED STATES DISTRICT COURT
OF THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | No.   03 C 3644 |
| | ) | |
| FUNDS IN THE AMOUNT OF ONE, | ) | The Honorable Elaine E. Bucklo, |
| HUNDRED THOUSAND AND ONE | ) | District Judge, Presiding |
| HUNDRED TWENTY DOLLARS | ) | |
| ($100,120.00 U.S.C.), | ) | |
| Defendant. | ) | |
| ------------------------------------------------------ | ) | |
| NICHOLAS P. MARROCCO, and | ) | |
| VINCENT J. FALLON, | ) | |
| Claimants. | ) | |

**CLAIMANTS' ANSWER TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

Stephen M. Komie
Brian E. King
Komie and Associates
One North LaSalle Street, 42nd Floor
Chicago, IL 60602
312.263.2800

# Introduction

Plaintiff's motion for summary judgment alleges the Defendant *Res* is forfeitable because it was used in violation of 21 U.S.C. § 881(a)(6). That section outlines three theories for Plaintiff to forfeit property. Yet, Plaintiff has not selected any theory; instead, it chose to use the spaghetti at the wall approach and hopes something sticks. Plaintiff has had eight years to prove its case and in that time it has submitted zero evidence linking Claimants to any narcotics transaction.

In part, Plaintiff's motion ignores the history of this case. For example, Plaintiff alleges a statement of facts based on testimony from the motion to suppress. Yet, this Court heard the testimony, assessed the credibility of the witnesses, and made factual findings. The Court found the total absence of any evidence of a narcotics transaction. The Court also entered a memorandum opinion stating its findings of fact related to the initial encounter and subsequent seizure of the Defendant *Res*.

Plaintiff then appealed this Court's ultimate ruling, but did not contest any of this Court's factual findings. Therefore, these findings have become the law of the case. *U.S. v. Husband*, 312 F.3d 247, 250-51 (7th Cir. 2002) Thus, Claimants rely on the facts already determined by this Court. *United States v. $100,120.00 in U.S.C.*, 361 F.Supp.2d 757 (N.D.Ill. 2005); (Doc. 86).

Subsequent to the Court's rulings, *supra*, the parties engaged in extensive motion practice. (*See e.g.*, Doc. 87; 91; 98; 100; 102; and 106). On July 5, 2007, this Court entered Judgment and a Memorandum Opinion and Order. (Doc 109; 110). In the Memorandum, this Court stated,

> The government has presented no evidence that would establish a "substantial connection" between this res and narcotics trafficking other than the purported results of the drug detection dog's "sniff test" of the currency. Doc 109 at 8, citing *United States v. $30,670.00 in U.S.C.*, 403 F.3d 448 (7th Cir. 2005).

At that time, this Court found the dog sniff evidence inadmissible; and, ordered the Defendant

*Res* returned. Though, the appellate court reversed the ruling on the motion to suppress, the potential evidence has not changed. The only evidence potentially linking the *Res* to narcotics is *still*, the dog alert.

The pivotal question is whether a contested issue of material fact exists as to the probative value of the dog alert. If Plaintiff cannot prove the dog alert provides a link to narcotics, then Plaintiff cannot prove an essential element of its case. Therefore, Claimants answer to the motion focuses mainly on the probative value of the alleged dog sniff in this case.

Moreover, when the evidence is viewed in favor of Claimant, Plaintiff has not met its burden by a preponderance. This Court previously found Claimant Fallon's travel arrangements did not meet the drug courier profile. Further, this Court found Claimant Marrocco averred that the money was not related narcotics, that he was not a narcotics trafficker, and that the currency was the result of savings from lawful employment. Plaintiff has not provided any evidence refuting these facts. Therefore, summary judgment should be denied.

## Argument

**I. Plaintiff's theory of the case.**

Although Plaintiff does not provide any evidence in support of its implied theory, it does cite to *$30,670.00* for support; essentially, Plaintiff adopts the argument provided in *$30,670*. This is important because Plaintiff's Statement of Facts does not establish its dog alert theory; there is no testimonial, admissible evidence establishing Plaintiff's theory in the record. On this basis alone, the Court should deny summary judgment.

