# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 3644 |
| | ) | |
| **FUNDS IN THE AMOUNT OF ONE HUNDRED** | ) | |
| **THOUSAND AND ONE HUNDRED TWENTY** | ) | |
| **DOLLARS ($100,120 U.S.C.),** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This civil forfeiture action pursuant to 21 U.S.C.
§ 881(a)(6), in which the government seeks the forfeiture of funds
it claims were "furnished or intended to be furnished in exchange
for a controlled substance, are proceeds from the sale of a
controlled substance, or were monies used or intended to be used to
facilitate narcotics trafficking," was filed in this court more
than eight years ago. After a peripatetic journey in this court
and one stop in the court of appeals, it is now ripe for decision
on the government's pending motion for summary judgment. For the
reasons that follow, I grant the motion.

### I.

On the morning of December 6, 2002, DEA Task Force Agent
Officer Romano searched the passenger manifest of an Amtrak train
scheduled to depart Chicago's Union Station for Seattle later that
day. He discovered that a passenger named Vincent Fallon had

purchased a one-way, first class ticket with cash less than seventy-two hours before the train's scheduled departure, and he concluded that these details fit the drug-courier profile. Shortly before the train's departure, Officer Romano, accompanied by another DEA agent, Officer Terry, approached Mr. Fallon's compartment. The officers identified themselves, said they were conducting a routine check, and asked whether they could ask Mr. Fallon some questions. Mr. Fallon complied with their request, and further agreed to show the officers his identification and ticket. Mr. Fallon told the officers that he was traveling to Seattle to visit a female friend, and that he planned to stay for about a week.

The officers asked whether Mr. Fallon was carrying any drugs, weapons, or large sums of money, to which he replied that he was not. Officer Romano noticed that Mr. Fallon was sweating. The officers then asked about the backpack and briefcase in Mr. Fallon's compartment. Mr. Fallon said that the items belonged to him, that he had packed them, and that no one had given him anything to carry. Mr. Fallon consented to a search of the backpack, which produced nothing untoward, but he declined to allow the officers to search the briefcase. Officer Romano reached into Mr. Fallon's compartment and picked up the briefcase. Finding it locked, he asked Mr. Fallon about its contents. Mr. Fallon replied that it contained "personal effects," which he further stated were "the entirety of the purpose that [he] was taking the train." Mr.

Fallon stated that he did not have a key to the briefcase, and that he used a knife to open it. Upon further questioning, Mr. Fallon admitted that the briefcase contained money, "about $50,000," which he said he planned to use to purchase a house in Seattle. At that point, Agent Romano told Mr. Fallon that the briefcase and its contents would be detained for further investigation and instructed Mr. Fallon to accompany the officers inside the station.

Officer Romano then contacted the Chicago Police Department to request that a drug detection dog be sent to Union Station. Inside the station, Officer Romano used a knife to open the briefcase and saw that it contained bundles of cash. Officer Romano quickly closed and latched the briefcase without removing its contents.

Shortly thereafter, Chicago Police Canine Officer Richard King arrived at Union Station. After a brief discussion with Officer Romano, during which Officer King observed the briefcase containing the money,[1] Officer King left to retrieve his dog, "Deny,"[2] while Officer Romano hid the briefcase in a room known as the "roll call" room. The roll call room contained a counter top extending along the length of one wall, upon which sat a fax machine and a computer, and beneath which were several storage cabinets with

---

[1] The government seems to suggest--without squarely asserting--that Officer King did not know what the briefcase looked like prior to Deny's alert to the briefcase. There is evidence to support claimants' contention that Officer King did see the briefcase, so I assume that to be the case, although this fact is ultimately insignificant to my analysis.

