IN THE
UNITED STATES DISTRICT COURT
OF THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
)
Plaintiff, )
vs. )            No.   03 C 3644
)
FUNDS IN THE AMOUNT OF ONE, )      The Honorable John J. Tharp, Jr.,
HUNDRED THOUSAND AND ONE )         District Judge, Presiding
HUNDRED TWENTY DOLLARS )
($100,120.00 U.S.C.), )
                    Defendant. )
_____)
NICHOLAS P. MARROCCO, and )
VINCENT J. FALLON, )
                    Claimants. )

**CLAIMANTS' MOTION IN *LIMINE* TO EXCLUDE
ANY TESTIMONY OR EVIDENCE CONCERNING THE ALLEGED
DOG SNIFF OF DEFENDANT *RES* PURSUANT TO FEDERAL RULE OF
EVIDENCE 403 OR, IN THE ALTERNATIVE, DUE TO SPOLIATION**

NOW COME Claimants, NICHOLAS P. MARROCCO and VINCENT FALLON,

by and through their attorney, STEPHEN M. KOMIE of KOMIE AND

ASSOCIATES, and in support of their Motion in *Limine* to Exclude any

Testimony or Evidence Concerning the Alleged Dog Sniff of the Defendant *Res*,

state as follows:

## I.  Statement of Facts

1. Claimants have contemporaneously filed a motion for a *Daubert* hearing.

    Due to the similarities in the subject matter, Claimants incorporate the

    substance of the allegations in their *Daubert* Motion herein.

2. On December 6, 2002, law enforcement officers encountered an individual by the name of Vincent Fallon on a train at Union Station in Chicago. 730 F.3d 711, 713 (7th Cir. 2013). After briefly questioning Fallon, the officers instructed Fallon to accompany them back to their office with his luggage. (*Id.*) The details of the initial encounter and conversation are not relevant to the instant motion. The subsequent facts are.

3. Once at the office, Officer Romano used a pocket knife to open the briefcase and discovered that it contained bundles of money. (*Id.*) Romano then shut the briefcase. (*Id.*) Officer Sterling Terry (Romano's partner) then called a police dispatcher and requested that a police dog (the "canine unit") be brought to the office to conduct a sniff search of the briefcase. (*Id.*) The dog and its handler, Chicago Police Officer Richard King arrived shortly thereafter. (*Id.*)

4. Assisting Officer Terry testified that Officer King (the dog handler) was shown the briefcase and where it was sitting when he arrived on the scene. (TR. at 86.)[1] King testified he was aware the briefcase contained "suspect narcotics transaction money," before he retrieved Deny to conduct the sniff-search. (TR. at 12.)

5. King then returned with Deny to a room where he had performed searches with Deny on previous occasions. (TR. at 14.) King testified Deny started

---

[1]Citations to "TR. at __ " refer to the transcripts of the evidentiary hearing on the Motion to Suppress, conducted April 26-27, 2004. R. 43; 44.

searching the perimeter walls of the room before making his way over to the briefcase. (TR. at 15.) King then testified Deny began pulling and biting at the briefcase. (*Id.*) King testified that the briefcase was not secreted in a cabinet, but rather was located in an accessible area. (TR. at 15-16.)

6. Romano testified differently; he stated that he took the briefcase and secreted it inside a filing cabinet. (TR. at 198.) Romano testified that when King and Deny entered the room, Deny was on a leash, which King released. (TR. at 199.) After Deny was let off the leash, Romano testified the dog went straight to the cabinet where the briefcase was secreted and started scratching on it. (*Id.*) According to Romano, Deny did not search around the perimeter of the room at any time. (*Id.*) Romano testified that Deny never touched the briefcase with either it's paws or mouth. (TR. at 200.)

