**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 03644 |
| | ) | |
| FUNDS IN THE AMOUNT OF ONE | ) | Judge John J. Tharp, Jr. |
| HUNDRED THOUSAND AND ONE | ) | |
| HUNDRED TWENTY DOLLARS | ) | |
| ($100,120.00), | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| NICHOLAS MARROCCO and VINCENT | ) | |
| FALLON, | ) | |
| | ) | |
| Claimants. | ) | |

## MEMORANDUM OPINION AND ORDER

The long and tortured history of the case begins with the December 6, 2002 seizure of $100,120 (the "funds") from Vincent Fallon at Union Station in Chicago. The government seized the funds after, among other events, a drug-detection dog (named Deny; pronounced "Denny") alerted to a briefcase containing the currency. The United States filed this action for civil forfeiture of the funds, which, after over a decade of motion practice and two trips to the Seventh Circuit, recently proceeded to a five-day jury trial. The jury returned a verdict for the government, finding the defendant funds forfeit; the Court entered judgment for the government and a decree of forfeiture. The claimants, Nicholas Marrocco and Vincent Fallon, have filed a renewed motion for judgment as a matter of law under Rule 50(b), ECF No. 319, a motion for a new trial under Rule 59, ECF No. 320, and a motion to determine that the forfeiture is constitutionally excessive, ECF No. 321. For the following reasons, the motions are denied.

# BACKGROUND

The evidence presented at trial substantially confirmed the facts narrated in the Seventh Circuit's September 19, 2013 Opinion. *See United States v. Funds in Amount of One Hundred Thousand One Hundred & Twenty Dollars ($100,120.00)*, 730 F.3d 711, 713-15 (7th Cir. 2013) ("*Funds II*"); *see also United States v. Marrocco*, 578 F.3d 627, 629-31 (7th Cir. 2009) ("*Funds I*"). This Opinion assumes familiarity with the earlier decisions and will summarize the facts only as relevant to the pending motions.

The thirteen-year history of this case is awash with pre-trial rulings, reversals and remands, and new or revised rulings. Upon the second remand from the Seventh Circuit and Judge Bucklo's transfer of the case, this Court issued a number of significant pre-trial rulings that acutely limited the government's case. Because, notwithstanding the Seventh Circuit's ruling in *Funds II*, the government had persisted in its argument that the reliability of dog-sniff evidence could not be challenged and had failed to contest the expert evidence the claimants offered, this Court held that the government forfeited any objections to the claimants' experts. *See United States v. Funds in the Amount of One Hundred Thousand & One Hundred Twenty Dollars ($100,120.00)*, 127 F. Supp. 3d 879, 882-84 (N.D. Ill. 2015) ("*Funds III*") ("[The government's] insistence on spitting into the wind [ ] has substantially damaged its case."). Because of the extensive delay in naming its own expert, the government also forfeited the opportunity to offer evidence establishing a scientific basis (known as the "Furton theory") to counter the claimants' defense that drug-dog alerts are meaningless because most American currency is tainted with residue from illegal narcotics. *Id* at 884-85; *see also id.* at 896-902 (denying government's motion to reconsider). Along the same lines, the Court precluded any opinion testimony by Officer King (Deny's handler) regarding what substance Deny alerted to (*e.g.*, methyl benzoate evaporating from the currency, as suggested by the Furton theory), either

in training exercises or in the field. *Id*. at 885-86. The Court also declined to reverse Judge Bucklo's prior ruling granting the claimants' motion to suppress Fallon's custodial statements made in the Amtrak office at Union Station (as well as the declaration that Fallon signed disclaiming an interest in the funds). *Id*. at 891-92; *see also id*. at 902-05 (denying government's motion to reconsider); *see also United States v. Funds in Amount of One Hundred Thousand & One Hundred Twenty Dollars*, 361 F. Supp. 2d 757, 762 n.1 (N.D. Ill. 2005) (Bucklo, J.), *rev'd on other grounds in Funds I.*

Additionally, the claimants won the vigorously contested debate concerning the jury instruction setting forth the elements the government was required to prove by a preponderance of the evidence, specifically whether the "substantial connection" language of 18 U.S.C. § 983 applies to each of the potential theories of forfeiture—that the funds were (1) furnished or intended to be furnished in exchange for a controlled substance; (2) the proceeds from the sale of a controlled substance; or (3) monies used or intended to be used to facilitate a controlled substances transaction. *See* 21 U.S.C. § 881(a)(6) (moneys subject to forfeiture). The government's proposed instruction only required proof of a substantial connection between the money and a controlled substance under the facilitation theory of forfeiture. *See* Gov. Prop. Inst. Nos. 25-27, ECF No. 273. The claimants' proposed elements instruction and argument on the instructions urged the Court to require the government to prove a substantial connection between the money and a controlled substance under any of the statutory forfeiture bases. *See* Cl. Prop. Inst. Nos. 26, 28, ECF No. 280.

After three rounds of discussion on this particular instruction (at the December 18, 2015 pre-trial conference, the January 22, 2016 pre-trial conference, and on January 28, 2016, prior to the close of the claimants' case), the Court concluded that the "substantial connection" language

in the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") applies to all three theories of forfeiture. *See* Pub. L. No. 106–185, 114 Stat. 202 (2000) (codified as amended at 18 U.S.C. §§ 981, 983); *see also* 21 U.S.C. § 881(a)(6). The Court drafted a jury instruction on the elements, requiring the jury to find both a substantial connection between the funds and an unlawful controlled substance ***and*** that the funds were (1) furnished or intended to be furnished in exchange for a controlled substance; (2) the proceeds from the sale of a controlled substance; or (3) monies used or intended to be used to facilitate a controlled substances transaction. *See* Jury Inst. 6, ECF No. 311.