In *$30,670*, the appellate court asked the parties to submit publicly available data concerning the problem of widespread currency contamination. *$30,670*, 403 F.3d at 454. Plaintiff submitted two studies by Kenneth Furton and an affidavit from a Stefan Rose. *Id*. at 457-58. It appears

appellant did not submit any studies disputing the government's case. *Id.* at 456. Thus, the appellate court adopted Furton's conclusions as to why a dog sniff alert to contaminated currency is probative. *Id.* at 458-60.

According to Furton and Rose, a dog does not smell pure cocaine, but rather, smells a chemical associated with cocaine known as methyl benzoate. *Id.* at 458. And although it is not entirely clear where this chemical comes from[1], Furton suggests it evaporates quickly. *Id.* According to Furton, this means the money must have recently come into contact with a large amount of narcotics[2] because otherwise the methyl benzoate would have evaporated. *Id.* And Furton claims that the amount of cocaine necessary to produce enough of this mystery chemical is so large that it would take 50,000 "innocently" contaminated bills in order to induce a dog alert.[3] *Id.* at 459.

---

[1] The Seventh Circuit failed to address this significant question. Furton claims two possible sources for methyl benzoate: (1) the coca leaf extraction process, or (2) association with solvents present in illicit cocaine samples. As to the first hypothesis, if methyl benzoate is as highly volatile as Furton claims, it is doubtful it would have survived the jungles of South America and transport to the States in order to become attached to the Defendant *Res*. The idea of the second hypothesis is that 'stuff' or cutting agents are added to cocaine, which combines with it to produce methyl benzoate. As will be demonstrated below, methyl benzoate is a by-product of the natural breakdown of cocaine. Thus, methyl benzoate is not "added to" the cocaine; it is constantly being produced as the cocaine degrades. Of course, methyl benzoate cannot evaporate unless it exists in the first place. If the methyl benzoate exists as a result of the degradation of the cocaine, then logic dictates that more methyl benzoate will be produced to replenish the methyl benzoate that dissipates as a result of evaporation, and so on, and so on.

[2] Furton's theory only accounts for residual cocaine on currency. It does not account for heroin, marijuana, methamphetamine, phencyclidine (pcp), or any other narcotic a dope sniffer dog could be trained to detect. Thus it cannot account for the fact that the currency is not only contaminated with cocaine, but also with several other narcotics that the dog in this case is allegedly trained to detect. Clmt. Statement of Additional Facts ¶2.

[3] Furton's studies were conducted over a decade ago and in order to determine the average amount of cocaine on currency, relied upon even older studies. As has been testified to by Claimants' expert, Sanford Angelos, the currency has become steadily more contaminated as time has progressed. *See* Clmt Exh. 2, ¶¶ 6-7. Thus, Furton's study may well be stale given that

3

As will be demonstrated below, Furton's studies are built on a foundation of erroneous assumptions which are not scientifically valid; his bias is palpable; and his credibility is impaired. In sum, Furton's studies are junk science intended to achieve a predetermined result. Claimants thus raise genuine issues of material fact because Plaintiff's dog alert theory conflicts with other evidence in this case.

**II. A genuine issue of material fact exists as to whether Deny is properly trained and certified to discriminate between innocently contaminated currency and currency that has been used in connection to a narcotics transaction.**

Plaintiff claims Deny is a reliable drug sniffer dog. But, Plaintiff has not presented any evidence that Deny can reliably discriminate between narcotics, narcotics contaminated currency, or so-called untainted currency. Clmt. Statement of Additional Facts (hereinafter, "SAF") at ¶¶17; 20; 22. Conversely, Claimants have submitted the affidavit of an expert in the field of canine specific odor detection training, which contests whether Deny is properly trained to reliably discriminate between innocently contaminated currency and currency that has been used in connection to a narcotics transaction. SAF at ¶¶ 16-17; 20-21.

Contrary to Plaintiff's claims, Deny's training relative to currency is sparse. Indeed, out of 116 training episodes, only three pertained to currency. By Plaintiff's own records, none of those three episodes involved a control group of uncirculated, contaminant-free currency.

The first test did not even have a control. On May 12, 1998, Deny was asked to find a lone sample of heroin-scented, circulated currency. Gov. Exh. K, Ex. 2. After finding the sample, Deny was rewarded. *Id.* But, Deny may have thought he was rewarded because he found something that smelled like heroin, or smelled like the trace amounts of cocaine that was on the currency, or even the currency itself. Or maybe Deny thought it was because he found something

---

his assumptions on the percentage and amount of contamination may no longer be valid.