[2] Pronounced "Denny."

hinged doors.  On the other side of the room was a table, a copy machine, and several filing cabinets.  Officer Romano hid the briefcase behind the closed door of one of the cabinets.[3]

After the briefcase had been hidden, Officer King entered the roll call room with Deny and commanded him to search for drugs. Whether Deny went straight to the cabinet containing the briefcase or, instead, sniffed about the roll call room before proceeding to the cabinet is in dispute.  But the evidence is uncontroverted that Deny "alerted" to the cabinet door by scratching and pulling at it, then, after opening the cabinet door, alerted to the briefcase itself by scratching and biting it.[4]  Deny did not alert to any other area or item in the roll call room.

The government subsequently learned that contrary to Mr. Fallon's initial statements to the officers, neither the briefcase nor its contents belonged to him.  In fact, Mr. Fallon picked up the briefcase containing the money from claimant Nicolas Marrocco's house the day before Mr. Fallon was scheduled to travel to Seattle. Mr. Fallon had agreed to deposit the money, which belonged to Mr.

---

[3]Claimants purport to dispute "whether the briefcase was hidden behind a closed cabinet door." But claimants' citation in support of the putative dispute reads "See e.g., Exh. 6 at__." The cited exhibit is a portion of the deposition transcript of Officer King (who did not know where the briefcase was hidden) and does not support the existence of a dispute on this issue.

[4]Claimants object to and purport to deny portions of this statement, but I conclude that their objections are without merit and their denials either unsupported (as discussed in the previous footnote) or immaterial (whether Deny went straight to where the briefcase was hidden, or instead made a systematic search of the room before alerting to the briefcase).

Marrocco, in a safety-deposit box in Seattle.

Mr. Marrocco claims that he has never been in the business of selling drugs, and that the money in the briefcase represents a portion of his savings from lawful employment over the course of his life. Mr. Marrocco testified that he kept his savings at home, in a shoe box, because he had not had any bank accounts since at least 1992. The documentary evidence of Mr. Marrocco's income does not cover the entire period during which he claims to have amassed $100,120 in savings. But his 1999 federal income tax return states an adjusted gross income of $40,500; his 2000 federal income tax return states an adjusted gross income of $39,000; his 2001 W-2 form states that his gross pay for that year was $35,000; and records from Bloomingdale's Pizza (where Mr. Marrocco was employed from 1999 until April of 2002), show that his gross pay for 2002 was $9,643.57. Mr. Marrocco was unemployed between April of 2002 and December of 2002, when the funds were seized. Mr. Marrocco testified that his monthly living expenses for the 2000-2003 period were approximately $2,375 (although he later disavowed that estimate, claiming that his rent was sometimes lower than the $1,400 he estimated as part of the $2,375 total, and further asserting that his parents or his employer sometimes paid his rent and other expenses).

Based on the foregoing evidence, the government calculates what it calls Mr. Marrocco's "take-home" pay by subtracting

federal, state, and FICA taxes from Mr. Marrocco's gross earnings, then adding back his tax refunds, and concludes that Mr. Marrocco's living expenses exceeded his lawful net income by over $20,000 for the 1999-2002 period. Claimants object to the government's use of its own calculations, and they further object that Mr. Marrocco's earnings and expense history over a longer period should be considered. But claimants do not offer any evidence of specific, additional income for Mr. Marrocco for any time period, other than Mr. Marrocco's testimony that his parents gave him approximately $40,000 ("a very general guesstimate") during the 1999-2003 time frame, and that he was working towards partnership in a pizza franchise that "did" $1.6 to $1.8 million a year. Claimants further state that Mr. Marrocco "moonlighted" at several jobs for an unspecified time period after leaving college, but they offer no evidence of what his income may have been during that time. Claimants also point to Mr. Marrocco's testimony that he lived "rent free and virtually expense free" at his parents' home from approximately 1992-1997.

II.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). I must construe all facts in the light most favorable to the claimants, but I am "not

required to draw every conceivable inference from the record." *U.S. v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 454 (7th Cir. 2005) (*"$30,670"*) (quoting *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004).