7. According to Officer Terry's testimony, the drug sniffer dog has always alerted positively to currency subjected to a sniff test at the Amtrak Police Office. (TR. 136-37.) Doc. 211 at 45, ¶24) This was later admitted by the government. (Doc. 211 at 45, ¶25) According to the government, there were 86 occasions between fiscal years 2002 through 2007 in which a drug sniffer dog was utilized at Union Station to sniff test currency. (*Id.*). Of the 86 occasions, the drug sniffer dog alerted positive on the currency 100% of the time. (*Id.*)

8. In any event, after the sniffer dog allegedly alerted to the briefcase, the currency was removed from the briefcase, sealed into evidence bags, and

sent to a bank to be counted. There is no dispute that the Defendant *Res* was destroyed by the government, *i.e.*, the actual funds were deposited and no longer available for inspection by Claimants. (TR. 91-92.) Further, as the Seventh Circuit noted the currency is unavailable for scientific testing.

9.  During discovery and subsequent motion practice, the government has tendered documents relating to Deny's training and field performance, amongst other discovery. Further, Plaintiff has filed at least two affidavits executed by Deny's handler, Officer Richard King. Affidavits attached as Exhibits A and B.

10. It is expected that Plaintiff will offer the testimony of Handler Richard King and his speculation about Deny's behavior on or about December 6, 2002. Claimants object to the admission of any evidence concerning Deny's purported "sniff test" on December 6, 2002.

**II. Law Applicable**

11. Federal Rule of Evidence 403, provides,

    Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R.Evid. 403.

12. The government seeks to forfeit the Defendant *Res* pursuant to 21 USC § 881(a)(6). Said statute, provides, in pertinent part,

    All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange,

and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter. *Id.*

13. The government has not produced and cannot produce a competent witness to testify the Defendant *Res* was:

   a.    furnished or was intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of Section 881;

   b.    traceable to such an exchange described above; and/or

   c.    used or was intended to be used to facilitate any violation of Section 881, whatsoever.

14. Because the government does not have any direct evidence of one of the three elements described above, the government intends to rely on circumstantial evidence *via* opinion testimony to establish this alleged connection.

15. Therefore, Federal Rule of Evidence 702 governs the admissibility of any opinion testimony the government intends to introduce in this case, which provides,

   If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed.R.Evid. 702.

16.  That specifically, the government intends to use a purported dog sniff as the only evidence of a connection between narcotics and the Defendant *Res*.

## III. Analysis

17.  In prior motion practice, Plaintiff has alleged "Deny" alerted to the briefcase Mr. Fallon had been carrying. And the briefcase contained the Defendant *Res*.

18.  This Court made the following factual findings when it decided Claimants' motion to suppress; to wit,

> The patrol officer with the dog, 'Deny,' arrived someplace between 2:25 p.m. and 3:00. None of the witnesses (who also included Deny's handler, Officer Richard King), agreed on this point. It was not, however, more than an hour after the encounter on the train. Officer King told Officer Romano to hide the briefcase in another room, which was done. Deny found the bag and gave a positive alert that it contained drugs or money that had been contaminated with drugs. Deny was not asked to sniff any of the 19 bundles of money found in the bag. The money was later taken to a bank and deposited with other money. *United States v. $100,120.00,* 361 F.Supp.2d 757, 760 (N.D.Ill. 2005).

19.  Plaintiff has alleged the canine alert means the sniffer dog "alerted to the presence of the odor of an illegal drug coming from the briefcase containing the seized currency."

20.  That obviously, Deny, being a canine, is incompetent to testify. Therefore, Plaintiff has produced an affidavit(s) from the dog's handler, Officer King, attesting to his opinion of Deny's reaction to the briefcase, King's

interpretation of Deny's reaction, and King's opinion of his interpretation of Deny's purported reliability.

21. Plaintiff has never produced any evidence that Officer King is an expert in canine olfaction, scientific statistical analysis, or the chemical composition of any illegal narcotics allegedly contaminating the briefcase.

22. Plaintiff nevertheless claims, Officer King's interpretation of the sniffer dog's purported alert "establishes that the source of the funds was from illegal drug transactions."