Despite the many rulings that severely constrained the government's case and increased its evidentiary burden, the jury nonetheless found for the government. The claimants now ask the Court to set aside the jury's verdict and enter judgment for them as a matter of law, or to grant them a new trial, or to reduce or eliminate the forfeiture as constitutionally excessive.

## DISCUSSION

### I. Rule 50(b) Motion for Judgment as a Matter of Law

Judgment as a matter of law is proper if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). Rule 50(b) allows a party to renew a denied motion for judgment as a matter of law within 28 days of an adverse jury verdict. Fed. R. Civ. P. 50(b). In considering a Rule 50(b) motion, the court "construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook Cty.*, 689 F.3d 655, 659 (7th Cir. 2012). Although the court "must determine that more than a mere scintilla of evidence supports the verdict," it must not "make credibility determinations or weigh the evidence." *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2013) (citations and internal quotation marks omitted). Rather, the role of the court is to

"decide whether a highly charitable assessment of the evidence supports the jury's verdict or if, instead, the jury was irrational to reach its conclusion." *Id*.

"Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." *Passananti,* 689 F.3d at 660 (quoting Fed. R. Civ. P. 50(b), comm. note (2006 amend.)). At the close of the government's case, the claimants moved for judgment as a matter of law,[1] arguing that the evidence the government presented failed to establish a substantial connection between the funds and a controlled substance. The claimants highlighted that there had been no evidence of a drug transaction and that, therefore, there could not be any proceeds from such a transaction, nor had there been any evidence of a controlled substance for which the funds had been furnished or intended to be furnished. Without any such evidence, claimants argued that there was not a scintilla of evidence connecting the funds to a controlled substance, let alone substantially connecting them. Although the Court agreed that there had been no evidence of a specific drug transaction (no one expected any such evidence), the Court reminded claimants that the principal focus of this case since day one had been the positive alert by the drug dog. Citing the Seventh Circuit in *Funds II*, the Court explained that it was for the jury to determine the probative value of the dog-sniff and, therefore, denied the motion. The claimants renewed their motion at the close of all of the evidence, which the Court denied for the same reasons.

The claimants have now renewed their initial motion for judgment as a matter of law under Rule 50(b), reasserting their prior arguments that the government did not present any

---

[1] The claimants moved for a motion for directed verdict, which is treated as a motion for judgment as a matter of law. *See* Fed. R. Civ. P. 50(a) comm. note (1991 amend.) ("If a motion is denominated a motion for directed verdict or for judgment notwithstanding the verdict, the party's error is merely formal. Such a motion should be treated as a motion for judgment as a matter of law in accordance with this rule.").

evidence of a controlled substance offense. Mot. JMOL ¶¶ 6-8. The claimants also argue that the Court is limited to consideration of the evidence presented in the government's case-in-chief because they are renewing the motion they made at the close of the government's case.[2] Reply JMOL 1-3, ECF No. 335. It is unnecessary to decide whether the Court is permitted to consider evidence introduced outside of the government's case-in-chief because, even under the limited review of the evidence presented at the time of the original motion, the claimants have failed to establish that no rational jury could have rendered a verdict for the government.

In arguing that there was insufficient evidence to establish a substantial connection between the currency and drug trafficking, the claimants essentially ignore all of the evidence presented to show that the dog reliably alerted to currency tainted with the odor of various illegal narcotics. It is true enough that the government presented no scientific evidence as to what a dog actually is smelling when alerting to drug-tainted currency, but it presented detailed information

_____

[2] It is not entirely clear whether, on a Rule 50(b) motion that is renewing a Rule 50(a) motion made at the close of the plaintiff's evidence, the Court is limited to considering the evidence presented at the time of the original motion. A number of courts deciding a renewed Rule 50(b) motion following a Rule 50(a) motion made at the close of the plaintiff's case have, without considering the question, merely recited the standard that "in entertaining a motion for judgment as a matter of law, the court should review *all of the evidence in the record*." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (emphasis added); *see, e.g. Baugh v. Cuprum S.A. De C.V.*, No. 08 C 4204, 2015 WL 9304338, at *2 n.2 (N.D. Ill. Dec. 22, 2015) (Rule 50(b) motion renewing motion made at close of plaintiff's case-in-chief governed by "consider all evidence" standard); *Corcoran v. City of Chicago*, No. 10-CV-06825, 2015 WL 1345545, at *2 (N.D. Ill. Mar. 23, 2015) (same). *But see The Thomas D. Philipsborn Irrevocable Ins. Trust v. Avon Capital, LLC*, No. 11 C 3274, 2015 WL 5695861, at *1-2 (N.D. Ill. Sept. 28, 2015) (reciting "consider all evidence" standard from *Reeves* but concluding that "the evidence *Plaintiffs presented* was just enough to send the question to the jury" (emphasis added)). Because "[t]he standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion under Rule 50(a)," however, it follows that "the post-verdict motion for judgment can be granted only if the prior motion should have been granted." 9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2537 (3d ed. 2008). That suggests that Rule 50(b) motions may consider only the evidence of record when the Rule 50(a) motion was made. *Cf.* Fed. R. Crim. P. 29 (where court has reserved decision on motion for judgment of acquittal, "it must decide the motion on the basis of the evidence at the time the ruling was reserved").

about Deny's training and reliability in locating drugs and drug-tainted currency from which it was perfectly rational for a jury to conclude that Deny alerted to the currency-stuffed briefcase because the currency it contained had been exposed to narcotics.[3] To support the reliability of Deny's positive alert, the government presented Michael Decker, a former canine trainer with the Chicago Police Department ("CPD"). Decker testified about his training to become a CPD canine and officer handler trainer and his experience training new odor detection dogs and conducting maintenance training for certified drug-detection dogs.[4] Decker explained that the CPD standards for certifying drug detection dogs were higher than those used by other national drug-detector-dog certification organizations, which included 560 total hours of training, 205 of which were spent on narcotics detection. Decker also testified that he taught each handler to keep a dog log, in which the handler recorded training and field exercises, to prove reliability of the dog and to help identify any training deficiencies. Specific to Deny, Decker testified that Deny's dog log showed 116 sniff searches in pre-certification training, in all of which Deny properly located the target, and a number of which involved searches for currency tainted with the odor of narcotics. With respect to currency searches, the dog log even showed a "money lineup," in which Deny searched and did not alert to untainted currency (*i.e.*, currency that the trainers had

---

[3] It bears noting that the claimants failed to exploit the government's lack of scientific testimony by presenting their expert witness, Dr. Woodford, whom they had advertised as an expert on odor science and canine olfaction training. *See* Cl. Mot. Lim. Ex. E, ECF No. 242-5. Dr. Woodford's testimony would have gone unrebutted at trial, but for unexplained reasons, the claimants did not call him to testify.