4

that smelled like a combination of all three. See Clmt. SAF at ¶19; See Also, Ex. 2, C5 at 192, fn 13 (Where Researcher discuss study finding detection dogs may be alerting to the currency itself and not the narcotics.) We simply do not know because there was no control. *Id.*

The records reflect, the only time Deny was possibly asked to sniff multiple samples of currency, he gave a positive alert. See Gov. Exh. K, Ex. 2 at July 10, 1998; Clmt's SAF, ¶16. However, even then, the other money samples were labeled as "unscented," not as uncirculated. *Id*. There is a difference, as uncirculated currency is the only type of currency in which a trainer knows the money has not been contaminated. *Cf.* Gov. Exh K at ¶27; Clmt. SAF ¶¶16-22.

Plaintiff claims Deny was certified. However, his certification was done by the same organization that did the training. Gov. Exh. K, Ex. 3. This is highly unusual in the narcotics detection dog field as it opens the door to bias. Clmt. SAF, ¶15; Exh. 1, ¶5. Moreover, the certification is signed by an unknown Deputy Superintendent. Plaintiff has not provided any evidence as to the credentials of the individual signing the certification. *Id*.; See Gov. Exh. K, ¶ 9. Thus, there is no evidence that this individual has any background concerning narcotic detection dogs. For all we know, he may be an administrative paper-pusher. Finally, neither the affidavit nor the certification itself provides any information regarding what precisely Deny is certified to do or what standards Deny needed to meet in order to become "certified." *Id.*

Once out in the field, Deny was occasionally trained, yet not on a monthly basis as Plaintiff claims. Gov. Exh. K, at ¶12. About 4 years and 5 months elapsed between the time Deny was certified and the date of the seizure. According to Plaintiff, he should have received additional monthly training equal to the 53 months he was in the field. *Id*.; Exh. K, Ex. 4.

In fact, he received only about half that, or 27 training episodes. *Id*. But even his record is telling, because as time progressed, Deny received fewer and fewer brush-up training episodes.

5

Deny only received three training episodes for the entire 2002 calendar year. *Id.*

The majority of Deny's field training lessons were dedicated to narcotics. Plaintiff claims, Deny alerted in field training 93 times, but only 10 of those related to currency. *Id.* Examining the 10 currency-related alerts reveals that 9 out of 10 utilized no control whatsoever, and the lone sniff test that referenced a money line up involved heroin. *Id.* But again, that lone test used street money and not uncirculated United States Currency. *Id*. at Feb. 17, 1999 entry. At no time, either during training or post-certification field training was Deny ever asked to discriminate between tainted currency and uncirculated currency free from contamination. Clmt. SAF, ¶¶16-22.

Curiously, in the field, Deny was asked to do the exact opposite of his training. The majority of the sniff tests purported to be upon currency and not narcotics. Plaintiff claims he alerted 166 times in the field and of these, 113 times were to currency. Deny, of course, positively alerted to 100 percent of the currency he was asked to sniff in the field. This Court may recall, it asked Officer King directly whether there were times when there was money, and Deny did not alert. Clmt. SAF, Ex. 6 at p. 33. The Officer said "yes." *Id.* Claimants comment that they were unable to find one field entry where Deny did not alert to the currency. Claimant also remarks, Plaintiff has not provided any evidence that the currency from those sniff tests was ever scientifically tested for the presence of narcotics; thus, it is impossible to know what Deny's error rate was. Plaintiff assumes the error rate was zero, but we could equally assume the error rate was 100 percent because there is no evidence supporting Plaintiff's conclusion. The only thing we know is, after Deny alerted positively 113 times to currency in the field, he was rewarded.

**III.** **A genuine issue of material fact exists as to whether the sniff test in this case adequately protected against cross-contamination or the possibility of a false positive alert.**

The officers testified that they had placed narcotics and allegedly narcotics-tainted currency

6

in the roll call room of the Amtrak police office. Gov. Exh. K at ¶¶18-19. Yet, there is no evidence that any attempts were made to ensure the place where the sniff test took place was free from possible contaminants. Clmt. SAF ¶27.