To prevail on its claim of forfeiture, the government must prove, by a preponderance of the evidence, that there was "a substantial connection between" the seized funds and the commission of a drug-related offense. 18 U.S.C. § 881(a)(6); $30,670, 403 F.3d at 454. The Seventh Circuit has already concluded that Mr. Fallon's suspicious travel arrangements were consistent with the drug courier profile, and that this profile, combined with Mr. Fallon's "conflicting responses when questioned about the briefcases's contents,"[5] warranted a reasonable suspicion that the briefcase contained contraband. *U.S. v. Marrocco*, 578 F.3d 627, 633 (7th Cir. 2009)(*"Marrocco"*). In addition, the government argues 1) that Deny's alert is reliable and persuasive evidence that the money in the briefcase had recently been in contact with a controlled substance; and 2) that the evidence does not support claimants' assertion that the money came from a lawful source. Taken together, the government argues, these factors lead to only

---

[5]I consider only those statements that Mr. Fallon made before being taken into custody. *See U.S. v. Funds in Amount of One Hundred Thousand and One Hundred Dollars*, 361 F.Supp.2d 757, 762, n. 1 (N.D. Ill. 2005) (government may not rely on Mr. Fallon's post-custody, *non-Mirandized* statements) (rev'd on other grounds, *U.S. v. Marrocco*, 578 F.3d 627 (7th Cir. 2009)).

one reasonable conclusion: that the seized funds were substantially connected to a narcotics-related offense, i.e., that they were "furnished or intended to be furnished in exchange for a controlled substance, are proceeds from the sale of a controlled substance, or were monies used or intended to be used to facilitate narcotics trafficking," and are therefore subject to forfeit.

Claimants argue that Deny's alert to the briefcase does not support summary judgment because there are genuine factual disputes over 1) whether Deny was properly trained and certified to discriminate between innocently contaminated currency and currency that has been used in connection with a narcotics transaction; 2) whether Deny alerted to the odor of methyl benzoate or instead to the odor of circulated currency innocently contaminated with cocaine; and 3) whether the methodology of the "sniff-search" in this case adequately protected against cross-contamination or the possibility of a false positive alert. In addition to these issues, claimants argue that Mr. Marrocco has "proven" that the seized funds came from a lawful source.

On the issue of Deny's training and certification, it is undisputed that the dog (and his handler, Officer King) received 500 hours of training, including in narcotics detection for marijuana, cocaine, heroin, ecstasy, and methamphetamine, and was certified by the Chicago Police Department Training Division as a

Police Utility Dog in July of 1998.[6] Deny received annual re-certifications every year until 2007. According to Officer King, the entries recorded in the "dog-log" appended to his affidavit of June 24, 2010, reflect that during Deny's pre-certification training with Officer King, the pair conducted 116 sniff searches. In each of these searches, Deny alerted to the presence of drugs (114 times) or drug-tainted money (two times). In each of the two instances of a positive alert to currency, and in one further post-certification training exercise, Deny alerted to drug-tainted currency but did not alert to untainted, circulated currency. *See* 06/24/10 King Aff., ¶ 29; 12/21/10 King Aff., ¶¶ 5-7.

Claimants purport to dispute this evidence based on their expert, Mr. Kroyer's, own interpretation of the "dog log."[7] But Mr. Kroyer has no personal knowledge of that document, and his interpretation of it is insufficient to controvert the sworn testimony of Officer King, who created the log and participated in the events it records, and who affirmatively disputes Mr. Kroyer's interpretation. The evidence is thus undisputed that on three

---

[6]Deny received annual re-certifications every year until 2007, when he retired.

[7]Claimants also make legal arguments in objection to these factual statements (e.g., that the statements are vague, irrelevant, compound, conclusory, etc.). But L.R. 56.1 statements are not the place for legal arguments. See *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n. 2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts.") In any event, I conclude that claimants' objections are without merit.

separate occasions during his training, Deny alerted to currency
contaminated with narcotics but did not alert to untainted
currency.