23. Thus, it appears Plaintiff intends to argue that Deny's alleged positive alert to the briefcase indicates the currency contained therein, recently, or just prior to packaging, had been in close or actual proximity to a significant amount of narcotics, and is not the result of any alleged innocent environmental contamination of circulated U.S. currency by traces of narcotics.

24. Plaintiff's claims regarding Deny's purported alert amount to equating a sniffer dog's sense of smell with a scientific test, which can conclusively establish the presence of an unknown controlled substance. Just as a State's Attorney would claim a Breathalyser can accurately and reliably detect alcohol, so here, the government claims Deny's cold, wet nose can reliably detect alleged byproducts of the chemical degradation and oxidation of cocaine exposed to the atmosphere.

25. The United States Supreme Court has held, district courts are to be gatekeepers regarding the admissibility of opinion or scientific testimony. *Daubert v. Merrill Dow Pharmaceuticals. Inc.,* 509 U.S. 579 (1993).

26. Plaintiff has not produced evidence that a positive canine alert to U.S. currency indicates the currency had recently, or just prior to packaging, been in close or actual proximity to a significant amount of narcotics.

27. Plaintiff has not produced evidence that this so-called theory has been tested.

28. That the government has not produced any evidence that the purported sniff test by Deny of the subject *Res* has been or could be tested.

29. That the government has not produced any evidence that Officer King has any scientific training on the ability and effectiveness of dogs to identify narcotics on U.S. Currency.

30. That Officer King's affidavits do not cite any scientific work experience in the training or evaluation of dogs for detection of narcotics on U.S. currency or any experience relating to determining the length of time narcotics residue can be detected by dogs after currency has allegedly come in contact with the narcotics.

31. In sum, Officer King's affidavits fail to allege any evidence whatsoever as to King's training, education, or experience to testify to the matters described above. Therefore, Officer King is not competent to testify to his opinion of Deny's reaction to the briefcase in question.

32. Moreover, Plaintiff does not know and has not provided any evidence of Deny's rate of false positive alerts to currency in the field. Therefore, Deny's error rate as to currency sniff tests in the field is unknown.

33. Plaintiff has not provided any literature (or other documents) to show that Plaintiff's theory as to narcotic residue contamination has achieved "general acceptance" in the expert community.

34. Plaintiff has not provided any studies, which support its theory of narcotic residue contamination of currency.

35. However, Claimants have provided numerous affidavits and reports from a variety of experts which refute Plaintiff's unsupported theory. See attached Exhibit C, Affidavit of Dr. Lawrence Myers; Exhibit D, Report of André Falco Jimenez; Exhibit E, Report of Dr. Warren James Woodford.

36. Dr. Lawrence Myers has reported and averred that:

   a. A positive alert by Deny "does not support the theory that the currency was recently, or just prior to packaging in close or actual proximity to a significant amount of narcotics."

   b. "There is no scientific evidence to support the theory that Deny's reliability in the field as to drug seizures translates to reliable identification of drug-tainted currency."

   c. "There is no scientific evidence that the reliability of the dog-handler team of King and Deny has ever been determined. There are no records of replicated, controlled, randomized, double-blind

tests performed to determine reliability. The team's reliability is only attested to by the opinion of the handler and an annual certificate issued by the Chicago Police Department Training Division without a description of how such certificates are earned. Moreover, there is no testimony of any specialized expertise on the part of the handler, Officer King, to competently render such an opinion regarding the reliability of the canine."

d.  "There are no records or testimony that the dog-handler team engaged in double-blind training. * * * The lack of such blind training has been shown to result in teams that utilize cues by the handler to alert rather than actually utilizing the odor of the desired target."

e.  "There is no evidence of numerous non-alerts by the canine, Deny, to circulated U.S. currency. There is no evidence in the records provided that the dog Deny was trained to reliably discriminate narcotics contaminated currency from general circulation currency." In other words, **every time** Deny was asked to sniff currency in the field he alerted to the currency.