[4] The claimants objected that Decker's testimony was irrelevant as to Deny's training because Decker was not certified as a trainer until after Deny received his K-9 certification. Decker, however, testified that the training programs were the same when he was conducting the training in 2000 as when he went through the training program in 1995. Moreover, Decker testified that, once he became a trainer, he interacted with Deny on a monthly basis (approximately) for maintenance training exercises.

not exposed to the odor of narcotics), and then, in a subsequent search, Deny alerted to heroin-tainted currency.

Deny's handler, Officer Richard King, also testified about Deny's training as a narcotics detection dog over the course of approximately 20 weeks. King would give the command, "fetch dope," and Deny would begin searching for narcotics. Because Deny was trained as an aggressive indicator, when Deny located hidden drugs, he would scratch or bite at the source item. King testified about a number of entries in the dog log, explaining that Deny was trained to detect the odor of narcotics whether found on rags, in PVC pipes, burlap bags, glass jars, metal pipes, and on U.S. currency, and that Deny trained not only at the CPD canine training center but also in diverse locations such as a forest preserve, at a school, and at an auto pound. Deny's dog log of post-certification training for the relevant period of time (from mid-1998 through the date of the seizure of the funds) includes 81 positive alerts to illegal drugs, nine positive alerts to drug-tainted currency, and one negative alert to untainted currency. *See* Gov. Trial Ex. 4. King explained that the type of U.S. currency used in training exercises varied: sometimes the trainers used uncirculated currency obtained from the Federal Reserve and sometimes the trainers asked the officers to take money out of their wallets to use in the training exercises. According to King, he never knew where the drugs or tainted currency were hidden before he and Deny conducted a search.

King testified that on December 6, 2002, he and Deny were called to Union Station to do a money sniff. King directed the requesting officer (Amtrak police officer and Drug Enforcement Administration ("DEA") task force member Eric Romano) to hide the suspect money in the Amtrak "roll call" room (part of the Amtrak police office). After retrieving Deny from his car,

King unleashed Deny in the room and ordered Deny to "fetch dope." Deny searched the room for about a minute and indicated on a cabinet in which Officer Romano had hidden Fallon's briefcase containing the funds. King testified that Deny pulled the briefcase out of its hiding place and scratched at it[5]—the same behavior King observed Deny exhibit when locating drugs or tainted currency in training. King testified that he did not know where Romano had hidden the money before he and Deny conducted the search in the Amtrak police room.

The testimony of Officers Decker and King provided a sufficient basis for the jury to conclude that Deny was capable of detecting the odor of currency that had been tainted with the odor of unlawful narcotics. Counsel for the claimants vigorously challenged Deny's reliability through cross-examination of the officers and presentation of its own dog training expert, but in doing so, they also reinforced the message to the jury that the reliability of dog alerts to currency is a question of how well the dog has been trained rather than an issue of scientific inquiry (and again, the claimants presented no scientific evidence about dog sniffs themselves despite the fact that the government was precluded from presenting such evidence). And while a jury might well have concluded that Deny's alert in this case was unreliable for reasons that the claimants

---

[5] The claimants attempted to impeach King regarding the location of the briefcase in the roll call room: King testified at trial that he could not recall the exact location of the briefcase in the roll call room, but that it was not in plain sight. Referring to King's earlier testimony at a hearing in front of Judge Bucklo, the claimants asked if King had testified that he did not believe that the briefcase was in a cabinet, at which point the government objected to the question as not impeaching, and the Court sustained the objection. The claimants also attempted, without great effect, to impeach Romano regarding the location of the briefcase: Romano testified at trial that he hid the briefcase in a wooden cabinet; he had previously testified at a hearing in front of Judge Bucklo that he hid the briefcase in a filing cabinet. Romano testified inconsistently, however, as to whether Deny searched the perimeter of the room before locating the briefcase or whether Deny immediately indicated on the cabinet with the briefcase, and as to whether Deny was able to partially open the door of the cabinet containing the briefcase. Regardless, any inconsistencies in the testimony of the witnesses at trial and during a suppression hearing more than a decade earlier did not undermine the testimony that King did not know the location of the briefcase, and that Deny found it quickly and alerted on it aggressively.

advanced (*e.g.*, that Romano or King had cued Deny; that the room in which the bag had been hidden had not been adequately cleaned; that Deny was not adequately proofed off competing odors), they could also reasonably reject those challenges based on Deny's unblemished record of locating drugs and drug-tainted currency and other objects both in training and in the field and the contrary testimony of King and Romano as to how the search was conducted. The claimants had every opportunity to present the deficiencies they perceived in Deny's training and deployment during the search, but the question of the reliability of Deny's alert was ultimately for the jury, as the Seventh Circuit made plain in *Funds II,* 730 F.3d at 727 (noting the "dispute[ ] of material fact impacting the question of whether Deny's alert demonstrates that the Funds recently were in contact with illegal drugs.").