Both of Claimants' experts noted opinions on this issue. David Kroyer, an expert dog trainer, familiar with the capabilities of detection dogs, noted that no steps were taken to ensure a "clean" testing environment. *Id.* He opined that this is important because of a dog's ability to detect residual odors even after contaminants are removed. *Id.*

Similarly, Sanford Angelos, a DEA forensic chemist, commented on the same issue. He noted that testimony indicated that numerous suspects and sniff tests had been conducted in this office and no steps were taken to ensure the area was kept laboratory clean. *Id.* He noted there were at least two opportunities for contamination, (1) upon opening the bag in the Amtrak Office and (2) contamination from the file cabinet or general area in which the sniff took place. *Id.*

Given the incredible acuity of the nose of a drug sniffer dog, the potential for contamination was real. Yet, the officers took zero steps to ensure a clean environment. They took no steps to test the room with a control sniff *sans* the currency. *Id.* The officers also took no steps to provide the dog with a control bag or object secreted in the same area.[4] In sum, a genuine issue of material fact exists as to whether the sniff test in this case is reliable due to the officers' failure to protect against possible contamination and the failure to ensure reliability by using a control object with the subject *Res*.

**IV.   A genuine issue of material fact exists as to whether Deny alerted to the odor of methyl benzoate or merely to the odor of circulated currency innocently contaminated with illicit cocaine.**

---

[4] A control bag would be an object similar to the attache, which the officers had handled and had contained a sample of verified, untainted currency. Clmt. SAF ¶27; Exh. 1, ¶7.

7

Sanford Angelos was an employee of the United States Department of Justice, Drug Enforcement Administration for thirty years. Clmt. SAF ¶1, Ex. 2, ¶2. At retirement, he was a Senior Forensic Chemist. *Id.* Mr. Angelos reviewed documents from this case, various appellate court opinions, as well as numerous scientific studies. Clmt. SAF Ex. 2, ¶4. Mr. Angelos formed opinions to a reasonable degree of scientific certainty based on his knowledge, skill, experience, training and education. *Id.* at ¶5. His opinions are fully set forth in his affidavit. See generally, *Id.*

As detailed below, Plaintiff's theory concerning currency contamination relies on certain studies conducted at *Florida International University* by Kenneth Furton. Mr. Angelos reviewed those studies, and opined that there is no scientific validity to Furton's conclusion that if a detector canine alerts to currency the currency must have been recently involved in the drug trade. Clmt. SAF at ¶14.

Mr. Angelos opined, it is common for cocaine traffickers to adulterate it with other substances in order to increase its weight. Clmt. SAF, Exh.2 at ¶6. This process, referred to as cutting, allows a trafficker to increase its profit by effectively artificially increasing his supply. *Id.* The practical effect is that "illicit" or street cocaine is not pure; rather, it is commonly only 92-93% pure. *Id.* This means, the remaining 7-8% is not cocaine at all; it is some other substance(s) mixed with the cocaine to increase the aggregate amount of white powder. This fact is significant for the reasons addressed below.

**A. The Furton studies are biased.**

The Furton's motivation is clear: undermine the judicial reasoning of the United States Court of Appeals for the Ninth Circuit. Clmt. SAF at Exh.2, C10, pp. 56-57. Such

advocacy may be commonplace in the courts, but it has no place in the scientific community. Nary a one of the other scientific studies cited by Angelos reveal such unashamed proof of bias and desired outcome. Judges and jurors routinely assess the credibility of biased witnesses; this Court should consider the bias exhibited by Furton's own words.[5] The bias and desired outcome is pellucid upon examination of the faulty assumptions Furton has woven into the fabric of his "so-called" scientific studies. Furton should be called to testify in this case so that he can answer how much money he has received from the Department of Justice and other branches of law enforcement. Only then can a fact finder assess whether his credibility is impaired given his direct pecuniary interest in the results of his "scientific" studies.

**B. Furton's studies are based on a series of faulty assumptions.**

    **1. Furton erroneously claims that a detector dog only keys on methyl benzoate when alerting to cocaine.**

At the core of Furton's studies is the premise that a narcotics detector dog does not alert to pure cocaine, but rather to methyl benzoate, a chemical associated with cocaine. *Id.* at p. 58. As his *aide-de-camp*, Stefan Rose, claims, the dog cannot smell the cocaine. *30,670.00*, 403 F.3d at 457-58. At room temperature and average humidity, cocaine hydrochloride will naturally breakdown and produce, or off-gas, a sweet-smelling chemical known as methyl benzoate. Clmt. SAF at ¶5. This is important because methyl benzoate is not an impurity of cocaine, but rather, it is natural result of cocaine degradation. *Id*. Thus, as Furton notes, methyl benzoate is always associated with cocaine.