Between the time Deny was certified and the time of the sniff
search at issue, Deny performed approximately 309 sniff searches
(in training and in the field) and gave 259 positive alerts.[8]  In
fifty searches, Deny did not alert.  Of Deny's 259 positive, post-
certification alerts, ninety-three were in training exercises.
Eighty-two of these revealed hidden drugs, and ten revealed drug-
scented currency.  As noted previously, Deny did not alert to
untainted currency in training on these occasions.

Deny also made 166 positive, post-certification alerts in the
field, forty-five of which revealed narcotics.  There is a dispute
over whether Deny made 113 or 115 positive alerts to currency in

_____

[8]Claimants object that the evidence discussed in this
paragraph is hearsay, as it is based directly on the "dog log"
itself, rather than on Officer King's testimony.  This objection
has some merit.  The government should have had Officer King
attest to the factual underpinnings for the numbers it relies
upon as evidence of Deny's reliability.  Nevertheless, while the
issue is close, I conclude that Officer King's affidavit
sufficiently attests to the meaning of the terms used in the log
(for example, he states that "pos" refers to a "positive" alert,
06/24/10 King Aff., ¶ 26, and that "references to 'scented' or
'tainted' currency are to currency that was placed in close
proximity to an illegal drug, thereby picking up the scent of
that drug," *id.*, ¶ 28) to support the government's interpretation
of the log entries on which its calculations are based, *see,
e.g.*, entries of 1/27/99, recording a "pos" result to "heroine
scented money," and 02/17/99, recording a "pos" result to
"heroine tainted U.S.C."), and that, as noted above, claimants
offer no competent evidence to support any alternative
interpretation.

the field, but this dispute is immaterial because even if Deny
alerted 115 times to currency (as claimants contend), and even if
every single one of these alerts was a false alert, it is
nevertheless undisputed that drugs or currency *known* to be tainted
with the scent of drugs was found after 137 of his 259 positive,
post-certification alerts (ninety-two times in training and forty-
five times in the field), making his reliability no less than
52.8%. This percentage already satisfies the more-likely-than-not
standard needed to prevail on a preponderance of the evidence, *see*
*U.S. v. Limares*, 269 F.3d 794, 798 (7th Cir. 2001), and if Deny's
positive alerts during his pre-certification training are also
considered, his reliability jumps to 67.5%,[9] surpassing the 62% the
*Limares* court specifically held to be sufficient. His reliability
climbs higher still if even a fraction of Deny's field alerts to
currency is assumed to be a "true" alert to the scent of drugs on
money that was recently in close proximity with drugs.

Furthermore, Deny's reliability is not materially challenged
by claimants' putative experts. David Kroyer, a dog trainer whose

---

[9]Out of Deny's 375 total positive alerts (pre- and post-
certification), drugs or currency known to be scented with drugs
was found after 253 positive alerts, or 67.4% of the time. I
note, simply for the sake of precision, that this percentage is
marginally different the one the government offers, and but it
seems to me that the government erroneously counted 374 total
alerts, rather than 375, which is the total suggested by the
numbers the government elsewhere asserts: 116 positive alerts in
pre-certification training, plus 309 positive alerts in post-
certification training and field work combined.

esoteric credentials are summarily, and rather unhelpfully, described in the first paragraph of his short affidavit,[10] first suggests that Deny's certification by the Chicago Police Department is deficient, opining that it is "normal" for dogs to be certified by outside agencies. Mr. Kroyer further opines that Deny's certification, or his handler's affidavit, should reflect which odors he is certified to detect, and the standards he is required to meet for certification.[11] Mr. Kroyer then opines that Deny's training was deficient. None of these opinions materially controverts the evidence of Deny's reliability, however, which is based not on his paper credentials, but on his actual performance in training and in the field. As the Seventh Circuit has remarked, the government "need not describe training methods or give the dogs' scores on their final exams. It is enough if a dog is