f.  He opined that the importance of discrimination training (between generally circulated currency and so-called drug contaminated currency is threefold. First, the scientific record is conclusive that nearly all currency in circulation is contaminated with trace

amounts of narcotics. Second, the currency itself has an odor which a dog can detect. Third, currency is contaminated with numerous other odors (*e.g.*, *sebum* or fingerprint oil) which a dog can also detect and associate with a reward.

g.   He opined that "proofing" a dog off alerting to general circulation currency is absolutely necessary in order to insure reliability. Proofing is a term of art which in this context essentially means to conduct discrimination training regarding generally circulated currency and narcotics contaminated currency.

h.   He opined that another factor to consider in this case is the potential for cueing. This results when a handler causes a dog to alert based on the handler's behaviors. Myers notes that it important to understand that the human behaviors may be completely unintentional yet may still result in an improper alert. In support of this opinion, he discusses a recent peer-reviewed scientific article which found a false alert rate of 85% by trained narcotics and/or explosive detector dogs due to improper handler cueing. *See* attached Exhibit F, Lit, L., *Handler Beliefs Affect Scent Detection Dogs Outcomes*, 14 ANIMAL COG. 3 at 389 (2011). In other words, cueing is not a remote possibility, but rather a virtual certitude when the handler is lead to believe that the object of the search is present - just as in this very case.

I.     For all these reasons, as well as additional ones more fully
       explained in his affidavit, Dr. Myers opined that the alert by Deny
       and his handler in this case is completely unreliable.

37.   André Falco Jimenez, a former police officer and certified narcotics
      detection dog trainer with over 30 years experience reports that, without
      limitation:

   a.   Deny and Officer King's training and in-service deployment
        techniques result in serious issues of reliability for the team.

   b.   He found no evidence that Deny and his handler (which he refers
        to as "the team") were trained to alert only to narcotics tainted U.S.
        Currency.

   c.   He found evidence that King's in-service deployment technique of
        rewarding Deny after currency finds resulted in training Deny to
        alert to U.S. Currency regardless of whether the currency was, in
        fact, tainted with narcotics.

   d.   He found evidence that the team's training was not varied enough
        to produce a reliable narcotic detector dog.

   e.   He applied this problem of invaried training episodes to the search
        conditions here, and opined that Deny learned to locate the
        "desired" result by simply identifying the object with the most
        recent human odor present upon it. In other words, Deny was not
        keying on narcotics or even the scent of the currency, but rather

the object which had most recently been touched and handled - in this case, the bag containing the Defendant *Res.*

f.   Falco's Report discusses how he has tested this result in the field and discussed a scientific, peer reviewed study which also documented this phenomenon. Exhibit F, Lit, L., *supra.*

g.   He reports that another critical error affecting the reliability is that the handler was told what they were searching for and knew that the object was going to be present in the search location.

h.   He opines that an additional problem with the team is there is no independent certification for the team. In other words, the team was both trained and certified by the same agency, here, the Chicago Police Department. In his opinion, in order to insure reliability, independent certification of the team is critical.

I.   Amongst other issues with the training, he reports that the amounts of narcotics used during training of the team was too low. He explains that using small amounts of the target scent will essentially create a dog that is "too sensitive" to the odor, which leads to a dog alerting to residual odors of narcotics and other scents.

j.   For the above reasons, more fully explained in his attached Report, Falco reports that the dog-handler team in this case is unreliable.

38.   Dr. Warren James Woodford, a forensic toxicologist reports that:

a.    He patented the methyl benzoate odor which is used as a dog-training aid to assist in training detector dogs to alert to the odor of cocaine.

b.    He is aware that up to 90% of the currency in general circulation is contaminated with trace amounts of narcotics.

c.    He opines that the so-called "Two Hour Theory" is scientifically flawed and invalid. The theory suggests that methyl benzoate will evaporate from currency within two hours after exposure to cocaine. This theory has been cited by the government numerous times in support of its claim that a drug sniffer dog alert to currency means that the currency was recently in close proximity to large amounts of cocaine. According to Dr. Woodford, the research behind the theory is fatally flawed and not scientifically valid.