Although testimony about Deny's alert, and dog alerts generally, was central at trial, the government also presented other evidence to satisfy its burden of proof. The government presented Agent Romano's testimony about his encounter with Fallon on the train. Romano, who testified based on his experience as an Amtrak police officer on the DEA task force, explained that Amtrak was an attractive transportation option for drug couriers because of the lack of baggage screening (at the time in 2002) and a rider's ability to limit interactions with other passengers by reserving a private sleeper car. He described the factors he looked for in identifying potential drug couriers—one-way travel, travel to drug "source" cities (like Chicago or Seattle), tickets purchased with cash and/or purchased within 72 hours of travel. Romano explained why he identified Nicholas Fallon as a person to monitor because Fallon's travel plans included each of the suspect factors—a one-way ticket from Chicago to Seattle in a private sleeper car purchased with cash two days before the trip. Romano further described his interaction with Fallon on December 6, 2002—that Fallon first said he was traveling to Seattle to

meet a lady friend, said he was not carrying any large amounts of currency, and said he was carrying a locked briefcase that he packed himself but for which he did not have the key. When Romano inquired further, Fallon admitted that he had $50,000 in the briefcase and that he was travelling to Seattle to put a down payment on a house, at which point Romano informed Fallon that he was taking the bag into custody.

The government also presented testimony of claimant Nicholas Marrocco in its case-in-chief. Marrocco testified that the defendant funds were his and that he had given them to Fallon to take to Seattle to deposit in a safe deposit box. According to Marrocco, the funds were intended for an investment in a bar or restaurant somewhere on the west coast (nothing about a down payment on a house); although he had discussed different opportunities with friends, Marrocco had not decided where he planned to invest the funds. Marrocco explained that, at the time, he was unaware of the availability of wire transfers and that he was more comfortable sending the money via train rather than taking it by car—despite the fact that Marrocco had never traveled by train before—because a car could breakdown, or by plane because he didn't like to fly and because one might be questioned about the money at the airport, which would delay your travels. After quibbling over the definition of "bundled," Marrocco admitted that he separated stacks of currency by denomination and wrapped them together with rubber bands, for a total of 20 bundles of cash (although only 19 bundles were recovered from Fallon in the briefcase).

As for the source of the funds, Marrocco testified that he had credit problems in college and, as a result, was unable to open a bank account. Marrocco explained that the funds were his cash savings from his employment over the preceding decade; he had worked at a pizza restaurant for eight years and became a partner in the business in 2002. The government

introduced Marrocco's tax returns and/or W-2s for the years immediately preceding the seizure, which showed total wages before tax of $40,500 in 1999, $39,000 in 2000, $35,000 in 2001, and take home pay of $6,993.95 in 2002 (the reduced amount resulting from the termination of Marrocco's employment at the pizza restaurant in April of 2002). *See* Gov. Trial Exs. 18-21. The government also introduced Marrocco's responses to interrogatories, in which he listed his monthly expenses, totaling $975 (plus $1400 in rent, which his parents paid), plus one or two vacations per year and a number of furniture purchases each exceeding $500.[6] *See* Gov. Trial Ex. 17. Marrocco also testified that his parents purchased a car for him in April 2002; he and his father each paid $1000 towards the down payment, and his mother made the monthly payments on the car (according to the testimony of Timothy Marrocco, Nicholas's father).

Taking this evidence in a light most favorable to the government, there is certainly more than a mere scintilla of evidence supporting the jury's verdict. It was not irrational for the jury to infer that it was more likely than not that the defendant funds were substantially connected to a controlled substance, based on (1) the positive drug-dog alert, supported by Decker's testimony of how CPD trains drug dogs and Deny's record in training and in the field, as well as King's testimony of Deny's behavior when alerting to illegal drugs and tainted currency in training as compared to the behavior Deny exhibited when he located the briefcase with the funds; (2) Romano's testimony that Fallon's travel plans matched those of drug couriers and Fallon's inconsistent explanations for his trip and regarding the contents of the briefcase; and (3) Marrocco's story (which the jury apparently found incredible) that he squirreled away over $100,000 in cash (because he couldn't get a bank account), which he then entrusted to Fallon to

---

[6] The government introduced the interrogatory responses into evidence in its case-in-chief through Marrocco but failed to question him about the specific amounts of his expenses. Nonetheless, the exhibit was entered into the evidence in the government's case-in-chief, and the jury had access to the information contained therein.

take to Seattle via train (to avoid the questioning and potential delay of a car trip or air travel) to deposit in a safe deposit box in an unidentified bank to use either for a down payment on a house or for an unspecified future business venture. It was not unreasonable for jurors to reject the inconsistent and improbable explanations that Fallon and Morocco offered to explain why Fallon was carrying in excess of $100,000 with him on a train or for the jurors to conclude that they resorted to those phony stories because the currency was indeed substantially connected to drug trafficking—"why else all the lies?" *Hutchens v. Chicago Bd. of Ed.*, 781 F.3d 366, 374 (7th Cir. 2015) (a reasonable jury might find employer's false explanations for adverse actions evidence of racial discrimination). As Learned Hand explained, the jury's impression of a witness's credibility "may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952); *see also*, *e.g.*, *Wright v. W.*, 505 U.S. 277, 296 (1992) (plurality opinion) ("if the jury did disbelieve [defendant], it was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt"); *Wilson v. United States*, 162 U.S. 613, 620-21 (1896) (jury had the right "to regard false statements in explanation or defense . . . as in themselves tending to show guilt"); *United States v. Bacon*, 598 F.3d 772, 776 (11th Cir. 2010) ("because [defendant] testified, the jury was free to disbelieve her and consider her statements as untruthful and as substantive evidence of her guilt"); *United States v. Chatmon*, 742 F.3d 350, 353 (8th Cir. 2014) ("jury could have inferred that the statement was false and that its falsity indicated consciousness of guilt"); *United States v. Jocic*, 207 F.3d 889, 893 (7th Cir. 2000) (if "a defendant decides to testify and deny the charges

against him and the finder of fact thinks he is lying, his untruthful testimony becomes evidence of guilt to add to the other evidence"); *United States v. Burgos*, 94 F.3d 849, 867 (4th Cir. 1996) ("Relating implausible, conflicting tales to the jury can be rationally viewed as further circumstantial evidence indicating guilt.").