---

[5] *E.g.*, Furton contemptuously notes the Ninth Circuit considered a newspaper article reporting that six of eight banknotes coming from "so-called" [Furton's words] non-users showed detectable levels of cocaine. Who were these "so-called" non-users Furton mocks? They were: "a police chief, a circuit judge, a state senator, a mayor, a community college president, the Orlando Sentinel editor, a reverend, and a county chairman." *United States v. $30,060.00 in U.S.C.*, 39 F.3d 1039, 1043 (9th Cir. 1994.)

Furton admits the amount of methyl benzoate off-gassed depends on the purity of the cocaine. Furton found that methyl benzoate "readily forms " when exposed to certain solvents, but does not "spontaneously form to any appreciable extent in pharmaceutical grade cocaine." Clmt. SAF at Exh.2, C10, p. 58. In other words, when impurities are added, the production of methyl benzoate may soar to levels 25 times that of pure cocaine. *Cf. Id.* at 62 & Exh.2, C11 at 46. (pure cocaine contains 0.0008% methyl benzoate w/w (weight for weight); illicit cocaine contains .02% methyl benzoate w/w.) In the real world, our currency is tainted with illicit cocaine, not pure cocaine.

Further, Angelos opined, it has been shown that a detector canine is keying to both the vapor of illicit cocaine and methyl benzoate. Clmt. SAF ¶6. Citing a 1996 study, Angelos reports, researchers found methyl benzoate is not the detection odor signature for cocaine. In that study, Waggoner compared the threshold detection limits of canines to three samples, (1) pharmaceutical cocaine; (2) "illicit" cocaine; and (3) methyl benzoate. Clmt. SAF, Exh.2, C9.

The study found that in order to achieve a 90% accuracy rate on detection of pure methyl benzoate, the sniffer dogs needed a minimum concentration of 50 ppb methyl benzoate, that is, 50 parts per billion.[6] *Id.* at 221. However, the researchers found the dogs could accurately detect illicit cocaine vapor when the concentration of methyl benzoate was just 0.1 ppb, or one-tenth of one part per billion.[7] *Id.* at 223. That is a difference of 500 times. In other words, the concentration of methyl benzoate in the illicit cocaine vapor was 500 times less than the amount

---

[6] Researchers at Auburn University found dogs can detect odors when particles in the air are at a concentration of 500 parts per trillion. Richard E. Myers, *Detector Dogs and Probable Cause*, 14 GEO MASON L.REV. 1 (2006). Waggoner noted, the dogs' detection ability "surpassed the detection limits of the analytical instruments used. . ." Clmt. SAF at Exh. 2, C9, p. 225.

[7] The threshold levels (minimums) for detection of methyl benzoate and illicit cocaine vapors were 16 ppb and .03 ppb, respectively. *Id.* at 224.

the dogs could even detect; thus, making it impossible that the dogs were relying on the odor of methyl benzoate to detect the illicit cocaine.[8]

Despite the fact that the 1996 study pre-dated Furton's studies, he ignored the results and posited a completely contradictory theory: narcotics dogs only alert to methyl benzoate. This is a dispositive contradiction because everything that follows is fluff. If Furton's primary assumption is incorrect, his studies are academic.

Furthermore, Furton's studies erroneously assume the evaporation rate of methyl benzoate on currency contaminated with pure cocaine is equal to that of currency contaminated with illicit cocaine. Clmt. SAF ¶14. This evaporation rate is wrong because it fails to account for the replenishment of methyl benzoate. *Id*. As stated above, illicit cocaine produces 25 times more methyl benzoate than pure cocaine. Thus, Furton fails to account for the replenishment of methyl benzoate that would occur on real world currency. *Id*.