_____

[10] "Owner, President, Certified Training and Behavior Consultant, Master Trainer and Training Director of Canine Headquarters Police K9 division. Eleven years training experience. Placed green and finished K9 detection dogs for Law Enforcement, Military, and Homeland Security/Border Patrol. Trained and placed handlers for Law Enforcement, and Military. One Hundred percent (100%) passing rate under NNDDA certification. Conducted seminars and workshops nationally and internationally on detection dog training. Assisted in developing a program for mine detection rats at Bogota University, Columbia (sic)." This recitation, which frankly raises more questions than answers about Mr. Kroyer's credentials ("certified" by whom? "Canine Headquarters Police K9 division" of what police force?), does little to establish whether he is qualified to offer any of the opinions he expresses.

[11] In fact, Officer King's affidavit does state that Deny is certified to detect marijuana, cocaine, heroin, ecstasy, and methamphetamine.

reliable in the field." *Limares*, 269, F.3d at 798. Moreover, Mr.
Kroyer's opinion that Deny was inadequately trained, is based on
his own interpretation of the "dog log," a document of which, as
noted above, Mr. Kroyer has no personal knowledge. In short, Mr.
Kroyer's opinions relating to Deny's certification and training do
not controvert the government's evidence of Deny's reliability.

    The same is true of Dr. Myers' affidavit, which similarly
suggests that proof of Deny's reliability requires something more
than evidence of his performance in the field. *See* Myers Aff.,
¶ 14 ("[t]here are no records of replicated, controlled,
randomized, double-blind tests performed to determine
reliability"). And Dr. Myers' opinion suffers from additional
flaws that do not require expert rebuttal to perceive. For
example, Dr. Myers suggests that Deny's ability to distinguish
contaminated currency from general circulation currency--despite
having been established on three separate occasions in Deny's pre-
and post-certification training exercises--should be disregarded
because "[t]here is no evidence of numerous non-alerts by the
canine, Deny, to circulated U.S. currency." This suggests, of
course, that *some* number of non-alerts to circulated currency *would*
be enough to establish Deny's ability to distinguish between
tainted and untainted currency. But if three times is not
sufficiently "numerous," how many times would be? Ten? Fifty?
One hundred? The Myers affidavit verily begs the question, but

then proceeds to its conclusion that Deny's alert is unreliable without even the hint of a response. For the same reason, Dr. Myers' opinion regarding the need to "proof" a detector dog off circulated currency--even were it not in conflict with the court's holding in *Limares* (reliability based on "how dogs perform in practice," not "how they were trained and 'proofed off' currency"), 269 F.3d at 798, and based largely on the discredited "currency contamination theory" (more on this below)--rings hollow on this record.

Nor does Dr. Myers' discussion of scientific studies involving "the potential for cuing" by a detector dog's handler or other individuals raise a genuine dispute over the reliability of Deny's alert in this case. Whatever the validity of such studies, the only bases Dr. Myers cites for his opinion that *this particular alert* may have been a response to some "cue," rather than to Deny's detection of the scent of narcotics, are that "the handler knew and saw the object of the search," and that the officer who had hidden the briefcase was "visible in the doorway of the room in which it had been placed." There is no dispute, however, that Deny's handler, Officer King, did not know where the briefcase was hidden, and thus could not have "cued" Deny to alert to the cabinet door. And, without any explanation of how Officer Romano might have "cued" Deny from the next room (much less any evidence that the dog actually saw the officer), the mere possibility that Officer Romano

may have been visible through the doorway is far too speculative a basis for concluding that Deny's alert was the result of the officer's improper influence, rather than the dog's detection of narcotics.