d.    He opines that extinction training (a form of discrimination training) is absolutely necessary in order to properly train a canine to discriminate between innocently contaminated, general circulation currency and atypically narcotic contaminated currency. His reasons for this mirror Dr. Myers', *e.g.*, general circulation currency has a distinct odor which is easily detected by a canine.

e. He opines that extinction training must be conducted under "blind" conditions so as to minimize the very real effects of handler cueing.

f. He opines that dogs intended to be used for narcotic/currency duty should be trained using methyl benzoate as opposed to "street" cocaine. His reason for this opinion, in part, is because street cocaine is not pure and has cutting agents added which can be detected by a canine. However, because the cutting agents (or odors) are rarely known, this results in a non-standardized alert. For example, if one of the cutting agents is talcum powder, a dog would learn to associate an alert to talcum powder with a reward. Plaintiff admits that in this case, Deny was trained using non-standard, "street" cocaine.

g. He opines that there is no evidence that Deny was trained to ignore "dead scents," also known as residual odors. This is a problem because it may result in an alert when the target substance (a narcotic) is not present.

h. He opines that absent "methyl benzoate extinction training, there is not a logical or scientific basis that Deny's purported alert to the currency in question is probative of anything whatsoever."

I. He opines that "the only manner in which to verify the probative value of Deny's purported alert would have been to conduct a

detailed crime laboratory analysis of the actual currency seized to precisely quantify the amount of methyl benzoate it was emitting." And this was not done in this case.

j.      He opines that the testing conditions and methodology employed in this case leads to questions about the reliability of the purported sniff test.

k.      He opines that "because the dog had zero training to do what it was deployed to do (alleged discrimination of sniffing of currency), Deny could have been "led by the nose," i.e., cued by the handler, to do what he did."

l.      In sum, for those reasons, as well as numerous others cited in his attached report, Dr. Woodford finds Deny's purported alert to the currency is completely unreliable.

39.      To summarize, Plaintiff's theory as to narcotic residue contamination is so unreliable, that even if relevant, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

40.      In this case, this evidence is misleading because a jury may believe Plaintiff 's theory is widely accepted by the scientific community. But Plaintiff is presenting a theory that a dog sniff is pathognomonic for a drug transaction, when there is a second viable theory for the contamination of the currency. Thus, the jury may be mislead into

believing a dog sniff alert equates to the actual fact of a narcotics transaction having taken place. This is especially true because Plaintiff has had **twelve** years to investigate and uncover a narcotics transaction. Yet, to date this case has always and still does represent a drug-less, bald seizure of currency without a scintilla of reliable evidence. This is especially true where the jury will never see, touch, or smell the Defendant *Res*. Had the government not destroyed it, it would be available for jury inspection.

41. That additionally presentation of this evidence and theory is not only misleading, but prejudicial as Plaintiff destroyed the *Res*. Thus, Claimants are deprived an opportunity to have independent tests conducted on the money. This topic is more fully set forth below in the section on spoliation.

42. Therefore, the Court should conclude that the prejudicial impact outweighs the probative value, grant this motion in *limine,* and exclude any evidence relating to the currency and the purported dog sniff because it would be unfairly  prejudicial and misleading to the jury.

## II. Exclusion for Spoliation

43. That the government has admitted after it took possession of the Defendant *Res*, it intentionally deposited the currency in to a commercial bank, thereby, destroying the evidence of the currency seized in this case.

44. That likewise, this Court has made a factual finding that the evidence no longer exists. *United States v. Funds in the Amount of One Hundred Thousand and One Hundred Twenty Dollars ($100,120 U.S.C.),* 361 F.Supp.2d 757, 760 (N.D. Ill. 2005).

45. That as provided above, the only alleged evidence of a connection between the currency and any purported narcotics transaction is the circumstantial evidence of the dog sniff.