The claimants' emphasis on *United States v. Funds in the Amount of $271,080*, 816 F.3d 903 (7th Cir. 2016) ("*$271,080*") is unpersuasive. *See* Mot. Add'l. Auth., ECF No. 324. The claimants highlight the Seventh Circuit's commentary on the government's lack of evidence connecting the *$271,080* claimants to drug trafficking. *Id.* ¶¶ 8-10 (citing *$271,080*, 816 F.3d at 909). Evidence of drug trafficking was not all that was missing from the government's case in *$271,080*, however; there was no evidence of the drug dog's training, methodology, or field performance and no evidence that the bundled currency or the list of dates and numbers were things a drug dealer would do. *$271,080*, 816 F.3d at 909. But most importantly (and the reason the court held that there was a fact issue preventing summary judgement), the government had not presented evidence to rebut the claimants' testimony and records showing that they legally earned the money. *Id.* at 908-09. Here, while there was no direct evidence that Marrocco or Fallon engaged in drug trafficking, there was evidence of Deny's training and reliability, evidence that Fallon's behavior matched that of drug couriers, and the jury's apparent rejection of Marrocco's testimony that he earned the funds legitimately.

Moreover, as the government points out, *$271,080* was decided on a motion for summary judgment; the Seventh Circuit reversed the grant of summary judgment for the government because "a jury reasonably ***could find*** that the government failed to meet its burden of proving by a preponderance of the evidence that th[e] money is substantially connected to drug trafficking." *Id.* at 908 (emphasis added). Here, a reasonable jury had a sufficient evidentiary

basis to support its finding that the government proved by a preponderance of the evidence that the funds were substantially connected to a controlled substance offense. Accordingly, the claimants' renewed motion for judgment as a matter of law is denied.

## II.     Rule 59 Motion for a New Trial

Federal Rule of Civil Procedure 59(a) provides for a new trial "if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014). The claimants assert that they are entitled to a new trial because of a number of errors: (A) the jury instructions on forfeiture were confusing and contradictory; (B) the Court refused to give the jury a spoliation instruction; (C) the additional instruction in response to the juror question prejudiced the claimants; and (D) the Court did not use the claimants' proposed verdict form with special interrogatories.

### A.     Jury Instructions on Forfeiture

The claimants argue that three of the substantive jury instructions on forfeiture, the "elements instruction" explained *supra* at 3-4, the "transaction instruction,"[7] and the "offense instruction,"[8] when read together, were contradictory and confusing to the jury.[9] As previously

---

[7] The transaction instruction read:

To prevail in a civil forfeiture action, the plaintiff is not required to establish a substantial connection to a specific unlawful controlled substance transaction that occurred at a particular place and time. Rather, the plaintiff is required to prove by a preponderance of the evidence that there is a substantial connection to some unlawful controlled substance transaction.

Jury Inst. 6.

[8] The offense instruction read:

To prevail in a civil forfeiture action, the plaintiff is not required to prove the claimant committed a controlled substance offense. The fact the claimant did not directly participate in any illegal activity involving any of the defendant properties is not a defense to the forfeiture of the defendant properties.

Jury Inst. 6.

explained, the elements instruction incorporated the claimants' arguments that the government must prove a substantial connection to a controlled substance under any of the three theories of facilitation in 21 U.S.C. § 881(a)(6). The claimants do not take issue with this instruction; instead, they argue that the transaction instruction and offense instruction undermined the elements instruction, effectively relieving the government of its burden to prove a substantial connection between the funds and a controlled substance offense.

The transaction instruction informed the jury that government did not need to link the funds to a specific controlled substance transaction at a given time and place, but only to some unidentified unlawful controlled substance transaction. The claimants assert that such an instruction liberated the government of the substantial connection requirement because it is impossible to prove a substantial connection to *a transaction* without proving *the specific transaction*. Mem. in Supp. 3-4, ECF No. 322. Not so; lipstick on the collar lands a husband in the doghouse even if his wife does not know the sordid details of how it got there. Even post-CAFRA, there is no requirement that the government must prove the specifics of a particular transaction. *See* 18 U.S.C. § 981; *see also United States v. $242,484.00*, 389 F.3d 1149, 1160 (11th Cir. 2004) ("[The government] does not need to show a relationship between the property and a particular drug transaction—only that the property was related to some illegal drug transaction.").

---

[9] The government argues that the claimants never objected that these three instructions were confusing and contradictory and have, therefore, waived any such objection. Resp. Mot. New Trial 3-5, ECF No. 330. While the government is correct that the claimants did not use these specific terms, they voiced these same substantive objections to these instructions repeatedly each time the Court discussed the jury instructions. This satisfies Federal Rule of Civil Procedure 51(c)(1). *See Chestnut v. Hall*, 284 F.3d 816, 819 (7th Cir. 2002) (Rule 51 requires "that objections to jury instructions be made in a timely fashion and on the record, [and] also with sufficient specificity to apprise the district court of the legal and factual bases for any perceived defect."). Accordingly, the claimants have not waived their objections to these instructions.

As for the offense instruction, which informed the jury that the government was not required to prove that the claimants committed a controlled substance offense and that the fact that the claimants did not directly participate in illegal activity is not a defense to forfeiture, the claimants argue that it misstates the law because it contradicts the innocent owner defense. Under 18 U.S.C. § 983(d), a claimant can assert that he is an "innocent owner," meaning he did not know of the conduct giving rise to the forfeiture or upon learning of the conduct, he "did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2)(A). The claimant bears the burden of proving that he is an innocent owner by a preponderance of the evidence. 18 U.S.C. § 983(d)(1).