**2. Even ignoring Furton's erroneous assumptions, his calculations are incorrect.**

Furton concluded that the amount of cocaine required to produce enough methyl benzoate to cause a dog to alert was 50,000 times higher than the average amount of cocaine present on currency. But, his math does not add up. Angelos noted,

> A banknote with 500 milligrams of cocaine with 0.02% methyl benzoate would be 0.1 milligrams or 100 micrograms of methyl benzoate. This is 10 to 100 times greater than the threshold reported. Furton's adds to the calculation the 90% loss of methyl benzoate to obtain the 10 micrograms. This is again based on the faulty assumption that methyl benzoate is an impurity. It does not consider that methyl benzoate is a continually generated breakdown component of the cocaine on the banknotes as shown in the 1996 Dejarme study. Clmt. SAF Exh. 2 at ¶20.

---

[8] Moreover, the researchers found the absolute lowest level of methyl benzoate (16 ppb) needed for an alert surpassed the maximum amount of methyl benzoate (.1 ppb) present in the illicit cocaine samples. Thus, the researchers concluded, the dogs were **not** using methyl benzoate to identify illicit cocaine vapor, and suggested compounds in illicit cocaine other than methyl benzoate were important in how dogs recognize illicit cocaine. *Id.* at 223-24.

Using Furton's own numbers means his conclusion that a sample must contain at least 500 milligrams of cocaine to trigger a dog alert, is wrong. Furton claims the threshold levels of methyl benzoate needed are 1 to 10 micrograms, not 100. Thus, according to Furton's own calculations the amount of cocaine necessary to elicit an alert is as low as 5 to 50 milligrams of cocaine, not 500 milligrams. Furton also assumed 90% of the methyl benzoate would evaporate in 2 hours, without replenishment. If you throw out this erroneous assumption, Furton's calculations underestimate the levels by another factor of 10, meaning the number is as low as 0.5 to 5 milligrams of cocaine. See, Ex. 2, C5 at 192, fn 13 (Researcher discusses study where banknotes were contaminated with between .001 to 5 milligrams of cocaine; dogs alerted to banknote containing as little as .001 mgs to 0.5 mgs cocaine.)

3. **Furton's conclusion that a drug sniffer dog needs a 500 milligram sample of cocaine in order to alert is so outrageous it cannot be believed.**

Surely, Dr. Furton, could not have overestimated the amount by 495 milligrams. But then, the government has sought to forfeit property based on a dog alert to an amount as little as 3 to 4 milligrams of cocaine. (3-4 mg is about 0.7% of Furton's 500 mg figure.) In *United States v. One Gates Lear Jet, et. al*, 861 F.2d 868, 869 (5th Cir. 1988), the government sought to forfeit a Learjet based on a dog's alert to two different locations within the aircraft. The DEA brought in forensic chemists to collect evidence. *Id*. Using special equipment to vacuum the plane, the scientists recovered a mere 3 to 4 milligrams of cocaine. *Id*. A fair conclusion is that if a sniffer dog can alert to 3 to 4 milligrams of cocaine spread throughout an aircraft, then Furton's 500 milligram figure is a fantasy.

Plaintiff's own evidence contradicts Furton. Officer King testified that the mere hanging of a banknote over an amount of narcotic, sealed in a plastic bag, could transfer enough residual odor

to a banknote to cause an alert to the banknote. Gov. Exh. K at ¶28. The officer also testified that Deny had alerted to amounts of narcotics so low as to be un-inventoriable. *Id.* at ¶36.

4. **All of Furton's assumptions are incorrect and hence his conclusions are not scientifically valid.**

As demonstrated above and in the Angelos Affidavit, Claimants have raised a material issue of fact as to the validity of Furton's studies. All of Furton's assumptions are incorrect. And to compound the errors, his math is wrong. On summary judgment, viewing the facts in favor of Claimants, this Court must view the Waggoner study as correct and Furton's work as invalid.

C. *Revisiting United States v. $30,670.00 in United States Currency*

Plaintiff has taken the position in this case that this Court must follow Seventh Circuit precedent when on point. This is true, the court is obliged to apply controlling legal precedent. But this case presents a factual dispute.

In *$30,670.00*, there was no evidence contesting the validity of Furton's studies. Indeed, at summary judgment, claimant did not even contest the government's case. The appellate court's opinion was clear: its holding was based on the facts of that case. But the facts there are not the facts here. In this case, Claimants vehemently and bitterly contest every aspect of Plaintiff's case. And here, Claimants submit expert, scientific opinion testimony from a former DEA chemist with 30 plus years of experience, and numerous scientific studies contesting the validity of Furton's conclusions.