In short, the opinions in the Kroyer and Myers affidavit that purport to challenge Deny's training and certification simply do not controvert the government's proffered evidence of Deny's reliability. Accordingly, though the government raises *Daubert* challenges to both of these putative experts, I need not examine their opinions through the *Daubert* lens at all.

I now turn to claimants' argument that Deny may have alerted to the scent of cocaine on innocently contaminated currency, rather than to the scent of methyl benzoate on currency that was recently in proximity to narcotics. The government relies heavily on *$30,670* to rebut this argument, and for good reason: in that case, whose facts are similar to those here in a number of respects, the Seventh Circuit held that "a properly trained dog's alert to currency should be entitled to probative weight," 403 F.3d at 459, and granted the government's motion for summary judgment of forfeiture.

In *$30,670*, DEA agents who had previously reviewed a passenger manifest and determined that the ticket purchase of an Antonio Calhoun met the drug courier profile approached Mr. Calhoun at Midway Airport just before his scheduled departure. The agents

15

asked whether Mr. Calhoun was carrying narcotics or large amounts
of money.  After receiving conflicting answers from an increasingly
nervous-seeming Mr. Calhoun and observing unusual bulges under Mr.
Calhoun's clothing, the agents searched Mr. Calhoun's person and
found him to be wearing a woman's girdle stuffed with bundles of
cash.  The agents placed the cash in a plastic bag and hid the bag
inside one of several empty suitcases in a vacant DEA office.  The
agents met with an Officer Arrigo, the handler of a drug-detector
dog named "Bax," and told him that confiscated currency had been
hidden somewhere in the room.  Officer Arrigo then brought Bax into
the room and commanded him to search for the hidden drugs.  Bax
alerted positively to the suitcase containing the money seized from
Mr. Calhoun.

Because the Seventh Circuit determined that "the crucial
threshold issue is whether Bax's alert, which linked Calhoun's cash
hoard to illegal drug activity, is entitled to any probative
weight," *id*. at 455, it asked the parties to address, using
publicly available, empirical evidence, how frequently drug
detection dogs "falsely alert to currency that is not demonstrably
related to the drug trade, but has been contaminated by prior
owners," to test the validity of the "currency contamination
theory," which Mr. Calhoun argued eviscerated the probative value
of Bax's alert.  The court honed in on the issue of "whether dogs
alert only to cocaine itself or rather to the odor of a cocaine

16

byproduct, such as methyl benzoate" (which the court noted was "a matter of some scientific debate"), and concluded that "the critical question is not whether most currency in general circulation is tainted with cocaine, but whether the cocaine itself is what triggers dog alerts to currency." *Id*. After weighing the parties' competing evidence, the court was persuaded by studies showing that dogs alerted to the odor of methyl benzoate, rather than to the odor of cocaine, and concluded that, because methyl benzoate evaporates quickly, currency exposed to cocaine and returned to general circulation "will quickly lose any detectable odor of methyl benzoate." Accordingly, the court held that positive dog alerts are indeed entitled to probative weight.

Claimants seek to reopen this debate with the affidavits of their putative experts, all of whom opine that Deny's alert may have detected innocently contaminated currency.[12] But as I previously held in this case, "*$30,670.00* puts to rest any argument that dog sniffs are universally unreliable based on the "currency contamination" theory." Order of March 11, 2011. In that order, I noted that while the government must present evidence that *this* dog sniff is reliable to prevail on its claim, it need not reestablish the validity of dog sniffs in general by debunking, for

---

[12]Claimants rely primarily on the affidavit of Sanford Angelos for this argument, but each of claimants' experts appear to incorporate this opinion. Myers Aff., ¶¶ 17-19; Kroyer Aff., ¶ 10.

a second time, the "currency contamination theory." The Seventh Circuit has already weighed in on this issue, and it held that the "currency contamination theory" does not eviscerate the probative value of an alert to currency by a properly trained dog. *$30,670*, 403 F.3d at 459. Accordingly, claimants are not entitled to a jury based on any putative dispute that Deny may have alerted to innocently contaminated currency.