46. That by destroying the evidence, the government has made it impossible for Claimant to conduct any independent tests on the subject *Res.*

47. That in a civil jury trial, when one party alleges another party has destroyed evidence, the alleging party is allowed to request a spoliation instruction be read to the jury. Such an instruction generally instructs the jury, if it determines that one party has intentionally destroyed evidence in bad faith, it may infer said evidence would have been unfavorable to the party alleged to have destroyed the evidence. See *e.g.,* Seventh Circuit Pattern Jury Instructions, Inst. 1.20, West (2008).

48. That in the present case it is undisputed that the government intentionally destroyed the evidence, as it admitted this fact.

49. That the government has provided no reason or excuse why it intentionally destroyed the evidence.

50. That the government certainly has the resources to store and secure evidence, as the government was able to store and secure other evidence

in this case; to wit, the briefcase from which the Defendant *Res* was seized.

51. That the destruction of the evidence also follows a pattern in civil forfeitures of currency. The government routinely destroys the evidence by depositing the subject *res* into a commercial bank post-seizure in all money-only cases within this jurisdiction.

52. That the Court should infer the government's destruction of the evidence was done in bad faith because the government knew by destroying the subject *Res*, it would denying Claimants the ability to rebut the key evidence the government seeks to introduce to win its case.

53. That the government is also aware that there is much debate in the courts as to the probative value of a dog sniff, and by destroying the evidence of the currency it renders it impossible for any claimant to ever test the government's theory as to the seized currency.

54. That for example, the government's theory is that Deny alerted to the currency because he detected the odor of methyl benzoate. They also conveniently claim that this odor quickly dissipates, thus they may argue that scientific testing would serve no purpose. To the contrary, if scientific testing demonstrated that the odor of methyl benzoate was still present (or was at least in 2003-04 soon after discovery began in this case and Claimants would have had an opportunity to request it), then the government's pseudo-scientific theory could have been rebutted. To

conclude that scientific testing would serve no purpose necessitates one's prejudicial assumption that the government's theory is ironclad. Claimants' expert, Dr. Woodford, will testify to the contrary.

54. That the government's actions represent a willful and wanton governmental indifference to the rights of the citizens to prove the government wrong. The government owns crime labs. The labs have the scientific equipment to analyze the currency at their fingertips. And yet, they destroy the currency so that no other scientist on the planet can disagree with them. Therefore, they have absolutely perfected the art of contingent fee law enforcement, which is no different from the historic role of the justices of the peace and law enforcement officers finding every speeder guilty in order to pay their salaries.

55. That moreover, if we accept the government's claim as true, that the currency in this case was contaminated with a significant amount of narcotics, the government's actions are even more egregious. As opposed to actually physically destroying the currency, quarantining it, or cleaning it, the government intentionally re-injects this currency back into the money supply only to cross-contaminate other currency in circulation. Given the number of forfeiture cases, the government likely does this every day throughout the nation.

56. That in the ordinary case, when one party destroys evidence it generally does so to conceal the evidence completely from the fact-finder and/or

the opposing party. This case is slightly different. The government wants to introduce its theory regarding the currency and the purported dog sniff. However, by destroying the *Res*, it made it impossible for Claimants to rebut the government's theory. Therefore, the proper sanction would be a complete bar to the introduction of the dog sniff and currency evidence.

57.     In the alternative to an outright ban on the introduction of any evidence regarding the purported dog sniff, the Court should allow a pattern jury instruction regarding spoliation to be read to the jury in the trial of this cause.

WHEREFORE, for the foregoing reasons, the Claimants respectfully request this Honorable Court to enter an order granting Claimants' Motion in *Limine* to Exclude any Testimony or Evidence Concerning the Alleged Dog Sniff of the Defendant *Res.*

Respectfully submitted,

NICHOLAS MARROCCO and
VINCENT FALLON, Claimants,
By and through their attorneys
KOMIE AND ASSOCIATES

By:      /s/ Stephen M. Komie

Stephen M. Komie
Komie and Associates
One North LaSalle Street, 42nd Floor

Chicago, IL 60602
312.263.2800