The offense instruction did not negate the innocent owner defense; the innocent owner defense only comes into play once the government "has met its burden of proving the property is subject to forfeiture . . . and in that case the burden shifts to the claimant to prove legitimate ownership." *$271,080*, 816 F.3d at 908. At that point, the claimant raises the defense "that he did not know about the illegal use of his property." *Id.* Here, the claimants have never raised such an argument nor did they request an instruction on the innocent owner defense; rather, their theory has always been that the funds were legitimately acquired and never connected in any way to any illegal activity. This instruction, therefore, in no way undermined the claimants' arguments. *Cf. United States v. Sawyer*, 558 F.3d 705, 710 (7th Cir. 2009) ("A defendant is entitled to have a jury consider a proffered defense so long as that defense has a foundation in the evidence . . . .").[10]

---

[10] The claimants also assert that the offense instruction was prejudicial because the Court had granted the government's motion in limine preventing the claimants from highlighting the lack of criminal drug charges against, or convictions of, the claimants. *See* Reply Mot. New Trial 5-6; *see also* Plf. Mt. Lim. ¶ 4, ECF No. 275. The claimants made such an argument in closing without any objection by the government, however, which renders the point moot.

Reading the three instructions together, the jury was instructed that, to find for the government, it must find a substantial connection between the funds and some unlawful controlled substance offense, but that the government was not required to prove that the claimants (or anyone else) committed a specific controlled substance offense. This is an accurate statement of the law and is not contradictory or confusing. The motion for a new trial on this ground is denied.

### B.     Lack of a Spoliation Instruction

The Court addressed the claimants' request for a spoliation instruction long before trial, concluding that such an instruction was inappropriate given the law of the case, specifically Judge Bucklo's prior ruling that the claimants had failed to demonstrate that the government had failed to preserve the currency in bad faith. *See Funds III*, 127 F. Supp. 3d at 887-90 ("Notwithstanding this Court's disagreement with Judge Bucklo's prior ruling denying the claimants' spoliation motion, that ruling remains the law of the case because the claimants did not appeal it."); *see also* Min. Order Den. Mot., ECF No. 166 (Bucklo, J.) (Order denying motion in limine to exclude evidence of dog alert based on government's spoliation of the currency). The claimants acknowledge that this issue has been addressed twice already but argue that the law of the case doctrine is discretionary and urge the Court to reconsider. The law of the case doctrine promotes consistency, finality, and judicial economy by "presum[ing] that once a court has decided a particular issue in a case, the issue should not be reopened without good cause." *Boyer v. BNSF Ry. Co.*, No. 14-3131, 2016 WL 3094541, at *13 (7th Cir. June 1, 2016). A court is not prohibited "from revisiting an issue when there is a legitimate reason to do so, whether it be a change in circumstances, new evidence, or something the court overlooked earlier." *Id*.

Here, there has been no change in circumstances or new evidence since this Court decided the issue last year; the claimants are merely rehashing arguments they made in that motion. *See* Cl. Mot. Lim. ¶¶ 46-54, ECF No. 242. Moreover, this ruling has not caused a manifest injustice; the claimants were able to (and did) make arguments regarding the government's resources and ability to test the currency for drug contamination and highlighted the lack of scientific testing of the currency in this case. The jury heard such argument and rejected it. The Court will not revisit this decision.[11]

As to the claimants' argument that they were deprived of the opportunity to demonstrate that the serial numbers of the currency confirm Marrocco's testimony that he had been saving the funds for a decade, this argument has never been raised in the thirteen years the claimants have been litigating this case. It is not a manifest injustice that the claimants were unable to present an argument that has apparently just occurred to them after more than a decade of litigation. *See King v. Cooke*, 26 F.3d 720, 726 (7th Cir. 1994) (improper to present new legal theories in Rule 59 motion); *International Paper Co. v. Androscoggin Energy LLC*, No. 00 C 6215, 2005 WL 2429794, at *3 (N.D. Ill. Sept. 30, 2005) ("Rule 59(a) is not intended to allow parties to merely relitigate old matters or to present the case under new theories.").

## C.  Instruction in Response to Juror Note

During deliberations, the jury sent a note asking, "Did the CPD and Amtrack [sic] Police follow 'proper procedures' (in 2002) related to a drug related-confiscation? Or—were they required to send suspected items to a crime lab?" Jury Note, ECF No. 317. The government argued that the jury note asked two separate questions, the first, a Fourth Amendment question

---

[11] The Court notes that while the law of the case prevented the spoliation instruction the claimants desired, the law of the case doctrine was also the basis of this Court's decision to grant the claimants' motion to suppress Fallon's custodial statements. *See Funds III*, 127 F. Supp. 3d at 891-92.

regarding the legality of the seizure, and the second, an evidentiary question. Claimants' counsel proposed a response: "Members of the jury, you have received all of the evidence in this case. You must decide this case based upon the evidence heard in Court." Cl. Jury Inst. 50, ECF No. 338. The Court agreed that the claimants' proposed response was proper to the extent that the jury asked for additional evidence. With respect to the first portion of the note, however, the Court determined to the extent the jury was inquiring into the legality of the seizure, that it was not relevant to whether the funds were subject to forfeiture. The claimants objected to a separate response to the first portion of the note, arguing that the note constituted a single question focusing on the evidentiary issue of sending the funds to the crime lab and that, by informing the jury that the proper procedures issue was irrelevant, the jury would also conclude that whether the funds were sent to a crime lab was also irrelevant. *See* Cl. Mem. in Supp. 8-9. The Court drafted a proposed response to the first portion of the note, stating that the "legal issue" was not relevant, to which claimants' counsel indicated agreement. Excerpt Trial Day 5 Tr. at 12:9-13 ("Much better.").[12] The Court sent the following response to the jury:

> The question of whether "the CPD and Amtrak Police follow[ed] 'proper procedures' (in 2002) related to a drug related-confiscation" is a legal issue that is not relevant to your determination of whether the funds are subject to forfeiture. As to whether they were "required to send suspected items to a crime lab?" you have received all of the evidence in this case. You must decide this case based upon the evidence heard in Court.