Another distinguishing fact between *$30,670.00* and this case, is that there is no evidence Deny was trained using pseudo-cocaine. See *id.* at 460-61. Here, Deny was trained exclusively using illicit cocaine and as Waggoner found, dogs can detect illicit cocaine when levels of methyl benzoate are not even detectible, *supra*. Plaintiff admits, the facts must be taken in a light most

13

favorable to Claimants. Based on the evidence presented, a genuine issue of material fact exists as to whether the dog alert in this case supports the conclusion that the currency was related to a narcotics transaction.

**V. Claimant Marrocco has proven a lawful source of the Defendant *Res.*, and the government has not presented any evidence disputing this.**

Plaintiff cherry picks from the record and attempts to portray Marrocco as an unemployed person with inflated expenses that could not possibly accumulate any savings whatsoever. Plaintiff asks the Court to focus on an interrogatory encompassing a period one year after the seizure and just two years prior to the seizure. And asks the Court to completely ignore almost a decade of Marrocco's work, living and saving history prior to the seizure. Claimant contests every conclusion made in Plaintiff's alleged statement of facts. However, more importantly, Claimant contests the arbitrary 2 year time period Plaintiff uses in order to reach its conclusions.

Plaintiff cites *$30,670.00*, without elaboration and claims that case supports its case. However, in that case, claimant had declared bankruptcy less than two years prior to the seizure, so the government computed his income as of that point. *$30,670*, 403 F.3d at 465. At summary judgment, Calhoun did not dispute the government's facts. That is nothing like this case. In this case, Plaintiff can point to no reason why the "counting" should only include 2 years prior to the seizure.[9] Indeed, Claimant is unaware of any rule of law or case which would allow the Court to ignore the majority of Marrocco's working life prior to the seizure.

As Plaintiff is aware after leaving college, Marrocco lived in his parent's home for at least a

---

[9] Plaintiff seems to suggest that because of the Furton theory, the period of time should be limited. That argument, of course, assumes Furton's theory can be accepted by the Court. *But see, $506,231.00*, 125 F.3d at 444, 453 (Where the court discounted an alleged alert by a drug sniffer dog to a half million dollar cash hoard found in a boarded up dumbwaiter at a pizzeria, and presumably, the *res* was there for some time.) Given that Claimants have raised a valid fact question as to Furton's work means this theory cannot be assumed to be true.

five year period. Clmt. SAF at ¶35. And when he did so, he lived virtually expense-free. *Id*. at ¶39. Moreover, at that time, Marrocco testified both at his deposition and in his affidavit, he was often working multiple jobs. *Id*. at ¶36. This testimony is undisputed as there is no evidence in the record contradicting these facts. The Court can take notice that although Plaintiff deposed Marrocco, it chose not to explore his work, expense, or saving history during the period he lived with his parents.

Additionally, it is quite reasonable to expect that an individual living with virtually no expenses can quite easily save substantial amounts of money from even modest employment. In this case, with Marrocco uncontested testimony that he was working a full time job and often moonlighting with a bartending position, it is even easier to see how Marrocco could save and accumulate a sizable sum of money.

Further, after taking the position with Bloomingdale Pizza, Marrocco testified he was working toward a partnership interest in the Rosati pizza franchise. *Id*. at ¶37. The store was clearly successful with gross revenue of approximately 1.6-1.8 million per year. *Id.* During this time Marrocco's expenses were also lower than the government claims because after moving from his parents home, the apartment rent was only $800 per month. *Id*. at ¶35. At times this rent was paid by the franchise and his car was provided by the business, as well. *Id*. at ¶37. This pattern continued for at least another 3 years. *Id*. at ¶35.

In sum, Marrocco has proven a lawful source of the Defendant Res, and the government has not refuted any of his claims. For all of the foregoing summary judgment should be denied.

# Conclusion

WHEREFORE, for the foregoing reasons, Claimants, Vincent Fallon and Nicholas Marrocco, by and through their attorneys, Komie and Associates, and respectfully pray this Honorable Court enter an order denying Plaintiff's Motion for Summary Judgment.

Respectfully submitted,


NICHOLAS MARROCCO AND
VINCENT FALLON, Claimants,
By and through their attorneys
KOMIE AND ASSOCIATES


By:  /s/ Stephen M. Komie


Stephen M. Komie
Komie and Associates
One North LaSalle Street, 42nd Floor
Chicago, IL 60602
312.263.2800