Claimants' final argument relating to the dog sniff evidence is that the record permits the reasonable conclusion that the methodology of the search allowed for cross-contamination. In other words, Deny's alert may have accurately detected the odor of narcotics, but that the briefcase and currency seized from Mr. Fallon became contaminated with that odor only after it was seized. But this argument, like the previous one, is defused by the court's analysis in *$30,670*.

Claimants insist that "no steps were taken to ensure a 'clean' testing environment," relying on the affidavits of Mr. Kroyer and of Sanford Angelos, a DEA chemist. But in *$30,670*, the Seventh Circuit held that the failure to apply a particular methodology does not invalidate a facially unobjectionable sniff search and alert by a demonstrably reliable detector dog, particularly in the absence of any positive indication that the area in which the search was conducted was actually contaminated--such as an alert to other objects or areas of the room. *See $30,670*, 403 F.3d at 464.

Moreover, Mr. Angelos's opinion, which posits "the possibility that the currency or the case itself was contaminated in the Amtrak Police Office," explicitly acknowledges that this theory "would, of course, require that the desk where [the briefcase] was opened had traces of cocaine on it or that cocaine is floating in the atmosphere in that general area." Angelos Aff., ¶ 11. But there is no evidence that either of these conditions obtained, placing Angelos's opinion squarely in the realm of speculation of the kind rejected by the *30,670* court. 403 F.3d at 464 ("the mere possibility of cross-contamination does not deprive Bax's alert of probative weight.").

In sum, the government has proffered evidence of Deny's reliability in detecting the odor of currency that has recently been in contact with significant amounts of narcotics, and the opinions of claimants' experts do not raise a raise a triable dispute as to the reliability of Deny's alert. Accordingly, Deny's alert to the briefcase supports the government's claim of "a substantial connection between" the seized funds and the commission of a drug-related offense.

I further conclude that claimants have not controverted the government's evidence that Mr. Marrocco could not have accumulated $100,120 through lawful means. For the only period in which Mr. Marrocco's earnings are documented, his self-reported expenses exceeded his lawful income by a substantial amount. While it is

true that Mr. Marrocco's affidavit makes reference to additional sources of income (stating, for example, that he "moonlighted at a successful sports bar franchise as a bartender"), Mr. Marrocco "provided no evidence, such as receipts or bank statements, to substantiate" his testimony, 403 F.3d at 452. Moreover, Mr. Marrocco's testimony regarding his purported employment history conspicuously lacks any details of the kind that would be necessary to probe the veracity of his statements: in some cases, he does not even name his putative employer or indicate the dates he was allegedly employed, much less does he provide any estimate of the income he claims to have earned.

As for Mr. Marrocco's unsubstantiated "guesstimate" that he received $40,000 from his parents over the course of several years, and his claim to have lived "rent-free and virtually expense-free" for a five-year period long before the events at issue, this imprecise and self-serving testimony does not overcome the obvious discrepancy between his documented lawful income and his self-reported expenses during the three-year period immediately preceding the government's seizure of the funds in the briefcase.

In sum, claimants' evidence is insufficient to rebut the government's evidence that Mr. Marrocco could not have accumulated $100,120 in savings through lawful means. *See $30,670*, 403 F.3d at 466, citing *United States v. $174,206.00* in U.S. Currency, 320 F.3d 658, 662 (6th Cir. 2003)("[E]vidence of legitimate income that is

insufficient to explain the large amount of property seized, *unrebutted by any evidence* pointing to any other source of legitimate income or any evidence indicating innocent ownership, satisfies the burden imposed by [§ 881(a)(6)].") (emphasis in $30,670).

### III.

Because the totality of the circumstances in this case leads to only one reasonable conclusion--that the subject funds were substantially connected to a narcotics-related offense--the government is entitled to summary judgment of forfeiture.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: October 4, 2011