Jury Note Resp., ECF No. 337.

This instruction did not prejudice the claimants by telling the jury "that [whether the funds were sent to a crime lab] was not relevant to their deliberations." Mem. in Supp. 9. To the

---

[12] Arguably, the claimants assent to the final version of the Court's response waived any objection, but the government does not assert waiver as to this issue.

contrary, the two-part response made clear that the jury note had been interpreted as involving two distinct issues: a legal issue (whether the police followed proper procedures) which was not relevant to the jury's deliberations, and an evidentiary issue (whether a crime lab report was required to determine the presence of drugs on the currency) which they had to resolve on the basis of the evidence introduced at trial. Rather than implying that both the proper procedures and crime lab issues were irrelevant, as the claimants maintain, the response expressly instructed the jury that the issues were separate and distinct. And even if, as the claimants maintain, the jurors intended only to ask an evidentiary question, telling them that a separate legal question was not relevant to their deliberations could not have prejudiced the claimants precisely because the response was bifurcated; the lack of relevance statement related only to the legal question, not the evidentiary question. Accordingly, the motion for a new trial on these grounds is denied.

### D.      Lack of Special Interrogatories on the Verdict Form

The claimants assert that they were prejudiced by the Court's refusal to give the jury a verdict form with special interrogatories requiring the jury to affirm that they found a substantial connection between the funds and a controlled substance offense and to identify under which of the three theories they found the funds forfeit. *See* Cl. Prop. Jury Inst. 46, ECF No. 280. Whether to submit a special verdict form to the jury is committed to the Court's discretion. *E.E.O.C. v. Management Hospitality of Racine, Inc.*, 666 F.3d 422, 439-40 (7th Cir. 2012). They may be advisable in cases where multiple complicated and interrelated claims are submitted to a jury after a multi-week trial, *Huff v. Sheahan*, 493 F.3d 893, 905 n.14 (7th Cir. 2007), but that does not describe this trial; despite its procedural complexity, the dispute presented to the jury was simply whether it was more likely than not that the seized currency had a substantial connection to drug trafficking. Had the Court accepted the government's proposed elements instruction and

limited the substantial connection requirement only to the facilitation theory of forfeiture, then a special interrogatory would have been useful to ensure the jury found the dual requirements if it found under the facilitation theory. Here, however, the government was required to prove a substantial connection between the funds and a controlled substance under any of the three theories. Thus, it is not necessary to know under which theory the jury made its finding. The elements instruction clearly delineated the government's burden to prove two elements: (1) a substantial connection between the funds and a controlled substance offense and (2) that the funds fell under one of the three theories of forfeiture. Special interrogatories on the verdict form were not necessary, and the lack of such a form did not prejudice the claimants.

The claimants have not identified any error that prejudiced them so as to make the trial unfair, nor have they established that the jury's verdict was against the manifest weight of the evidence. The Rule 59 motion for a new trial is, therefore, denied.

## III. Whether the Forfeiture is Constitutionally Excessive

Alternatively to the motions for judgment as a matter of law and for a new trial, the claimants ask that the Court determine that the forfeiture violates the Excessive Fines Clause of the Constitution and either reduce or eliminate the forfeiture. *See* Mem. in Supp. 18-21; *see also* U.S. Const. amend. VIII. Under 18 U.S.C. § 983(g), a claimant may petition the court to determine whether the forfeiture was constitutionally excessive. The claimant has the burden of proving that the forfeiture is grossly disproportionate to the offense giving rise to the forfeiture by a preponderance of the evidence. 18 U.S.C. § 983(g)(2)-(3).

The claimants argue that there is no evidence of the claimants' involvement with a controlled substance transaction and, therefore, any amount of forfeiture is disproportionate to their conduct and unconstitutionally excessive. That argument fails for the reasons already

discussed; the jury reasonably determined that the funds were substantially connected to a controlled substance offense. The forfeiture of funds that have a substantial connection to drug trafficking is not disproportionate to the conduct; it is directly proportional to the wrongful conduct. This is not a case in which, for example, a house or other valuable assets have been forfeited based on a tangential connection to an offense that permits forfeiture. *See, e.g.*, *United States v. Abair,* 746 F.3d 260, 268 (7th Cir. 2014) (expressing doubt about the proportionality of the forfeiture of the entire value of a home based on a minor structuring offense that was not tied to other wrongdoing). Rather, this is a case where the currency forfeited was, the jury concluded, exchanged in drug transactions or used to facilitate drug transactions, and in a manner so closely tied to such transactions that the currency itself was tainted by the odor of the drugs—*i.e.,* "that the Funds recently were in contact with illegal drugs." *Funds II,* 730 F.3d at 727. To the extent that the currency represented the proceeds of drug transactions, forfeiture of those proceeds does not violate the Eighth Amendment. *See, e.g.*, *United States v. Funds on Deposit at Bank One Chicago Account 1110010428312*, 393 F. App'x 391, 392 (7th Cir. 2010) ("forfeiting the proceeds of crime never violates the Eighth Amendment"); *United States v. Betancourt,* 422 F.3d 240, 250-51 (5th Cir. 2005); *United States v. Real Property Located at 22 Santa Barbara Drive,* 264 F.3d 860, 874-75 (9th Cir. 2001). It is difficult to imagine how the currency could have been used to "facilitate" such transactions other than to pay for the drugs, but even assuming such other means of facilitation, where it was so directly tied to the transaction that the currency was tainted with the odor of the drugs, there would plainly be a correlation between the value of the currency and the drugs. In that case, too, then, there would be nothing "excessive"—*i.e.,* unfairly punitive—about a forfeiture of the entire amount.

Further, and as already noted, the claimants did not put on a defense that they were innocent owners, which, if the jury had believed it, would have precluded the forfeiture, or at least have been a basis to argue that forfeiture was excessive when compared to the claimants' conduct. *See United States v. Malewicka*, 664 F.3d 1099, 1104 (7th Cir. 2011) (considering, among other factors, "the nature of the harm caused by the defendant's conduct" in determining whether a forfeiture was constitutionally excessive (citing *United States v. Bajakajian*, 524 U.S. 321, 337-40 (1998)). Here, the jury's verdict represents its conclusion that the funds were either (1) furnished or intended to be furnished in exchange for a controlled substance; (2) the proceeds from the sale of a controlled substance; or (3) monies used or intended to be used to facilitate a controlled substances transaction. Under any of the three theories, the forfeiture is not constitutionally excessive. The jury's verdict necessarily reflects the rejection of Marrocco's testimony about the origin of the funds, so his argument that any forfeiture was disproportionate to his wrongdoing cannot prevail.

The claimants' argue that the Court cannot consider the jury's verdict in making the proportionality determination because, to do so would merely be "rubber-stamping of forfeiture verdicts," Reply Const. Exc. 3, ECF No. 334, and would negate the language of Section 983(g), which states that the claimant "shall have the burden [of proof] . . . by a preponderance of the evidence at a hearing conducted by the court without a jury." 18 U.S.C. § 983(g)(3). As an initial matter, the notion that a jury trial on issues relevant to whether a forfeiture is disproportional deprives claimants of due process is not compelling; to the extent that the claimants had a jury trial on issues relevant to their proportionality claim, they received more process than they were due. "Even if the Court ultimately conducted a Section 983(g) hearing after any seizure and without a jury, having a jury weigh in on background circumstances setting up the hearing would

be of immense help." *United States v. $7,679.00 United States Currency*, No. 13-CV-1057A, 2016 WL 1258348, at *7 (W.D.N.Y. Mar. 31, 2016). A jury's findings as to the basis for forfeiture may be directly relevant to consideration of a challenge to the proportionality of the forfeiture under § 983(g). *United States v. Real Prop. located at 5294 Bandy Rd., Priest River, Bonner Cty., Idaho*, No. 2:12-CV-00296-CWD, 2014 WL 5513748, at *14 (D. Idaho Oct. 31, 2014) ("At this stage in the proceeding, the Court is without the benefit of the jury's findings on whether [the claimant] knew of, or was willfully blind to, his father's criminal activities on the Property. Those findings would directly relate to [the claimant's] culpability and are thus an essential prerequisite to any constitutional inquiry.").

More significantly, this argument confuses the nature of the inquiry permitted by § 983(g). As claimants envision it, the § 983(g) inquiry would revisit the forfeiture finding itself lest the Court "rubber stamp" the jury's verdict. But § 983(g) does not license courts to make *de novo* determinations of whether any forfeiture was appropriate; it permits only challenges based on an argument that the value of the assets forfeited is grossly disproportional to the conduct that gave rise to the forfeiture (here, drug trafficking). Thus, § 983(g) does not promise the claimants a hearing to revisit the question of whether there was a substantial connection between the seized currency and drug trafficking; the jury's verdict already establishes that there was. What § 983(g) provides is an opportunity for claimants to challenge the amount of forfeiture in light of the conduct that gave rise to the forfeiture. Here, that translates to an argument that forfeiting currency that has a substantial connection to drug trafficking is grossly disproportional to drug trafficking.

There is no basis or need to hold a hearing on that question. As a textual matter, "shall" applies to the claimants' burden, not to the requirement that the court conduct a hearing. *See* 18 U.S.C. § 983(g)(3). Moreover, a hearing would be a waste of judicial resources; there is no additional evidence that the parties could present relevant to this determination that was not brought up in the preceding 13 years of litigation and which the claimants did not have an opportunity to present at trial. The claimants have had the opportunity to present evidence and argument at trial and through post-trial briefing and have been adequately heard by this Court; they identify no new evidence they would seek to present at a proportionality hearing. *See, e.g., United States v. Real Prop. Located at 265 Falcon Rd., Carbondale, Williamson Cty., Ill.*, No. 08-700-JPG, 2009 WL 1940457, at \*9 (S.D. Ill. July 7, 2009) ("because, as a matter of law, forfeiture of property worth $144,000 on which the [marijuana] grow operation was conducted is not grossly disproportionate to [claimant's] illegal conduct, the Court need not hold a hearing" on the proportionality of the forfeiture); *United States v. Six Negotiable Checks in Various Denominations Totaling One Hundred Ninety One Thousand Six Hundred Seventy One Dollars & Sixty Nine Cents*, 389 F. Supp. 2d 813, 823 (E.D. Mich. 2005) (no hearing required under CAFRA where parties addressed excessiveness issue in post-trial submissions).

\*       \*       \*

In *Funds II*, the claimants argued, "Deny was not reliable. Claimants deserve an opportunity to put this question to a jury." Appellant Br. 31-32, No. 11-3706, ECF No. 17. They got that opportunity but lost. Because they have not provided the Court with any reason to overturn the jury's verdict, the claimants' motions for judgment as a matter of law and for a new trial are denied. Because the jury determined that the government met its burden of proving by a preponderance of the evidence that the funds were exchanged for a controlled substance, or were

the proceeds of or were used to facilitate a controlled substance transaction, forfeiture of the funds does not violate the Excessive Fines Clause of the Constitution; the motion to determine that the forfeiture is constitutionally excessive is denied.

Dated: June 24, 2016

_____
John J. Tharp, Jr.
United States District Judge